# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

AMY POMEROY,

Plaintiff-Appellant

v.

UTAH STATE BAR, et al.,

Defendants-Appellees.

Appeal from the United States District Court for the District of Utah
Case No. 2:21-cv-00219-TC-JCB, Hon. Tena Campbell, presiding

## APPELLANT'S OPENING BRIEF
## (ORAL ARGUMENT REQUESTED)

Scott Day Freeman
Adam Shelton
John Thorpe
Scharf-Norton Center for
Constitutional Litigation at the
GOLDWATER INSTITUTE
500 East Coronado Road
Phoenix, Arizona 85004
(602) 462-5000
litigation@goldwaterinstitute.org
*Attorneys for Plaintiff-Appellant*

# TABLE OF CONTENTS

Table of Contents ...................................................................... i

Table of Authorities ................................................................ iv

Glossary .............................................................................. vii

Statement of Related Cases ...................................................... 1

Jurisdictional Statement .......................................................... 1

Introduction ........................................................................... 1

Statement of the Issues .......................................................... 5

Statement of the Case ............................................................ 5

A.   "Integrated" or "mandatory" state bar associations .................... 6

B.   Utah's mandatory bar ..................................................... 7

C.   USB consistently publishes nongermane content in the *Utah Bar Journal* and on social media. ................................................ 8

D.   USB engages in nongermane conduct by lobbying for changes to Utah's laws. ....................................................................... 14

E.   USB's inadequate procedures for objections to uses of mandatory dues.   25

F.   Ms. Pomeroy's injuries are continuing. ................................. 26

G.   Procedural History ........................................................ 27

Summary of Argument ........................................................... 28

Argument .............................................................................. 31

**I.**  Standard of Review ...................................................... 31

II. Compelled membership in USB violates Appellant's right to freedom of association. ........................................................................................ 32

    A. A freedom of association challenge requires the application of exacting scrutiny. ................................................................................................ 33

    B. The undisputed evidence demonstrates that the USB fails exacting scrutiny because it engages in nongermane speech on controversial political and ideological issues. .................................................... 35

        1. The USB publishes extensive content that is nongermane to regulating the practice of law or improving legal services. ............... 36

        2. USB's legislative program is nongermane. ................................... 42

    C. There is no "*de minimis* exception" to the First Amendment. .............. 44

    D. The USB's "opt-out" procedures are inadequate. ................................ 46

Conclusion ........................................................................................ 51

Statement Regarding Oral Argument .................................................. 51

Certificate of Compliance ................................................................... 53

Certificate of Service ......................................................................... 53

Addendum ......................................................................................... 54

    Addendum 1: Order and Memorandum Decision Granting in Part and Denying in Part Motion to Dismiss (April 4, 2022) (Docket No. 94) ........ 55

    Addendum 2: Order and Memorandum Decision on Motions for Summary Judgment (April 25, 2024) (Docket No. 151) ........................................... 72

    Addendum 3: Judgment in a Civil Case (April 25, 2024) (Docket No. 152) ...................................................................................... 103

    Addendum 4: Utah Code of Judicial Administration ("CJA") R. 14-101 ...................................................................................... 104

Addendum 5: CJA R. 14-102 .................................................................. 105

Addendum 6: CJA R. 14-106 .................................................................. 107

Addendum 7: CJA R. 14-107 .................................................................. 109

Addendum 8: CJA R. 14-111 .................................................................. 111

Addendum 9: CJA R. 14-207 .................................................................. 112

Addendum 10: CJA R. 14-716 ................................................................ 114

Addendum 11 CJA R. 14-802 ................................................................. 116

# TABLE OF AUTHORITIES

**Cases**

*Abood v. Detroit Board of Education.*, 431 U.S. 209 (1977) ..... 3, 25, 29, 47, 49, 50

*Bonham v. D.C. Libr. Admin.*, 989 F.2d 1242 (D.C. Cir. 1993)..............................45

*Boudreaux v. Louisiana State Bar Association*, 86 F.4th 620
(5th Cir. 2023)................................................................. 28, 30, 32–36, 39, 43–45

*Chicago Teachers Union v. Hudson*, 475 U.S. 292 (1986) ...... 25, 26, 44, 46, 48, 49

*Christian Legal Soc'y Chpt. of Univ. of Cal. v. Martinez*, 561 U.S. 661 (2010) ....45

*Crowe v. Oregon State Bar*, 989 F.3d 714 (9th Cir. 2021) (*"Crowe I"*) ...............28

*Crowe v. Oregon State Bar*, 112 F.4th 1218 (9th Cir. 2024)
(*"Crowe II"*) ............................................................................ 28, 30, 34, 46

*Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022) ......... 25, 43

*Elrod v. Burns*, 427 U.S. 347 (1976) ......................................................................50

*Familias Unidas v. Briscoe*, 544 F.2d 182 (5th Cir. 1976) .....................................50

*Florio v. Gallaudet Univ.*, 619 F. Supp. 3d 36 (D.D.C. 2022)................................40

*Harris v. Quinn*, 573 U.S. 616 (2014) ....................................................................42

*Holt v. Hobbs*, 574 U.S. 352 (2015) .......................................................................35

*In re Pet. for a Rule Change to Create a Voluntary State Bar of Neb.*, 841 N.W.2d
167 (Neb. 2013) ....................................................................................................7

*Janus v. AFSCME*, 138 S. Ct. 2448
(2018) ..................................................... 3–5, 26, 28, 29, 31, 33–36, 39, 47, 49–52

*Jarchow v. State Bar of Wis.*, 140 S. Ct. 1720 (2020) ...............................................6

*Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550 (2005) ........................................41

*Jones v. Jegley*, 947 F.3d 1100 (8th Cir. 2020) ......................................................34

iv

*Keller v. State Bar of California,* 496 U.S. 1
  (1990) ......................................2–4, 6, 25, 28–31, 33–36, 40, 42, 43, 45, 47–49, 52

*Knox v. SEIU, Loc. 1000*, 567 U.S. 298 (2012).............................. 26, 28, 33, 44, 50

*Lathrop v. Donohue*, 367 U.S. 820 (1961) ...............................................................51

*Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525 (2001) ............................................45

*McCutcheon v. FEC*, 572 U.S. 185 (2014)...............................................................45

*McDonald v. Longley*, 4 F.4th 229
  (5th Cir. 2021)................................................. 6, 15, 28–30, 33–36, 42, 46, 29, 51

*Pomeroy v. Utah State Bar*, 598 F. Supp.3d 1250 (D. Utah 2022) .................. 43, 45

*Schell v. Chief Just. & Justs. of Okla. Sup. Ct.*, 11 F.4th 1178
  (10th Cir. 2021).......................................................................... 2, 3, 28, 33, 39, 44

*Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955 (10th Cir. 2002)..........32

*UMLIC-Nine Corp. v. Lipan Springs Dev. Corp.*, 168 F.3d 1173
  (10th Cir. 1999)....................................................................................................31

*Yim v. City of Seattle*, 63 F.4th 783 (9th Cir. 2023) .................................................32

**Statutes**

28 U.S.C. § 1291 ........................................................................................................1

28 U.S.C. § 1331 ........................................................................................................1

28 U.S.C. § 1343 ........................................................................................................1

42 U.S.C. § 1983 ........................................................................................................1

**Other Authorities**

Leslie C. Levin*, The End of Mandatory State Bars?*, 109 Geo. L.J. Online 1 (2020)
  ...............................................................................................................................6, 35

Ralph H. Brock, "*An Aliquot Portion of Their Dues": A Survey of Unified Bar
  Compliance with Hudson and Keller*, 1 Tex. Tech J. Tex. Admin. L. 23 (2000) ..6

**Rules**

Utah Code of Judicial Administration ("CJA") Rule 14-101 ..............................7, 32

CJA Rule 14-102.................................................................................................7, 32

CJA Rule 14-106...................................................................................................8

CJA Rule 14-107.................................................................................................7, 32

CJA Rule 14-111.................................................................................................7, 32

CJA Rule 14-207...................................................................................................7

CJA Rule 14-716...................................................................................................7

CJA Rule 14-802.................................................................................................7, 32

# GLOSSARY

| | |
|---|---|
| ABA | American Bar Association |
| CJA Rules | Utah Judicial Council Code of Judicial Administration Rules |
| USB | Utah State Bar |

## STATEMENT OF RELATED CASES

There are no prior or related appeals.

## JURISDICTIONAL STATEMENT

Plaintiff-Appellant Amy Pomeroy brought this action against the Utah State Bar and its officials under 42 U.S.C. § 1983, seeking relief for violations of her free speech and association rights. The district court had subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343. This Court has jurisdiction over this appeal under 28 U.S.C. § 1291 because it seeks review of a final decision of the district court that disposed of all the parties' claims.

This appeal is timely. On April 25, 2024, the district court entered an order denying Ms. Pomeroy's Motion for Summary Judgment and granting Defendants' Motion for Summary Judgment, thereafter entering a judgment dismissing Ms. Pomeroy's claims in full. APP.243–74. Ms. Pomeroy timely filed this appeal on May 20, 2024. APP.275–77.

## INTRODUCTION

Ms. Pomeroy is a Utah lawyer who challenges the constitutionality of Utah statutes that mandate that she join the Utah State Bar ("USB") as a condition of practicing her profession. Her claims are based upon her rights of freedom of association and speech under the First and Fourteenth Amendments. She provided the district court with numerous examples of USB engaging in activities that are ideological in nature and nongermane to any interest Utah has in regulating

1

lawyers and improving the quality of legal services. Yet the district court, applying the incorrect legal standard, dismissed her claims. This appeal followed.

In *Keller v. State Bar of California,* 496 U.S. 1, 13 (1990), the Supreme Court held that mandatory bar dues are subject to "the same constitutional rule" that applies to "compulsory dues [for] labor unions." In so holding, the Court reversed a lower court's decision that had subjected the use of mandatory bar dues to a different constitutional rule: it had said that mandatory bar dues should be categorically "exempted" from First Amendment scrutiny because bar associations are like government agencies that can tax and spend at will. *Id*. at 10. The Supreme Court disagreed, and held that bar associations are akin to public-sector unions and are thus subject to the same First Amendment constraints when it comes to taking people's money to subsidize political and ideological advocacy against their will. *Id*. at 11–12.

This Court recognized in *Schell v. Chief Just. & Justs. of Okla. Sup. Ct.*, 11 F.4th 1178, 1193–95 (10th Cir. 2021), however, that *Keller* only addresses part of the constitutional equation. *Keller* concerned the constitutional implications of a mandatory bar spending dues for improper purposes, thus creating a compelled speech issue for objecting members. But *Keller* did not address, and expressly reserved, the question of whether states may force attorneys to *join* a bar

association that engages in an activity that is not germane to the bar's core regulatory purposes. *Keller*, 496 U.S. at 17.

In fact, a lawyer compelled to join a mandatory bar association can also bring a claim based upon her right of freedom of association. *Schell*, 11 F.4th at 1193–95. And although *Keller* applied the same constitutional rule as applies to public sector unions when analyzing the compelled speech claim, that standard cannot work in the context of a freedom of association claim, because the Supreme Court expressly held in *Janus v. AFSCME*, 138 S. Ct. 2448, 2465 (2018), that exacting scrutiny applies to those claims. What's more, *Janus* overturned *Keller*'s underpinnings: overruling *Abood v. Detroit Board of Education.*, 431 U.S. 209 (1977), on which *Keller* relied. So, although *Keller* remains "good law" in the technical sense that *Janus* did not expressly overrule it, its lenient scrutiny with regard to freedom of speech and association is no longer valid.

In this case, Utah violates the First Amendment rights of Plaintiff-Appellant Amy Pomeroy in two ways: First, it requires her to *join* USB as a condition of practicing law, even though USB engages in nongermane political, ideological, and other activities she strongly opposes. This compulsory membership requirement presents precisely the question that *Keller* "decline[d]" to address, 496 U.S. at 17. As the Supreme Court has repeatedly recognized, most notably in *Janus*, 585 U.S. at 916, such compelled association triggers

3

exacting First Amendment scrutiny.

And the membership requirement cannot possibly survive that scrutiny, because the state has many other ways of serving its regulatory interests without forcing attorneys to join a bar association against their will. Indeed, many other states already respect attorneys' First Amendment rights by making bar membership optional. There is no reason Utah cannot do the same.

Second, Utah violates Ms. Pomeroy's First Amendment rights by forcing her to subsidize the bar association's political and ideological advocacy, which she strongly opposes, and by failing to provide adequate "safeguards" related to the spending of her dues on these activities. Because, under *Keller*, 496 U.S. at 13, the "same constitutional rule" applies to bar dues that applies to compulsory union fees, exacting scrutiny must apply to both. As *Janus* recognized, such mandatory fees violate the First Amendment unless they serve a compelling state interest that cannot be served by any significantly less-restrictive means. 585 U.S. at 894. And Utah cannot survive that scrutiny because it has many other ways of serving its regulatory interests without forcing attorneys to subsidize political and ideological speech they oppose—as, again, many other states already do. The Constitution requires Utah to do the same.

## STATEMENT OF THE ISSUES

1. In *Janus*, the Supreme Court held that laws that require a person to join and subsidize a private organization's political or ideological speech are subject to "exacting" First Amendment scrutiny. 585 U.S. at 916. Utah compels attorneys to become members of USB and to fund it, as a condition of practicing law. Did the district court err in failing to apply exacting scrutiny when examining whether USB engaged in nongermane activity?

2. Did the district court err in concluding that all USB activities Appellant alleged to be nongermane were germane?

## STATEMENT OF THE CASE

Amy Pomeroy is a lawyer in good standing residing in Utah. She wants to continue to practice law in Utah. But she does not want to subsidize and associate with the numerous nongermane activities of USB. But state law *requires* Ms. Pomeroy to associate with—and fund—USB's nongermane activities, including its overtly political activities, as a condition of practicing law in Utah.

This lawsuit challenges Utah's requirement that attorneys join USB to practice law in Utah when USB engages in nongermane conduct, including nongermane political lobbying.

## A.    "Integrated" or "mandatory" state bar associations

State bar associations generally come in two types: mandatory and voluntary. Mandatory bars—also known as integrated bars—require attorneys to join the association and pay mandatory dues as a condition of practicing law in the state. *Keller v. State Bar of Cal*., 496 U.S. 1, 4–5 (1990). This, of course, burdens attorneys' First Amendment rights. *McDonald v. Longley*, 4 F.4th 229, 245 (5th Cir. 2021); *see also Keller*, 496 U.S. at 12 (stating that mandatory bar associations can burden First Amendment rights in a way analogous to "agency-shop" arrangements burdening rights of union members).

Voluntary bar associations come with no such requirements and impose no such burden. *See Jarchow v. State Bar of Wis.*, 140 S. Ct. 1720, 1720 (2020) (Thomas, J., dissenting from denial of certiorari). Slightly more than half the states and the District of Columbia have mandatory bars; most of the others have voluntary bar associations. *See* Leslie C. Levin*, The End of Mandatory State Bars?*, 109 Geo. L.J. Online 1, 2 (2020); *see also* Ralph H. Brock, *"An Aliquot Portion of Their Dues": A Survey of Unified Bar Compliance with Hudson and Keller*, 1 Tex. Tech J. Tex. Admin. L. 23, 24 (2000).[1] Voluntary bar states include

---

[1] After this article's publication, California adopted a bifurcated system under which lawyers pay only for purely regulatory activities and are not forced to fund the bar association's political or ideological speech, eliminating most if not all of the First Amendment problems. *See* Marilyn Cavicchia, *Newly Formed California Lawyers Association Excited to Step Forward*, ABA J. (Apr. 30, 2018), available at

such highly populous states as California, New York, and Illinois, where lawyers are regulated directly without requiring membership in a bar association. *See In re Pet. for a Rule Change to Create a Voluntary State Bar of Neb*., 841 N.W.2d 167, 171 (Neb. 2013).

## B.     Utah's mandatory bar

Utah law compels every attorney in Utah to join its integrated bar association, USB, before she can practice law in the state. Utah Code of Judicial Administration ("CJA Rules") 14-101, 14-102, 14-802. Utah law also requires attorneys licensed in the state to pay annual dues to USB. CJA Rules 14-107, 14-111(a), 14-207, 14-716. If an attorney fails to timely pay that annual fee, USB administratively suspends her license to practice law, depriving the attorney of the right to practice law in Utah. CJA Rules 14- 111(a). The Utah Supreme Court has authorized the Utah Bar to "administer rules and regulations that govern the practice of law in Utah" and "assist the Court in governing admission to the practice of law." Rule 14-102(a)(1), (2).

The Utah Supreme Court authorizes the USB to "adopt positions" on legislation. That court limits this power to "issues concerning the courts of Utah,

---

https://bit.ly/2LEYNg0. Nebraska also adopted a bifurcated system in 2013 but then made its bar association fully voluntary. S*ee In re Petition*, 841 N.W.2d at 173; Neb. S. Ct. Rule 3-100(B) (amended effective February 12, 2020, to require payment of an annual assessment to the Nebraska Supreme Court rather than the Nebraska State Bar Association).

procedure and evidence in the courts, the administration of justice, the practice of law, and matters of substantive law on which the collective expertise of lawyers has special relevance." CJA Rule 14-106. The Board must maintain a written record of its positions on public policy issues and provide notice of its positions to members. *Id*. Furthermore, at the end of the legislative session, the Board calculates its lobbying expenses and must provide a rebate procedure to any objecting USB member. *Id*. Among its various other activities, USB also uses member dues to publish the *Utah Bar Journal* six times each year and operate social media accounts, including on Twitter and LinkedIn.

**C.     USB consistently publishes nongermane content in the *Utah Bar Journal* and on social media.**

The *Utah Bar Journal*—which is funded with members' mandatory dues— has included multiple articles that take positions on the current social and political issues of the day that extend beyond situations related specifically to the need to regulate lawyers in their unique capacity as individuals who deliver legal services to Utah's courts and the public.  For example:

- A March/April 2017 article from USB's President focused on diversity in Utah's legal community and argued: "Utah was founded in part by individuals who understood how it was to be viewed as an outsider," and drew a connection between this idea and "President Donald Trump's executive order banning certain immigrants from entering the United

8

States." Robert O. Rice, *The Utah Center for Legal Inclusion*, Utah Bar Journal (2017), APP.109. It also praised the newly formed Utah Center for Legal Inclusion for its mission to "provide law firms, bar associations, schools, and government agencies with tools to help eliminate discrimination in the workforce, manage implicit biases in hiring and operational decision, and promote inclusive policies so that all levels of the legal profession can benefit from diversity in race, ethnicity, culture, sex, gender identity, sexual orientation, and religion." APP.111.

- A March/April 2017 article criticized the electoral college system with analogies to BYU football games and included several "lessons [] for Donald Trump" or corporate change-of-ownership issues. Learned Ham, *The Times They Are a Changin'*, Utah Bar Journal (2017). APP.114.

- A July/August 2017 article discussing civility and inviting readers to think through a challenging scenario with opposing counsel. J. Frederic Voros, Jr., *Civility in a Time of Incivility*, Utah Bar Journal (2017). APP.153–57. Going through several possible responses, it suggested, "You could play it like a 2016 presidential candidate and call your opponent 'lyin' Fred." APP.156.

- A January/February 2018 article discussed "[b]oard diversity" and the fact that some jurisdictions are adopting "minimum female

representation" mandates for boards of directors. James U. Jensen, *Script for Mock Board Meeting of Pure Play, Inc.*, Utah Bar Journal (2018), APP.116.

- A November/December 2018 article about a World War II-era Japanese internment camp in Topaz, Utah, argued that "some are currently trying to again elevate war powers to suppress the rights of vilified minorities," such as "the Trump administration's various travel bans." Steffen Thomas, *Legal History in the Utah Desert, Reflecting on Topaz*, Utah Bar Journal (2018). APP.127.

- A March/April 2019 article arguing that while some people may "condone … verbal or political attacks [on the press] when they align with their own political or ideological views," concluding that "all such attacks pose a danger to democracy and the rule of law." As examples of such "attacks," this article identified "President Trump's repeated labeling of the news media as 'the enemy of the people,'" and President Obama "call[ing] Fox News 'destructive' and sa[ying] it is 'masquerading as the news.'" Paul C. Farr, *Judicial Independence and Freedom of the Press*, Utah Bar Journal (2019). APP.130

- A March/April 2020 article lamenting high drug prices and arguing that "solutions to skyrocketing drug prices must extend beyond normal

market forces in order to sufficiently counter the titan pharmaceutical seller power." Cami Schiel, *Why Can't I Self-Check Out My Percocet?*, Utah Bar Journal (2020). APP.141. The article specifically analyzed various policy proposals to reduce drug prices, arguing, for example, that "Medicare should be permitted to negotiate with drug manufacturers," "[o]ut-of-pocket maximums should be reduced." It also asserted that "price transparency and foreign competition … will not be sufficient to increase drug affordability as a whole." *Id.*

- A March/April 2021 article asserting the importance of pursing "equity" as distinct from "equality." Heather Farnsworth, *We've Come A (Little) Way, Baby*, Utah Bar Journal (2021). APP.142–44.

- A March/April 2021 article, on "Systemic Racism and Implicit Bias in Prosecution," arguing that "we must be willing to examine our current and historical roles in institutionalized racism, not rush to justify them," and that "we need to create a safe space in the courtroom." Margaret Olson & Ivy Telles, *The Road to Solutions*, Utah Bar Journal (2021). APP.145–46.

- A March/April 2021 advertisement for the USB's 2021 Summer Convention which highlighted a session "equity and inclusion dialogue sessions." APP.147.

- A March/April 2021 article expressing hope that "[e]ven post-pandemic, … people who do not feel well, or who are coming off a cold, etc., will thoughtfully don a mask when going to the store or getting on an airplane." Gregory K. Orme, *Silver Linings of the Pandemic*, Utah State Bar (2021). APP.148.

- A January/February 2023 article arguing for more cryptocurrency regulation stating: "[t]he lack of regulation allows promoters to attract investors with a lot of ridiculous hype and misinformation," that "cryptocurrency" is a misnomer "because it isn't money except as used by some criminals to conceal their identity and prevent tracking their money," and argued against "[l]ibertarian ideologues and anarchists," who "are among cryptomoney's biggest promoters." George Sutton, *Cryptocurrency – Cryptoscam – Why Regulation, Deposit Insurance, and Stability Matter*, Utah Bar Journal (2023). APP.158–59. It asserted that "the whole market is a virtual construct with no real substance," and if one "[l]ook[s] through the facade, [ ] there are just grifters and geeks having a party." APP.166.

Whatever the merits of any of these articles they relate to social and political debates, not the bar's regulatory purpose. Nor is USB's choice to address cultural and political debates not limited to the *Journal*. USB also uses social media

platforms like LinkedIn and Twitter[2] to communicate with members on matters that do not bear on its regulatory mission. Five specific instances stand out:

On September 12, 2022, USB reposted a tweet celebrating a "Living Color Award" recipient and the annual "Living Color Gala"—"a night to honor those individuals who have made it their mission to attract and foster diversity and inclusion initiatives throughout the state of Utah." APP.167–71. The award and gala are associated with Living Color Utah. APP.167; USB "retweeted" a post calling racism a "public health crisis," APP.172; and USB tweeted an article about "strong public support for admitting DREAMers into the USB," APP.173.

On LinkedIn, USB shared a post from the American Bar Association ("ABA") inviting people "to participate" in a 21-day "Native American Heritage Equity Habit-Building Challenge" syllabus. This program of recommended articles and lectures, publicly available on the ABA's website, features content such as "More than Mascots: It's Time to End Cultural Appropriation of Native Americans in Sports"; "The Standing Rock Resistance and Our Fight for Indigenous Rights"[3]; and "Gabrielle Petito Coverage Looks Like Racist Clickbait to Some Native

---

[2] Although "Twitter" is now "X," Appellant refers to it as Twitter as that was the name of the platform at the time of the conduct.

[3] The "Standing Rock Resistance" refers to the illegal ten-month trespass and occupation of private property intended to block construction of the federally approved oil pipeline. The protests resulted in hundreds of criminal charges and dozens of convictions.

Americans." ABA, *ABA Wide 21-Day National Native American Heritage Equity Habit Building Challenge*. APP.174–86. Additionally, the USB shared a post from Utah Governor Spencer Cox celebrating "a few ceremonial bill signings to spotlight pieces of legislation that align with the goals outlined in our #OneUtah Roadmap," including "13 bills that focus on law enforcement and mental health." APP.187.

**D.    USB engages in nongermane conduct by lobbying for changes to Utah's laws.**

The state supreme court authorizes USB to engage in lobby activities. In describing its lobbying activity in the January/February 2021 issue of its *Journal*, USB stated: "In recent years, the Bar has played an active role in major public policy debates, such as taxation of legal services, whether the supreme court should regulate the practice of law, and what criteria should be considered when filling judicial vacancies. As our state continues to grow and change, we anticipate there will be other major issues that will require the Bar's input." APP.189 (emphasis added). *See also* May/June 2018 issue ("the 2018 General Session [of the Utah State Legislature] was successful for the Utah bar as our leaders influenced the language of legislation and enhanced the bar's relationship with lawmakers and staff"). APP.195.

In 2019, USB opposed a proposed "Tax Equalization and Reduction Act" (H.B. 441, 2019 General Sess. (Utah 1999)), which would have modified the

state's tax system in various ways, because it would have imposed a tax on legal services. *See* July/August 2019 issue of *Utah Bar Journal* (statement by USB's then-President that "the Bar took a strong stand" against the bill; that USB "is continuing to be actively involved in monitoring and opposing a sales tax on legal services;" and that USB "ask[s] all [USB members] [to] stay involved and [to] encourage [their] clients to do the same"). APP.191–92.

USB "had significant influence on the language and structure" of legislation affecting the Utah Attorney General's ability to withhold release of an opinion requested by the legislature based on potential conflict of interest or attorney-client privilege. APP.193–94.

USB's official website lists the bills before the Utah legislature on which it took positions on its website for the 2019, 2020, 2021, and 2022 legislative sessions.[4] In 2019, USB evaluated 98 bills, taking public positions supporting or

---

[4] The district court avoided addressing much of USB's legislative activities by stating that "there is insufficient information in the record" regarding the legislation USB supported or opposed. APP.248. But the district court and Fifth Circuit in *McDonald* had no difficulty determining that some of the Texas bar's legislative activity was nongermane based upon the subject matter of the bill. *See* 4 F.4th at 248. Under Federal Rule of Evidence 201, this Court can and should take judicial notice of the official publications of USB-related positions on bills considered by the Utah legislature, *see* https://www.utahbar.org/legislative/, as well as the content and disposition of those bills by the Utah legislature, *see* https://le.utah.gov/Documents/bills.htm.

opposing on 19 of them. *See* 2019 Governmental Relations Committee Decisions.

APP.196–98. The 2019 bills included, but are not limited to, the following:

| Bill Number | Title | Brief Summary |
| --- | --- | --- |
| UT H 124 (Opposed) | Divorce Provisions Amendment | Requires that a party (not the Division of Child and Family Services) request a modification of a court order in juvenile court. |
| UT H 298 (Supported) | Offender Registry Amendments | Changes substantive law regarding the procedure for being removed from the registry, name changes of offenders, and the penalties of certain offenses. |
| UT H 308 (Opposed) | Abuse of Process and Demand Letters | Creates a cause of action for abuse of process and demands concerning the Americans with Disabilities Act that prohibits abuse and establishes remedies. |
| UT H 371 (Supported) | Consent to Services for Homeless Youth | Waives fees for homeless youth to get a Birth Certificate and ID and modifies criminal penalties for those who shelter homeless youths. |
| UT H 431 (Supported) | Expungement Act Amendments | Allows for automatic expungement or deletions for certain individuals and certain convictions. |
| UT H 441 (Opposed) | Tax Equalization and Reduction Act | Amends corporate franchise and income tax |

| Bill Number | Title | Brief Summary |
| --- | --- | --- |
| | | rates and the calculation of certain tax exemptions and benefits, while also creating new taxes. In general, a sweeping substantive tax bill. |
| UT H 448 (Opposed) | Litigation Funding Transparency | Provides procedures for obtaining information about the funding of certain lawsuits. The bill also establishes remedies. |

In 2020, the USB took public positions supporting or opposing 21 bills. *See* 2020 Legislative Positions. APP.199. These included, but are not limited to, the following:

| **Bill Number** | **Title** | **Brief Summary** |
| --- | --- | --- |
| HB0064 (Supported) | Custody and Visitation Rights Amendment | Modified the substantive visitation rights of grandparents. |
| HB0100 (Supported) | Veterans Treatment Court Act | Establishes a veterans treatment court that includes monitoring and treatment for substance abuse. |
| HB0102 (Supported) | Retaliation and Obstruction of Justice Amendments | Makes threatening or harming a prosecutor a felony and modifies the list of what constitutes obstruction of justice. |

| Bill Number | Title | Brief Summary |
|---|---|---|
| HB0189 (Opposed) | Jury Duty Exceptions | Allows for anyone over the age of 72 to be excused from jury duty. |
| HB0206 (Supported) | Bail and Pretrial Release | Modifies the substantive bail law. |
| HB0303 (Supported) | Diversion Fees Amendments | Grants courts authority to assess a diversion fee on a criminal defendant. |
| HB0324 (Supported) | Conviction Integrity Units | Allows prosecution agencies to create conviction integrity units that review convictions and recommend changes to convictions |
| SB0034 (Supported) | Sex Offender Registry Amendments | Requires the removal of an individual from the Sex Offender Registry if the offense the individual committed is no longer a registerable offense. |
| SB0060 (Opposed) | Advice and Consent Amendments | Modifies the provisions relating to the Senate's advice and consent for gubernatorial nominees. |
| SB0139/ SB0170/ SB0175 (Supported) | Indigent Defense Services/Indigent Defense/Indigent and Parental Defense | Creates the Office of Indigent Defense Services and the powers and duties of that office, as well as an Indigent Appellate Defense Division, and modifies the Child Welfare Parental Defense Program. |

| Bill Number | Title | Brief Summary |
| --- | --- | --- |
| SB0177 (Opposed) | Small Claims Amendments | Makes substantive and jurisdictional amendments to the law of small claims, including increasing the amount required for a small claims action. |
| SB0220 (Opposed) | Confession of Judgement Amendments | Allows parties to enter into a confession of judgment before a default in some situations and clarifies which default can give rise to a confession of judgement. |

In 2021, USB evaluated 105 bills, taking public positions supporting or opposing on 11 bills. *See* 2021 Governmental Relations Committee Bills List. APP.200–204. They included, but are not limited to, the following:

| Bill Number | Title | Brief Summary |
| --- | --- | --- |
| HB0026 (Supported) | 24-7 Sobriety Program Expansion | Changes 24-7 Sobriety Program from a pilot program to a real program and modifies the substantive rights of individuals in drug court. |
| HB0100 (Supported) | Postconviction Remedies Act Amendments | Modifies the substantive rights of petitioners appealing convictions. |
| HB0255 (Supported) | Protective Order Revisions | Modifies substantive law of protective orders including the timeline for |

| Bill Number | Title | Brief Summary |
|---|---|---|
| | | filing objections, circumstances for modifying or dismissing cohabitant abuse protective orders, and adds sexual battery as a reason to grant a protective order. |
| HB0260 (Supported) | Criminal Justice Modifications | Modifies the substantive law governing the Office of State Debt Collection. |
| HB0316 (Supported) | Common Law Marriage Amendments | States that a petition to terminate an unsolemnized marriage must occur within a year. |
| HB0373 (Supported) | Conviction Reduction Amendments | Allows for the reduction of a degree of a criminal offense for certain defendants. |
| SB0050 (Supported) | Juvenile Offender Penalty Amendments | Modifies the substantive rights of a juvenile convicted of sexual offenses. |
| SB0173 (Supported) | Medical Records Amendments | Changes law regarding medical records to enact new requirements for electronic records and for waiving fees for indigent individuals. |
| SB0179 (Supported) | DUI Probation Amendments | Allows Adult Probation and Parole to supervise probation of certain DUI defendants. |
| SB0215 (Supported) | Sex Offender Registry Amendment | Modifies substantive law regarding the Sex and |

| Bill Number | Title | Brief Summary |
|---|---|---|
| | | Kidnap Offender Registry. |

In 2022, USB evaluated 107 bills, taking public positions supporting or opposing on 19 bills. APP.205–9. These included, but are not limited to, the following:

| Bill Number | Title | Brief Summary |
|---|---|---|
| HB0065 (Supported) | Forensic Biological Evidence Preservation | Amends asset forfeiture provisions to integrate biological evidence retention requirements and sets forth the requirements for retaining and destroying biological evidence. |
| HB0093 (Supported) | Juror and Witness Fee Amendments | Amends the fees for jurors and witnesses. |
| HB0107 (Supported) | Small Claims Amendments | Amends the amount required to bring a small claims action. |
| HB0179 (Supported) | Juvenile Record Amendments | Amends provisions on inspecting juvenile court records and amends requirements for petitioning for expungement. |
| HB0392 (Supported) | Expungement Fee Amendments | Modifies law on suspension of expungement fees and sunset dates for the suspension. |

| Bill Number | Title | Brief Summary |
|---|---|---|
| SB0035 (Supported) | Expungement Modifications | Amends procedures for automatic expungement and deletion of certain offenses. |
| SB0043 (Initially Opposed) | Occupational and Professional Licensing Modifications | Modifies substantive law relating to the duties of licensing boards and requirements of license applications for several professions. |
| SB0085 (Supported) | Protective Order and Stalking Injunction Expungement | Allows for and provides requirements for expungement of certain protective orders and stalking injunctions. |
| SB0087 (Supported) | Court Fee Waiver Amendments | Allows court fees to be waived for indigent individuals. |
| SB0141 (Opposed) | Criminal Evidence Retention Amendments | Requires that property not needed to prosecute an action be returned to owner within 90 days and provides exceptions to that rule. |

In 2023, USB evaluated 118 bills, taking public positions supporting or opposing on 14 bills.5. Among others, these included the following:

| Bill Number | Title. | Brief Summary |
|---|---|---|
| HB 174 (Support) | Conviction Reduction Amendments | Adopts new standards for the reduction of a degree |

5 https://www.utahbar.org/wp-content/uploads/2023/03/2023-Governmental-Relatrions-Committee.pdf.

| | | of an offense for which an individual has been convicted. |
|---|---|---|
| HB 216 (Support) | Business and Chancery Court Amendments | Required the creation of a Business and Chancery Court. |
| HB 244 (Support) | Utah Victim Services Commission | Modifies the membership of the State Commission on Criminal and Juvenile Justice, the Utah Substance Use and Mental Health Advisory Council, the Utah Council on Victims of Crime, and the Domestic Violence Offender Treatment Board. |
| HB 251 (Support) | Court Amendments | Amended and modified provisions relating to civil actions in the state district court. |
| HB 323 (Support) | Expungement Fee Waiver Amendment | Extend the automatic repeal date for the suspension of fees for petitions for expungement. |
| HB 328 (Oppose) | Asbestos Litigation Amendments | Amends the process for asbestos litigation including requiring certain initial disclosures and requires a prima facie showing of evidence in certain asbestos actions. |
| SB 032 (Support) | Administrative Appeals Amendments | Amend the procedure for filing an appeal from an agency action. |

| | | |
|---|---|---|
| SB 049 (Support) | Juvenile Custodial Interrogation Amendments | Amends the time period requirement for the custodial interrogation of the child and addresses disclosures made to a child before the custodial interrogation of a child. |
| SB 052 (Support) | Parental Indigent Defense Amendment | Amend law allowing for indigent defense of parents from appeals of parental rights termination. |
| SB 067 (Support) | Juvenile Commitment Amendments | Amends the provisions on the juvenile commitment statute, including setting out provisions on the length of the commitment. |
| SB 129 (Oppose) | Judiciary Amendments | Amends the judicial selection process in Utah and removes Bar- and court-appointed members from the judicial nominating commission. |
| SB 186 (Support) | Juvenile Court Amendments | Amends requirements for requesting restitution in juvenile courts. |
| SB 220 (Support) | Juvenile Court Judge Amendments | Increased the number of juvenile judges assigned to a certain judicial service. |
| SB 238 (Support) | Court Fee Amendments | Would have created additional fees in civil actions. |

Finally, during Utah's 2023 legislative session, USB interjected itself into a controversial political dispute arising from the Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022), by opposing a bill crafted by one of its own members (HJR2), designed to allow Utah's abortion law to become effective. *See* APP.220–42.

**E.   USB's inadequate procedures for objections to uses of mandatory dues.**

When *Keller* was decided, compulsory union dues were subject to the rule of *Abood v. Detroit Board of Education*, 431 U.S. 209 (1977). *Abood* held that compulsory union dues could not be used to fund union activities that are not "germane" to collective bargaining. *Id.* at 235–36. Accordingly, *Keller* said it would violate the First Amendment to use compulsory bar dues for purposes not "germane" to "regulating the legal profession and improving the quality of legal services." 496 U.S. at 13–14. *Keller* also stated that a bar association could "meet its *Abood* obligation by adopting the sort of procedures described in [*Chicago Teachers Union v. Hudson*, 475 U.S. 292 (1986)]," which implemented *Abood*. *Id.* at 17.

Under those so-called *Hudson* Procedures, a bar association would be required to provide members with (1) "an adequate explanation of the basis for the [mandatory bar association] fee"; (2) "a reasonably prompt opportunity to challenge the amount of the fee before an impartial decisionmaker"; and (3) "an

escrow for the amounts reasonably in dispute while such challenges are pending." *Id.* at 16 (citations omitted). The *Hudson* Procedures ostensibly provided a mechanism to address the compelled speech concern raised by a mandatory bar association engaging in nongermane activities.

When Ms. Pomeroy filed this lawsuit, USB's refund procedures were inadequate because (1) USB does not offer to refund portions of dues it uses for certain activities *other than* nongermane lobbying activities; (2) USB makes this offer to its members in the form of an inadequate "opt-out" procedure, i.e., a refund, rather than a proactive "opt-in" procedure[6]; and (3) it does not provide members an adequate explanation of the amount of member dues it expended on the challenged activities.

## F.     Ms. Pomeroy's injuries are continuing.

USB's requirements that attorneys join and pay dues to it continue to injure Ms. Pomeroy. She does not wish to be a member of USB because she does not wish to associate with that organization or its political and ideological speech, *regardless* of whether a portion of her dues are used to fund them. Nor does she want to bear the burden of monitoring USB's activities and then "opting out"

---

[6] For the significance of the "opt-out," as opposed to "opt-in" rule, *see Knox v. SEIU, Loc. 1000*, 567 U.S. 298, 314–17 (2012). The *Janus* decision put this question to rest by requiring "clear[] and affirmative[] consent *before* any money is taken from" union members—and, by extension, attorneys. *Janus*, 585 U.S. at 930 (emphasis added).

each year to avoid subsidizing its legislative activity or other nongermane advocacy. Accordingly, USB's procedure that allows the Bar to use her money first, placing the burden on Ms. Pomeroy to "opt out" later, are inadequate.

## G. Procedural history

On April 13, 2021, Ms. Pomeroy filed her Complaint, which includes four claims for relief: (1) compelled membership violates rights to free association and speech; (2) use of mandatory dues for nongermane speech violates her rights of free speech and association; (3) inadequate safeguards on use of dues; and (4) compelled membership in the Utah Bar Foundation violates rights of free speech and association.

On April 4, 2022, the district court granted Defendants' motion to dismiss in part and denied it in part. The district court dismissed USB itself as to all claims for relief, but not the individual Defendants sued in their official capacities as the Executive Director and members of USB responsible for enforcing Utah's mandatory bar requirement. APP.067–83. As to Ms. Pomeroy's claims against the official capacity Defendants, the district court dismissed the second and fourth claims for relief. APP.083.

After discovery, the parties filed cross motions for summary judgment in October 2022. The district court filed its Order and Memorandum Decision on Motions for Summary Judgment on April 25, 2024, granting Defendants' motion

and denying Ms. Pomeroy's motion. APP.243–73. Plaintiff timely appealed.

APP.275.

## SUMMARY OF ARGUMENT

*Keller* said California's State Bar could not constitutionally force members

to subsidize speech that was not germane to the regulation of lawyers and

improving the quality of legal services. 496 U.S. at 17. But *Keller* left unanswered

whether (as the Ninth Circuit recently put it) "the First Amendment tolerates

mandatory membership itself—independent of compelled financial support—in an

integrated bar that engages in nongermane political activities." *Crowe v. Oregon*

*State Bar*, 989 F.3d 714, 729 (9th Cir. 2021) (*"Crowe I"*).

This Court acknowledged the viability of such a claim in *Schell*. 11 F.4th at

1193–95. And this case squarely presents that question. Although *Keller* did not

resolve the compelled membership issue, it does provide guidance for resolving

that question, as does the Supreme Court's more recent decisions in *Janus* and

*Knox, supra*, the Ninth Circuit's decision in *Crowe v. Oregon State Bar*, 112 F.4th

1218 (9th Cir. 2024) ("*Crowe II*"), and the Fifth Circuit's decisions in *Boudreaux*

*v. Louisiana State Bar Association*, 86 F.4th 620 (5th Cir. 2023), and *McDonald,*

*supra*.

First, *Keller* said that the "same constitutional rule" that applies in public-

sector union cases also applies to compulsory bar associations. 496 U.S. at 13.

When the Supreme Court decided *Keller*, that rule was the one set forth in *Abood*, which was the origin of *Keller*'s "germaneness" requirement. Although *Keller* adopted *Abood*'s "germaneness" construct in relation to a mandatory bar's ability to compel dues from members, the Court did not address whether lawyers can be forced to join a bar association to begin with, *see Keller*, 496 U.S. at 17—and consequently it also declined to specify what standard of scrutiny applies to *that* claim.

In the decades that followed, the Supreme Court developed a more robust and protective case law regarding associational rights. The issue unaddressed by *Keller* has now been addressed, including in the context of mandatory bar associations.

And it is clear what standard of scrutiny applies: exacting scrutiny. *Janus*, 138 S. Ct. at 2465. *Janus* involved a public sector union. And because the "same constitutional rule" applies to compulsory bar associations as to compulsory public-sector unions, *Keller,* 496 U.S. at 13, it makes sense for the same level of scrutiny to apply here.

Two circuit court of appeals have already applied *Keller* considering *Janus*' clarification on developed records.

In *McDonald*, the Fifth Circuit explained that if a bar association engages in only germane conduct, then exacting scrutiny is satisfied. 4 F.4th at 246. If a

mandatory bar association engages in *non*germane activities, however, then compelled membership fails exacting scrutiny. *Id.* at 245–46.

The Fifth Circuit later expounded upon its *McDonald* decision in *Boudreaux*, where it again applied exacting scrutiny ruling that the Louisiana State Bar Association violated Mr. Boudreaux's associational rights based upon a few instances of nongermane messaging that cost the bar association nothing, or next to nothing. Even such seemingly innocuous statements as ones relating to the health benefits of eating walnuts, the importance of daily exercise, and urging lawyers to get enough sunshine were *nongermane*, and thus could not constitutionally be funded through mandatory dues. 86 F.4th at 632.

More recently still, the Ninth Circuit applied exacting scrutiny to find that the Oregon State Bar violated the plaintiffs' associational rights by including a statement on a single page of its monthly publication that was a thinly veiled criticism of then-President Trump and his supporters. Again, the court endorsed applying exacting scrutiny and found that the bar failed to meet the standard when it published the statement. *Crowe II*, 112 F.4th at 1233.

Here, however, the district court did not apply exacting scrutiny. *See* APP.252. Instead, it simply concluded that all the bar's challenged conduct was "germane" under *Keller* and, therefore, Ms. Pomeroy's claims failed. APP.267.

But the reconciliation of *Keller* and *Janus* by the Fifth and Ninth Circuits provides the better path for faithful application of both Supreme Court precedents. Doing so here requires reversing the decision below and the application of exacting scrutiny to Ms. Pomeroy's claims. Because no meaningful dispute exists as to the underlying USB conduct supporting those claims, this Court should take the additional step of reversing the district court's denial of Ms. Pomeroy's Motion for Summary Judgment. That is because the challenged activities are nongermane as a matter of law and therefore fail this standard.

## ARGUMENT

### I.     Standard of Review

This Court reviews *de novo* the grant of summary judgment, applying the same standard the district court applied. *See, e.g.*, *UMLIC-Nine Corp. v. Lipan Springs Dev. Corp.*, 168 F.3d 1173, 1176 (10th Cir. 1999). In considering the appeal of a district court's disposition of cross-motions for summary judgment, courts view the evidence for each motion "in the light most favorable to the [nonmoving] party" and determine "whether any genuine issue of material fact was in dispute [and] … whether the district court correctly applied the [relevant] substantive law." *Id.* "This standard requires us to examine the record in order to determine whether any genuine issue of material fact was in dispute; if not, we determine whether the district court correctly applied the substantive law." *Id.*

Here, no meaningful disagreement exists as to the facts, and the district court did not identify any in its summary judgment order. The dispute is purely legal. This Court should apply the exacting scrutiny standard the district court refused to apply; determine that the challenged USB activities are nongermane; vacate the judgment entered against Appellant and reverse the district court; enjoin enforcement of Utah's mandatory bar scheme as to Ms. Pomeroy; and remand for further proceedings consistent with this Court's decision. *See Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 969 (10th Cir. 2002); *Yim v. City of Seattle*, 63 F.4th 783 (9th Cir. 2023) (reversing ruling on cross motions for summary judgment and directing partial judgment be entered for non-prevailing party below); *see also Boudreaux*, 86 F.4th at 640 (reversing in part, remanding for the remedy proceedings, and preliminarily enjoining the enforcement of Louisiana's mandatory bar scheme as to Mr. Boudreaux).

## II.     Compelled membership in USB violates Appellant's right to freedom of association.

Utah law requires Ms. Pomeroy to maintain membership in USB as a condition of practicing law. *See* Utah Judicial Council Code of Judicial Admin. ("CJA") Rules 14-101, 14-102(a)(1), 14-107, 14-111, 14-802(a).

USB, however, engages in speech and lobbying activities (particularly on controversial political and ideological issues) that Ms. Pomeroy finds

objectionable. This mandatory association with speech and activities she disagrees with violates her right of freedom of association.

In the years since *Keller* was decided, the Supreme Court has never explicitly resolved the question of whether compulsory bar associations are compatible with the freedom of association, and neither has this Court. *Schell*, 11 F.4th at 1194. But *Janus* and *Knox*, as well as the Fifth Circuit's application of those legal principles in *McDonald* and *Boudreaux*, show why the answer is no.

First, the applicable level of scrutiny is at least as high as exacting scrutiny—pursuant to which "mandatory associations are permissible only when they serve a 'compelling state interest that cannot be achieved through means significantly less restrictive of associational freedoms." *McDonald*, 4 F.4th at 246 (citation and internal marks omitted). Second, mandating membership in USB fails that test because USB goes far beyond the two—and only two—constitutionally permissible bases for mandatory membership, which are "regulating the legal profession and improving the quality of legal services." *Keller*, 496 U.S. at 13.

## A. A freedom of association challenge requires the application of exacting scrutiny.

It follows from *Keller* and *Janus* that an integrated bar association must satisfy exacting scrutiny to survive a freedom of association challenge. *Janus*, 138 S. Ct. at 2465; *see also McDonald*, 4 F.4th at 246. *Keller* said the "same constitutional rule" that applies to public-sector unions also applies to compulsory

bar associations, 496 U.S. at 13, and *Janus*, 138 S. Ct. at 2465, said *exacting scrutiny* applies in the public-sector union context. The conclusion is clear: at a minimum, exacting scrutiny applies to the freedom of association question presented here.

That means, first, that the state must prove[7] that mandatory membership serves a compelling interest. The only two interests identified in *Keller* as applying to mandatory bars are regulating the legal profession and improving the quality of legal services. *Keller*, 496 U.S. at 13. Second, under exacting scrutiny, the state must show that these compelling interests "cannot be achieved through means significantly less restrictive of associational freedoms" than forcing attorneys to join USB. *Janus*, 585 U.S. at 894 (citation omitted).

USB cannot pass this test. At a minimum, if it engages in nongermane activity—which it does—then it is not serving the compelling interests. *See Crowe II*, 112 F.4th at 1233; *Boudreaux*, 86 F.4th at 629; *McDonald*, 4 F.4th at 249. Although a mandatory bar association that only engages in *germane* activity *might* meet exacting scrutiny, "[c]ompelled membership in a bar association that engages in *non*-germane activities … *fails* exacting scrutiny." *McDonald*, 4 F.4th at 246

---

[7] Under exacting scrutiny, the burden is on the state. *Jones v. Jegley*, 947 F.3d 1100, 1105 (8th Cir. 2020).

(emphasis added).[8] The *Keller* Court, for example, observed that a compulsory bar may not use member dues to "endorse[] a gun control initiative," or "a nuclear weapons freeze initiative," or "oppose[] federal legislation limiting federal-court jurisdiction over abortions, public school prayer, and busing." *Keller*, 496 U.S. at 15. And *Boudreaux* made clear that even seemingly harmless matters such as encouraging lawyers to get exercise and eat healthy, fall *outside* the limits permitted by *Keller*:

> If a bar association may tout the health benefits of broccoli, may it also advise attorneys to practice Vinyasa yoga, adhere to a particular workout regimen, or get married and have children, if it believes that those activities improved attorney wellness and therefore the quality of legal services in the state? How remote or indirect can the purported benefit to legal services be?

86 F.4th at 632–33.

### B. The undisputed evidence demonstrates that the USB fails exacting scrutiny because it engages in nongermane speech on controversial political and ideological issues.

For an activity to be "germane" to the two compelling state interests recognized by *Keller*, it must be "necessarily or reasonably incurred" for either of

---

[8] *See also* Levin, 109 Geo. L.J. Online at 18–19 (no evidence that states with voluntary bar associations result in subpar legal professions); *Holt v. Hobbs*, 574 U.S. 352, 368–69 (2015) (the fact that many states have voluntary bar associations suggests that means less restrictive than forced bar membership exist to regulate lawyers); *Janus*, 138 S. Ct. at 2466 (voluntary union membership in 28 states suggests a less restrictive means to compulsory public-sector union membership).

them, *McDonald*, 4 F.4th at 247 (citation omitted), and "inherently tied to the practice of law or the legal profession." *Boudreaux*, 86 F.4th at 633. Although political and ideological activity may not *necessarily* be nongermane, *Keller*, 496 U.S. at 17, it certainly *is* nongermane when it does not strictly and inherently relate to regulating lawyers and improving legal services. And if a bar's conduct is both nongermane *and* political/ideological in nature, that compounds the constitutional violation. *See Janus*, 138 S. Ct. at 2463.

Thus, the dispositive question is whether the USB engages in activity that is not germane to regulating the practice of law and improving the quality of legal services. The answer is unambiguous: USB certainly engages in a wide range of conduct not related to either purpose. It frequently engages in activities that are both nongermane *and* political/ideological, which compounds Ms. Pomeroy's constitutional injury. The USB exemplifies this form of nongermane conduct in its *Journal* publications and legislative program.

### 1. The USB publishes extensive content that is nongermane to regulating the practice of law or improving legal services.

It is undisputed that the USB has published a *substantial* amount of content that has little or no conceivable, let alone "inherent," connection to regulating the practice of law or improving legal services. In addition to the *Journal* articles, it publishes nongermane content on other forums, particularly social media, which includes:

36

- Commentary on President Trump's immigration policy, particularly the so-called "travel bans." APP.109; APP.127.

- Criticism of President Trump's rhetorical style, including the satirical suggestion that a rude or unprofessional lawyer would behave "like [President Trump] and call your opponent 'lyin' Fred.'" APP.130.

- Criticism of multiple public officials' relationships with the media. *Id.*

- Criticism of the electoral college system. APP.112–14.

- Extensive discussion of implicit bias, the concepts of equity versus equality, systemic racism, promotion of events like diversity award dinners and "equity and inclusion dialogue sessions," and various diversity initiatives such as "minimum female representation" mandates. APP.109–11; APP.115–23; APP.142–44; APP.147.

- Analysis and evaluation of a book author's proposals for criminal penalties, "up to and including incarceration," for any person "who is made aware of a sexual assault but focuses on protecting the institution in which it occurs rather than the survivor of the assault." App.151–52.

- In-depth argument and analysis of the merits of various policy proposals regarding pharmaceutical pricing. APP.133–41.

- Opinions about whether people should keep wearing face masks, and whether they should resume practices like shaking hands, after the end of the pandemic. APP.148–50.

- Advocacy for heavier cryptocurrency regulation and vociferous criticism of cryptocurrency markets, including assertions that cryptocurrency "isn't money except as used by some criminals," and that "the whole market [for cryptocurrency] is a virtual construct with no real substance," "just grifters and geeks having a party." APP.158–66.

- Promotion of a "Native American Heritage Equity Habit Building Challenge," which includes prescribed readings on "cultural appropriation," the Standing Rock pipeline protests, and allegations that the Gabby Petito press coverage was systemically racist. APP.174–86.

- Sharing a social media post promoting Governor Cox's "OneUtah Roadmap" legislative agenda, which includes "bills that focus on law enforcement and mental health" as well as other social media posts about public health crises and the admission of "DREAMERers" into the USB. APP.187.

*All* of this nongermane content is funded by USB members' mandatory dues, and it is therefore compelled speech and association in violation of the First Amendment. Particularly problematic, however, is the content that focuses on hot-

button cultural and political issues. Like the rest of the country, the Utah bar includes people with a wide range of viewpoints on these matters, and many lawyers no doubt agree with all of the above propositions. But many also disagree with equal fervor. These latter, however, are legally required to *fund* such speech—that is, they are "compel[led]…to furnish contributions of money for the propagation of opinions which [they] disbelieve[]," *Janus*, 138 S. Ct. at 2464 (quoting Thomas Jefferson)—and to *maintain membership* in an organization that engages in this speech, regardless of how they feel about it.

This Court has already recognized that the risk of nongermane activity is particularly acute when dealing with issues that "break along political lines" or involve "an ideological tinge." *Schell*, 11 F.4th at 1194 (explaining that "views on the appropriateness of 'big money and special interest groups' in elections and the ability of donors to 'buy court opinions" could have "strayed from the germane purposes of the [Oklahoma Bar Association] and discussed matters in an ideological manner."). Much of the content in the *Utah Bar Journal* deals with matters that fit into this category: for example, implicit bias, equity versus equality, immigration policy, the proper relationship between politicians and the media. This kind of ideological, value-laden content cannot be "germane" simply because it references "laws" or that some lawyers might have experiences in these areas or be interested in the subject matter. If it is, then, as *Boudreaux* points out, there is no

limiting principle to the germaneness construct. 86 F.4th at 632 ("But if bar associations may opine, advise, and inform on anything that they deem is generally conducive to attorney health and wellness, there is no limiting principle.").

Indeed, the USB itself admits that terms like "racism," "racial equity," and "white privilege" fundamentally involve "embedded value judgments and opinions rather than facts"—so much so, in fact, that USB *itself* said that Ms. Pomeroy's interrogatories about USB's activities in these areas were "not susceptible of a meaningful response"! *See* USB Response to First Set of Interrogatories, APP.215–16.

USB is right: these terms are fundamentally inseparable from "embedded value judgments and opinions." *See, e.g.*, *Florio v. Gallaudet Univ.*, 619 F. Supp. 3d 36, 46 (D.D.C. 2022) (explaining that a statement about "the face of systemic racism" was merely the speaker's "'subjective view' or 'interpretation' of [the situation]," involving "an inherently subjective assessment"). And that is exactly why they are not germane to the two compelling state interests *Keller* recognized.

It does not matter whether the nongermane content was specifically attributed to USB members, or whether a reasonable reader would interpret the above articles to represent USB's views collectively versus merely the views of the author individually. While some of the articles cited above were written by individual bar members, much of the nongermane content appears in contexts

40

closely associated with USB itself: for example, statements from USB presidents and social media posts from USB's official accounts. This would lead a reasonable reader to view these statements as representing the positions of USB in an official, collective sense. The whole point of USB is to speak for and represent the legal profession generally in the eyes of the public. Its own website says that it "envisions its role as leading society in the creation of a justice system," and that its "mission" is "representing lawyers in Utah and serving … the legal profession."[9] In other words, it holds itself out as collectively representing "lawyers" and the "profession" as a whole.

But forcing Ms. Pomeroy to be spoken for in such a manner—especially with respect to political/ideological messages that have nothing to do with the regulation of the profession or improvement of legal services, violates Ms. Pomeroy's associational rights. *See further Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 568 (2005) (Thomas, J., concurring) ("The government may not, consistent with the First Amendment, associate individuals or organizations involuntarily with speech by attributing an unwanted message to them, whether or not those individuals fund the speech, and whether or not the message is under the government's control.").

---

[9] https://www.utahbar.org/about/.

To be as clear as possible, however: Ms. Pomeroy's compelled *speech* claim does not turn on the identity of the speaker or the context of the speech, or on the amount or extent of the speech (although the amount of nongermane speech here is significant). It depends on whether the speech in question was germane to the compelling state interest. *See Keller*, 496 U.S. at 13. By publishing nongermane content in the *Journal* and elsewhere, the USB has violated the "bedrock principle" that "no person in this country may be compelled to subsidize speech by a third party that he or she does not wish to support." *Harris v. Quinn*, 573 U.S. 616, 656 (2014). And Ms. Pomeroy's free *association* claim turns not on the amount of money taken from her or spent by USB, but instead on the fact that she is forced to join an organization that engages in activities far beyond the compelling interests that can alone warrant compulsory association (regulating the profession and improving the practice of law).

### 2.    USB's legislative program is nongermane.

None of the bills referenced above regulates lawyers *qua* lawyers or the lawyer's role in the improvement of the quality of legal services. Instead, each sought or seeks to change Utah's substantive law—that is, "the law[s] *governing* cases, disputes, or transactions *in which attorneys might be involved*," which as *McDonald* made clear, "is non-germane to the purposes identified in *Keller*." 4 F.4th at 247–48 (emphasis in original).

The district court noted in a prior order that USB's lobbying regarding the Utah Attorney General's right to invoke conflict-of-interest or attorney-client privilege "goes far beyond regulating the legal *profession*, and instead affects the office of a separate public official." *Pomeroy v. Utah State Bar*, 598 F. Supp.3d 1250, 1261 (D. Utah 2022) (emphasis in original). Likewise, USB's lobbying and public communications regarding the taxation of legal services was not germane to regulating lawyers—at least not in any sense of USB's mission to regulate lawyers, since USB has no authority over taxation. Nor is a debate over the *taxation* of legal services germane to *improving* legal services. Utah's legislature decides the public policy of the state. It is not the job of USB, resting on the authority of its compelled membership, to interject itself into these debates, as it has in a most obvious way with respect to HJR 2, debated in the aftermath of the *Dobbs* decision. *See* Section I.D., *supra*. If advocacy regarding gun control or a nuclear freeze weren't germane in *Keller*, 496 U.S. at 15, then advocacy regarding abortion is not germane here.

The USB Defendants would no doubt draw some connection between the above-described activities and USB's role in regulating the practice of law and improving legal services. But germaneness is not a matter of simply drawing some connection, however tangential, to a legitimate purpose. *See Boudreaux*, 86 F.4th at 632. If that were the test, it would be vastly overinclusive. The Supreme Court

has placed key limits on germaneness for this very reason. In *Knox*, it rejected the notion that political expenditures were germane to collective bargaining merely because they would result in a more friendly electorate or more friendly public officials. *See* 567 U.S. at 320. It explained:

> If we were to accept this broad definition of germaneness, it would effectively eviscerate the limitation on the use of compulsory fees to support unions' controversial political activities. Public-employee salaries, pensions, and other benefits constitute a substantial percentage of the budgets of many States and their subdivisions. As a result, a broad array of ballot questions and campaigns for public office may be said to have an effect on present and future contracts between public-sector workers and their employers. If the concept of "germaneness" were as broad as the [union] advocates, public-sector employees who do not endorse the unions' goals would be essentially unprotected against being compelled to subsidize political and ideological activities to which they object.

*Id.* at 320–21.

These limits are particularly salient in the bar association context. Terms like "legal services" and "practice of law" can easily be construed to touch on virtually anything and could be connected to practically any policy topic. For that very reason, there must be a "limiting principle." *Boudreaux*, 86 F.4th at 632.

### C.    There is no "*de minimis* exception" to the First Amendment.

In its Order deciding the parties' cross motions for summary judgment, the district court suggested that a constitutional analysis of USB's activities is unnecessary because (a) the conduct would fit under a *de minimis* exception that it claimed this Court left open in *Schell*, and (b) the *Hudson* refund procedures

suffice to cure any constitutional violation, making court involvement unnecessary. *See* APP.254–55. These were reversible errors.

First, evidence that the USB lobbied on *more than forty* nongermane bills over three years is not *de minimis*.

Second, the Tenth Circuit has never recognized a *de minimis* exception to the First Amendment. And that is because there is no such exception. *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 567 (2001) ("There is no *de minimis* exception for a speech restriction that lacks sufficient tailoring or justification"); *Boudreaux*, 86 F.4th at 636 ("[W]e decline to recognize a *de minimis* exception to the rule from *Keller*."); *cf. Bonham v. D.C. Libr. Admin.*, 989 F.2d 1242, 1245 (D.C. Cir. 1993) (no *de minimis* exception to the Establishment Clause). To apply such an exception would require courts to weigh both the importance and effectiveness of USB's advocacy efforts, which would be futile—requiring analysis of how much effect any particular lobbying effort had—and would involve "ad hoc balancing of relative social costs and benefits," *McCutcheon v. FEC*, 572 U.S. 185, 206 (2014) (citation omitted), none of which is appropriate in the First Amendment context. *See also Christian Legal Soc'y Chpt. of Univ. of Cal. v. Martinez*, 561 U.S. 661, 717–18 (2010) (Alito, J., dissenting) ("This Court does not customarily brush aside a claim of unlawful discrimination with the

observation that the effects of the discrimination were really not so bad. We have never before taken the view that a little viewpoint discrimination is acceptable.").

The district court based its purported *de minimis* rule in part on the opinion of the District Court of Oregon in the *Crowe* case, which the district court here believed implicitly applied a *de minimis* exception. But the Ninth Circuit rejected that approach in a later stage of the *Crowe* litigation, when it held that a single, one-page statement by the Oregon Bar in its own publication was nongermane and consequently failed exacting scrutiny. *See Crowe II*, 112 F.4th at 1238. The nongermane statements here are far more replete.

Finally, as explained below, USB's *Hudson* Procedures are themselves inadequate, and attempt to address only the compelled speech violation; they do nothing to redress the violation of *associational* rights, which are not contingent on the amounts of money involved at all, and are therefore not amenable to a *de minimis* rule.

### D. The USB's "opt-out" procedures are inadequate.

In *McDonald*, the Fifth Circuit held that a payment structure which prevents or hinders a bar member from identifying whether the bar's expenditures are germane or not in *itself* a constitutional injury. *See* 4 F.4th at 253 n.41. Here, Ms. Pomeroy's third claim for relief sets forth such a claim.

The whole notion of after-the-fact refunds originated in the recognition that it is unconstitutional to force people to subsidize speech with which they disagree. While *Abood* was the prevailing precedent, courts held that a person could be compelled to pay—so long as she could get her money back from an association that spent that money on speech with which she disagrees. In other words, the rule was that "'dissent is not to be presumed' and that only employees who have affirmatively made known to the union their opposition to political uses of their funds are entitled to relief." 431 U.S. at 238 (citation omitted). But not only has *Abood* been overruled, but the presumption against dissent has been reversed, because the *Janus* Court made clear that "[u]nless employees clearly and affirmatively consent *before* any money is taken from them," requiring payment of dues that fund nongermane speech is unconstitutional. 585 U.S. at 930 (emphasis added). And "the same constitutional rule" must apply in the bar context. *Keller,* 496 U.S. 1, 13.

But laying aside the question of whether the after-the-fact refund requirement of *Keller* remains viable after *Janus*, USB's procedures are entirely inadequate. *Keller* said mandatory bars must maintain minimum safeguards for members who do not wish to fund nongermane activities, *id.* at 14, and in particular, the bar must give members "an adequate explanation of the basis for the fee, a reasonably prompt opportunity to challenge the amount of the fee before an

impartial decisionmaker, and an escrow for the amounts reasonably in dispute while such challenges are pending." *Id.* at 16 (citation omitted).

Yet USB's procedures fall short of this standard. *See* Answer, APP.092–95, 102–105 ¶¶ 51–66, 108–22 (admitting the factual underpinnings of Plaintiff's allegations while denying the legal conclusion to be drawn from them).

It categorically refuses to refund portions of fees it uses for some nongermane activities. Although it claims to have procedures for requesting refunds of portions of fees that would support its legislative agenda, it does *not* refund portions of fees that support *other* nongermane activities, like those in the *Journal* or other publications.

Significantly, this issue is distinct from Ms. Pomeroy's compelled speech claim. So even if this Court were to conclude that *all* of USB's conduct survives exacting scrutiny, Ms. Pomeroy still should prevail on this claim, because its refusal of refunds and its lack of transparency mean that USB can engage in nongermane conduct in the future. The *Hudson* Procedures that *Keller* required are not just remedial, they're prophylactic: they're supposed to ensure that members can determine how their fees are being used and to act if they determine that some use is problematic.

USB makes that impossible (or quite difficult) because, in violation of *Keller*'s and *Hudson*'s requirements, it does *not* provide members an adequate

explanation of the basis for its fees. Instead, it simply asks members to trust its calculations. But those aren't really calculations at all. Instead, USB simply asserts what portion of its budget it spends on lobbying, then rounds that percentage up to the next whole number. And because the USB does not provide members with a basis to determine its nongermane non-legislative activities, members have at most "inquiry notice," which falls short of *Hudson*'s and *Keller*'s requirements. As the Fifth Circuit has explained:

> The Bar does not furnish Texas attorneys with meaningful notice regarding how their dues will be spent. Nor does it provide them with any breakdown of where their fees go. Instead, it places the onus on objecting attorneys to parse the Bar's proposed budget—which only details expenses at the line-item level, often without significant explanation—to determine which activities might be objectionable. That is a far cry from a *Hudson* notice, which estimates the breakdown between chargeable and non-chargeable activities and explains how those amounts were determined.

*McDonald*, 4 F.4th at 254.

The USB's slipshod approach gives members no assurance that the remainder of the USB's nongermane activities fall within the difference between the actual percentage calculated for lobbying and the rounded figure offered for refund. The USB's supposed protection here is entirely arbitrary, and it cannot satisfy *Hudson*'s and *Keller*'s requirements.

USB's inadequacies are heightened in light of the fact that *Janus* has changed the rule from the presumption against dissent that *Abood* used, and now

requires that "affirmative[] consent [be obtained] *before* any money is taken." 585 U.S. at 930 (emphasis added). That rule is certainly incompatible with USB's incomplete, slipshod, and misleading procedures. USB's procedures enable it to avail itself of members' compelled dues to fund its activities—thereby using those dues—and later refund a miniscule portion of them (without interest) to those members who somehow become aware of the nongermane expenditure and undertake the burden of seeking a refund of a small fraction of those dues. This is precisely the process that the Court called a "substantial impingement on First Amendment rights" in *Knox*, 567 U.S. at 317, and which it declared unconstitutional in *Janus*.

Although all of that is true of Ms. Pomeroy's compelled speech claim, the problem is even worse with respect to her free association claim. Even if the USB were to refund in full the portion of dues attributable to its legislative agenda, it has nevertheless in the interim forced members *en masse* to support views and be counted as part of the "legal profession" for which USB purports to speak. Associational rights are not monetary in nature; violations of these rights are considered "irreparable" injuries, *Familias Unidas v. Briscoe*, 544 F.2d 182, 187 (5th Cir. 1976), precisely because they cannot be remedied through damages. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373

(1976). USB's implementation of an inadequate—indeed, constitutionally obsolete—after-the-fact refund procedure therefore virtually ensures the violation of freedom of association rights, separate and apart from whether Ms. Pomeroy is forced to *fund* nongermane speech.

## CONCLUSION

In *Lathrop v. Donohue*, 367 U.S. 820 (1961), Justice Hugo Black—well known for his staunch defense of the First Amendment--said: "[t]he mere fact that a lawyer has important responsibilities in society does not require or even permit the State to deprive [her] of those protections of freedom set out in the Bill of Rights for the precise purpose of insuring the independence of the individual against the Government." *Id.* at 875-76 (Black, J. dissenting). In *McDonald, Crowe,* and other cases, the Courts of Appeals—and, in *Janus*, the Supreme Court—have vindicated his words. This Court should do likewise, and vacate the judgment dismissing Appellant's claims, reverse the district court's determination that the USB has engaged in germane activities, and preliminarily enjoin the enforcement of Utah's mandatory bar requirement as to Ms. Pomeroy while this matter is remanded for a remedy determination.

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff-Appellant Amy Pomeroy respectfully requests oral argument because this case presents important and complex questions of constitutional law,

including the relationship between the Supreme Court's decisions in *Keller v. State Bar of California*, 496 U.S. 1 (1990), and *Janus v. AFSCME*, 138 S. Ct. 2448 (2018).

**RESPECTFULLY SUBMITTED** this 19th day of October 2024 by:

/s/ *Scott Day Freeman*
Scott Day Freeman
Adam Shelton
Scharf-Norton Center for Constitutional Litigation at the
GOLDWATER INSTITUTE
500 East Coronado Road
Phoenix, Arizona 85004
Telephone: (602) 462-5000
Fax: (602) 256-7045
litigation@goldwaterinstitute.org
*Attorneys for Plaintiff-Appellant*

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(B) and 32(g)(1), I certify that this Brief:

(1) Was prepared using 14-point Times New Roman Font;

(2) Is proportionately spaced and contains 10,893 words;

(3) all required privacy redactions have been made per 10th Cir. R. 25.5;

(4) if required to file additional hardcopies, that the ECF submission is an exact copy of those documents;

(5) the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, and according to the program are free from viruses.

*/s/ Scott Day Freeman*
Scott Day Freeman


# CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of October 2024, the foregoing brief was filed and served on all counsel of record via the ECF system.


*/s/ Scott Day Freeman*
Scott Day Freeman

**ADDENDUM**

**TABLE OF CONTENTS**

| ADD. NO. | DOCUMENT DESCRIPTION | PAGE |
|:---:|:---|:---:|
| 1 | Order an Memorandum Decision Granting in Part and Denying in Part Motion to Dismiss (April 4, 2022) (Docket No. 94) | 55 |
| 2 | Order and Memorandum Decision on Motions for Summary Judgment (April 25, 2024) (Docket No. 151) | 72 |
| 3 | Judgment in a Civil Case (April 25, 2024) (Docket No. 152) | 103 |
| 4 | Utah Code of Judicial Administration ("CJA") R. 14-101 | 104 |
| 5 | CJA R. 14-102 | 105 |
| 6 | CJA R. 14-106 | 107 |
| 7 | CJA R. 14-107 | 109 |
| 8 | CJA R. 14-111 | 111 |
| 9 | CJA R. 14-207 | 112 |
| 10 | CJA R. 14-716 | 114 |
| 11 | CJA R. 14-802 | 116 |

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| AMY POMEROY,<br><br>        Plaintiff,<br><br>v.<br><br>UTAH STATE BAR, et al.,<br><br>        Defendants. | **ORDER AND MEMORANDUM DECISION GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS**<br><br>Case No. 2:21-CV-00219-TC-JCB<br><br>District Judge Tena Campbell<br><br>Magistrate Judge Jared C. Bennett |

In this civil rights suit, Plaintiff Amy Pomeroy, a licensed attorney in Utah, alleges mandatory membership in the Utah State Bar (USB) and Utah Bar Foundation (UBF) violates her First and Fourteenth Amendment rights.  Defendants filed a motion to dismiss Ms. Pomeroy's Complaint.  (ECF No. 68.)  For the following reasons, the court GRANTS IN PART and DENIES IN PART the motion to dismiss.

## BACKGROUND[1]

The USB is a Utah non-profit corporation which Utah attorneys must join and pay an annual fee in order to practice law in Utah.  John C. Baldwin is Executive Director, Heather Farnsworth is President, and Heather Thuet is President-Elect.  Marty Moore, John W. Bradley, Chrystal Mancuso-Smith, Michelle Quist, Mark Morris, Mark Pugsley, Traci Gunderson, Andrew Morse, Tom Seiler, Kristin Woods, Rick Hoffman, and Shawn Newell are members of

---

[1] All factual allegations come from Ms. Pomeroy's Complaint.  The court accepts them as true for purposes of this order.  See Albers v. Bd. of Cnty. Comm'rs, 771 F.3d 697, 700 (10th Cir. 2014).

the USB's Board of Commissioners (the Board).[2]  Baldwin and Farnsworth, along with the members of the Board, are responsible for enforcing the state's requirement that attorneys join the USB and pay annual fees to the USB to practice law in Utah.  If an attorney fails to pay the annual fee, "the USB administratively suspends the attorney's license to practice law, which prohibits the attorney from practicing law in the state."  (Compl. ¶ 32, ECF No. 2.)

Under the Utah Judicial Council Code of Judicial Administration (CJA) Rules, the USB is "authorize[d]" and "directe[d]" "to study and provide assistance on public policy issues and to adopt positions on behalf of the Board."  (Compl. ¶ 38, ECF No. 2 (citing CJA Rule 14-106(a).)[3] The USB has advocated for and against substantive Utah legislation, including taxation of legal services, whether the state attorney general can invoke a potential conflict of interest or attorney-client privilege to withhold release of an opinion requested by the legislature, and how Utah selects judges.  Additionally, the USB uses member dues to fund the *Utah Bar Journal*, which "take[s] or publicize[s] positions on current controversies," including by touting the importance of "equity" as distinct from "equality," invoking the concept of implicit bias, calling for courtrooms to be a "safe space" for allegations of unfairness, and reviewing a book that proposes criminal penalties for anyone who protects an institution in which a sexual assault occurs. (Compl. ¶ 50, ECF No. 2.)

---

[2] In Defendants' Reply in Support of Motion to Dismiss, they explain that since the outset of the suit, "five of the individuals holding the official capacities named in the Complaint have been changed. . .  First, Elizabeth Wright became Executive Director of the Utah State Bar, replacing John C. Baldwin.  Second, Heather Thuet because the President, replacing Heather Farnsworth.  Third, Krist[i]n Woods became President-Elect, replacing Heather Thuet. Fourth, Gregory N. Hoole became a 3rd Division Commissioner, replacing Mark Pugsley.  Fifth, Tyler S. Young became a 4th Division Commissioner, replacing Tom Seiler." (ECF No. 78.)

[3] The CJA rules further instruct that the USB may take positions on the following public policy issues: "issues concerning the courts of Utah, procedure and evidence in the courts, the administration of justice, the practice of law, and matters of substantive law on which the collective expertise of lawyers has special relevance and/or which may affect an individual's ability to access legal services or the legal system."  (Compl. ¶ 40, ECF No. 2 (citing CJA Rule 14-106(a)(1)).)

Within the *Utah Bar Journal*, the USB publishes notice of member-attorneys' right to receive a rebate of the portion of their dues used for lobbying and legislative matters.  Members may not prevent their dues from being used for lobbying purposes before the fact, and the USB does not provide information about how it determines which expenditures are classified as lobbying and legislative-related.  The USB does not offer a means to object to or receive refunds for other, non-lobbying or legislative USB activities.  Nor does the annual budget made available to members identify specific expenditures, only general categories.

Ms. Pomeroy, who lives in Orem, is an attorney duly licensed under the laws of Utah.  She is a member of the USB and pays its annual fee solely because it is a mandatory prerequisite to practicing law in Utah.  Ms. Pomeroy does not want to associate with the USB or USF and opposes the use of any of her mandatory fees to "fund any amount of political or ideological speech, regardless of its viewpoint." (Compl. ¶ 68, ECF No. 2.)  She also objects to the lack of safeguards available to allow attorneys to opt out of paying for political and ideological speech.

On April 14, 2021, Pomeroy filed her Complaint against the USB, Baldwin, Farnsworth, Thuet, and the members of the Board.  (ECF No. 2.)  The Complaint brings four causes of action under 28 U.S.C. § 2201 and 42 U.S.C. § 1983, alleging the following practices violate her First and Fourteenth Amendment rights to free speech and free association: (1) compelled membership in the USB, (2) the USB's collection of mandatory bar dues, (3) failing to provide safeguards to ensure mandatory dues are not used for impermissible purposes, and (4) compelled membership in the UBF. Defendants now ask the court to dismiss each of Ms. Pomeroy's causes of action.  (ECF No. 68.)  The court turns to the party's arguments.

/ / /

/ / /

## LEGAL STANDARDS

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff's complaint "must plead facts sufficient to state a claim to relief that is plausible on its face."  Slater v. A.G. Edwards & Sons, Inc., 719 F.3d 1190, 1196 (10th Cir. 2013) (internal quotation marks omitted) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).  A claim is facially plausible when the complaint contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Burnett v. Mortg. Elec. Registration Sys., Inc., 706 F.3d 1231, 1235 (10th Cir. 2013) (quoting Iqbal, 556 U.S. at 678).  The court must accept all well-pleaded allegations in the complaint as true and construe them in the light most favorable to the plaintiff. Albers, 771 F.3d at 700.  The court's function is "not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted."  Sutton v. Utah State Sch. for the Deaf & Blind, 173 F.3d 1226, 1236 (10th Cir. 1999) (quoting Miller v. Glanz, 948 F.2d 1562, 1565 (10th Cir. 1991)).

Rule 12(b)(1) motions to dismiss for lack of subject-matter jurisdiction take two forms: facial attacks and factual attacks.  Laufer v. Looper, 22 F.4th 871, 875 (10th Cir. 2022).  A facial attack challenges the sufficiency of the complaint, while a factual attack presents additional evidence.  Muscogee (Creek) Nation v. Okla. Tax. Comm'n, 611 F.3d 1222, 1227 n.1 (10th Cir. 2010).  Defendants bring a facial attack.  In evaluating a facial attack, the court "must accept the factual allegations in the complaint as true," Safe Streets All. v. Hickenlooper, 859 F.3d 865, 878 (10th Cir. 2017) and "apply a standard patterned on Rule 12(b)(6)."  Garling v. EPA, 849 F.3d 1289, 1293 n.3 (10th Cir. 2017).

/ / /

4

## ANALYSIS

Defendants argue the Complaint should be dismissed pursuant to Rule 12(b)(1) because the USB is immune from suit under the Eleventh Amendment and Ms. Pomeroy lacks Article III standing because her alleged injury is not redressable. Defendants further argue that even if Ms. Pomeroy establishes standing, she has failed to adequately allege her claims and the Complaint should be dismissed pursuant to Rule 12(b)(6). The court will address the Eleventh Amendment immunity, Article III standing, and Rule 12(b)(6) arguments in turn.

### I.   The USB Has Eleventh Amendment Immunity from Suit

The Eleventh Amendment precludes unconsented suits in federal court against a state or an arm of the state. See, e.g., Wagoner Cnty. Rural Water Dist. No. 2. v. Grand River Dam Auth., 577 F.3d 1255, 1258 (10th Cir. 2009). An arm of the state is an entity created by a state government which operates as an alter ego or instrumentality of the state. See Watson v. Univ. of Utah Med. Ctr., 75 F.3d 569, 574 (10th Cir. 1996). This court has previously held the USB is an arm of the state because it acts as an alter ego of the Utah Supreme Court. Rose v. Utah State, No. 2:09-cv-695-TC, 2009 WL 5066687, at *4 (D. Utah Dec. 16, 2009). In Rose, to determine the USB's arm of the state status, the court considered how state laws characterize the USB. Id. at *3 (citing Sturdevant v. Paulsen, 218 F.3d 1160, 1164 (10th Cir. 2000)). The court held that because the Utah Constitution gives the Utah Supreme Court exclusive authority to govern the practice of law, and because the Utah Supreme Court promulgates the Rules under which the USB functions, the USB was an alter ego of the Utah Supreme Court and, therefore, an arm of the state. Id. at *3–*4 (citing Utah State Bar v. Summerhayes & Hayden, Pub. Adjusters, 905 P.2d 867, 870 (Utah 1995)).

Ms. Pomeroy nonetheless argues that under Watson, the USB is not an arm of the state because it has relative autonomy from the state since the members elect commissioners, and because it is financed independently from the state treasury.  (ECF No. 74 at 8.)  Defendants respond that despite the fact commissioners are elected, the USB does not enjoy significant autonomy concerning the issues in the suit—mandatory membership and license fee rules— because the Utah Constitution has vested the Utah Supreme Court has "reserved substantial control over the membership and license fee rules challenged in this suit."  (ECF No. 78 at 3.) As to the USB's independent funding, Defendants note entities can retain Eleventh Amendment immunity even if a judgment would have no impact on the state's finances.  (ECF No. 78 at 3 (citing Regents of the Univ. of Calif. v. Doe, 518 U.S. 425, 431 (1997).)

The court agrees with Defendants.  The Tenth Circuit has explained that the central inquiry is whether an entity is more like an arm of the state or a political subdivision.  See Sturdevant, 218 F.3d at 1164.  The factors Ms. Pomeroy relies on, as enumerated in Watson, are simply an "elaborat[ion]" of that central inquiry, which originates from a Supreme Court decision.  Id. (citing Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 280 (1977)).[4]  As the court previously observed in Rose, the Utah Constitution gives the Utah

---

[4] Defendants argue that a more recent arm-of-the-state test applies.  See ECF No. 68 at 11 (citing Couser v. Gay, 959 P.3d 1018, 1024 (10th Cir. 2020)).  Under the Couser test, the court considers: (1) the entity's character under state law, (2) the degree of control exercised by the state, (3) the entity's finances, and (4) whether the entity is primarily concerned with local or state affairs.  Couser, 959 P.3d at 1024.  Defendants argue each of these factors weighs in favor of immunity, and further argue that several circuits have used a similar test to find state bar associations have Eleventh Amendment immunity.  See ECF No. 78 at 1 n.2 (collecting cases).  The Couser test is essentially a more granular version of the Mt. Healthy test, which determines whether the entity is more like an arm of the state or a political subdivision.  Compare Sturdevant, 218 F.3d at 1164 (citing Mt. Healthy, 429 U.S. at 280) with Couser, 959 P.3d at 1024 (citing Mt. Healthy, 429 U.S. at 280)).  Because Couser, Sturdevant, and Watson each apply the Mt. Healthy test, the court does not choose between them but notes that under any breakdown of the factors, the USB would be considered an arm of the state due to its characterization under state law and the high degree of control the Utah Supreme Court maintains over it.  See also Sturdevant, 218 F.3d at 1170 ("Because of the open-ended nature of the arm-of-the-state analysis, it is easy to become caught up in the minutiae of state law . . . These details, however, must not eclipse a fundamental distinction that emerges from Mt. Healthy . . . between alter egos or instrumentalities of states on the one hand, and political subdivisions such as cities and counties on the other.").

6

Supreme Court the power to govern the practice of law and promulgates the Rules under which the USB functions, including those rules concerning mandatory membership and fees.  This makes the USB an alter ego of the state and therefore an arm of the state; it is not analogous to a municipality or political subdivision under the Watson test as Ms. Pomeroy argues.  See Rose, 2009 WL 5066698, at *4.  Because the USB is an arm of the State, it is immune from suit under the Eleventh Amendment.  All claims brought against the USB must, therefore, be dismissed.

However, the other defendants will not be dismissed on the basis of Eleventh Amendment immunity, as requested in the motion to dismiss.  While the Eleventh Amendment "does not permit judgments against state officers declaring they violated federal law in the past," the Ex parte Young exception allows a suit against state officials in their official capacities to prevent the ongoing violation of federal law.  See, e.g., Johns v. Stewart, 57 F.3d 1544, 1554–55 (10th Cir. 1995) (citing Ex parte Young, 209 U.S. 123, 159–60 (1908)).  Because Ms. Pomeroy seeks to enjoin the future enforcement of the USB's rules concerning mandatory membership and fees, Eleventh Amendment immunity does not apply to the remaining defendants.

## II.    Ms. Pomeroy Has Standing to Challenge the Remaining Defendants

To survive a 12(b)(1) motion to dismiss based on standing, a plaintiff must demonstrate that: "(1) she has suffered an injury in fact; (2) there is a causal connection between the injury and the conduct complained of; and (3) it is likely that the injury will be redressed by a favorable decision."  Winsness v. Yocom, 433 F.3d 727, 731–32 (10th Cir. 2006) (citation omitted).  Defendants argue Ms. Pomeroy has not alleged the third prong: redressability.  To determine whether the redressability prong is adequately alleged at the pleading stage, without "prejudging the merits," the court must determine whether a favorable decision on the merits could redress

the alleged injuries on the facts alleged, accounting for the flexibility of injunctive relief.

Petrella v. Brownback, 697 F.3d 1285, 1294–95.

A defendant must have authority to enforce a challenged statute or rule to meet the

redressability prong.  See Bronson v. Swensen, 500 F.3d 1099, 1111 (10th Cir. 2007).  Whether

Defendants have enforcement authority is "related to whether, under Ex parte Young, they are

proper state officials for suit."  Kitchen v. Herbert, 755 F.3d 1193, 1201 (10th Cir. 2014)

(internal quotation marks and citation omitted).[5]  "Under Ex parte Young, a state defendant sued

in his official capacity must have some connection with the enforcement of a challenged

provision. An officer need not have a special connection to the allegedly unconstitutional statute;

rather, he need only have a particular duty to enforce the statute in question and a demonstrated

willingness to exercise that duty."  Id. (internal quotation marks and citations omitted).

Defendants argue Ms. Pomeroy lacks standing to sue because the injuries she alleges

cannot be redressed by a ruling enjoining the USB officials from enforcing the rules concerning

membership and payment of license fees.  Rather, USB officials "merely administer the rules as

agents of the Utah Supreme Court, which retains ultimate enforcement authority."  (ECF No. 68

at 16.)  Ms. Pomeroy responds that an injunction against the Defendants would prevent

enforcement of the mandatory membership and fee rules, redressing the injury she has alleged.

The court agrees with Ms. Pomeroy.  In Kitchen, the Tenth Circuit found plaintiffs had

standing to sue a county clerk for refusing to issue marriage licenses because an injunction

prohibiting enforcement of a state constitutional amendment (which, at the time, prohibited

same-sex marriage) would redress their alleged injuries by requiring the clerk to issue

---

[5] Defendants argue that Ms. Pomeroy's reliance on cases in the Ex parte Young line is "inapposite" because Article III standing and the Ex parte Young exception to Eleventh Amendment immunity are "distinct constitutional doctrines."  (ECF No. 78 at 4.)  However, as Kitchen makes clear, these distinct constitutional doctrines employ related considerations which the court may properly weigh.

8

certificates. <u>Kitchen</u>, 755 F.3d at 1201–02. Notably, the <u>Kitchen</u> court also determined plaintiffs had standing to sue the Utah Governor and Attorney General because they had legal authority to ensure county clerks enforced the law. <u>Id.</u> at 1202–04. However, the <u>Kitchen</u> court did not hold that because the governor and attorney general had "ultimate enforcement authority," they were the *only* proper defendants, as the Defendants here imply as to the Utah Supreme Court. Rather, for purposes of standing analysis, the redressability prong is met as long as the official in question has "clearly . . . assisted or currently assist in giving effect to the law." <u>Id.</u> at 1204 (citing <u>Prairie Band Potawatomi Nation v. Wagnon</u>, 476 F.3d 818, 828 (10th Cir. 2006)).

Here, Ms. Pomeroy has alleged Defendants enforce the rules she challenges by administratively suspending the licenses of attorneys who fail to pay annual membership fees. Notably, Defendants echo this characterization. (ECF No. 68 at 17.) Therefore, on the facts alleged, an injunction against the Defendants would prevent the enforcement of the USB's membership and fees requirements against Ms. Pomeroy, redressing her alleged injuries. At the motion to dismiss stage, these allegations are sufficient. Accordingly, Ms. Pomeroy has adequately alleged standing against the individual Defendants, and the claims against them will not be dismissed pursuant to Rule 12(b)(1).

### III.    Ms. Pomeroy's Complaint Adequately States Two Causes of Action

Ms. Pomeroy's complaint states four causes of action, each seeking declaratory and injunctive relief under 28 U.S.C. §§ 2201, 2202 and 42 U.S.C. §§ 1983, 1988 for violations of the First and Fourteenth Amendment rights to free speech and association. Her first claim concerns compelled membership in the USB. Her second claim concerns the USB's collection of mandatory bar dues. The third claim concerns the USB's failure to provide safeguards to prevent mandatory dues from being used for impermissible purposes. The fourth claim concerns

compelled membership in the UBF.  The Defendants move to dismiss each claim under Rule 12(b)(6).  The court will discuss each claim in turn.

### A.  Ms. Pomeroy's Claim Based on Compelled Membership in the USB Survives

Under Keller v. State Bar of California, conditioning the right to practice law on bar membership is not itself a free speech or association violation: a state bar may "constitutionally fund activities germane to those goals out of the mandatory dues of all members." Keller v. State Bar of California, 496 U.S. 1, 14 (1990).  An activity or expenditure is germane under Keller if it pertains to "regulating the legal profession" or "improving the quality of the legal service available to the people of the State." Id. at 14 (internal quotation marks omitted) (citing Lathrop v. Donahue, 367 U.S. 820, 843 (1961).  As such, a state bar may not "fund activities of an ideological nature which fall outside those [germane] areas of activity." Id.  A plaintiff may bring a First Amendment challenge to mandatory bar membership where she has alleged "at least some of a state bar's actions might not be germane to regulating the legal profession and improving the quality of legal services in the state." Schell v. Chief Just. & Justs. of Okla. Sup. Ct., 11 F.4th 1178, 1194 (10th Cir. 2021).  The parties disagree as to whether Ms. Pomeroy has adequately alleged the USB has funded non-germane activities or speech, as necessary to allege a First Amendment violation arising from her compelled membership in the USB.[6]

The lobbying and legislative activities of the USB that Ms. Pomeroy identifies as non-germane include: (1) lobbying against a proposed state tax on services which would have applied to legal services, (2) lobbying against legislation affecting the attorney general's ability to invoke

---

[6] Ms. Pomeroy also argues that because Keller relied on logic from Abood v. Detroit Bd. of Ed., 431 U.S. 209 (1977), which was overruled in 2018 by Janus v. Am. Fed'n of State, Cnty., and Mun. Emps., Council 31, 138 S. Ct. 2448 (2018), Keller no longer controls and the court should apply strict scrutiny to the association claim, as in Janus. However, the Tenth Circuit has since held that because the Supreme Court has yet to reconsider Keller, it is still binding law.  See Schell, 11 F.4th at 1190.  Accordingly, this court uses the framework explicated in Keller.

a conflict of interest or attorney-client privilege to withhold release of an opinion requested by the legislature, and (3) lobbying against a proposal to change Utah's merit-based judicial selection to one based on non-partisan elections.  Ms. Pomeroy additionally alleges that certain articles published and statements made in the *Utah Bar Journal*, which is funded by the USB with member dues, were non-germane, including: (1) a statement from the USB's president on the importance of equity as distinct from equality, (2) articles invoking the concept of implicit bias, (3) an article calling for courtrooms to be safe spaces for allegations of unfairness, and (4) a review of a book which advocates punishing those who become aware of a sexual assault and protect the institution where the assault occurs.  (Compl. ¶¶ 42–50, ECF No. 2.)

At the motion to dismiss stage, construing all facts in the light most favorable to Ms. Pomeroy, she has adequately alleged the USB has funded non-germane activities through its lobbying activities and publication of statements in the *Utah Bar Journal*.  The Tenth Circuit recently held in Schell that plausible allegations two articles in a state bar journal "strayed from the germane purposes of the [bar association] and discussed matters in an ideological matter" were sufficient to support a freedom of association challenge.  Schell, 11 F.4th at 1194.  The Schell court explained, "views on the appropriateness of 'big money and special interest groups' in elections . . . often break along political lines."  Id.  Therefore, an article invoking the topic of "big money and special interest groups" plausibly had "an ideological tinge," especially in context of other allegations in the complaint.  Id.  In contrast, the Schell court found articles encouraging attorneys to warn the public about the harms of politics in the judicial system, responding to criticism of the merit-based process for selecting judges, and discussing the role of attorneys in the state legislature were germane to the goal of improving the quality and availability of legal services.  Id. at 1193.

Viewing the allegations in the light most favorable to Ms. Pomeroy, the Complaint plausibly identifies articles in the March/April 2021 Utah Bar Journal that could be non-germane. Invoking the concept of implicit bias, discussing the important of equity as a distinct concept from equality, and reviewing a book which advocates punishing people who protect an institution where a sexual assault occurred are all topics that could plausibly be seen as having an "ideological tinge," and express viewpoints that could "break along political lines." These topics plausibly stray from the goals of regulating the legal profession and improving the quality of legal services by taking ideological positions and addressing broader public policy issues.[7]

In addition, Ms. Pomeroy plausibly alleges some of the USB's legislative activities are non-germane. For example, she identifies the USB's opposition to the "Tax Equalization and Reduction Act." (Compl. ¶ 43, ECF No. 2.) The Act proposed a new tax on services broadly in the state of Utah, which would include legal services. Ms. Pomeroy argues, and the court agrees, this is not necessarily germane because the tax does not directly pertain to regulating the legal profession or the quality of legal services, but only the cost of legal services, an argument which could be used to allow the USB to lobby for or against the imposition of any generally applicable tax. Additionally, Ms. Pomeroy plausibly alleges that taking a position on proposed legislation affecting the attorney general's ability to invoke a potential conflict of interest or attorney-client

---

[7] The statements fare no better in context. See ECF No. 68-1: Utah Bar Journal March-April 2021. For instance, Ms. Pomeroy's allegation about an article "calling for courtrooms to include a 'safe space'" comes from an article titled "The Road to Solutions: Systemic Racism and Implicit Bias in Prosecution," an article which heavily invokes the concepts of implicit bias and institutional racism. Id. at 26–27. Opinions on these concepts often "break along political lines," and the article has at least an "ideological tinge" in calling for prosecutors to examine their implicit biases, even if prosecution is obviously related to the practice of law. See Schell, 11 F.4th at 1194. While this article was written by contributors, Ms. Pomeroy alleges the USB publishes the Bar Journal with member fees. At the motion to dismiss stage, this is sufficient to plausibly allege bar officials have funded non-germane activities. See id. at 1184, 1194 (allegations a state bar used mandatory member dues to "publish political and ideological speech" sufficient at the motion to dismiss stage); see also GFF Corp. v. Associated Wholesale Grocers, Inc., 130 F.3d 1381, 1385 (10th Cir. 1997) (a document referred to in a complaint may be considered on a motion to dismiss without converting it to a motion for summary judgment).

privilege was non-germane.  Defendants argue without analysis this proposed legislation was "a direct regulation of the legal profession."  (ECF No. 68 at 22.)  However, the attorney general is an elected official in Utah, and proposed legislation affecting the attorney general's practices vis-à-vis the Utah State Legislature goes far beyond regulating the legal *profession*, and instead affects the office of a separate public official.[8]  As such, Ms. Pomeroy has plausibly alleged the USB engages in lobbying activities that go beyond public policy issues affecting the regulation of the legal profession or the quality of legal service.[9]

In summary, Ms. Pomeroy has sufficiently alleged that the Defendants engage in non-germane activities.  Therefore, she has sufficiently stated a claim for violation of her freedom of speech and freedom of association rights based on mandatory membership in the USB.

### B.  Ms. Pomeroy's Claim Concerning the USB's Mandatory Bar Dues Fails

In Opposition, Ms. Pomeroy acknowledges this claim would be foreclosed if the Tenth Circuit denied rehearing in Schell,[10] which considered a challenge to the Oklahoma State Bar's mandatory fees and found they were permitted by the First Amendment.  See Opposition at 17

---

[8] The court agrees with Defendants that Ms. Pomeroy's third identified legislative position—the USB's position on Utah's merit-based system for selecting judges—does relate to the regulation of the legal profession.  See Schell, 11 F.4th at 1193 (article responding to criticism of state's merit-based process for selecting judges is germane to regulating the legal system).  However, because Ms. Pomeroy has plausibly identified other non-germane activities, the fact that some are germane means she has adequately stated a claim under Keller.  See id. at 1194 (holding Keller does not foreclose freedom of association challenge where some activities are germane and some are not).

[9] The Defendants' arguments to the contrary are unavailing.  In their motion, Defendants rely heavily on McDonald v. Longley, a recent Fifth Circuit case which, at summary judgment, determined the publication of the *Texas Bar Journal* was germane under Keller.  4 F.4th 229, 251–52 (5th Cir. 2021).  Putting aside the fact that McDonald's analysis is not binding and arises in a different procedural posture, that case does not contain a detailed analysis of the germaneness of articles as Schell does, and Defendants cite parts of the opinion which pertain to diversity efforts, not bar journal articles.  See ECF No. 68 at 25 (citing McDonald, 4 F.4th at 249 (discussing the State Bar of Texas's diversity initiatives)).  Similarly, Defendants argue that the *Utah Bar Journal* should be designated as a non-public forum and the speech in the journal can only be attributed to the bar if it "determines the content" of the speech.  (ECF No. 68 at 24–25 (citing Rosenberg v. Rector & Visitors of the Univ. of Va., 515 U.S. 819, 833 (1995)).)  But Ms. Pomeroy's Complaint contains allegations the USB funds the *Utah Bar Journal*, publishes statements from the USB's president in the *Journal*, and engages in political and ideological speech using the Bar Journal.  This is sufficient at the pleading stage to allege the USB "determines the content" of the *Utah Bar Journal*.

[10] 2 F.4th 1312 (10th Cir. 2021), opinion withdrawn and superseded on reh'g, 11 F.4th 1178 (10th Cir. 2021).

n.5.  A week after Ms. Pomeroy's opposition was filed, the Tenth Circuit granted in part the petition for rehearing to the extent its opinion was modified in a revised opinion, but denied the petition for rehearing en banc.  See Schell, 11 F.4th at 1182.  The modified opinion did not change the holding concerning mandatory bar dues.  Id. at 1194 n.10.  Accordingly, the second claim for relief is foreclosed, a fact Ms. Pomeroy acknowledged at oral argument.  Having been conceded, the second claim for relief is dismissed (though the court notes Ms. Pomeroy has preserved this issue for appellate review).

### C.  Ms. Pomeroy's Claim for Lack of Procedural Safeguards Survives

Because integrated bars cannot use compulsory dues to fund non-germane activities, Keller held integrated bars must provide a refund mechanism for non-germane activities.  Keller, 496 U.S. at 16–17.  The Keller court held integrated bars satisfy this obligation when they adopt a procedure modeled on Teachers v. Hudson, 475 U.S. 292 (1986) which outlined a "minimum set of procedures by which a union in an agency-shop relationship could meets its requirement under Abood," namely: "an adequate basis for the fee, a reasonably prompt opportunity to challenge the amount of the fee before an impartial decisionmaker, and an escrow for the amounts reasonably in dispute while such challenges are pending."  Keller, 496 U.S. at 16–17 (internal quotation marks and citations omitted).  The Keller court reserved the question of whether an alternative procedure would satisfy that obligation because it did not have a fully developed record on which to consider the question.  Id. at 17.  But regardless of what type of procedure might be appropriate,[11] because Defendants concede they do not provide any refund mechanism for non-lobbying activities, the motion to dismiss the third claim must be denied.

---

[11] In the decades since Keller was decided, the Supreme Court has not returned to the issue, and the Tenth Circuit has not provided guidance on refund mechanisms.  The Ninth Circuit recently held an integrated bar did not need to strictly follow the Hudson procedures because that bar "provide[d] procedures adequately tailored to minimize the infringement of its members first amendment rights."  Crowe v. Oregon State Bar, 989 F.3d 714, 726 (9th Cir.

In their motion, Defendants argue because the USB will refund any member's pro rata share of bar dues spent on legislative and lobbying activities, not just non-germane legislative and lobbying, it is "over-inclusive" about the speech that triggers a refund, and therefore need not comply with the strictures of Hudson.  (ECF No. 68 at 27.)  In opposition, Ms. Pomeroy argues that while the USB offers a refund for lobbying or legislative-related activities, it does not provide a means of objecting to, or receiving refunds for, non-lobbying USB activities that may not be germane, nor does it provide a mechanism to dispute whether activity is properly deemed lobbying or legislation-related. (ECF No. 74 at 21, citing Compl. ¶ 113.)  In reply, Defendants concede: "Pomeroy is correct that the [USB]'s refund policy does not allow refunds for non-germane non-lobbying activities."  ECF No. 78 at 10.  However, they argue that Pomeroy has "alleged no such activities," and thus would be seeking an advisory opinion.

But in fact, as discussed above, the court already concluded that Pomeroy sufficiently alleged the USB engages in non-germane activities by funding the *Utah Bar Journal*, which, she alleges, contains non-germane speech.  See also Schell, 11 F.4th at 1194 (holding publication of bar journal can constitute non-germane activity.)  Defendants therefore concede that they provide no mechanism whatsoever to seek refunds for that potentially non-germane activity.  As such, they fail to meet the baseline requirement created by Keller that refunds be made available for non-germane activities.  Accordingly, the court need not determine at this stage what sort of refund procedure is adequate under Keller as Defendants have conceded they provide no refund policy for non-germane non-lobbying activities.  Because the Defendants admit they do not

---

2021), cert. denied sub nom. Gruber v. Oregon State Bar, 142 S. Ct. 78, 211 L. Ed. 2d 15 (2021), and cert. denied, 142 S. Ct. 79, 211 L. Ed. 2d 15 (2021) (internal quotation marks and citation omitted).  The Fifth Circuit disagrees, finding the Hudson procedures are "the Constitutional floor" that an integrated bar must meet.  Boudreaux v. Louisiana State Bar Association, 3 F.4th 748, 758 (5th Cir. 2021).

comply with the Supreme Court's guidance concerning refund procedures, this argument fails and the third claim will not be dismissed.

### D.  Ms. Pomeroy's Claim for Compelled Membership in UBF Fails

The legal standards discussed <u>supra</u> regarding compelled membership in the USB apply equally to Ms. Pomeroy's allegations concerning the UBF.  As such, to state a claim for relief, Ms. Pomeroy must allege the UBF has funded activities that are not germane to its valid goals and purposes.  <u>See</u> <u>Schell</u>, 11 F.4th at 1192.  However, the Complaint is devoid of any specific factual allegations concerning the UBF.  The only paragraph which contains any UBF-related allegations states: "Utah's requirement that all attorneys be members of the UBF injures [Ms. Pomeroy] because she does not wish to associate with the UBF or any political or ideological speech or other activities that it may engage in; she wishes to decide for herself which charitable and advocacy organizations she will and will not associate with and contribute to."  (Compl. ¶ 74, ECF No. 2.)  This paragraph does not allege any factual content describing the "political or ideological speech or other activities" the UBF engages in.  In opposition, Ms. Pomeroy argues that it is "beyond dispute that the UBF is a 501(c)(3) nonprofit organization, separate from the USB, that makes donations to various other organizations," and further explains discovery is necessary to determine which organizations the UBF has supported as that information has been removed both from the UBF website and past archived versions of the website.  ECF No. 78 at 24 n.7.  However, these allegations appear nowhere in the Complaint.

 "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice [to state a claim]."  <u>Iqbal</u>, 556 U.S. at 678 (internal citation omitted.)  Without alleging any facts that could allow the court to make the inference that the UBF has engaged in non-germane activities, the claim fails and must be dismissed.

## <u>CONCLUSION</u>

For the reasons stated above, the Defendants' Motion to Dismiss (ECF No. 68) is

GRANTED IN PART and DENIED IN PART.  All claims brought against the Utah State Bar

are dismissed.  The second claim for relief against the remaining defendants is dismissed per Ms.

Pomeroy's concession.  The fourth claim for relief brought against the remaining defendants is

dismissed for failure to state a claim pursuant to Rule 12(b)(6).  The first and third claims

brought against the remaining defendants are not dismissed.

SO ORDERED this 4th day of April, 2022.

BY THE COURT:

TENA CAMPBELL
United States District Judge

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| AMY POMEROY,<br><br>    Plaintiff,<br><br>v.<br><br>UTAH STATE BAR, et al.,<br><br>    Defendants. | **ORDER AND MEMORANDUM DECISION ON MOTIONS FOR SUMMARY JUDGMENT**<br><br>Case No. 2:21-cv-00219-TC-JCB<br><br>District Judge Tena Campbell<br>Magistrate Judge Jared C. Bennett |

Plaintiff Amy Pomeroy sued Defendant Utah State Bar (Utah Bar) and officers and members of the Utah Bar under 42 U.S.C. § 1983 and 42 U.S.C. § 1988.  Ms. Pomeroy contends that the Utah Bar has violated her First and Fourteenth Amendment rights to free speech and association by compelling her membership in the Utah Bar and engaging in activities that are not germane, that is, relevant or connected to, regulating the legal profession or improving the quality of legal services available in Utah.  She also argues that the Utah Bar has violated her free speech rights for failing to provide safeguards to ensure members' mandatory dues are not used for impermissible purposes.

Both parties have moved for summary judgment.  (Pomeroy Mot. Summ. J., ECF No. 127; Utah Bar Mot. Summ. J., ECF No. 128).  For the reasons stated below, the court denies Ms. Pomeroy's motion for summary judgment and grants the Utah Bar's motion.

## BACKGROUND

The Utah Bar is an integrated bar, meaning that attorneys must join and pay compulsory dues to the Utah Bar if they want to practice law in Utah.  See Utah Sup. Ct. R. Prof'l. Prac. 14-102(d)(1) ("A person may only practice law in Utah if that person is a licensed lawyer and an active [Utah] Bar member in good standing[.]").  The Utah Supreme Court has authorized the

**ADDENDUM NO. 2**

Utah Bar to "administer rules and regulations that govern the practice of law in Utah" and "assist the Court in governing admission to the practice of law."   Rule 14-102(a)(1), (2).   Purposes and responsibilities of the Utah Bar include: "advancing the administration of justice[,]" "fostering and maintaining integrity, learning competence, public service, and high standards of conduct among those practicing law[,]" "providing a service to the public, to the judicial system, and [Utah] Bar members[,]" and "assisting [Utah] Bar members in improving the quality and efficiency of their practice[.]"   Rule 14-102(b)(1), (4), (8), (10).

The Utah Bar also has authority to engage in legislative activities.   It may "study and provide assistance on public policy issues and … adopt positions on behalf of the [Utah Bar] Board on public policy issues."   Rule 14-106(a).   The Board of Commissioners to the Utah Bar is "authorized to review and analyze pending legislation, to provide technical assistance to the Utah Legislature … and to adopt a position in support of or in opposition to a policy initiative, to adopt no position on a policy initiative, or to remain silent on a policy initiative."   Id.

Among its various activities, the Utah Bar uses member dues to publish the Utah Bar Journal six times each year and operate social media accounts.   The Utah Bar's mission and vision is that "[t]he lawyers of the Utah … Bar serve the public and legal profession with excellence, civility, and integrity.   [The Utah Bar] envision[s] a just legal system that is understood, valued, and accessible to all."   Mission & History of the Bar, Utah State Bar, https://www.utahbar.org/about/.

The Utah Bar has established procedures through which members who object to the expenditure of their fees on activities—legislative or otherwise—can apply for a rebate and, possibly, receive a refund.   Utah State Bar Keller Refund Request Policieis [sic] and Procedures, https://www.utahbar.org/wp-content/uploads/Keller-Refund-and-Objection-Procedures.pdf.   Utah

Bar members who object to expenditures on legislative activities must apply for a rebate in writing to the Executive Director after the Utah Bar Journal publishes its annual notice of rebate. Id.  "Any member of the Bar who objects to the expenditure of funds by the Board may apply for a license fee rebate in an amount representing that member's pro rata portion of the amount of the lawyer's licensing fees spent on legislative activities … for the preceding 12-month period." Id.  Members objecting to "the use of any portion of the licensee's license fees for activities he or she considers promotes or opposes political or ideological causes which are not already included in the rebate may request the Board to review the licensee's objections."  Id.  Within 45 days of the publication of the notice of rebate, members must object in writing and submit their objections by mail to the Executive Director.  Id.  The Board will then review each written objection, respond to each, and, if the Board agrees with the objection, "immediately refund the portion of the licensee's dues that are attributable to the activity, with interest paid on that sum of money from the date the licensee's fees were received to the date of the refund."  Id.  "The Board's response[s] [to each objection] will include an explanation of the Board's reasoning in agreeing or disagreeing with each objection."  Id.

Ms. Pomeroy, as a Utah lawyer, "is compelled to [be] a member of the [Utah Bar] and to pay an annual fee to the [Utah Bar] as a condition of engaging in [the legal] profession." (Compl., ECF No. 2 at ¶ 33.)  She challenges those requirements because the Utah Bar has used her dues to engage in what she alleges are objectionable non-germane activities, including lobbying, publishing the Utah Bar Journal, and making statements on Utah Bar social media accounts.  She also argues that "[b]ecause the U[tah Bar] refuses to implement adequate procedures to allow [her] to avoid funding objectionable non-germane activities with her

3

membership dues, [the Utah Bar] has violated its obligation to implement procedural safeguards as [required and laid out by] the Supreme Court[.]"  (ECF No. 127 at 2.[1])

## LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Material facts are those that might affect the outcome of the case.  See Birch v. Polaris Indus., Inc., 812 F.3d 1238, 1251 (10th Cir. 2015) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").

Once the movant shows there is an absence of a genuine dispute of material fact, Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (citation omitted), the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id. at 248.  "[W]hile [courts] draw all reasonable inferences in favor of the non-moving party, 'an inference is unreasonable if it requires a degree of speculation and conjecture that renders [the factfinder's] findings a guess or mere possibility.'"  GeoMetWatch Corp. v. Behunin, 38 F.4th 1183, 1200 (10th Cir. 2022) (quoting Pioneer Ctrs. Holding Co. Emp. Stock Ownership Plan & Tr. v. Alerus Fin., N.A., 858 F.3d 1324, 1334 (10th Cir. 2017)).

"The standard for cross-motions for summary judgments is the same as for individual motions for summary judgment."  Cannon v. State Farm Mut. Auto. Ins. Co., No. 2:13-cv-186,

---

[1] Record citations are to PDF pages rather than internal document pages.

2013 WL 5563303, at *1 (D. Utah Oct. 7, 2013) (citation omitted). "[The court] must view each motion separately, in the light most favorable to the non-moving party, and draw all reasonable inferences in that party's favor." Boyz Sanitation Serv., Inc. v. City of Rawlins, 889 F.3d 1189, 1195 (10th Cir. 2018).

## ANALYSIS

### I.     Scope of Challenged Utah Bar Activities.

Before reaching the merits of Ms. Pomeroy's claims, the court must first determine what material it should examine to decide the parties' motions. This issue is of particular importance because Ms. Pomeroy challenged many Utah Bar activities in her motion for summary judgment that she did not reference in her complaint. (See Defs.' Opp'n to Pomeroy Mot. Summ. J., ECF No. 134 at 1; see also ECF No. 2 at ¶¶ 42–50.)

"[T]he liberal pleading standard for … complaints under [Fed. R. Civ. P.] 8(a) … [typically] does not afford plaintiffs with an opportunity to raise new claims at the summary judgment stage." Navajo Nation Hum. Rights Comm'n v. San Juan Cnty., 281 F. Supp. 3d 1136, 1149 (D. Utah 2017) (citation omitted). But "failure to set forth in the complaint a theory upon which the plaintiff could recover does not bar a plaintiff from pursuing a claim." Rodriguez v. Cascade Collections LLC, 532 F. Supp. 3d 1099, 1112–13 (D. Utah 2021) (quoting McBeth v. Himes, 598 F.3d 708, 716 (10th Cir. 2010)). A court may allow a plaintiff to "constructively amend the [complaint] by means of [a] summary-judgment motion," by applying the same standard that governs motions to amend. Id. at 1113 (citation omitted). Federal Rule of Civil Procedure 15 directs that "[t]he court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). "If the new theory prejudices the other party in maintaining its defense, however, courts will not permit the plaintiff to change her theory." McBeth, 598 F.3d

at 716.  Courts finding "undue delay, bad faith, or dilatory motive" may also prevent the plaintiff from adding new claims.  Rodriguez, 532 F. Supp. 3d at 1113 (citing Ahmad v. Furlong, 435 F.3d 1196, 1202 (10th Cir. 2006)).

The court finds that the new allegations are unduly delayed.  Ms. Pomeroy filed her complaint on April 13, 2021.  (See ECF No. 2.)  She filed her summary judgment motion nearly two years later.  (See ECF No. 127.)  In Rodriguez, the court noted that "[b]ecause [the plaintiff] asserted the new claims relatively early in the litigation—and while fact discovery was still open—the court finds no undue delay."  532 F. Supp. 3d at 1113.  Here, Ms. Pomeroy asserted the new allegations 21 months after filing her complaint, after fact discovery had closed.

But Ms. Pomeroy is not adding entirely new claims; instead, she points to additional examples to support her original claims.  Furthermore, the Utah Bar has already addressed the additional Utah Bar Journal articles and social media posts in its briefing.  (See ECF No. 134 at 25–34.)  Finding no prejudice to the Utah Bar, the court will therefore consider this new material.

In contrast, there is insufficient information in the record for the court to review the pieces of legislation Ms. Pomeroy challenged for the first time in her motion for summary judgment.  Ms. Pomeroy's source for this legislation is "www.utahbar.org.legislative" (see ECF No. 127-1), and she provides the court with the Title and Number of the Legislation, the Prime Sponsor, and the outcome and date of the vote taken on the legislation by the Utah Bar's governmental relations committee.  (ECF No. 127 at 10–15; Table of Bills & Votes, ECF No. 127-26.)  She also includes "Brief Summaries," but the origin of these summaries is unclear.  (ECF No. 127 at 10–15.)  With this limited information, it is not possible for the court to analyze the Utah Bar's lobbying on this legislation without speculating about the content of the legislation and the Utah Bar's activities.  See GeoMetWatch, 38 F.4th at 1200 ("[A]n inference is

6

unreasonable if it requires a degree of <u>speculation</u> and conjecture that renders [the factfinder's] findings <u>a guess or mere possibility</u>." (citation omitted)).

There is more information in the record to analyze a proposal related to the injunctions standard in the Utah Rules of Civil Procedure, which is also tied to an abortion trigger law (H.J.R. 2).  (Emily Anderson Stern, <u>'Expression of unchecked power': Court may be forced to reconsider hold on Utah's abortion ban soon</u>, Salt Lake Trib. (Jan. 23, 2023, 3:59 PM), https://www.sltrib.com/news/politics/2023/01/23/expression-unchecked-power-court/, ECF No. 127-32; Memorandum on H.J.R. 2, ECF No. 127-30; Joint Resolution Amending Rules of Civil Procedure on Injunctions, ECF No. 127-31.)  But, as the Utah Bar notes, the law was still being debated when Ms. Pomeroy filed her motion.  (<u>See</u> ECF No. 134 at 26).  Consequently, the court will not analyze Ms. Pomeroy's objection to this legislative activity and will only examine the legislation that Ms. Pomeroy challenged in the complaint.

## II.     First and Fourteenth Amendment Claims Based on Compelled Membership in the Utah Bar.

Ms. Pomeroy claims that by compelling her membership in the Utah Bar and engaging in non-germane activities, the Utah Bar has violated her rights to freedom of speech and association.  The Supreme Court has twice addressed such challenges.

First, in <u>Lathrop v. Donohue</u>, the Court considered whether a state bar's "compelled financial support of group activities" violated freedom of association rights.  367 U.S. 820, 828, 843 (1961) (plurality).  The plaintiff challenged the integration of the Wisconsin Bar, arguing that he was "coerced to support an organization which is authorized and directed to engage in political and propaganda activities."  <u>Id.</u> at 822.  Specifically, he challenged the bar's "promot[ion of] law reform" and its efforts to "make[] and oppose[] proposals for changes in laws and constitutional provisions and argue[] to legislative bodies and their committees and to

the lawyers and to the people with respect to the adoption of changes in codes, laws, and constitutional provisions." Id.  Contrary to the plaintiff's "convictions and beliefs[,]" the Wisconsin State Bar also "used its employees, property and funds in active, unsolicited opposition to the adoption of legislation … which was favored by the plaintiff." Id.  The plurality held that "legislative activity is not the major activity of the State Bar." Id. at 839.  And because "the bulk of State Bar activities serve the function … of elevating the educational and ethical standards of the Bar to the end of improving the quality of the legal service available to the people of the State," a "legitimate end of state policy[,]" the Wisconsin State Bar did not violate the freedom of association right by engaging in the challenged activities. Id. at 843.  But noting the lack of a full record, the plurality of the court declined to address whether the use of the plaintiff's dues money "to support the political activities of the State Bar" was a violation of the plaintiff's free speech rights. Id. at 844–45.

The Court reached that question three decades later in Keller v. State Bar of California. 496 U.S. 1, 9, 14 (1990).  The petitioners—California State Bar members—claimed that through various activities, including lobbying and holding conferences, the California State Bar "expends mandatory dues payments to advance political and ideological causes to which they do not subscribe, in violation of their First and Fourteenth Amendment rights to freedom of speech and association." Id. at 1.  The Court held that a state bar may fund activities using mandatory member dues without violating free speech rights if the activities are germane. Id. at 14.  An activity or expenditure is germane if it is "necessarily or reasonably incurred for the purpose of regulating the legal profession or improving the quality of the legal service available to the people of the State." Id. (citation omitted).  The Court noted that "the extreme ends of the [germaneness] spectrum are clear: [c]ompulsory dues may not be used to endorse or advance a

gun control or nuclear weapons freeze initiative[,]" but may be spent on activities "connected with disciplining members of the Bar or proposing ethical codes for the profession." Id. at 16. But the Keller Court only addressed the petitioners' freedom of speech challenge and not their request for an "injunction prohibiting the State Bar from using its name to advance political and ideological causes or beliefs[,]" both because the lower courts did not address this claim and because the "request for relief appear[ed] to implicate a much broader freedom of association claim than was at issue in Lathrop." Id. at 17.

The Tenth Circuit recently pointed to this statement when it reversed a lower court's decision granting a motion to dismiss a challenge to the activities of the Oklahoma Bar, noting that "[n]either Lathrop nor Keller addressed a broad freedom of association challenge to mandatory bar membership where at least some of a state bar's actions might not be germane to regulating the legal profession and improving the quality of legal services in the state." Schell v. Chief Just. and Justs. of Okla. Sup. Ct., 11 F.4th 1178, 1194 (10th Cir. 2021). In Schell, the plaintiff argued that the Oklahoma Bar was using mandatory member dues to 1) publish articles in the Oklahoma Bar Journal that were non-germane and 2) engage in non-germane legislative activities. Id. at 1191–92. These arguments echoed the claims that litigants have made in several other challenges to compelled membership in integrated state bars.[2]

In its decision, the Tenth Circuit first considered whether the Keller decision remained good law after the Supreme Court's decision in Janus v. American Federation of State, County, and Municipal Employees, Council 31, 585 U.S. 878 (2018). Janus overturned Abood v. Detroit

---

[2] See McDonald v. Longley, 4 F.4th 229, 237 (5th Cir. 2021); Boudreaux v. La. State Bar Ass'n, 86 F.4th 620, 625 (5th Cir. 2023); Crowe v. Or. State Bar, 989 F.3d 714, 720–23 (9th Cir. 2021); Romero v. Colegio de Abogados de P.R., 204 F.3d 291, 293 (1st Cir. 2000); Taylor v. Buchanan, 4 F.4th 406, 407 (6th Cir. 2021); Kingstad v. State Bar of Wis., 622 F.3d 708, 709 (7th Cir. 2010); Gardner v. State Bar of Nev., 284 F.3d 1040, 1041 (9th Cir. 2002).

Board of Education, 431 U.S. 209 (1977),[3] the case on which Keller primarily relied, holding

that "exacting scrutiny, if not a more demanding standard, generally applies" in the Court's First

Amendment jurisprudence. Janus, 585 U.S. at 885, 925. The Tenth Circuit observed that Keller

was meaningfully distinct from Abood and held that "Janus did not overrule Keller's discussion

of Abood, or its related discussion of germaneness, as the test for the constitutionality of

mandatory dues and expenditures." Schell, 11 F.4th at 1191. This ruling is consistent with the

decisions of other Circuit Courts. See, e.g., Crowe v. Or. State Bar, 989 F.3d 714, 725 (9th Cir.

2021) (rejecting view that Janus must be consulted when analyzing the plaintiff's Keller free

speech claim); Taylor v. Buchanan, 4 F.4th 406, 408 (6th Cir. 2021) (same); cf. Boudreaux v. La.

State Bar Ass'n, 86 F.4th 620, 626 (5th Cir. 2023) (applying "heightened First Amendment

scrutiny" but clarifying that "the constitutionality of mandatory bar associations still turned on

'germaneness.'"). The court is not persuaded by Ms. Pomeroy's argument that the court should

apply exacting scrutiny to the challenged Utah Bar activities.

     The Tenth Circuit also answered a question that was left open in Keller—namely, the

standard by which a court should evaluate the broader freedom of association claim that the

Keller Court mentioned but did not address. See Keller, 496 U.S. at 17. The Tenth Circuit

applied the germaneness standard to both the freedom of speech and freedom of association

claims: "In assessing whether the non-time-barred allegations in Mr. Schell's Amended

Complaint are sufficient to advance a claim for a free speech or freedom of association violation,

we consider the germaneness of the alleged activities to the valid goals and purposes" of the

---

[3] In Abood, the Supreme Court held that "agency shop" arrangements—"whereby every
employee represented by a union even though not a union member must pay to the union, as a
condition of employment, a service fee equal in amount to union dues"—were constitutional, so
long as the union expended an objecting individual's dues for activities germane to collective
bargaining. 431 U.S. at 211, 235–36.

Oklahoma Bar.[4]  Schell, F.4th at 1192 (emphasis added); see also Boudreaux, 86 F.4th at 628 ("If a bar's speech activities are germane, then there is no free association or free speech problem with compulsory membership.").

The Tenth Circuit determined that the plaintiff's claims "rest[ed] on two Oklahoma Bar Journal articles" neither party put in the record, thereby preventing the court from analyzing them.  Schell, F.4th at 1193–94.  On remand, the Tenth Circuit instructed the district court "to apply the test from Keller to determine whether the articles [were] germane to the accepted purposes of the state bar" and, if the articles were not germane, "to assess whether Mr. Schell may advance a freedom of association claim based on these two articles."  Id. at 1195.  But the Tenth Circuit declined to decide to "what degree, in quantity, substance, or prominence a bar association must engage in non-germane activities in order to support a freedom-of-association claim based on compelled bar membership."  Id. at 1195 n.11.  In other words, the Tenth Circuit suggested a multifactored approach to the analysis of a freedom of association claim involving non-germane speech and left open the possibility that a de minimis amount of non-germane speech would not run afoul of an objecting member's associational rights.

The Fifth Circuit rejected this suggestion, ruling that a state bar violates the freedom of association right when it engages in any non-germane activities.  Boudreaux, 86 F.4th at 636–37 (holding that Fifth Circuit caselaw did not support such an exception and that a de minimis standard would be "unworkable in the context of free speech").  The Fifth Circuit was

---

[4] The Ninth Circuit has suggested that Keller's germaneness standard does not necessarily apply to a freedom of association claim.  Crowe, 989 F.3d at 728–29 ("Given that [the Supreme Court and the Ninth Circuit] have never addressed such a broad free association claim, the district court will also likely need to determine whether Keller's instructions with regards to germaneness and procedurally adequate safeguards are even relevant to the free association inquiry.").  As discussed below, the Oregon District Court—citing the Tenth Circuit's decision in Schell— nevertheless applied the germaneness standard to the associational rights claim on remand.

unpersuaded by the argument that "mandatory bar associations could not exist" if "every single tweet and email must be strictly 'germane,'" noting that it was "not an impossible burden for bar associations to speak only on topics germane to their purposes." Id. at 637.  The Fifth Circuit proposed a hypothetical tweet supporting "the repeal of all antidiscrimination laws" as an example demonstrating the potential dangers of a de minimis exception.  Id.

This court declines to follow the Fifth Circuit's approach for several reasons.  First, the court is concerned about the burden that such a rigid standard would impose—on the court, if not the bar association.  The court's experience in this case, including Ms. Pomeroy's request at summary judgment to include additional content from recent bar journals and social media accounts, suggests that the lack of a de minimis exception could convert this court into a perpetual monitor of every bar journal article and social media post.  A single tweet wishing attorneys a happy Memorial Day or posting a picture of a puppy dressed like a judge could render mandatory state bars unconstitutional—or at least result in lengthy legal proceedings.

Moreover, and as discussed in more detail below, the Supreme Court has required integrated bars to provide refund mechanisms for member dues that are used for non-germane activities.  Keller, 496 U.S. at 16–17 (discussing requisite refund mechanisms, referred to as "Hudson procedures").  Such a system presupposes the possibility that a state bar might engage in at least some non-germane activities: the refund mechanism is what allows a state bar to cure these infringements on the freedom of speech.  But an opt-out procedure cannot cure a freedom of association violation.  See Taylor, 4 F.4th at 410 (Thapar, J., concurring) ("The speech claim would prevail if an integrated bar association used mandatory membership fees to fund non-germane political or ideological activity without providing adequate opt-out procedures … The association claim could go forward even if the bar association allowed lawyers to opt out of

funding ideological activity."); <u>Crowe</u>, 989 F.3d at 727, 729 (holding that the district court was correct to find that the adequacy of the Oregon State Bar's opt-out procedures protected the plaintiffs' free speech rights but that their freedom of association claim remained viable).  Opt-out procedures (and several decades of jurisprudence evaluating the constitutionality of these procedures) would be superfluous if every instance of non-germane speech amounted to a violation of the freedom of association right.[5]

The Supreme Court did not adopt such a strict approach to the freedom of association claim in <u>Lathrop</u>, 367 U.S. at 843, but instead determined that there was no violation of the associational right because "the bulk of State Bar activities serve the function, or at least so Wisconsin might reasonably believe, of elevating the educational and ethical standards of the Bar to the end of improving the quality of the legal service available to the people of the State …." 367 U.S. at 843.  It is true that <u>Lathrop</u> did not refer to the germaneness framework later adopted by <u>Keller</u>, and that courts must now define and address the broader freedom of association claim that <u>Keller</u> left unresolved, but <u>Lathrop</u> suggests that a holistic approach is useful in the freedom of association context.

Indeed, even the Fifth Circuit—though purporting to reject any <u>de minimis</u> exception—has evaluated certain bar activities in a holistic way.  Finding that the publication of the <u>Texas Bar Journal</u> was germane to the practice of law, the Fifth Circuit did not analyze every article but rather considered the <u>Journal</u>'s purposes as a whole:

> The <u>Texas Bar Journal</u> publishes information related to regulating the profession and improving legal services.  Such information includes, among other things, (1)

---

[5] The Fifth Circuit has characterized <u>Hudson</u> procedures as "prophylactic 'safeguards' designed to prevent the spread of non-germane activities."  <u>Boudreaux</u>, 86 F.4th at 638.  But if engaging in any non-germane activity amounts to a violation of a bar member's right to freedom of association, then it is unclear how the opt-out procedures—utilized after a bar has engaged in said activity—could be prophylactic.

notices regarding disciplinary proceedings against Bar members, see Tex. R. Disciplinary P. 6.07; (2) announcements of amendments to evidentiary and procedural rules, see Tex. Gov't Code § 22.108(c); id. § 22.109(c); (3) "public statements, sanctions, and orders" issued by the State Commission on Judicial Conduct, see id. § 33.005(e); and (4) articles "devoted to legal matters and the affairs of the [Texas] Bar and its members," Tex. State Bar R. art. IX. Moreover, the Journal purports to feature articles advancing various viewpoints, and, in any event, includes a disclaimer clarifying that the Bar does not endorse any views expressed therein.

McDonald v. Longley, 4 F.4th 229, 252 (5th Cir. 2021).[6]

For these reasons, this court follows the approach adopted by the District of Oregon in a recent case. Crowe v. Or. State Bar, No. 3:18-cv-2139, 2023 WL 1991529 (D. Ore. Feb. 14, 2023). On remand from the Ninth Circuit, the district court was faced with a challenge to mandatory membership in the Oregon State Bar. The district court applied the germaneness framework to the associational rights claim as suggested by the Tenth Circuit in Schell. Id., at *1. The court also disagreed with "the Fifth Circuit's ultimate conclusion in McDonald that the mere fact that an integrated bar engages in 'some' nongermane activity means that the bar violates associational rights under the First Amendment, without considering whether there is a threshold, or de minimis, amount of nongermane activity that is acceptable." Id., at *5. Without delineating a precise threshold for nongermane activity, the court held that "a single statement (or even two statements) will not meet it." Id.

---

[6] The Journal's disclaimer that the Texas Bar does not endorse specific views is more likely to alleviate freedom of association concerns than freedom of speech. A bar member may object to the use of their dues for the publication of various views regardless of whether the bar endorses those views, but it is unlikely that a reasonable person would attribute the beliefs expressed by an article in a state bar journal containing such a disclaimer to the state bar's members. See Lathrop, 367 U.S. at 859 (Harlan, J., concurring) ("Surely the Wisconsin Supreme Court is right when it says that [a mandatory state bar member] can be expected to realize that everyone understands or should understand that the views expressed are those of the State Bar as an entity separate and distinct from each individual." (citation omitted)).

14

The court therefore analyzes Ms. Pomeroy's claims as follows.  For her freedom of speech claim, the court follows <u>Keller</u> and <u>Schell</u> by 1) analyzing the germaneness of the challenged articles and activities and 2) considering whether the Utah Bar has developed adequate opt-out procedures.  For her freedom of association claim, the court begins by analyzing the germaneness of the challenged articles and activities.  Should the court find that the Utah Bar has engaged in non-germane activities, the court will follow the Tenth Circuit's suggestion to analyze the "quantity, substance, [and] prominence" of the non-germane conduct. <u>Schell</u>, 11 F.4th at 1195 n.11.  In other words, the court will assess 1) the amount of non-germane conduct; 2) the substance of that conduct, including whether the conduct is political or ideological; and 3) the prominence of that conduct, including whether a disclaimer would prevent a reasonable person from attributing the conduct to the beliefs of an objecting member.

With this framework in mind, the court first addresses the germaneness of the Utah Bar's challenged activities.

### A.  <u>Utah Bar Journal</u> Articles Challenged in the Complaint

Ms. Pomeroy challenges several <u>Utah Bar Journal</u> articles.  The complaint first identifies a January/February 2021 <u>Utah Bar Journal</u> issue discussing a claim that the Utah Bar has played an active role in major public policy debates, including debates about the Utah Supreme Court's role in regulating the practice of law and what criteria should be considered when filling judicial vacancies.[7]  (ECF No. 2 at ¶ 42.)  This issue, to the extent it refers to these debates, is germane.

---

[7] The same issue mentions that the Utah Bar has played an active role in a major public policy debate about the taxation of legal services.  (ECF No. 2 at ¶ 42.)  Ms. Pomeroy specifically points to the Utah Bar's advocacy surrounding H.B. 441, the "Tax Equalization and Reduction Act."  (<u>Id.</u> ¶ 43.)  The court discusses whether the Utah Bar's advocacy on this bill is germane in Section B below.

The supreme court's role in regulating the practice of law impacts the regulation of the legal profession.  The debate over what criteria should be considered when filling judicial vacancies affects who sits on the court, which in turn impacts the regulation of the legal profession and affects the structure and integrity of the judicial system and associated attorney services.  See Schell, 11 F.4th at 1193.

Second, Ms. Pomeroy's complaint identifies the May/June 2018 Utah Bar Journal issue, which "state[s] that the 2018 General Session [of the Utah State Legislature] was successful for the Utah Bar, as [its] leaders influenced the language of legislation and enhanced the bar's relationship with lawmakers and staff."  (ECF No. 2 at ¶ 46 (citation omitted).)  This statement highlights the important role of the Utah Bar and its attorneys in using their professional skills to interpret and advise on pending legislation that may affect the legal profession.  See Schell, 11 F.4th at 1193.  Such a statement is germane.  And it relates to the Utah Bar's "core function to advance the interests of the profession."  Id.

Finally, the complaint alleges that recent Utah Bar Journal issues have included statements that opine on current controversies.  Ms. Pomeroy points to three articles in the March/April 2021 issue.  The first is an article by then-Utah Bar President Heather Farnsworth that asserts the importance of pursuing "equity" as distinct from "equality."  (ECF No. 2 at ¶ 50.)  The second is an article calling for courtrooms to include "safe space[s]" where unfairness allegations will not be treated with "defensiveness and denial."  (Id.)  The same article invokes the concept of "implicit bias."  (Id.)  And the third is an article reviewing a book that proposes criminal penalties for anyone who is made aware of a sexual assault but chooses to protect the institution over the assault survivor.  (Id.)

These three articles involve political or ideological topics.  See Schell 11 F.4th at 1193 (finding that the following materials are inherently political or ideological: 1) an article criticizing big money and special interest groups making campaign contributions and electing judges and 2) an article advocating for the ability of prisoners to bring tort claims against jails). But although these activities are of a political or ideological nature, they are not necessarily non-germane.  See Keller, 496 U.S. at 14.

In her article, President Farnsworth reiterates the Utah Bar's commitment to improving diversity among the Board of Bar Commissioners and the bar membership.  (Mar./Apr. 2021 Utah Bar Journal Issue, ECF No. 68-1 at 14.)  She distinguishes between equality and equity to argue that both are necessary to promote inclusion and truly benefit from diversity.  (Id.) "[E]quality does not take demographic related needs into account, while equity strives to identify the specific requirements of an individual's needs" based on their characteristics.  (Id.)  President Farnsworth also recognizes that there are benefits to increasing diversity and inclusion within the Utah Bar's leadership and among its members.  "Beyond the public perception and confidence in our system[,] diversity affects the quality of legal services and judicial decisions."  (Id. (citation omitted).)  Further, "[t]he [American Bar Association (ABA)] finds [that] a diverse legal profession is more just, productive, and intelligent because diversity, both cognitive and cultural, often leads to better questions, analysis, solutions, and processes."  (Id. (citation omitted).)

Articles on diversity initiatives "aimed at 'creating a fair and equal legal profession for minority, women, and LGBT attorneys'" have been found to be germane.  McDonald, 4 F.4th at

249.  President Farnworth's article advocating for the creation of a more fair, equal, productive, and intelligent legal profession in Utah is germane.[8]

The article calling for courtrooms to include "safe spaces" and invoking the concept of "implicit bias" is also germane.  In this article, <u>The Road to Solutions: Systemic Racism and Implicit Bias in Prosecution</u>, the authors call for safe spaces in courtrooms to raise the issues of systemic racism and implicit bias.  (ECF No. 68-1 at 26–27.)  "Everyone in the courtroom should be free to be anti-racist, … and … shine a light on unconscious bias or racial inequities without the fear of backlash.  Raising fundamental fairness issues must be normalized in our profession." (<u>Id.</u>)  The article closes by inviting prosecutors, and fellow lawyers, to join in this commitment. (<u>Id.</u>)  An article calling on the judicial system to improve the administration of justice and advance a fair, inclusive, and accessible justice system is germane, and Ms. Pomeroy fails to advance any persuasive arguments to the contrary.  <u>See</u> <u>Crowe,</u> 2023 WL 1991529, at *3 ("Plaintiffs do not explain how … improving the administration of justice, or advancing a fair, inclusive, and accessible justice system do not fall within the acceptable spectrum.  Indeed, other federal appellate courts have concluded that [speech] … falling within these categories [is] germane.").  Advocating for conduct that enhances the public's trust in the judicial system and associated attorney services is also germane.  <u>Id.</u> (citing <u>Schell,</u> 11 F.4th at 1193).

The book review about criminal penalties for anyone made aware of a sexual assault, but who chooses to protect the institution over the assault survivor, is also germane.  As the book

---

[8] Relevant to Ms. Pomeroy's freedom of association challenge, this issue of the <u>Utah Bar Journal</u> has a disclaimer that reads: "Statements or opinions expressed by contributors are those of the authors and not necessarily those of the <u>Utah Bar Journal</u> or the Utah State Bar."  (ECF No. 134 at 9.)  This disclaimer is in all <u>Utah Bar Journal</u> issues.  The Utah Bar presented the court with full <u>Utah Bar Journal</u> issues because Ms. Pomeroy's submissions left out the disclaimer in each issue.  (<u>See</u> <u>id.</u>)

review states, the main topic raises many relevant questions, including: "Can we criminalize the behavior of someone who fails to act when they know someone is being harmed? And if so, should we?" (ECF No. 68-1 at 43.)  The article reviewing the book does not condone its ideas. (See id. at 43–44 (discussing ideas the book brings up, including focusing on root causes and prevention for the lack of reporting of sexual assaults).)  These ideas and themes focus on access to justice for a particular group: sexual assault survivors.  See Crowe, 2023 WL 1991529, at *5. Even if these ideas and themes could "be construed as inflammatory or ideological that does not mean they are nongermane," so long as they are "reasonably related to the advancement of the acceptable goals of the [Utah Bar]."  See id. (citation omitted).  This article is therefore germane to the Utah Bar's permitted functions, which ultimately advance the interests of the profession. See Schell, 11 F.4th at 1193.

## B.  Lobbying Activities Challenged in the Complaint

The first piece of legislation Ms. Pomeroy identifies in her complaint is proposed legislation affecting the attorney general's ability to invoke a potential conflict of interest or attorney-client privilege (H.B. 198).  (See May/June 2018 Utah Bar Journal Issue, ECF No. 68-7 at 27–28.)  After a U.S. congressman resigned, Utah conducted its first special election for a vacancy in the U.S. House of Representatives, and the Utah Governor and legislature disagreed about how to implement the election.  (Id.)  The legislature requested an opinion from the attorney general, while the attorney general was already counseling the Governor on the issue, making both parties clients of the attorney general under Utah Code Subsection 67-5-1(7) and Utah Constitution article VII, section 16.  (Id.)  The proposed legislation would have prevented

the attorney general from invoking a potential conflict of interest, or the attorney-client

relationship, to withhold the release of the opinion from the legislature.  (Id.)

The court agrees with the Utah Bar that lobbying against the proposed legislation is

germane.  The legislation was "directly targeted at Utah's lead lawyer and sought to regulate him

in his role as a lawyer."  (ECF No. 128 at 21.)  The proposed change would have altered the

ethical regulations governing the practice of law.  (Decl. Elizabeth Wright, ECF No. 129-1 at ¶ 6

("The Utah State Bar opposed the bill because it believed … the bill attempted to regulate the

practice of law, by amending the conflict of interest and attorney-client confidentiality rules in

the Utah Rules of Professional Conduct.").)  The legislation refers to the Utah Rules of

Professional Conduct, demonstrating that the legislation sought to modify the ethical

responsibilities of an attorney as an attorney rather than as a public official.  Reflecting the

states' "strong interest in allocating to the members of the bar, rather than the general public the

expense of ensuring that attorneys adhere to ethical practices," Harris v. Quinn, 573 U.S. 616,

655–56 (2014), Utah Bar opposition to legislative interference with the ethical rules governing

attorneys is germane.

The second piece of legislation that Ms. Pomeroy cites is H.B. 441, the "Tax Equalization

and Reduction Act."  (ECF No. 2 at ¶ 43.)  "The Act proposed a new tax on services broadly in

the state of Utah, which would include legal services."  (Order & Mem. Decision, ECF No. 94 at

12.)  The Utah Bar has clarified that while the Act itself was a comprehensive bill, the Utah Bar

"limited its lobbying efforts to opposing the proposed tax on legal services because it believed

the tax would exacerbate access to justice problems, directly reducing the quality and availability

of legal services in the state."  (ECF No. 128 at 22.)  The Utah Bar explains that, in opposing the

bill, the Utah Bar objected to direct increases in the costs of legal services, instead of indirect increases.  The court finds that this lobbying effort, too, is germane.

### C.  Utah Bar Activities Challenged for the First Time at Summary Judgment

As stated above, the court will review most of the additional Utah Bar activities that Ms. Pomeroy challenges for the first time at summary judgment.  Specifically, the court will review the additional Utah Bar Journal articles and social media posts that Ms. Pomeroy alleges amount to violations of her rights.  The court holds that these activities, too, are germane.

Ms. Pomeroy's motion for summary judgment identifies two articles, three tweets, and an advertisement focused on diversity, equity, inclusion, and increasing access to justice.[9]  As stated above, "courts have concluded that articles and initiatives [with similar focuses] are germane."  Crowe, 2023 WL 1991529, at *3; see also McDonald, 4 F.4th at 249 (finding diversity initiatives "aimed at creating a fair and equal legal profession" to be germane).

Ms. Pomeroy identifies two other articles about the rule of law and civility.  The first is Judicial Independence and Freedom of the Press, which advocates for protecting and

---

[9] Then-Utah Bar Journal President Robert Rice wrote the first article: The Utah Center for Legal Inclusion.  (See Mar./Apr. 2017 Utah Bar Journal Issue, ECF No. 134-2 at 13–15.)  The theme of the article was diversity in Utah's legal community.  (Id.)  The second article—Script for Mock Board Meeting of Pure Play, Inc.—discussed "[b]oard diversity" and how some jurisdictions are adopting "minimum female representation" mandates for boards of directors.  (Jan./Feb. 2018 Utah Bar Journal Issue, ECF No. 134-3 at 30.)  University of Utah Law reposted the first of the three tweets on September 12, 2022, and it celebrated a graduate's "Living Color Award." (Retweet dated Sept. 12, 2022, ECF No. 127-15.)  The second tweet is a July 30, 2021, tweet the Utah Bar reposted, which states: "Listening to @DrWilliamASmith at the @UtahStateBar summer convention. Racism is a public health crisis.  Racism is an act of violence.  What are the perceptions of African American men?"  (Retweet dated July 30, 2021, ECF No. 127-17.)  And the third is a tweet that says: "strong public support for admitting Dreamers into the [Utah Bar]" and includes a link to an article reporting the same.  (Tweet dated Jan. 22, 2020, ECF No. 127-18.)  Ms. Pomeroy claims that the Summer Convention Advertisement highlighted equity and inclusion dialogue sessions, but the advertisement itself does not mention equity and inclusion. (See ECF No. 68-1 at 58.)

strengthening democracy and the rule of law.  (Mar./Apr. 2019 Utah Bar Journal Issue, ECF No. 134-4 at 27–31.)  The second is Civility in a Time of Incivility, which encourages Utah lawyers to practice civility and comply with Utah Standards of Professionalism and Civility.  (Civility in a Time of Incivility, ECF No. 127-13.)  These articles are germane, as they enhance public trust in the judicial system and associated attorney services.  See Schell, 11 F.4th at 1193.

Next, Ms. Pomeroy's motion identifies an article in the November/December 2018 Utah Bar Journal issue about a World War II-era Japanese internment camp in Topaz, Utah.  (ECF No. 127 at 4.)  According to Ms. Pomeroy, the article argues that "some are currently trying to again elevate war powers to suppress the rights of vilified minorities[.]"  (Id.)  This is incorrect.  The article discusses "a place in the central Utah desert that stands as a living memorial to … Korematsu v. United States."  (Nov./Dec. 2018 Utah Bar Journal Issue, ECF No. 129-14 at 22–25.)  In the article, a law student who joined attorneys visiting the former internment camp reflected on the experience.  Seattle University School of Law Professor Lorraine Bannai joined attendees by Zoom to talk about her advocacy focused on correcting Korematsu.  (Id. at 23–24.)  In her remarks, Professor Bannai shared with the group that she worried the Supreme Court will repeat its mistakes in Korematsu, citing the Trump administration's travel bans.  (See id. at 25.)

The article's author does not endorse these comments, but the author merely provides context for the visit.  The article informs attorneys of the consequences of litigation and judicial opinions.  It acknowledges that lawyers and judges make mistakes, but that they can rectify those mistakes.  The article also calls for Utah attorneys to visit the Topaz site to learn about its history.  For these reasons, this article is "reasonably incurred for the purpose of" regulating the legal profession and improving the quality of legal service available to the people of the state. Keller, 496 U.S. at 14.

Next, Ms. Pomeroy identifies two articles that better equip Utah Bar attorneys to use their professional skills to interpret and advise on legislation concerning various subjects and counsel clients on related matters.  See Schell, 11 F.4th at 1193.  These articles are germane.  The first discusses proposals to reduce drug prices and alleviate the opioid crisis and issues facing the drug market. (Mar./Apr. 2020 Utah Bar Journal Issue, ECF No. 134-5 at 34–42.)  It also includes opioid crisis solutions for Utah attorneys.  (Id. at 41–42.)  The second explains the cryptocurrency market, identifies critiques and defenses of it, and remarks on challenges the cryptocurrency industry faces.  (Jan./Feb. 2023 Utah Bar Journal Issue, ECF No. 134-7 at 19–27.)

Next, Ms. Pomeroy's motion identifies an article titled Silver Linings of the Pandemic. (ECF No. 127 at 6.)  This article advocates for the idea that, post-pandemic, Utah Bar lawyers should have the option to work from home or appear before the court virtually.  (ECF No. 68-1 at 17–19.)  Promoting this idea—providing flexibility to Utah Bar lawyers to improve their practice—is germane.

Ms. Pomeroy also identifies a USB LinkedIn post, in which the Utah Bar shared a post from Utah Governor Spencer Cox celebrating the passage of pieces of legislation.[10]  (LinkedIn Post, ECF No. 127-20.)  By sharing Governor Cox's post, the Utah Bar is keeping members informed about legislation they might be called to advise on or that affects them in their practice. See Schell, 11 F.4th at 1193.  This LinkedIn post is germane.

---

[10] Neither party has briefed whether the Utah Bar's LinkedIn page contains a disclaimer similar to the disclaimer in all Utah Bar Journal issues.  While the LinkedIn posts Ms. Pomeroy challenges are germane, the lack of a disclaimer on the Utah Bar's page might contribute to a freedom of association violation under Schell if the Utah Bar posted or reposted non-germane content.  As mentioned above, the presence of a disclaimer that prevents a reasonable person from attributing the conduct to the beliefs of an objecting member is one factor a court may examine to decide whether the freedom of association right has been violated.

Ms. Pomeroy challenges another Utah Bar LinkedIn post, through which the Utah Bar shared a post from the ABA inviting people to participate in a 21-day Native American Heritage Equity Habit-Building Challenge syllabus.  (ECF No. 127 at 7–8.)  This is germane, as the Utah Bar is alerting its members to an optional event that fosters growth, learning, and community in the legal profession.  See Boudreaux v. La. State Bar Ass'n, 620 F. Supp. 3d 440, 458 (E.D. La. 2022) (finding optional activity with similar purposes to be germane).

Finally, Ms. Pomeroy's motion points to a Utah Bar Journal article titled The Times They Are a Changin'.  (ECF No. 127 at 4.)  Ms. Pomeroy argues that the article criticizes the electoral college system (id.), but the court finds that a better characterization is that the article uses satire and sports analogies to explain arguments for and against the electoral college.  (ECF No. 134-2 at 23–26.)  The article compares the transition of power from one presidential administration to the next to a corporate takeover, presenting "lessons … for Donald Trump," who had recently been elected.  (Id. at 25.)

This article presents a closer question about whether it is germane.  From a wider perspective, lawyers must understand the electoral system and the Constitutional scheme for a presidential election.  These principles relate to democracy and the rule of law, and a better understanding of this system "help[s] … build and maintain the public's trust in the legal profession and the judicial process ...."  Crowe, 2023 WL 1991529, at *3.  On the other hand, the electoral system is less directly related to the legal profession than other content discussed in the Utah Bar Journal.  Also, the article was published after the 2016 presidential election, in which Donald Trump was elected President after losing the popular vote.  Many people called for the

24

end of the electoral college system as a result.[11]  Given this context, the article is politically

charged.  But even topics that involve "a sensitive political topic" can be germane.  <u>McDonald</u>, 4

F.4th at 249.  For these reasons, the court finds that reasonable minds could disagree about

whether the article is germane.

Yet whether this single article is germane is not dispositive.  It is one <u>Utah Bar Journal</u>

article out of many Utah Bar activities that Ms. Pomeroy challenges in her complaint and at

summary judgment.  While politically charged to a degree, the article presents its ideas in a

neutral way.  The <u>Utah Bar Journal</u> issue containing this article, like all issues, has a disclaimer

that would prevent a reasonable person from attributing the viewpoint expressed in the article to

the beliefs of an objecting member.  Consequently, when taking these factors into consideration,

the court finds that the Utah Bar did not violate Ms. Pomeroy's freedom of association rights by

publishing this article.

All the other activities Ms. Pomeroy challenges in her complaint and at summary

judgment are germane.  As a result, the Utah Bar has not violated Ms. Pomeroy's rights to

freedom of speech and association.

### III.   <u>First and Fourteenth Amendment Claim for Lack of Adequate Procedural Safeguards.</u>

Ms. Pomeroy raises a facial challenge to the Utah Bar's refund procedures: "Even if the

[c]ourt finds that Plaintiff is not entitled to summary judgment regarding the nongermane content

in the <u>Utah Bar Journal</u>, the [Utah Bar] nevertheless has the ability to publish nongermane

content in that journal in the future."  (ECF No. 127 at 30.)  By lacking procedural safeguards to

---

[11] <u>See, e.g.</u>, Joseph P. Williams, <u>Time for a Change?</u>, U.S. News & World Rep. (Dec. 13, 2016), https://www.usnews.com/news/the-report/articles/2016-12-13/advocates-call-for-an-end-to-the-electoral-college-after-trumps-win.

25

refund non-germane activities, Ms. Pomeroy argues that the Utah Bar has violated the First and Fourteenth Amendment rights to free speech.

The court previously allowed this claim to proceed because the Utah Bar had conceded that, although it offered refunds for its legislative activities, it did not provide a refund mechanism for non-germane non-legislative activities.  (ECF No. 94 at 14.)  The Utah Bar is correct that "[a]s for legislative activity, there is no question that the [Utah Bar's] policy complies with <u>Keller</u>.  That is because the [Utah Bar] does not attempt to distinguish between germane and nongermane legislative activities and simply refunds all of a member's pro rata fees used for those activities."  (ECF No. 128 at 42.)  But at issue now is the refund for non-germane non-legislative activities.

In <u>Keller</u>, the court held that because integrated bars cannot use mandatory member dues to fund non-germane activities, they must provide a refund mechanism for such activities.  496 U.S. at 16–17.  <u>Keller</u> affirmed <u>Chicago Teachers Union, Local No. 1, AFT, AFL-CIO v. Hudson</u>, 475 U.S. 292, 310 (1986), which held that unions must adopt refund procedures that: (1) provide an adequate explanation of the basis for the fee; (2) a reasonably prompt opportunity to challenge the amount of the fee before an impartial decisionmaker; and (3) an escrow for the amounts reasonably in dispute while such challenges are pending.  496 U.S. at 16 (citation omitted).  The Supreme Court in <u>Keller</u> reserved the question whether, in the context of an integrated bar, each of these requirements was mandatory or whether alternative procedures would likewise satisfy the obligation of an integrated bar to protect against members' licensing fees being spent on non-germane activities.  <u>Id.</u> at 17.  The Tenth Circuit in <u>Schell</u> did not analyze the Oklahoma Bar's refund procedures because the Bar adopted procedures consistent

with the plaintiff's commands after the litigation began, which mooted the plaintiff's procedural safeguards claim.  11 F.4th at 1182.

Other courts have disagreed on whether the Hudson procedures are mandatory.  Compare Crowe, 989 F.3d at 726 (holding that alternative procedures can satisfy an integrated bar's obligations under Keller), with McDonald, 4 F.4th at 254 ("[G]iven that Keller indicated that Hudson's procedures are sufficient, and Janus held even more protective procedures are necessary, Hudson's procedures are both necessary and sufficient.").  This court is persuaded by the Ninth Circuit's reasoning in Crowe and holds that alternative procedures can satisfy an integrated bar's obligations under Keller.  Importantly, the Keller Court did not hold that "state bars [must] adopt procedures identical to or commensurate with those outlined in Hudson."  Crowe, 989 F.3d at 726.  Moreover, as discussed further below, the court is not convinced that strict adherence to Hudson in the context of a state bar is "necessary—or even effective—to minimize infringement[.]"  Id.

Ms. Pomeroy asserts that the Utah Bar's refund procedures are constitutionally deficient for four reasons: (1) the Utah Bar's refund procedures do not include portions of the fees spent on non-germane non-legislative activities; (2) the Utah Bar's information about the legislative activities refund is based on "slipshod calculations," lacks evidence that the refund amount is equal to the amount spent on non-germane activities, and therefore is not an adequate explanation for the basis of the fee; (3) the Utah Bar's budgets impermissibly make members "undertake an exercise in forensic accounting"; and (4) the Utah Bar only allows members to opt out of speech they disagree with through a refund after the fact, rather than employing an "opt-in" procedure and obtaining "clear, free, and affirmative consent … before an association can use

an individual's coerced fees or dues to support its political and ideological activities." (ECF No. 135 at 27–29); see McDonald, 4 F.4th at 253 (citation omitted).

Ms. Pomeroy's first argument is moot because the Utah Bar has presented evidence that it now has a refund mechanism for non-germane non-legislative activities. (See Utah Bar's Keller Refund Request Policies and Procedures, ECF No. 129-21.) As discussed in the Written Notice section, "[a] Bar licensee who objects to the use of any portion of the licensee's license fees for activities he or she considers promotes or opposes political or ideological causes[12] which are not already included in the rebate may request" a refund via the detailed procedures. (Id. (emphasis added).) This procedure allows an objecting attorney to opt out of the bar's expenditure of her fees on non-legislative activities with which she disagrees.

Ms. Pomeroy's second argument lacks support in the record. First, her assertions that the refund is not equal to the amount spent on non-germane activities and that the legislative activities refund is based on "slipshod calculations" (and not an adequate explanation of the basis for the fee) are misplaced. The Utah Bar's refund procedures not only explain how the Utah Bar calculates the pro rata fees spent on legislative activities, but the procedures effectively provide members who apply for the legislative activities rebate with automatic refunds of the pro rata fees spent on such activities (see ECF No. 129-21 at 2 (explaining legislative refund procedures)), so long as they meet the other conditions set forth in the procedures (i.e., applying for a rebate in writing to the Executive Director after the Utah Bar Journal publishes its annual

---

[12] It is unsurprising that the Utah Bar has labeled its activities in this way. Given the uncertainty about how courts should evaluate broad freedom of association claims, and the fact that at least one court (the Fifth Circuit) has held that any non-germane activity amounts to a freedom of association violation, it is unlikely that a state bar would classify any of its speech activities as non-germane. See Boudreaux, 86 F.4th at 639 ("[A] prospective budget can only provide so much notice when a bar association can and must classify all of its speech activities as germane.").

notice of rebate (see id.)).  Ms. Pomeroy claims that instead of providing members an adequate explanation of the basis for the fee, "the [Utah Bar] simply asks members to trust its calculations" for pro rata fees.  (ECF No. 127 at 31.)  But the Utah Bar offers an explanation that the court finds sufficient: "That pro rata portion is determined by dividing the total amount spent on legislative activities into the total amount of license revenue collected to date and multiplying that dividend by the licensing fees paid by the member."  (ECF No. 129-21 at 2.)  To the extent Ms. Pomeroy is also arguing that the Utah Bar has not given an adequate explanation of the basis for the fees spent on non-germane non-legislative activities, Ms. Pomeroy has not presented the court with any examples of inadequate explanations the Utah Bar has given objecting members, nor has she explained what else the Utah Bar would need to provide members to comply with Hudson.

Ms. Pomeroy's third argument is that the Utah Bar's lengthy budgets fail to give members sufficient notice of the Utah Bar's activities.[13]  The Utah Bar's budgets contain a breakdown of expenditures by department, giving mostly generic descriptions of expenditures. (See ECF Nos. 129-22–28.)  The Utah Bar's budgets resemble the Texas Bar's budgets in McDonald, in which the Fifth Circuit held that the budgets impermissibly "place[d] the onus on objecting attorneys to parse the Bar's proposed budget—which only details expenses at the line-item level, often without significant explanation—to determine which activities might be objectionable."  4 F.4th at 254.  That was "a far cry from a Hudson notice, which estimates the breakdown between chargeable and non-chargeable activities and explains how those amounts were determined."  Id. (citing Hudson, 475 U.S. at 307 n.18).

---

[13] The Utah Bar's budgets were provided to Ms. Pomeroy and the court in the appendix to the Utah Bar's motion for summary judgment.  (See Utah Bar Budgets, ECF Nos. 129-22–28.)

But the Utah Bar's generic descriptions of expenditures do not pose a constitutional problem because as discussed above, <u>Keller</u> did not hold that state bars are required to adopt procedures identical to those outlined in <u>Hudson</u>.  "<u>Hudson</u> required [a] high-level explanation in the context of a union <u>that affirmatively planned to engage in activities</u> unrelated to collective bargaining for which it could only charge its members.  The Court obligated the union to provide a detailed statement of fees in advance so that nonmembers could object before being charged for impermissible activities."  <u>Crowe</u>, 989 F.3d at 726 (emphasis added).  Ms. Pomeroy has not shown any affirmative plans by the Utah Bar to use members' dues for non-germane activities.  A more detailed breakdown between germane and non-germane activities would also not be possible given that the Utah Bar anticipates each year that all its expenditures will be germane.  (Defs.' Reply, ECF No. 141 at 19); <u>see</u> <u>Crowe</u>, 989 F.3d at 726 ("[A]dvance notice would not have offered additional protection against the alleged constitutional violations because [the] [Oregon Bar] would have characterized all of its activities as germane."); <u>see also</u> <u>Boudreaux</u>, 86 F.4th at 639 ("[A] prospective budget can only provide so much notice when a bar association can and must classify all of its speech activities as germane.").

Finally, the court finds that <u>Schell</u> forecloses Ms. Pomeroy's fourth argument.  The plaintiff in <u>Schell</u> brought a claim that contended that the Oklahoma Bar, "in accord with <u>Janus</u>, needed to create an opt-in dues system for the subsidization of political and ideological speech not germane to the goal of regulating the practice of law."  <u>Schell</u>, 11 F.4th at 1184–85.  While the district court did not dismiss a claim about "the [Oklahoma Bar's] alleged failure to adopt constitutionally adequate safeguards to prevent the impermissible use of mandatory bar dues[,]" it did dismiss the opt-in claim.  <u>Id.</u> at 1185–86.  The Tenth Circuit affirmed the district court's dismissal of the claim.  <u>Id.</u> at 1191.

None of Ms. Pomeroy's arguments about the Utah Bar's refund procedures are persuasive.  Given the adequacy of its procedures, the Utah Bar has not violated any member's free speech rights.

## ORDER

The Utah Bar has not violated Ms. Pomeroy's free speech and association rights by engaging in activities with which she disagrees, and its refund procedures do not violate its members' free speech rights.  Accordingly, the court ORDERS as follows:

1.      Ms. Pomeroy's motion for summary judgment (ECF No. 127) is DENIED.

2.      The Utah Bar's motion for summary judgment (ECF No. 128) is GRANTED.

DATED this 25th day of April, 2024.

BY THE COURT:

_____
TENA CAMPBELL
United States District Judge

AO 450 (Rev.5/85) Judgment in a Civil Case

# United States District Court

## District of Utah

AMY POMEROY,

                Plaintiff,

v.

UTAH STATE BAR, et al.,

                Defendants.

### JUDGMENT IN A CIVIL CASE

Case Number: 2:21-cv-00219-TC-JCB

IT IS ORDERED AND ADJUDGED that:

Judgment be entered in favor of the Defendants; all of Plaintiff's causes of action are dismissed.

April 25, 2024

_Date_

BY THE COURT:

U.S. District Judge Tena Campbell

**ADDENDUM NO. 3**

# Utah Courts

## UCJA Rule 14-101 (Code of Judicial Administration)

### Rule 14-101. Definitions.
*Rule printed on October 16, 2024 at 6:06 pm. Go to https://www.utcourts.gov/rules for current rules.*

**Effective:
11/1/2018**

As used in this article:

(a) "Bar" means the Utah State Bar;

(b) "Board" means Board of Commissioners of the Utah State Bar;

(c) "discipline" means disbarment, suspension, probation, reprimand, admonition or delicensure;

(d) "member" means a lawyer who has been admitted to the Bar, and who holds a current license, the classifications of which are to be set forth hereinafter;

(e) "Licensed Paralegal Practitioner" means a person licensed by the Utah Supreme Court to provide limited legal representation in the areas of (1) temporary separation, divorce, parentage, cohabitant abuse, civil stalking, and custody and support; (2) forcible entry and detainer and unlawful detainer; or (3) debt collection matters in which the dollar amount in issue does not exceed the statutory limit for small claims cases; and

(f) "Supreme Court" means the Utah Supreme Court.

---

**ADDENDUM NO. 4**

# Utah Courts
## UCJA Rule 14-102 (Code of Judicial Administration)

### Rule 14-102. Regulating the practice of law.
*Rule printed on October 16, 2024 at 6:06 pm. Go to https://www.utcourts.gov/rules for current rules.*

*Effective:*
*12/15/2020*

(a) **Vested authority.**

(1) The Supreme Court—by its constitutional power—authorizes and designates the Bar to administer rules and regulations that govern the practice of law in Utah, including regulating licensed paralegal practitioners. All persons authorized to practice law in Utah must be licensed by the Bar in accordance with this chapter and Chapter 15 of the Supreme Court Rules of Professional Practice.

(2) The Supreme Court recognizes a compelling state interest in using the Bar to assist the Court in governing admission to the practice of law and improving the quality of legal services in the state. The requirements imposed, the delegations made, and the authority granted to the Bar provide the best ways to promote these compelling state interests and there are no less restrictive alternatives available to achieve those results.

(b) **Responsibilities of the Bar**. The Bar's purposes, duties, and responsibilities include:

(1) advancing the administration of justice according to law;

(2) aiding the courts in the administration of justice;

(3) regulating the admission of persons seeking to practice law;

(4) fostering and maintaining integrity, learning competence, public service, and high standards of conduct among those practicing law;

(5) representing the Bar before legislative, administrative, and judicial bodies;

(6) preventing the unauthorized practice of law;

(7) promoting professionalism, competence, and excellence through continuing legal education and other means;

(8) providing a service to the public, the judicial system, and Bar members;

(9) educating the public about the rule of law and responsibilities under the law; and

(10) assisting Bar members in improving the quality and efficiency of their practice.

(c) **Qualifications**. This chapter prescribes the qualifications, duties, and obligations of lawyers, foreign legal consultants, and licensed paralegal practitioners licensed to practice law in Utah. The Supreme Court is responsible for disciplining a Bar member or licensed paralegal practitioner.

**ADDENDUM NO. 5**

(d) **Licensure required**. Suspended or disbarred persons may not practice law in Utah or hold themselves out as able to practice law in Utah. A person may only practice law in Utah if that person is:

(1) a licensed lawyer and an active Bar member in good standing;

(2) an inactive member in good standing providing pro bono legal services for or on behalf of a legal services organization approved by the Bar upon meeting certification and performance standards, conditions, and rules established by the Board;

(3) a foreign legal consultant licensed by the Bar; or

(4) a licensed paralegal practitioner and an active licensee of the Bar in good standing.

# Utah Courts

## UCJA Rule 14-106 (Code of Judicial Administration)

### Rule 14-106. Authority to engage in legislative activities.

Rule printed on October 16, 2024 at 6:15 pm. Go to
https://www.utcourts.gov/rules *for current rules.*

*Effective:*
*5/1/2019*

Pursuant to Article VIII, Section 4 of the Utah Constitution, the Supreme Court hereby authorizes and directs the Board to engage in legislative activities.

(a) The Board is authorized and directed to study and provide assistance on public policy issues and to adopt positions on behalf of the Board on public policy issues. The Board is authorized to review and analyze pending legislation, to provide technical assistance to the Utah Legislature, the Governor of Utah, the Utah Judicial Council and other public bodies upon request, and to adopt a position in support of or in opposition to a policy initiative, to adopt no position on a policy initiative, or to remain silent on a policy initiative. The position of the Board shall not be construed as the position of the Court or binding on the Court in any way.

(a)(1) The Board's consideration of public policy issues shall be limited to those issues concerning the courts of Utah, procedure and evidence in the courts, the administration of justice, the practice of law, and matters of substantive law on which the collective expertise of lawyers has special relevance and/or which may affect an individual's ability to access legal services or the legal system.

(a)(2) Public policy issues may be submitted to the Board for consideration in accordance with written procedures established by the Board.

(a)(3) The adoption of a Board position shall be in accordance with written procedures established by the Board.

(a)(4) The Board shall prepare and maintain a written record of the Board's positions on public policy issues and shall ensure reasonable notice and distribution to the members of the Bar and to Licensed Paralegal Practitioners.

(b) Governmental Relations Committee. The Board may establish a Governmental Relations Committee to assist in carrying out its responsibilities as set forth above. The committee's membership and procedures shall encourage broad participation and input and compliance with this policy.

(c) Legislative budget, rebates. At the end of the Utah general legislative session each year, the Board shall calculate all reasonable administrative expenses attributable to the Bar's legislative activities for the preceding 12 month period, identify each member's and Licensed Paralegal Practitioner's pro rata portion of the amount of license fees for the preceding 12

**ADDENDUM NO. 6**
107

month period spent for legislative activities and establish a fair and equitable rebate procedure of that amount for Bar members or Licensed Paralegal Practitioners who object to any legislative position taken by the Board.

108

# Utah Courts

**UCJA Rule 14-107** (Code of Judicial Administration)

### Rule 14-107. Duties of lawyers, foreign legal consultants, and licensed paralegal practitioners.

*Rule printed on October 16, 2024 at 6:08 pm. Go to https://www.utcourts.gov/rules for current rules.*

**Effective:**
**12/15/2020**

(a) **Roster and current record information**. The Bar must collect, maintain, and have ready access to current information of Bar members, foreign legal consultants, and licensed paralegal practitioners including:

(1) full name;

(2) date of birth;

(3) current physical addresses, and current telephone numbers for law office and residence, except that full-time judges are exempt from providing residential addresses and telephone numbers;

(4) current e-mail address;

(5) date of admission;

(6) date of any transfer to or from inactive status;

(7) all specialties in which certified;

(8) other jurisdictions in which the lawyer is admitted and date of admission; and

(9) nature, date, and place of any discipline imposed and any reinstatements.

(b) **Assessments**.

**ADDENDUM NO. 7**

(1) **Annual licensing fee.** To effectuate the Bar's purposes, every lawyer, foreign legal consultant, and licensed paralegal practitioner admitted or licensed to practice in Utah must pay to the Bar on or before July 1 of each year an annual license fee for each fiscal year to be fixed by the Bar Commission from time to time and approved by the Supreme Court. The fee must be sufficient to pay the costs of disciplinary administration and enforcement. The Bar administers the funds.

(2) **Failure to renew annual license**. Failure to pay the annual licensing fee or provide the required annual licensing information will result in administrative suspension. Any lawyer, foreign legal consultant, or licensed paralegal practitioner who practices law after failing to renew such license violates the Rules of Professional Conduct or Licensed Paralegal Practitioner Rules of Professional Conduct and may be disciplined. The executive director or designee must give notice of such removal from the rolls to such noncomplying member at the designated mailing address on the Bar's records and to the state and federal courts in Utah.

(3) **Reenrollment within three years of administrative suspension**. A lawyer, foreign legal consultant, or licensed paralegal practitioner who is administratively suspended for failing to pay licensing fees for three years or less may apply in writing for reenrollment. The request should be made to the Utah State Bar Licensing Department and include payment equal to the fees the lawyer, foreign legal consultant, or licensed paralegal practitioner would have been required to pay had such person remained an inactive member to the date of the request for reenrollment and a $200 reinstatement fee. Upon receipt, the Bar will order reenrollment and so notify the courts. Reenrollment based on failure to renew does not negate any orders of discipline.

(4) **Reenrollment after three years of administrative suspension**. A lawyer, foreign legal consultant, or licensed paralegal practitioner who is administratively suspended for three years or more for failing to pay license fees must comply with the admissions requirements set forth in the Supreme Court Rules of Professional Practice governing admission for lawyers who have been administratively suspended for nonpayment for three or more years before being reinstated.

# Utah Courts
## UCJA Rule 14-111 (Code of Judicial Administration)

### Rule 14-111. Practicing without a license prohibited.
*Rule printed on October 16, 2024 at 6:08 pm. Go to https://www.utcourts.gov/rules for current rules.*

**Effective:
12/15/2020**

(a) **Action or proceedings to enforce. Exception.** No person who is not licensed to practice law in Utah as an attorney at law or as a foreign legal consultant or licensed paralegal practitioner may practice or assume to act or hold himself or herself out to the public as a person qualified to practice law or to carry on the calling of an attorney at law in Utah or licensed paralegal practitioner. Such practice, or assumption to act or holding out, by any such unlicensed person will not constitute a crime, but this prohibition against the practice of law by any such person will be enforced by such civil action or proceedings, including writ, contempt, or injunctive proceedings, as may be necessary and appropriate, which action or which proceedings the Bar will institute after Board approval.

(b) Nothing in this article will prohibit a person who is unlicensed as an attorney, foreign legal consultant, or licensed paralegal practitioner from personally representing that person's own interests in a cause to which the person is a party in that person's own right and not an assignee.

**ADDENDUM NO. 8**

# Utah Courts

## UCJA Rule 14-207 (Code of Judicial Administration)

### Rule 14-207. Finances.
*Rule printed on October 16, 2024 at 6:12 pm. Go to https://www.utcourts.gov/rules for current rules.*

**Effective:
11/1/2023**

(a) **Budget.** The Board must prepare an annual budget that is published for comment before final adoption. The Board must adopt the budget at its first regular meeting following the reorganization meeting. No obligations may be incurred unless within the limits of the budget and within the scope of the authorized objectives of the Board. The Bar's annual budget must include a budget for the OPC, including the salaries of OPC counsel and staff, expenses, and administrative costs. The Board must ratify the budget for the OPC approved by the Oversight Committee unless the Board petitions the Supreme Court for modifications, in which case the budget approved by the Supreme Court is final.

(b) **Annual Licensing Fees.** The Board must annually submit to the Supreme Court recommendations on increasing, decreasing, or maintaining the annual licensing fees for attorneys, Licensed Paralegal Practitioners, and entities regulated by the Utah State Bar. The submission must include a basis for the recommendation.

(c) **Section dues.**

(1) Bar sections may, with Board approval, charge an annual membership fee to obtain the commitment of members to section activities and to provide revenue to carry out the section's purposes. The amount of such membership fees will be fixed by the section subject to the approval of the Board.

(2) The Bar must hold any funds raised by sections from membership fees as separately identifiable funds of the sections, and disburse to the sections as needed, to carry out the functions of the sections. Such funds may not revert to the general Bar fund at the end of the budget year, but will continue to be held as a separately identifiable fund.

(d) **Disbursements.**

**ADDENDUM NO. 9**

(1) Bar funds are disbursed only in accordance with the provisions of law and by these Bylaws, and at the direction of the Board.

(2) Checking accounts must be maintained with banks to be designated by the Board in such amounts as the Board will determine.

(3) No check may be drawn on Bar funds except as the Board authorizes.

(4) Checks under $1,000 may be signed by an Executive Committee member or by the executive director. Checks over $1,000 must bear the signatures of any two Executive Committee members or any one Executive Committee member and the executive director, unless the funds come from the revolving-fund account for day-to-day operating needs, in which case a check of any amount may be signed by an Executive Committee member or by the executive director. The Board designates the size of the revolving-fund account annually and may revise this at any time.

(e) **Investing funds.** The Board must direct any investment of Bar funds.

# Utah Courts
## UCJA Rule 14-716 (Code of Judicial Administration)

### Rule 14-716. License fees; enrollment fees; oath and admission.
Rule printed on October 16, 2024 at 6:13 pm. Go to https://www.utcourts.gov/rules for current rules.

**Effective:**
**9/1/2020**

(a) Court enrollment fees and Bar license fee. After notification that the Board has approved the Applicant for admission, the Applicant must pay to the Bar the applicable Bar license fee for either Active or Inactive status. The Bar also collects and transmits the federal and state court enrollment fees. The Applicant must pay to the Bar the mandatory Supreme Court enrollment fee, regardless of whether the Applicant elects Active or Inactive attorney status.

(b) Motion for admission and enrollment. Upon satisfaction of the requirements of Rule 14-716(a), the Board will submit motions to the Supreme Court and the United States District Court for the District of Utah for admission certifying that the Applicants have satisfied all qualifications and requirements for admission to the Bar. The Board will submit four motions for admission per year: February, May, August, and October. After the motions are submitted and upon approval by the Supreme Court and the United States District Court for the District of Utah and upon taking the required oath, an Applicant is eligible to be enrolled into Utah's state and federal courts.

(c) Oath of attorney and certificate of admission. Every Applicant must take an oath. The oath must be administered by the clerk of the Supreme Court, the clerk of a court of the United States, a Utah state judge of district or juvenile court level or higher, a judge of a court of the United States or a judge of a court of general jurisdiction or higher of a state of the United States. In the event of military assignment, a military court judge may administer the oath. After administration of the oath, each Applicant must sign the roll of attorneys maintained by the clerk of the Supreme Court at which time the Applicant receives a certificate of admission. If the oath is administered other than at a regularly scheduled ceremony conducted by the Court, the Applicant must contact the clerk of the Supreme Court for information on administration of the oath, and if applicable, the clerk of the United States District Court for the District of Utah.

(d) Time limit for admission. After receiving notice of approval for admission, an Applicant must pay the prescribed license and enrollment fees and take the oath as required by Rule 14-716(c) within six months or approval for admission is automatically withdrawn. Failure to timely satisfy the provisions of this rule requires an Applicant to recommence the application process including the submission of a new application, the payment of application fees, a new character and fitness investigation and the retaking of the Bar Examination, if applicable.

---

**ADDENDUM NO. 10**

115

# Utah Courts
## UCJA Rule 14-802 (Code of Judicial Administration)

### Rule 14-802. Authorization to practice law.
*Rule printed on October 16, 2024 at 6:07 pm. Go to
https://www.utcourts.gov/rules for current rules.*

**Effective:**
**1/5/2023**

(a) **Application.** Except as set forth in paragraphs (c) and (d), only persons who are active, licensed Bar members in good standing may engage in the practice of law in Utah.

(b) **Definitions.** For purposes of this rule:

(1) "Practice of law" means representing the interests of another person by informing, counseling, advising, assisting, advocating for, or drafting documents for that person through applying the law and associated legal principles to that person's facts and circumstances.

(2) "Law" means the collective body of declarations by governmental authorities that establish a person's rights, duties, constraints, and freedoms and includes:

(A) constitutional provisions, treaties, statutes, ordinances, rules, regulations, and similarly enacted declarations; and

(B) decisions, orders, and deliberations of adjudicative, legislative, and executive bodies of government that have authority to interpret, prescribe, and determine a person's rights, duties, constraints, and freedoms.

(3) "Person" includes the plural as well as the singular and legal entities as well as natural persons.

(c) **Licensed Paralegal Practitioners.** A person may be licensed to engage in the limited practice of law in the area or areas of (1) temporary separation, divorce, parentage, cohabitant abuse, civil stalking, custody and support, name or gender change, and petitions to recognize a relationship as a marriage; (2) forcible entry and detainer; and (3) debt collection matters in which the dollar amount in issue does not exceed the statutory limit for small claims cases.

(1) Within a practice area or areas in which a Licensed Paralegal Practitioner is licensed, a Licensed Paralegal Practitioner who is in good standing may represent the interests of a natural person who is not represented by a lawyer unaffiliated with the Licensed Paralegal Practitioner by:

**ADDENDUM NO. 11**
116

(A) establishing a contractual relationship with the client;

(B) interviewing the client to understand the client's objectives and obtaining facts relevant to achieving that objective;

(C) completing forms approved by the Judicial Council or preparing documents that are consistent with the relevant portions of the Judicial Council-approved forms;

(D) informing, counseling, advising, and assisting in determining which form to use and giving advice on how to complete the form;

(E) signing, filing, and completing service of the form;

(F) obtaining, explaining, preparing, and filing any document needed to support the form;

(G) reviewing documents of another party and explaining them;

(H) informing, counseling, assisting, negotiating, and advocating for a client for purposes of settlement;

(I) filling in, signing, filing, and completing service of a written settlement agreement form in conformity with the negotiated agreement;

(J) communicating with another party or the party's representative regarding the relevant form and matters reasonably related thereto; and

(K) explaining a court order that affects the client's rights and obligations.

(L) standing or sitting with the client during a proceeding to provide emotional support, answering factual questions as needed that are addressed to the client by the court or opposing counsel, taking notes, and assisting the client to understand the proceeding and relevant orders.

(d) **Exceptions and Exclusions.** Whether or not it constitutes the practice of law, the following activity by a nonlawyer, who is not otherwise claiming to be a lawyer or to be able to practice law, is permitted:

(1) Making legal forms available to the general public, whether by sale or otherwise, or publishing legal self-help information by print or electronic media.

(2) Providing general legal information, opinions, or recommendations about possible legal rights, remedies, defenses, procedures, options, or strategies, but not specific advice related to another person's facts or circumstances.

(3) Providing clerical assistance to another to complete a form provided by a municipal, state, or federal court located in Utah when no fee is charged to do so.

(4) When expressly permitted by the court after having found it clearly to be in the best interests of the child or ward, assisting one's minor child or ward in a juvenile court proceeding.

(5) Representing a party in small claims court as permitted by Rule of Small Claims Procedure 13.

(6) Representing without compensation a natural person or representing a legal entity as an employee representative of that entity in an arbitration proceeding, where the amount in controversy does not exceed the jurisdictional limit of the small claims court set by the Utah Legislature.

(7) Representing a party in any mediation proceeding.

(8) Acting as a representative before administrative tribunals or agencies as authorized by tribunal or agency rule or practice.

(9) Serving in a neutral capacity as a mediator, arbitrator, or conciliator.

(10) Participating in labor negotiations, arbitrations, or conciliations arising under collective bargaining rights or agreements or as otherwise allowed by law.

(11) Lobbying governmental bodies as an agent or representative of others.

(12) Advising or preparing documents for others in the following described circumstances and by the following described persons:

118

(A) A real estate agent or broker licensed in Utah may complete state-approved forms including sales and associated contracts directly related to the sale of real estate and personal property for their customers.

(B) An abstractor or title insurance agent licensed in Utah may issue real estate title opinions and title reports and prepare deeds for customers.

(C) Financial institutions and securities brokers and dealers licensed in Utah may inform customers with respect to their options for titles of securities, bank accounts, annuities, and other investments.

(D) Insurance companies and agents licensed in Utah may recommend coverage, inform customers with respect to their options for titling of ownership of insurance and annuity contracts, the naming of beneficiaries, and the adjustment of claims under the company's insurance coverage outside of litigation.

(E) Health care providers may provide clerical assistance to patients in completing and executing durable powers of attorney for health care and natural death declarations when no fee is charged to do so.

(F) Certified Public Accountants, enrolled IRS agents, public accountants, public bookkeepers, and tax preparers may prepare tax returns.

(13) Representing an Indian tribe that has formally intervened in a proceeding subject to the Indian Child Welfare Act of 1978, 25 U.S.C. sections 1901–63. Before a nonlawyer may represent a tribe, the tribe must designate the nonlawyer representative by filing a written authorization. If the tribe changes its designated representative or if the representative withdraws, the tribe must file a written substitution of representation or withdrawal.

(14) Providing legal services under Utah Supreme Court Standing Order No. 15.

---

**Advisory Committee Notes:**

Paragraph (a).

"Active" in this paragraph refers to the formal status of a lawyer, as determined by the Bar. Among other things, an active lawyer must comply with the Bar's requirements for continuing legal education.

Paragraph (b).

The practice of law defined in paragraph (b)(1) includes: giving advice or counsel to another person as to that person's legal rights or responsibilities with respect to that person's facts and circumstances; selecting, drafting, or completing legal documents that affect the legal rights or responsibilities of another person; representing another person before an adjudicative, legislative, or executive body, including preparing or filing documents and conducting discovery; and negotiating legal rights or responsibilities on behalf of another person.

119

Because representing oneself does not involve another person, it is not technically the "practice of law." Thus, any natural person may represent oneself as an individual in any legal context. To the same effect is Article 1, Rule 14-111 Integration and Management: "Nothing in this article shall prohibit a person who is unlicensed as an attorney at law or a foreign legal consultant from personally representing that person's own interests in a cause to which the person is a party in his or her own right and not as assignee."

Similarly, an employee of a business entity is not engaged in "the representation of the interest of another person" when activities involving the law are a part of the employee's duties solely in connection with the internal business operations of the entity and do not involve providing legal advice to another person. Further, a person acting in an official capacity as an employee of a government agency that has administrative authority to determine the rights of persons under the law is also not representing the interests of another person.

As defined in paragraph (b)(2), "the law" is a comprehensive term that includes not only the black-letter law set forth in constitutions, treaties, statutes, ordinances, administrative and court rules and regulations, and similar enactments of governmental authorities, but the entire fabric of its development, enforcement, application, and interpretation.

Laws duly enacted by the electorate by initiative and referendum under constitutional authority are included under paragraph (b)(2)(A).

Paragraph (b)(2)(B) is intended to incorporate the breadth of decisional law, as well as the background, such as committee hearings, floor discussions, and other legislative history, that often accompanies the written law of legislatures and other law- and rule-making bodies. Reference to adjudicative bodies in this paragraph includes courts and similar tribunals, arbitrators, administrative agencies, and other bodies that render judgments or opinions involving a person's interests.

Paragraph (c).

The exceptions for Licensed Paralegal Practitioners arise from the November 18, 2015 Report and Recommendation of the Utah Supreme Court Task Force to Examine Limited Legal Licensing. The Task Force was created to make recommendations to address the large number of litigants who are unrepresented or forgo access to the Utah judicial system because of the high cost of retaining a lawyer. The Task Force recommended that the Utah Supreme Court exercise its constitutional authority to govern the practice of law to create a subset of discreet legal services in the practice areas of: (1) temporary separation, divorce, parentage, cohabitant abuse, civil stalking, and custody and support; (2) unlawful detainer and forcible entry and detainer; and (3) debt collection matters in which the dollar amount in issue does not exceed the statutory limit for small claims cases. The Task Force determined that these three practice areas have the highest number of unrepresented litigants in need of low-cost legal assistance. Based on the Task Force's recommendations, the Utah Supreme Court authorized Licensed Paralegal Practitioners to provide limited legal services as

120

prescribed in this rule and in accordance with the Supreme Court Rules of Professional Practice. In the future, the Court may add additional practice areas for Licensed Paralegal Practitioners to assist otherwise unrepresented persons in obtaining legal representation.

Paragraph (c)(1).

A Licensed Paralegal Practitioner may complete forms that are approved by the Judicial Council and that are related to the limited scope of practice of law described in paragraph (c). The Judicial Council approves forms for the Online Consumer Assistance Program and for use by the public. The forms approved by the Judicial Council may be found at https://www.utcourts.gov/ocap/ and https://www.utcourts.gov/selfhelp/.

A Licensed Paralegal Practitioner may also prepare documents that are consistent with the relevant portions of the Judicial Council approved forms but that eliminate any unnecessary information or tailor the information to a client's specific needs. Such documents may be filed with the court by a Licensed Paralegal Practitioner in the same manner as forms approved by the Judicial Council. This paragraph is not intended to expand the scope of Licensed Paralegal Practitioners' limited scope of practice.

Paragraph (d).

To the extent not already addressed by the requirement that the practice of law involves the representation of others, paragraph (d)(2) permits the direct and indirect dissemination of legal information in an educational context, such as legal teaching and lectures.

Paragraph (d)(3) permits assistance provided by employees of the courts and legal-aid and similar organizations that do not charge for providing these services.

Paragraph (d)(7) applies only to the procedures directly related to parties' involvement before a neutral third-party mediator; it does not extend to any related judicial proceedings unless otherwise provided for under this rule (e.g., under paragraph (d)(5)).

---