# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

AMY POMEROY,

Plaintiff-Appellant

v.

UTAH STATE BAR, et al.,

Defendants-Appellees.

Appeal from the United States District Court for the District of Utah
Case No. 2:21-cv-00219-TC-JCB, Hon. Tena Campbell, presiding

## APPELLANT'S APPENDIX

Scott Day Freeman
Adam Shelton
John Thorpe
Scharf-Norton Center for
Constitutional Litigation at the
GOLDWATER INSTITUTE
500 East Coronado Road
Phoenix, Arizona 85004
(602) 462-5000
litigation@goldwaterinstitute.org
*Attorneys for Plaintiff-Appellant*

# TABLE OF CONTENTS

| Document Description | Trial Court Docket No. | Page No. |
|---|---|---|
| Civil Docket, U.S. District Court, Utah | | APP.004–APP.035 |
| Plaintiff's Complaint for Declaratory and Injunctive Relief (April 13, 2021) | 2 | APP.036–APP.065 |
| Order & Memorandum Decision Granting in Part & Denying in Parat Motion to Dismiss (April 4, 2022) | 94 | APP.066–APP.082 |
| Defendants' Answer (April 18, 2022) | 99 | APP.083–APP.107 |
| Robert O. Rice, *President's Message, The Utah Center for Legal Inclusion*, Utah Bar J. (2017) (USB000012–14) | 127-2 | APP.108–APP.110 |
| Learned Ham, *The Times They Are A Changin'*, Utah Bar J. (2017) (USB000022–24) | 127-3 | APP.111–APP.113 |
| James U. Jensen, *Script for Mock Board Meeting of Pure Play, Inc.*, Utah Bar J. (2018) (USB000368–76) | 127-4 | APP.114–APP.122 |
| Steffen Thomas, *Legal History in the Utah Desert, Reflecting on Topaz*, Utah Bar J. (2018) (USB000705–08) | 127-5 | APP.123–APP.126 |
| Paul C. Farr, *Judicial Independence and Freedom of the Press*, Utah Bar J. (2019) (USB000850–54) | 127-6 | APP.127–APP.131 |
| Cami Schiel, *Why Can't I Self-Check Out My Percocet?*, Utah Bar J. (2020) (USB001273–81) | 127-7 | APP.132–APP.140 |
| Heather Farnsworth, *We've Come A (Little) Way, Baby*, Utah Bar J. (2021) (USB001677–79) | 127-8 | APP.141–APP.143 |
| Margaret Olson & Ivy Telles, *The Road to Solutions: Systemic Racism and Implicit Bias in Prosecution*, Utah Bar J. (2021) (USB001689) | 127-9 | APP.144–APP.145 |

| Document Description | Trial Court Docket No. | Page No. |
| --- | --- | --- |
| Advertisement, *2021 Summer Convention*, Utah Bar J. (2021) (USB001783) | 127-10 | APP.146 |
| Gregory K. Orme, *Silver Linings of the Pandemic*, Utah Bar J. (2021) (USB001680–82) | 127-11 | APP.147–APP.149 |
| Anna Rossi, *Book Review, Armies of Enablers*, Utah Bar J. (2021) (USB001706) | 127-12 | APP.150–APP.151 |
| J. Frederic Voros, Jr., *Civility in a Time of Incivility*, Utah Bar J. (2021) (USB002483–87) | 127-13 | APP.152–APP.156 |
| George Sutton, *Cryptocurrency – Cryptoscam – Why Regulation, Deposit Insurance, and Stability Matter*, Utah Bar J. (2023) | 127-14 | APP.157–APP.165 |
| Sept. 12, 2022 USB Tweet celebrating a "Living Color Award" recipient & annual "Living Color Gala" | 127-15 | APP.166 |
| Living Color Gala, Utah Business (Jan. 26, 2022) | 127-16 | APP.167–APP.170 |
| July 30, 2021 USB Tweet re: racism | 127-17 | APP.171 |
| Jan. 22, 2022 USB Tweet re DREAMers | 127-18 | APP.172 |
| *ABA Wide 21-Day National Native American Heritage Equity Habit Building Challenge*, Am. Bar Ass'n | 127-19 | APP.173–APP.185 |
| USB LinkedIn Post re #OneUtah Roadmap | 127-20 | APP.186 |
| Doug Foxley, et al., *Legislative Update, 2021 Legislative Session Primer*, Utah Bar J. (2021) (USB001608–09) | 127-21 | APP.187–APP.188 |
| H. Dickson Barton, *President's Message, Thank You,* Utah Bar J. (2019) (USB000974) | 127-22 | APP.189–APP.191 |
| Douglas Foxley, et al., *Utah Law Developments, Legislative Update*, Utah Bar J. (2019) (USB000502–04) | 127-23 | APP.192–APP.194 |

| Document Description | Trial Court Docket No. | Page No. |
|---|---|---|
| 2019 Governmental Relations Committee Decisions | 127-24 | APP.195–APP.197 |
| 2020 Legislative Positions | 127-25 | APP.198 |
| 2021 Governmental Relations Committee Decisions | 127-26 | APP.199–APP.203 |
| 2022 Governmental Relations Committee Decisions | 127-27 | APP.204–APP.208 |
| Responses to Plaintiff's First Set of Interrogatories to Defendants | 127-28 | APP.209–APP.218 |
| Emily Anderson Stern, *Utah Bar Takes Stand Against Legislation Written by One of Its Own Members*, Salt Lake Tribune (Jan. 27, 2023) | 127-29 | APP.219–APP.223 |
| USB Memorandum re HJR002 | 127-30 | APP.224–APP.228 |
| H.J.R. 2 – Joint Resolution Amending Rules of Civil Procedure on Injunctions | 127-31 | APP.229–APP.233 |
| Emily Anderson Stern, *'Expression of Unchecked Power': Court May be Forced to Reconsider Hold on Utah's Abortion Ban Soon*, Salt Lake Tribune (Jan. 23, 2023) | 127-32 | APP.234–APP.241 |
| Order & Memorandum Decision on Motions for Summary Judgment (April 25, 2024) | 151 | APP.242–APP.272 |
| Judgment in a Civil Case (April 25, 2024) | 152 | APP.273 |
| Notice of Appeal (May 20, 2024) | 153 | APP.274–APP.276 |

**Query    Reports    Utilities    Help    Log Out**

# US District Court Electronic Case Filing System
## District of Utah (Central)
## CIVIL DOCKET FOR CASE #: 2:21-cv-00219-TC

| | |
|---|---|
| Pomeroy v. Utah State Bar et al | Date Filed: 04/13/2021 |
| Assigned to: Judge Tena Campbell | Date Terminated: 04/25/2024 |
| Case in other court: Tenth Circuit, 24-04054 | Jury Demand: None |
| Cause: 42:1983 Civil Rights Act | Nature of Suit: 440 Civil Rights: Other |
| | Jurisdiction: Federal Question |

**Plaintiff**

**Amy Pomeroy**                                    represented by    **Scott Day Freeman**
GOLDWATER INSTITUTE
500 E CORONADO RD
PHOENIX, AZ 85004
602-462-5000
Fax: 602-256-7045
Email: litigation@goldwaterinstitute.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Adam C. Shelton**
GOLDWATER INSTITUTE
500 E CORONADO RD
PHOENIX, AZ 85004
602-462-5000
Email: litigation@goldwaterinstitute.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ethan Blevins**
PACIFIC LEGAL FOUNDATEION
839 W 3600 S
BOUNTIFUL, UT 84010
916-419-7111
Fax: 916-419-7747
Email: eblevins@pacificlegal.org
*ATTORNEY TO BE NOTICED*

**Jacob H Huebert**
LIBERTY JUSTICE CENTER
440 N WELLS ST STE 200
CHICAGO, IL 60654
312-637-2280
Email: jhuebert@ljc.org

*TERMINATED: 04/07/2022*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Utah State Bar**                    represented by    **Troy L. Booher**
*TERMINATED: 04/04/2022*                               ZIMMERMAN BOOHER LLC
                                                       341 S MAIN ST 4TH FL
                                                       SALT LAKE CITY, UT 84111
                                                       (801) 924-0200
                                                       Email: tbooher@zjbappeals.com
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Christine M. Durham**
                                                       WILSON SONSINI GOODRICH &
                                                       ROSATI
                                                       15 W SOUTH TEMPLE STE 1700
                                                       SALT LAKE CITY, UT 84101
                                                       650-461-5346
                                                       Email: cdurham@wsgr.com
                                                       *TERMINATED: 04/06/2022*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Dick J. Baldwin**
                                                       PARR BROWN GEE & LOVELESS
                                                       101 S 200 E STE 700
                                                       SALT LAKE CITY, UT 84111
                                                       801-532-7840
                                                       Email: dbaldwin@parrbrown.com
                                                       *ATTORNEY TO BE NOTICED*

**Defendant**

**John C. Baldwin**                   represented by    **Troy L. Booher**
*Executive Director, Utah State Bar*                   (See above for address)
*TERMINATED: 10/04/2021*                               *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Christine M. Durham**
                                                       (See above for address)
                                                       *TERMINATED: 04/06/2022*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Dick J. Baldwin**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

**Defendant**

**Heather Farnsworth**                represented by    **Troy L. Booher**
*President, Utah State Bar*                             (See above for address)
*TERMINATED: 10/04/2021*                               *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

**Christine M. Durham**
(See above for address)
*TERMINATED: 04/06/2022*
*ATTORNEY TO BE NOTICED*

**Dick J. Baldwin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Heather Thuet**      represented by **Troy L. Booher**
*President, Utah State Bar*         (See above for address)
*TERMINATED: 10/18/2022*        *LEAD ATTORNEY*
                    *ATTORNEY TO BE NOTICED*

**Caroline Anais Olsen**
ZIMMERMAN BOOHER LLC
341 S MAIN ST 4TH FL
SALT LAKE CITY, UT 84111
801-924-0200
Email: colsen@zbappeals.com
*ATTORNEY TO BE NOTICED*

**Christine M. Durham**
(See above for address)
*TERMINATED: 04/06/2022*
*ATTORNEY TO BE NOTICED*

**Dick J. Baldwin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Marty Moore**      represented by **David C. Reymann**
*1st Division Commissioner, Utah State Bar*   PARR BROWN GEE & LOVELESS
*TERMINATED: 12/14/2023*       101 S 200 E STE 700
                  SALT LAKE CITY, UT 84111
                  (801) 532-7840
                  Email: dreymann@parrbrown.com
                  *LEAD ATTORNEY*
                  *ATTORNEY TO BE NOTICED*

**Troy L. Booher**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Caroline Anais Olsen**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Christine M. Durham**
(See above for address)

*TERMINATED: 04/06/2022*
*ATTORNEY TO BE NOTICED*

**Dick J. Baldwin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**John W. Bradley**                                 represented by   **Troy L. Booher**
*2nd Division Commissioner, Utah State Bar*                        (See above for address)
*TERMINATED: 10/18/2022*                                          *LEAD ATTORNEY*
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Caroline Anais Olsen**
                                                                 (See above for address)
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Christine M. Durham**
                                                                 (See above for address)
                                                                 *TERMINATED: 04/06/2022*
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Dick J. Baldwin**
                                                                 (See above for address)
                                                                 *ATTORNEY TO BE NOTICED*

**Defendant**

**Chrystal Mancuso-Smith**                         represented by   **David C. Reymann**
*in her official capacity as 3rd Division*                        (See above for address)
*Comissioner, Utah State Bar*                                     *LEAD ATTORNEY*
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Troy L. Booher**
                                                                 (See above for address)
                                                                 *LEAD ATTORNEY*
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Caroline Anais Olsen**
                                                                 (See above for address)
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Christine M. Durham**
                                                                 (See above for address)
                                                                 *TERMINATED: 04/06/2022*
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Dick J. Baldwin**
                                                                 (See above for address)
                                                                 *ATTORNEY TO BE NOTICED*

**Defendant**

**APP.008**

**Michelle Quist**
*3rd Division Commissioner, Utah State Bar*
*TERMINATED: 10/18/2022*

represented by **Troy L. Booher**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Caroline Anais Olsen**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Christine M. Durham**
(See above for address)
*TERMINATED: 04/06/2022*
*ATTORNEY TO BE NOTICED*

**Dick J. Baldwin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Mark Morris**
*in his official capacity as 3rd Division*
*Commissioner, Utah State Bar*

represented by **David C. Reymann**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Troy L. Booher**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Caroline Anais Olsen**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Christine M. Durham**
(See above for address)
*TERMINATED: 04/06/2022*
*ATTORNEY TO BE NOTICED*

**Dick J. Baldwin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Mark Pugsley**
*3rd Division Commissioner, Utah State Bar*
*TERMINATED: 10/04/2021*

represented by **Troy L. Booher**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christine M. Durham**
(See above for address)
*TERMINATED: 04/06/2022*
*ATTORNEY TO BE NOTICED*

**Dick J. Baldwin**

**APP.009**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Traci Gundersen**                              represented by   **David C. Reymann**
*in her official capacity as 3rd Division*                        (See above for address)
*Commissioner, Utah State Bar*                                    *LEAD ATTORNEY*
                                                                  *ATTORNEY TO BE NOTICED*

                                                                  **Troy L. Booher**
                                                                  (See above for address)
                                                                  *LEAD ATTORNEY*
                                                                  *ATTORNEY TO BE NOTICED*

                                                                  **Caroline Anais Olsen**
                                                                  (See above for address)
                                                                  *ATTORNEY TO BE NOTICED*

                                                                  **Christine M. Durham**
                                                                  (See above for address)
                                                                  *TERMINATED: 04/06/2022*
                                                                  *ATTORNEY TO BE NOTICED*

                                                                  **Dick J. Baldwin**
                                                                  (See above for address)
                                                                  *ATTORNEY TO BE NOTICED*

**Defendant**

**Andrew Morse**                                 represented by   **David C. Reymann**
*3rd Division Commissioner, Utah State Bar*                       (See above for address)
*TERMINATED: 12/14/2023*                                          *LEAD ATTORNEY*
                                                                  *ATTORNEY TO BE NOTICED*

                                                                  **Troy L. Booher**
                                                                  (See above for address)
                                                                  *LEAD ATTORNEY*
                                                                  *ATTORNEY TO BE NOTICED*

                                                                  **Caroline Anais Olsen**
                                                                  (See above for address)
                                                                  *ATTORNEY TO BE NOTICED*

                                                                  **Christine M. Durham**
                                                                  (See above for address)
                                                                  *TERMINATED: 04/06/2022*
                                                                  *ATTORNEY TO BE NOTICED*

                                                                  **Dick J. Baldwin**
                                                                  (See above for address)
                                                                  *ATTORNEY TO BE NOTICED*

**Defendant**

**Tom Seiler**                                   represented by   **Troy L. Booher**
*4th Division Commissioner, Utah State Bar*                       (See above for address)

**APP.010**

*TERMINATED: 10/04/2021*

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christine M. Durham**
(See above for address)
*TERMINATED: 04/06/2022*
*ATTORNEY TO BE NOTICED*

**Dick J. Baldwin**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

**Kristin Woods**                    represented by    **David C. Reymann**
*President of the Utah State Bar*                     (See above for address)
*TERMINATED: 12/14/2023*                              *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Troy L. Booher**
                                                      (See above for address)
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Caroline Anais Olsen**
                                                      (See above for address)
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Christine M. Durham**
                                                      (See above for address)
                                                      *TERMINATED: 04/06/2022*
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Dick J. Baldwin**
                                                      (See above for address)
                                                      *ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

**Rick Hoffman**                     represented by    **David C. Reymann**
*in his official capacity as a Public Member*         (See above for address)
*Commissioner, Utah State Bar*                        *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Troy L. Booher**
                                                      (See above for address)
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Caroline Anais Olsen**
                                                      (See above for address)
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Christine M. Durham**
                                                      (See above for address)
                                                      *TERMINATED: 04/06/2022*

*ATTORNEY TO BE NOTICED*

**Dick J. Baldwin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Shawn Newell**                                 represented by   **David C. Reymann**
*in his official capacity as a Public Member*                    (See above for address)
*Commissioner, Utah State Bar*                                   *LEAD ATTORNEY*
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Troy L. Booher**
                                                                 (See above for address)
                                                                 *LEAD ATTORNEY*
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Caroline Anais Olsen**
                                                                 (See above for address)
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Christine M. Durham**
                                                                 (See above for address)
                                                                 *TERMINATED: 04/06/2022*
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Dick J. Baldwin**
                                                                 (See above for address)
                                                                 *ATTORNEY TO BE NOTICED*

**Defendant**

**Elizabeth Wright**                             represented by   **David C. Reymann**
*in her official capacity as Executive*                          (See above for address)
*Director, Utah State Bar*                                       *LEAD ATTORNEY*
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Troy L. Booher**
                                                                 (See above for address)
                                                                 *LEAD ATTORNEY*
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Caroline Anais Olsen**
                                                                 (See above for address)
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Christine M. Durham**
                                                                 (See above for address)
                                                                 *TERMINATED: 04/06/2022*
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Dick J. Baldwin**
                                                                 (See above for address)
                                                                 *ATTORNEY TO BE NOTICED*

**APP.012**

**Defendant**

**Gregory N. Hoole**
*in his official capacity as 3rd Division
Commissioner, Utah State Bar*

represented by **David C. Reymann**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Troy L. Booher**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Caroline Anais Olsen**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Christine M. Durham**
(See above for address)
*TERMINATED: 04/06/2022*
*ATTORNEY TO BE NOTICED*

**Dick J. Baldwin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Tyler S. Young**
*in his official capacity as 4th Division
Commissioner, Utah State Bar*

represented by **David C. Reymann**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Troy L. Booher**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Caroline Anais Olsen**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Christine M. Durham**
(See above for address)
*TERMINATED: 04/06/2022*
*ATTORNEY TO BE NOTICED*

**Dick J. Baldwin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Erik Christiansen**
*in his official capacity as President of the
Utah State Bar,*

represented by **David C. Reymann**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Troy L. Booher**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Caroline Anais Olsen**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Dick J. Baldwin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Cara Tangaro**                      represented by    **Troy L. Booher**
*in her official capacity as 3rd Division*                (See above for address)
*Commissioner and President-Elect, Utah*                  *LEAD ATTORNEY*
*State Bar*                                                *ATTORNEY TO BE NOTICED*

**Caroline Anais Olsen**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Dick J. Baldwin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Beth Kennedy**                      represented by    **David C. Reymann**
*3rd Division Commissioner, Utah State Bar*               (See above for address)
*TERMINATED: 12/14/2023*                                  *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

**Troy L. Booher**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Caroline Anais Olsen**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Dick J. Baldwin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Matthew Hansen**                    represented by    **Troy L. Booher**
*in his official capacity as 2nd Division*                (See above for address)
*Commissioner, Utah State Bar*                            *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

**Caroline Anais Olsen** **APP.014**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Dick J. Baldwin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Thomas J Bayles**                          represented by   **David C. Reymann**
*in his official capacity as 5th Division*                    (See above for address)
*Commissioner, Utah State Bar*                                *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Troy L. Booher**
                                                              (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Caroline Anais Olsen**
                                                              (See above for address)
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Dick J. Baldwin**
                                                              (See above for address)
                                                              *ATTORNEY TO BE NOTICED*

**Defendant**

**J. Brett Chambers**                        represented by   **David C. Reymann**
*in his official capacity as 1st Division*                    (See above for address)
*Commissioner, Utah State Bar*                                *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Troy L. Booher**
                                                              (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Caroline Anais Olsen**
                                                              (See above for address)
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Dick J. Baldwin**
                                                              (See above for address)
                                                              *ATTORNEY TO BE NOTICED*

**Defendant**

**John Reese**                               represented by   **David C. Reymann**
*in his official capacity as 3rd Division*                    (See above for address)
*Commissioner, Utah State Bar*                                *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Troy L. Booher**
                                                              (See above for address)
                                                              *LEAD ATTORNEY*

**APP.015**

*ATTORNEY TO BE NOTICED*

**Caroline Anais Olsen**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Dick J. Baldwin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Kim Cordova**                    represented by   **David C. Reymann**
*in her official capacity as 3rd Division*                    (See above for address)
*Commissioner, Utah State Bar*                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

**Troy L. Booher**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Caroline Anais Olsen**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Dick J. Baldwin**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 04/13/2021 | 1 | Case has been indexed and assigned to Magistrate Judge Jared C. Bennett. Plaintiff Amy Pomeroy is directed to E-File the Complaint and cover sheet (found under Complaints and Other Initiating Documents) and pay the filing fee of $ 402.00 by the end of the business day. NOTE: The court will not have jurisdiction until the opening document is electronically filed and the filing fee paid in the CM/ECF system. Civil Summons may be issued electronically. Prepare the summons using the courts PDF version and email it to utdecf_clerk@utd.uscourts.gov for issuance. (nmt) (Entered: 04/13/2021) |
| 04/13/2021 | 2 | COMPLAINT *for Declaratory & Injunctive Relief* against All Defendants (Filing fee $ 402, receipt number 3451023) filed by Amy Pomeroy. (Attachments: # 1 Civil Cover Sheet Civil Cover Sheet) Assigned to Magistrate Judge Jared C. Bennett (Huebert, Jacob) (Entered: 04/13/2021) |
| 04/14/2021 | 3 | **RESTRICTED DOCUMENT****Summons Issued Electronically as to Andrew Morse. Instructions to Counsel: 1. Click on the document number. 2. If you are prompted for an ECF login, enter your 'Attorney' login to CM/ECF. 3. Print the issued summons for service. (nmt) (Entered: 04/14/2021) |
| 04/14/2021 | 4 | **RESTRICTED DOCUMENT****Summons Issued Electronically as to Chrystal Mancuso-Smith. |

**APP.016**

| | | Instructions to Counsel:<br>1. Click on the document number.<br>2. If you are prompted for an ECF login, enter your 'Attorney' login to CM/ECF.<br>3. Print the issued summons for service. (nmt) (Entered: 04/14/2021) |
|---|---|---|
| 04/14/2021 | [5](#) | **RESTRICTED DOCUMENT**Summons Issued Electronically as to Heather Farnsworth.<br>Instructions to Counsel:<br>1. Click on the document number.<br>2. If you are prompted for an ECF login, enter your 'Attorney' login to CM/ECF.<br>3. Print the issued summons for service. (nmt) (Entered: 04/14/2021) |
| 04/14/2021 | [6](#) | **RESTRICTED DOCUMENT**Summons Issued Electronically as to Heather Thuet.<br>Instructions to Counsel:<br>1. Click on the document number.<br>2. If you are prompted for an ECF login, enter your 'Attorney' login to CM/ECF.<br>3. Print the issued summons for service. (nmt) (Entered: 04/14/2021) |
| 04/14/2021 | [7](#) | **RESTRICTED DOCUMENT**Summons Issued Electronically as to John C. Baldwin.<br>Instructions to Counsel:<br>1. Click on the document number.<br>2. If you are prompted for an ECF login, enter your 'Attorney' login to CM/ECF.<br>3. Print the issued summons for service. (nmt) (Entered: 04/14/2021) |
| 04/14/2021 | [8](#) | **RESTRICTED DOCUMENT**Summons Issued Electronically as to John W. Bradley.<br>Instructions to Counsel:<br>1. Click on the document number.<br>2. If you are prompted for an ECF login, enter your 'Attorney' login to CM/ECF.<br>3. Print the issued summons for service. (nmt) (Entered: 04/14/2021) |
| 04/14/2021 | [9](#) | **RESTRICTED DOCUMENT**Summons Issued Electronically as to Kristin Woods.<br>Instructions to Counsel:<br>1. Click on the document number.<br>2. If you are prompted for an ECF login, enter your 'Attorney' login to CM/ECF.<br>3. Print the issued summons for service. (nmt) (Entered: 04/14/2021) |
| 04/14/2021 | [10](#) | **RESTRICTED DOCUMENT**Summons Issued Electronically as to Mark Morris.<br>Instructions to Counsel:<br>1. Click on the document number.<br>2. If you are prompted for an ECF login, enter your 'Attorney' login to CM/ECF.<br>3. Print the issued summons for service. (nmt) (Entered: 04/14/2021) |
| 04/14/2021 | [11](#) | **RESTRICTED DOCUMENT**Summons Issued Electronically as to Mark Pugsley.<br>Instructions to Counsel:<br>1. Click on the document number.<br>2. If you are prompted for an ECF login, enter your 'Attorney' login to CM/ECF.<br>3. Print the issued summons for service. (nmt) (Entered: 04/14/2021) |
| 04/14/2021 | [12](#) | **RESTRICTED DOCUMENT**Summons Issued Electronically as to Marty Moore.<br>Instructions to Counsel:<br>1. Click on the document number.<br>2. If you are prompted for an ECF login, enter your 'Attorney' login to CM/ECF.<br>3. Print the issued summons for service. (nmt) (Entered: 04/14/2021) |
| 04/14/2021 | [13](#) | **RESTRICTED DOCUMENT**Summons Issued Electronically as to Michelle Quist.<br>Instructions to Counsel: |

**APP.017**

| | | |
|---|---|---|
| | | 1. Click on the document number.<br>2. If you are prompted for an ECF login, enter your 'Attorney' login to CM/ECF.<br>3. Print the issued summons for service. (nmt) (Entered: 04/14/2021) |
| 04/14/2021 | 14 | **RESTRICTED DOCUMENT**Summons Issued Electronically as to Rick Hoffman.<br>Instructions to Counsel:<br>1. Click on the document number.<br>2. If you are prompted for an ECF login, enter your 'Attorney' login to CM/ECF.<br>3. Print the issued summons for service. (nmt) (Entered: 04/14/2021) |
| 04/14/2021 | 15 | **RESTRICTED DOCUMENT**Summons Issued Electronically as to Shawn Newell.<br>Instructions to Counsel:<br>1. Click on the document number.<br>2. If you are prompted for an ECF login, enter your 'Attorney' login to CM/ECF.<br>3. Print the issued summons for service. (nmt) (Entered: 04/14/2021) |
| 04/14/2021 | 16 | **RESTRICTED DOCUMENT**Summons Issued Electronically as to Tom Seiler.<br>Instructions to Counsel:<br>1. Click on the document number.<br>2. If you are prompted for an ECF login, enter your 'Attorney' login to CM/ECF.<br>3. Print the issued summons for service. (nmt) (Entered: 04/14/2021) |
| 04/14/2021 | 17 | **RESTRICTED DOCUMENT**Summons Issued Electronically as to Traci Gundersen.<br>Instructions to Counsel:<br>1. Click on the document number.<br>2. If you are prompted for an ECF login, enter your 'Attorney' login to CM/ECF.<br>3. Print the issued summons for service. (nmt) (Entered: 04/14/2021) |
| 04/14/2021 | 18 | **RESTRICTED DOCUMENT**Summons Issued Electronically as to Utah State Bar.<br>Instructions to Counsel:<br>1. Click on the document number.<br>2. If you are prompted for an ECF login, enter your 'Attorney' login to CM/ECF.<br>3. Print the issued summons for service. (nmt) (Entered: 04/14/2021) |
| 04/19/2021 | 19 | ~~**RESTRICTED DOCUMENT** RETURN OF SERVICE Executed for Personal served on Andrew Morse on 04/16/2021, filed by Plaintiff Amy Pomeroy. (Huebert, Jacob)~~ Modified on 4/21/2021 - stricken as improperly filed. (alf) (Entered: 04/19/2021) |
| 04/19/2021 | 20 | ~~**RESTRICTED DOCUMENT** RETURN OF SERVICE Executed for Personal served on Chrystal Mancuso-Smith on 04/16/2021, filed by Plaintiff Amy Pomeroy. (Huebert, Jacob)~~ Modified on 4/21/2021 - document stricken as improperly filed (alf). (Entered: 04/19/2021) |
| 04/19/2021 | 21 | ~~B>**RESTRICTED DOCUMENT** RETURN OF SERVICE Executed for Personal served on Heather Farnsworth on 04/16/2021, filed by Plaintiff Amy Pomeroy. (Huebert, Jacob)~~ Modified on 4/21/2021 - stricken as improperly filed (alf). (Entered: 04/19/2021) |
| 04/19/2021 | 22 | ~~**RESTRICTED DOCUMENT** RETURN OF SERVICE Executed for Personal served on Heather Thuet on 04/16/2021, filed by Plaintiff Amy Pomeroy. (Huebert, Jacob)~~ Modified on 4/21/2021 - stricken as improperly filed (alf). (Entered: 04/19/2021) |
| 04/19/2021 | 23 | ~~**RESTRICTED DOCUMENT** RETURN OF SERVICE Executed for Personal served on John Baldwin on 04/14/2021, filed by Plaintiff Amy Pomeroy. (Huebert, Jacob)~~ Modified on 4/21/2021 - stricken as improperly filed (alf). (Entered: 04/19/2021) |
| 04/19/2021 | 24 | ~~**RESTRICTED DOCUMENT** RETURN OF SERVICE Executed for Personal served on John W. Bradley on 04/16/2021, filed by Plaintiff Amy Pomeroy. (Huebert,~~ |

**APP.018**

| | | |
|---|---|---|
| | | ~~Jacob)~~ Modified on 4/21/2021 - stricken as improperly filed (alf). (Entered: 04/19/2021) |
| 04/19/2021 | 25 | ~~**RESTRICTED DOCUMENT** RETURN OF SERVICE Executed for Personal served on Kristin Woods on 04/16/2021, filed by Plaintiff Amy Pomeroy. (Huebert, Jacob)~~ Modified on 4/21/2021 - stricken as improperly filed (alf). (Entered: 04/19/2021) |
| 04/19/2021 | 26 | ~~**RESTRICTED DOCUMENT** RETURN OF SERVICE Executed for Personal served on Mark Morris on 04/16/2021, filed by Plaintiff Amy Pomeroy. (Huebert, Jacob)~~ Modified on 4/21/2021 - stricken as improperly filed (alf). (Entered: 04/19/2021) |
| 04/19/2021 | 27 | ~~**RESTRICTED DOCUMENT** RETURN OF SERVICE Executed for Personal served on Mark Pugsley on 04/16/2021, filed by Plaintiff Amy Pomeroy. (Huebert, Jacob)~~ Modified on 4/21/2021 - stricken as improperly filed (alf). (Entered: 04/19/2021) |
| 04/19/2021 | 28 | ~~**RESTRICTED DOCUMENT** RETURN OF SERVICE Executed for Personal served on Marty Moore on 04/16/2021, filed by Plaintiff Amy Pomeroy. (Huebert, Jacob)~~ Modified on 4/21/2021 - stricken as improperly filed (alf). (Entered: 04/19/2021) |
| 04/19/2021 | 29 | ~~**RESTRICTED DOCUMENT** RETURN OF SERVICE Executed for Personal served on Michelle Quist on 04/16/2021, filed by Plaintiff Amy Pomeroy. (Huebert, Jacob)~~ Modified on 4/21/2021 - stricken as improperly filed (alf). (Entered: 04/19/2021) |
| 04/19/2021 | 30 | ~~**RESTRICTED DOCUMENT** RETURN OF SERVICE Executed for Personal served on Rick Hoffman on 04/16/2021, filed by Plaintiff Amy Pomeroy. (Huebert, Jacob)~~ Modified on 4/21/2021 - stricken as improperly filed (alf). (Entered: 04/19/2021) |
| 04/19/2021 | 31 | ~~**RESTRICTED DOCUMENT** RETURN OF SERVICE Executed for Personal served on Shawn Newell on 04/16/2021, filed by Plaintiff Amy Pomeroy. (Huebert, Jacob)~~ Modified on 4/21/2021 - stricken as improperly filed (alf). (Entered: 04/19/2021) |
| 04/19/2021 | 32 | ~~**RESTRICTED DOCUMENT** RETURN OF SERVICE Executed for Personal served on Tom Seiler on 04/16/2021, filed by Plaintiff Amy Pomeroy. (Huebert, Jacob)~~ Modified on 4/21/2021 - stricken as improperly filed (alf). (Entered: 04/19/2021) |
| 04/19/2021 | 33 | ~~**RESTRICTED DOCUMENT** RETURN OF SERVICE Executed for Personal served on Traci Gundersen on 04/16/2021, filed by Plaintiff Amy Pomeroy. (Huebert, Jacob)~~ Modified on 4/21/2021 - stricken as improperly filed (alf). (Entered: 04/19/2021) |
| 04/19/2021 | 34 | ~~**RESTRICTED DOCUMENT** RETURN OF SERVICE Executed for Personal served on Utah State Bar on 04/14/2021, filed by Plaintiff Amy Pomeroy. (Huebert, Jacob)~~ Modified on 4/21/2021 - stricken as improperly filed. (alf). (Entered: 04/19/2021) |
| 04/21/2021 | 35 | NOTICE OF DEFICIENCY re 33 Return of Service, 27 Return of Service, 34 Return of Service, 28 Return of Service, 24 Return of Service, 26 Return of Service, 32 Return of Service, 25 Return of Service, 19 Return of Service, 31 Return of Service, 29 Return of Service, 20 Return of Service, 30 Return of Service, 21 Return of Service. Documents stricken as improperly filed. Must be filed as "Summons Returned Executed" in order to set answer deadlines. The clerk requests the filer of the original documents to refile the pleadings. The new pleadings will receive new document numbers on the docket. (alf) (Entered: 04/21/2021) |
| 04/21/2021 | 36 | **RESTRICTED DOCUMENT** SUMMONS Returned Executed by Amy Pomeroy as to Andrew Morse served on 4/16/2021, answer due 5/7/2021. (Huebert, Jacob) (Entered: 04/21/2021) |
| 04/21/2021 | 37 | **RESTRICTED DOCUMENT** SUMMONS Returned Executed by Amy Pomeroy as to Chrystal Mancuso-Smith served on 4/16/2021, answer due 5/7/2021. (Huebert, Jacob) (Entered: 04/21/2021) |

| 04/21/2021 | 38 | **RESTRICTED DOCUMENT** SUMMONS Returned Executed by Amy Pomeroy as to Heather Farnsworth served on 4/16/2021, answer due 5/7/2021. (Huebert, Jacob) (Entered: 04/21/2021) |
| 04/21/2021 | 39 | **RESTRICTED DOCUMENT** SUMMONS Returned Executed by Amy Pomeroy as to Heather Thuet served on 4/16/2021, answer due 5/7/2021. (Huebert, Jacob) (Entered: 04/21/2021) |
| 04/21/2021 | 40 | **RESTRICTED DOCUMENT** SUMMONS Returned Executed by Amy Pomeroy as to John C. Baldwin served on 4/14/2021, answer due 5/5/2021. (Huebert, Jacob) (Entered: 04/21/2021) |
| 04/21/2021 | 41 | **RESTRICTED DOCUMENT** SUMMONS Returned Executed by Amy Pomeroy as to John W. Bradley served on 4/16/2021, answer due 5/7/2021. (Huebert, Jacob) (Entered: 04/21/2021) |
| 04/21/2021 | 42 | **RESTRICTED DOCUMENT** SUMMONS Returned Executed by Amy Pomeroy as to Kristin Woods served on 4/16/2021, answer due 5/7/2021. (Huebert, Jacob) (Entered: 04/21/2021) |
| 04/21/2021 | 43 | **RESTRICTED DOCUMENT** SUMMONS Returned Executed by Amy Pomeroy as to Mark Morris served on 4/16/2021, answer due 5/7/2021. (Huebert, Jacob) (Entered: 04/21/2021) |
| 04/21/2021 | 44 | **RESTRICTED DOCUMENT** SUMMONS Returned Executed by Amy Pomeroy as to Mark Pugsley served on 4/16/2021, answer due 5/7/2021. (Huebert, Jacob) (Entered: 04/21/2021) |
| 04/21/2021 | 45 | **RESTRICTED DOCUMENT** SUMMONS Returned Executed by Amy Pomeroy as to Marty Moore served on 4/16/2021, answer due 5/7/2021. (Huebert, Jacob) (Entered: 04/21/2021) |
| 04/21/2021 | 46 | **RESTRICTED DOCUMENT** SUMMONS Returned Executed by Amy Pomeroy as to Michelle Quist served on 4/16/2021, answer due 5/7/2021. (Huebert, Jacob) (Entered: 04/21/2021) |
| 04/21/2021 | 47 | **RESTRICTED DOCUMENT** SUMMONS Returned Executed by Amy Pomeroy as to Rick Hoffman served on 4/16/2021, answer due 5/7/2021. (Huebert, Jacob) (Entered: 04/21/2021) |
| 04/21/2021 | 48 | **RESTRICTED DOCUMENT** SUMMONS Returned Executed by Amy Pomeroy as to Shawn Newell served on 4/16/2021, answer due 5/7/2021. (Huebert, Jacob) (Entered: 04/21/2021) |
| 04/21/2021 | 49 | **RESTRICTED DOCUMENT** SUMMONS Returned Executed by Amy Pomeroy as to Tom Seiler served on 4/16/2021, answer due 5/7/2021. (Huebert, Jacob) (Entered: 04/21/2021) |
| 04/21/2021 | 50 | **RESTRICTED DOCUMENT** SUMMONS Returned Executed by Amy Pomeroy as to Traci Gundersen served on 4/16/2021, answer due 5/7/2021. (Huebert, Jacob) (Entered: 04/21/2021) |
| 04/21/2021 | 51 | **RESTRICTED DOCUMENT** SUMMONS Returned Executed by Amy Pomeroy as to Utah State Bar served on 4/14/2021, answer due 5/5/2021. (Huebert, Jacob) (Entered: 04/21/2021) |
| 05/04/2021 | 52 | NOTICE of Appearance by Christine M. Durham on behalf of John C. Baldwin, John W. Bradley, Heather Farnsworth, Traci Gundersen, Rick Hoffman, Chrystal Mancuso-Smith, Marty Moore, Mark Morris, Andrew Morse, Shawn Newell, Mark Pugsley, Michelle |

| | | |
|---|---|---|
| | | Quist, Tom Seiler, Heather Thuet, Utah State Bar, Kristin Woods (Durham, Christine) (Entered: 05/04/2021) |
| 05/04/2021 | 53 | NOTICE of Appearance by Troy L. Booher on behalf of John C. Baldwin, John W. Bradley, Heather Farnsworth, Traci Gundersen, Rick Hoffman, Chrystal Mancuso-Smith, Marty Moore, Mark Morris, Andrew Morse, Shawn Newell, Mark Pugsley, Michelle Quist, Tom Seiler, Heather Thuet, Utah State Bar, Kristin Woods (Booher, Troy) (Entered: 05/04/2021) |
| 05/04/2021 | 54 | NOTICE of Appearance by Dick J. Baldwin on behalf of John C. Baldwin, John W. Bradley, Heather Farnsworth, Traci Gundersen, Rick Hoffman, Chrystal Mancuso-Smith, Marty Moore, Mark Morris, Andrew Morse, Shawn Newell, Mark Pugsley, Michelle Quist, Tom Seiler, Heather Thuet, Utah State Bar, Kristin Woods (Baldwin, Dick) (Entered: 05/04/2021) |
| 05/04/2021 | 55 | MOTION for Extension of Time to File Answer and Memorandum in Support filed by Defendants John C. Baldwin, John W. Bradley, Heather Farnsworth, Traci Gundersen, Rick Hoffman, Chrystal Mancuso-Smith, Marty Moore, Mark Morris, Andrew Morse, Shawn Newell, Mark Pugsley, Michelle Quist, Tom Seiler, Heather Thuet, Utah State Bar, Kristin Woods. (Attachments: # 1 Text of Proposed Order)(Baldwin, Dick) (Entered: 05/04/2021) |
| 05/04/2021 | 56 | ORDER granting 55 Motion for Extension of Time to Answer re 2 Complaint. Answer deadline updated for All Defendants to 6/30/2021. Signed by Magistrate Judge Jared C. Bennett on 5/4/21. (alf) (Entered: 05/05/2021) |
| 05/05/2021 | 57 | NOTICE - This case is assigned to a magistrate judge. To consent or request reassignment, use the form on this link or use the included form for non-efilers and send it to consents@utd.uscourts.gov within 15 days or mail to the court with *Attention: Consent Clerk* on the envelope. Notice e-mailed or mailed to Defendants John C. Baldwin, John W. Bradley, Heather Farnsworth, Traci Gundersen, Rick Hoffman, Chrystal Mancuso-Smith, Marty Moore, Mark Morris, Andrew Morse, Shawn Newell, Mark Pugsley, Michelle Quist, Tom Seiler, Heather Thuet, Utah State Bar, Kristin Woods, Plaintiff Amy Pomeroy. Form due by 5/20/2021. (alf) (Entered: 05/05/2021) |
| 05/05/2021 | 58 | RECEIVED Consent/Reassignment Form from Plaintiff Amy Pomeroy. (alf) (Entered: 05/05/2021) |
| 05/10/2021 | 59 | RECEIVED Consent/Reassignment Form from Defendants John C. Baldwin, John W. Bradley, Heather Farnsworth, Traci Gundersen, Rick Hoffman, Chrystal Mancuso-Smith, Marty Moore, Mark Morris, Andrew Morse, Shawn Newell, Mark Pugsley, Michelle Quist, Tom Seiler, Heather Thuet, Utah State Bar, Kristin Woods. (alf) (Entered: 05/10/2021) |
| 05/10/2021 | 60 | All Consent/Reassignment Forms have now been received. After review of all forms, Case Reassigned to District Judge per request of one or more party(s). Case randomly assigned to Judge David Barlow. Magistrate Judge Jared C. Bennett no longer assigned to the case. (alf) (Entered: 05/10/2021) |
| 05/27/2021 | 61 | ORDER REFERRING CASE to Magistrate Judge Daphne A. Oberg under 28:636 (b)(1) (A), Magistrate to hear and determine all nondispositive pretrial matters. No attached document. Signed by Judge David Barlow on 5/27/2021. (sds) (Entered: 05/27/2021) |
| 05/28/2021 | 62 | ORDER TO PROPOSE SCHEDULE - Plaintiff must propose a schedule to defendants in the form of a draft Attorney Planning Meeting Report by June 30, 2021. See order for |

**APP.021**

| | | |
|---|---|---|
| | | additional instructions. Signed by Magistrate Judge Daphne A. Oberg on 05/28/2021. (jl) (Entered: 05/28/2021) |
| 06/29/2021 | 63 | MOTION for Extension of Time to File Answer re 2 Complaint, and Memorandum in Support filed by Defendants John C. Baldwin, John W. Bradley, Heather Farnsworth, Traci Gundersen, Rick Hoffman, Chrystal Mancuso-Smith, Marty Moore, Mark Morris, Andrew Morse, Shawn Newell, Mark Pugsley, Michelle Quist, Tom Seiler, Heather Thuet, Utah State Bar, Kristin Woods. (Attachments: # 1 Text of Proposed Order) Motions referred to Daphne A. Oberg.(Baldwin, Dick) (Entered: 06/29/2021) |
| 06/29/2021 | 64 | DOCKET TEXT ORDER granting 63 Defendants' Motion for Second Extension of Time to Answer Complaint. The deadline for Defendants to respond to Plaintiff's Complaint is extended to July 7, 2021. Signed by Magistrate Judge Daphne A. Oberg on 6/29/2021. No attached document. (eh) (Entered: 06/29/2021) |
| 07/06/2021 | 65 | MOTION for Leave to File Excess Pages and Memorandum in Support filed by Defendants John C. Baldwin, John W. Bradley, Heather Farnsworth, Traci Gundersen, Rick Hoffman, Chrystal Mancuso-Smith, Marty Moore, Mark Morris, Andrew Morse, Shawn Newell, Mark Pugsley, Michelle Quist, Tom Seiler, Heather Thuet, Utah State Bar, Kristin Woods. (Attachments: # 1 Text of Proposed Order) Motions referred to Daphne A. Oberg.(Baldwin, Dick) (Entered: 07/06/2021) |
| 07/06/2021 | 66 | Motions No Longer Referred: 65 MOTION for Leave to File Excess Pages and Memorandum in Support. (sds) (Entered: 07/06/2021) |
| 07/06/2021 | 67 | ORDER granting 65 Motion for Leave to File Overlength Motion to Dismiss. Defendants' may file a motion that does not exceed thirty-three pages in length, excluding face sheet, table of contents, table of authorities, signature block, certificate of service, and exhibits. Signed by Judge David Barlow on 07/06/2021. (jl) (Entered: 07/06/2021) |
| 07/07/2021 | 68 | MOTION to Dismiss and Memorandum in Support filed by Defendants John C. Baldwin, John W. Bradley, Heather Farnsworth, Traci Gundersen, Rick Hoffman, Chrystal Mancuso-Smith, Marty Moore, Mark Morris, Andrew Morse, Shawn Newell, Mark Pugsley, Michelle Quist, Tom Seiler, Heather Thuet, Utah State Bar, Kristin Woods. (Attachments: # 1 Exhibit A - Utah Bar Journal, vol. 34, no. 2 (Mar.-Apr. 2021), # 2 Exhibit B - Utah Bar Journal, vol. 34, no. 1 (Jan.-Feb. 2021), # 3 Exhibit C - Utah Bar Journal, vol. 33, no. 3 (May-June 2020), # 4 Exhibit D - Utah Bar Journal, vol. 33, no. 2 (Mar.-Apr. 2020), # 5 Exhibit E - Utah Bar Journal, vol. 32, no. 4 (July-Aug. 2019), # 6 Exhibit F - Utah Bar Journal, vol. 32, no. 2 (Mar.-Apr. 2019), # 7 Exhibit G - Utah Bar Journal, vol. 31, no. 3. (May-June 2018), # 8 Exhibit H - Utah Bar Journal, vol. 31, no. 2 (Mar.-Apr. 2018), # 9 Exhibit I - Utah Bar Journal, vol. 30, no. 2 (Mar.-Apr. 2017)) (Baldwin, Dick) (Entered: 07/07/2021) |
| 07/14/2021 | 69 | REPORT OF ATTORNEY PLANNING MEETING. (Huebert, Jacob) (Entered: 07/14/2021) |
| 07/15/2021 | 70 | SCHEDULING ORDER. See order for deadlines. Signed by Magistrate Judge Daphne A. Oberg on 07/15/2021. (jl) (Entered: 07/15/2021) |
| 07/16/2021 | 71 | Consent MOTION for Extension of Time Response to Defendants' Motion to Dismiss filed by Plaintiff Amy Pomeroy. Motions referred to Daphne A. Oberg.(Huebert, Jacob) Modified by correcting event on 7/19/2021 (jl). (Entered: 07/16/2021) |
| 07/19/2021 | 72 | Motions No Longer Referred: 71 Consent MOTION for Extension of Time Response to Defendants' Motion to Dismiss. (sds) (Entered: 07/19/2021) |
| 07/19/2021 | 73 | ORDER granting 71 Motion for Extension of Time to File Response/Reply re 68 MOTION to Dismiss and Memorandum in Support. Plaintiff shall have to and including |

| | | |
|---|---|---|
| | | August 18, 2021 to file a response to Defendants' motion to dismiss. Signed by Judge David Barlow on 07/19/2021. (jl) (Entered: 07/19/2021) |
| 08/18/2021 | 74 | Plaintiff's RESPONSE to Motion re 68 MOTION to Dismiss and Memorandum in Support filed by Plaintiff Amy Pomeroy. (Huebert, Jacob) (Entered: 08/18/2021) |
| 08/26/2021 | 75 | MOTION for Extension of Time to File Response/Reply as to 68 MOTION to Dismiss and Memorandum in Support and Memorandum in Support filed by Defendants John C. Baldwin, John W. Bradley, Heather Farnsworth, Traci Gundersen, Rick Hoffman, Chrystal Mancuso-Smith, Marty Moore, Mark Morris, Andrew Morse, Shawn Newell, Mark Pugsley, Michelle Quist, Tom Seiler, Heather Thuet, Utah State Bar, Kristin Woods. (Attachments: # 1 Text of Proposed Order) Motions referred to Daphne A. Oberg. (Baldwin, Dick) (Entered: 08/26/2021) |
| 08/27/2021 | 76 | Motions No Longer Referred: 75 MOTION for Extension of Time to File Response/Reply as to 68 MOTION to Dismiss and Memorandum in Support and Memorandum in Support . District Judge will rule on motion. (ep) (Entered: 08/27/2021) |
| 08/27/2021 | 77 | ORDER granting 75 Motion for Extension of Time to File Response/Reply re 68 MOTION to Dismiss and Memorandum in Support. Replies due by 10/1/2021. Signed by Judge David Barlow on 8/27/2021. (jwt) (Entered: 08/27/2021) |
| 10/01/2021 | 78 | REPLY to Response to Motion re 68 MOTION to Dismiss and Memorandum in Support filed by Defendants John C. Baldwin, John W. Bradley, Heather Farnsworth, Traci Gundersen, Rick Hoffman, Chrystal Mancuso-Smith, Marty Moore, Mark Morris, Andrew Morse, Shawn Newell, Mark Pugsley, Michelle Quist, Tom Seiler, Heather Thuet, Utah State Bar, Kristin Woods. (Baldwin, Dick) (Entered: 10/01/2021) |
| 10/01/2021 | 79 | REQUEST to Submit for Decision re 68 MOTION to Dismiss and Memorandum in Support filed by Defendants John C. Baldwin, John W. Bradley, Heather Farnsworth, Traci Gundersen, Rick Hoffman, Chrystal Mancuso-Smith, Marty Moore, Mark Morris, Andrew Morse, Shawn Newell, Mark Pugsley, Michelle Quist, Tom Seiler, Heather Thuet, Utah State Bar, Kristin Woods. (Baldwin, Dick) (Entered: 10/01/2021) |
| 10/14/2021 | 80 | ORDER OF RECUSAL Judge David Barlow recused. Case reassigned to Judge Robert J. Shelby for all further proceedings. Signed by Judge David Barlow on 10/14/2021. (jl) (Entered: 10/14/2021) |
| 10/14/2021 | 81 | ORDER OF RECUSAL: Judge Robert J. Shelby recused. Case reassigned to Judge Dale A. Kimball for all further proceedings. Signed by Judge Robert J. Shelby on 10/14/21. (dla) (Entered: 10/14/2021) |
| 10/14/2021 | 82 | ORDER OF RECUSAL - Judge Dale A. Kimball recused. Case reassigned to Judge Howard C. Nielson, Jr. for all further proceedings. Signed by Judge Dale A. Kimball on 10/14/2021. (eat) (Entered: 10/14/2021) |
| 10/15/2021 | 83 | ORDER OF RECUSAL: Judge Howard C. Nielson, Jr recused. Case reassigned to Judge Tena Campbell for all further proceedings. Signed by Judge Howard C. Nielson, Jr on 10/15/21. (dla) (Entered: 10/15/2021) |
| 10/19/2021 | 84 | ORDER OF RECUSAL: Magistrate Judge Daphne A. Oberg recused. Case referral is reassigned to Magistrate Judge Cecilia M. Romero under 28:636 (b)(1)(A), Magistrate to hear and determine all nondispositive pretrial matters. Signed by Magistrate Judge Daphne A. Oberg on 10/19/21 (alt) (Entered: 10/19/2021) |
| 10/26/2021 | 85 | ORDER OF RECUSAL: Judge Tena Campbell recused. Case reassigned to Judge Ted Stewart for all further proceedings - case number is now 2:21cv00219 TS. Signed by Judge Tena Campbell on 10/26/21 (alt) (Entered: 10/26/2021) |

| | | |
|---|---|---|
| 10/26/2021 | 86 | ORDER OF RECUSAL Judge Ted Stewart recused. Case reassigned to Judge Jill N. Parrish for all further proceedings. Case number is now 2:21cv00219 JNP. Signed by Judge Ted Stewart on 10/26/2021. (jl) (Entered: 10/26/2021) |
| 10/26/2021 | 87 | ORDER OF RECUSAL - Judge Jill N. Parrish recused. Case reassigned to Judge Bruce S. Jenkins for all further proceedings. Signed by Judge Jill N. Parrish on 10/26/21. (jrj) (Entered: 10/26/2021) |
| 10/27/2021 | 88 | ORDER OF RECUSAL - Magistrate Judge Cecilia M. Romero recused. Case reassigned to Magistrate Judge Jared C. Bennett for all further proceedings. Signed by Magistrate Judge Cecilia M. Romero on 10/27/21. (jrj) (Entered: 10/28/2021) |
| 12/01/2021 | 89 | ORDER OF RECUSAL: Judge Bruce S. Jenkins recused. Case reassigned to Judge Tena Campbell for all further proceedings. Signed by Judge Bruce S. Jenkins on 10/27/2021. (kpf) (Entered: 12/01/2021) |
| 12/01/2021 | 90 | DOCKET TEXT ORDER - Pursuant to DUCivR 83-2(a)(2), the Chief Judge determined that reassignment of this case to Judge Campbell is necessary for the efficient administration of justice. No attached document. Signed by Judge Robert J. Shelby on 12/1/2021. (jwt) (Entered: 12/01/2021) |
| 12/06/2021 | 91 | **NOTICE OF HEARING ON MOTION** re: 68 MOTION to Dismiss : (Notice generated by Chris Ford) Motion Hearing set for 12/13/2021 at 01:30 PM in Judges Chambers before Judge Tena Campbell.<br><br>Chris Ford is inviting you to a scheduled ZoomGov meeting.<br><br>Join ZoomGov Meeting<br><br>https://www.zoomgov.com/j/1600647387?pwd=Z3RGTmxrcTJHdVNta1BvVkZieW9uZz09<br><br>Meeting ID: 160 064 7387<br>Passcode: 753669<br>One tap mobile<br>+16692545252,,1600647387# US (San Jose)<br>+16692161590,,1600647387# US (San Jose)<br>Dial by your location<br>+1 669 254 5252 US (San Jose)<br>+1 669 216 1590 US (San Jose)<br>+1 646 828 7666 US (New York)<br>+1 551 285 1373 US<br>Meeting ID: 160 064 7387<br>Find your local number: https://www.zoomgov.com/u/acVphj2H0F<br>Join by SIP<br>1600647387@sip.zoomgov.com<br>Join by H.323<br>161.199.138.10 (US West)<br>161.199.136.10 (US East)<br>Meeting ID: 160 064 738<br>Passcode: 753669<br><br>For zoom hearings, counsel MUST:<br>-Wear professional attire-Zoom hearings are official court proceedings;<br>-Be in a private professional setting (driving is expressly prohibited as is doing any type of multi-tasking); |

**APP.024**

| | | |
|---|---|---|
| | | -Prior to the hearing test your equipment to ensure proper bandwidth and volume;<br>-Attend via video and be prepared for the hearing.<br><br>(cff) (Entered: 12/06/2021) |
| 12/13/2021 | 92 | Minute Entry for proceedings held before Judge Tena Campbell: Motion Hearing held on 12/13/2021 re 68 MOTION to Dismiss filed by John W. Bradley, Rick Hoffman, Heather Farnsworth, John C. Baldwin, Marty Moore, Tom Seiler, Andrew Morse, Utah State Bar, Heather Thuet, Mark Morris, Chrystal Mancuso-Smith, Mark Pugsley, Michelle Quist, Kristin Woods, Traci Gundersen, Shawn Newell.<br><br>Counsel appear via ZOOM due to continued concerns with COVID-19.<br><br>The court hears argument and takes the matter under advisement.<br><br>Attorney for Plaintiff: Jacob Huebert.<br>Attorney for Defendants: Dick Baldwin.<br><br>Court Reporter: Teena Green.<br><br>(cff) (Entered: 12/14/2021) |
| 03/30/2022 | 93 | NOTICE of Appearance by Ethan Blevins on behalf of Amy Pomeroy (Blevins, Ethan) (Entered: 03/30/2022) |
| 04/04/2022 | 94 | ORDER AND MEMORANDUM DECISION granting in part and denying in part 68 Motion to Dismiss: All claims brought against the Utah State Bar are dismissed. The second claim for relief against the remaining defendants is dismissed. The fourth claim for relief brought against the remaining defendants is dismissed. The first and third claims brought against the remaining defendants are not dismissed. Signed by Judge Tena Campbell on 4/4/22 (alt) (Entered: 04/04/2022) |
| 04/05/2022 | 95 | MOTION for Admission Pro Hac Vice of Scott Day Freeman , Registration fee $ 250, receipt number AUTDC-4297164,<br><br>Attorneys awaiting Pro Hac Vice admission should immediately register to efile and receive electronic notification of case activity in the District of Utah at https://www.pacer.uscourts.gov/cmecf/dcbk.html.<br>Registration requests will not be approved until the court has granted the pro hac vice motion. Instructions are available on the court's website at https://www.utd.uscourts.gov/cmecf-electronic-case-filing.<br><br>filed by Plaintiff Amy Pomeroy. (Attachments: # 1 Exhibit Application for Pro Hac Vice Admission, # 2 Text of Proposed Order)(Blevins, Ethan) (Entered: 04/05/2022) |

**APP.025**

| | | |
|---|---|---|
| 04/06/2022 | 96 | DOCKET TEXT ORDER granting 95 Motion for Admission Pro Hac Vice of Attorney Scott Day Freeman for Amy Pomeroy.<br><br>*Attorneys admitted Pro Hac Vice must register to efile and receive electronic notification of case activity in the District of Utah at https://www.pacer.uscourts.gov/cmecf/dcbk.html. Instructions are available at https://www.utd.uscourts.gov/cmecf-electronic-case-filing.*<br><br>*Attorneys admitted Pro Hac Vice may download a copy of the District of Utahs local rules from the courts web site at https://www.utd.uscourts.gov/rules-practice.*<br><br>So ordered by Judge Tena Campbell on 4/6/22 (docket text only - no attached document) (alt) (Entered: 04/06/2022) |
| 04/06/2022 | 97 | SUBSTITUTION OF COUNSEL Caroline Anais Olsen replacing Christine M. Durham as counsel on behalf of John W. Bradley, Traci Gundersen, Rick Hoffman, Gregory N. Hoole, Chrystal Mancuso-Smith, Marty Moore, Mark Morris, Andrew Morse, Shawn Newell, Michelle Quist, Heather Thuet, Kristin Woods, Elizabeth Wright, Tyler S. Young. (Olsen, Caroline) (Entered: 04/06/2022) |
| 04/07/2022 | 98 | SUBSTITUTION OF COUNSEL Scott Day Freeman replacing Jacob H Huebert as counsel on behalf of Amy Pomeroy. (Freeman, Scott) (Entered: 04/07/2022) |
| 04/18/2022 | 99 | ANSWER to Complaint filed by John W. Bradley, Traci Gundersen, Rick Hoffman, Gregory N. Hoole, Chrystal Mancuso-Smith, Marty Moore, Mark Morris, Andrew Morse, Shawn Newell, Michelle Quist, Heather Thuet, Kristin Woods, Elizabeth Wright, Tyler S. Young.(Baldwin, Dick) (Entered: 04/18/2022) |
| 05/02/2022 | 100 | Stipulated MOTION for Amended Scheduling Order filed by Defendants John W. Bradley, Traci Gundersen, Rick Hoffman, Gregory N. Hoole, Chrystal Mancuso-Smith, Marty Moore, Mark Morris, Andrew Morse, Shawn Newell, Michelle Quist, Heather Thuet, Kristin Woods, Elizabeth Wright, Tyler S. Young. (Attachments: # 1 Text of Proposed Order) Motions referred to Jared C. Bennett.(Baldwin, Dick) (Entered: 05/02/2022) |
| 05/02/2022 | 101 | AMENDED SCHEDULING ORDER granting 100 Motion for Amended Scheduling Order. Amended Pleadings due by 5/18/2022. Joinder of Parties due by 5/18/2022. Fact Discovery due by 10/17/2022. Motions due by 11/14/2022. Final Pretrial Conference set for 3/27/2023 at 03:00 PM in Rm 3.400 before Judge Tena Campbell. 2-Day Jury Trial set for 4/17/2023 at 08:30 AM in Rm 3.400 before Judge Tena Campbell. Signed by Magistrate Judge Jared C. Bennett on 5/2/22 (alt) (Entered: 05/02/2022) |
| 05/11/2022 | 102 | Stipulated MOTION for Leave to File Excess Pages and Memorandum in Support filed by Defendants John W. Bradley, Traci Gundersen, Rick Hoffman, Gregory N. Hoole, Chrystal Mancuso-Smith, Marty Moore, Mark Morris, Andrew Morse, Shawn Newell, Michelle Quist, Heather Thuet, Kristin Woods, Elizabeth Wright, Tyler S. Young. (Attachments: # 1 Text of Proposed Order) Motions referred to Jared C. Bennett. (Baldwin, Dick) (Entered: 05/11/2022) |
| 05/12/2022 | 103 | Motion No Longer Referred to Magistrate Judge Jared C. Bennett: 102 Stipulated MOTION for Leave to File Excess Pages. District Judge Tena Campbell will handle the motion. (jcd) (Entered: 05/12/2022) |
| 05/12/2022 | 104 | ORDER granting in part and denying in part 102 Motion for Leave to File Excess Pages: Defendants may file a Motion for Certification of Appeal/Motion to Stay containing 3,600 words. Signed by Judge Tena Campbell on 5/12/22 (alt) (Entered: 05/12/2022) |

| | | |
|---|---|---|
| 05/19/2022 | 105 | MOTION for Certificate of Appealability re 94 Order MOTION to Stay and Memorandum in Support filed by Defendants John W. Bradley, Traci Gundersen, Rick Hoffman, Gregory N. Hoole, Chrystal Mancuso-Smith, Marty Moore, Mark Morris, Andrew Morse, Shawn Newell, Michelle Quist, Heather Thuet, Kristin Woods, Elizabeth Wright, Tyler S. Young. Motions referred to Jared C. Bennett.(Baldwin, Dick). Added MOTION to Stay and corrected existing motion relief and entry text on 5/20/2022 (alt) Modified on 6/27/2022: changed first relief to "Certificate of Appealability" (alt) (Entered: 05/19/2022) |
| 05/19/2022 | 106 | Motion No Longer Referred to Magistrate Judge Jared C. Bennett: 105 MOTION for Certification of Order for Interlocutory Appeal and Stay. District Judge Tena Campbell will handle the motion. (jcd) (Entered: 05/19/2022) |
| 05/20/2022 | | Modification of Docket re 105 MOTION for Certification of 94 Order for Interlocutory Appeal MOTION to Stay. Error: Motion requesting 2 different reliefs was filed with only one relief selected but not entered correctly. Correction: Second relief, "Stay" has been added to the entry and first motion relief text corrected. (alt) (Entered: 05/20/2022) |
| 05/23/2022 | 107 | Consent MOTION for Extension of Time to File Response/Reply as to 105 MOTION for Certification of 94 Order for Interlocutory Appeal MOTION to Stay filed by Plaintiff Amy Pomeroy. (Attachments: # 1 Text of Proposed Order) Motions referred to Jared C. Bennett.(Freeman, Scott) (Entered: 05/23/2022) |
| 05/24/2022 | 108 | ORDER granting 107 Motion for Extension of Time to File Response/Reply re 105 MOTION for Certification of 94 Order for Interlocutory Appeal MOTION to Stay: Response due by 6/16/2022. Signed by Judge Tena Campbell on 5/24/22 (alt) (Entered: 05/24/2022) |
| 06/16/2022 | 109 | Plaintiff's RESPONSE to Motion re 105 MOTION for Certification of 94 Order for Interlocutory Appeal MOTION to Stay filed by Plaintiff Amy Pomeroy. (Freeman, Scott) (Entered: 06/16/2022) |
| 06/27/2022 | 110 | MOTION for Extension of Time to File Response/Reply as to 105 MOTION for Certification of 94 Order for Interlocutory Appeal MOTION to Stay and Memorandum in Support filed by Defendants John W. Bradley, Traci Gundersen, Rick Hoffman, Gregory N. Hoole, Chrystal Mancuso-Smith, Marty Moore, Mark Morris, Andrew Morse, Shawn Newell, Michelle Quist, Heather Thuet, Kristin Woods, Elizabeth Wright, Tyler S. Young. (Attachments: # 1 Text of Proposed Order) Motions referred to Jared C. Bennett. (Baldwin, Dick) (Entered: 06/27/2022) |
| 06/27/2022 | 111 | Motion No Longer Referred to Magistrate Judge Jared C. Bennett: 110 MOTION for Extension of Time to File Response/Reply as to 105 MOTION for Certification of 94 Order for Interlocutory Appeal MOTION to Stay. The motion will be handled by the district judge. (aja) (Entered: 06/27/2022) |
| 06/27/2022 | 112 | ORDER granting 110 Motion for Extension of Time to File Response/Reply re 105 MOTION for Certificate of Appealability re 94 Order MOTION to Stay: Reply Memo due by 7/14/2022. Signed by Judge Tena Campbell on 6/27/22 (alt) (Entered: 06/27/2022) |
| 06/28/2022 | 113 | MOTION for Admission Pro Hac Vice of Adam C. Shelton , Registration fee $ 250, receipt number AUTDC-4376380, <br><br> Attorneys awaiting Pro Hac Vice admission should immediately register to efile and receive electronic notification of case activity in the District of Utah at https://www.pacer.uscourts.gov/cmecf/dcbk.html. <br> Registration requests will not be approved until the court has granted the pro hac vice motion. Instructions are available on the court's website at |

| | | |
|---|---|---|
| | | https://www.utd.uscourts.gov/cmecf-electronic-case-filing.<br><br>filed by Plaintiff Amy Pomeroy. (Attachments: # 1 Exhibit Application for Pro Hac Vice Admission, # 2 Text of Proposed Order)(Blevins, Ethan) (Entered: 06/28/2022) |
| 06/30/2022 | 114 | DOCKET TEXT ORDER granting 113 Motion for Admission Pro Hac Vice of Attorney Adam C. Shelton for Amy Pomeroy.<br><br>*Attorneys admitted Pro Hac Vice must register to efile and receive electronic notification of case activity in the District of Utah at https://www.pacer.uscourts.gov/cmecf/dcbk.html. Instructions are available at https://www.utd.uscourts.gov/cmecf-electronic-case-filing.*<br><br>*Attorneys admitted Pro Hac Vice may download a copy of the District of Utahs local rules from the courts web site at https://www.utd.uscourts.gov/rules-practice.*<br><br>So ordered by Judge Tena Campbell on 6/30/22 (docket text only - no attached document) (alt) (Entered: 06/30/2022) |
| 07/14/2022 | 115 | REPLY to Response to Motion re 105 MOTION for Certificate of Appealability re 94 Order MOTION to Stay filed by Defendants John W. Bradley, Traci Gundersen, Rick Hoffman, Gregory N. Hoole, Chrystal Mancuso-Smith, Marty Moore, Mark Morris, Andrew Morse, Shawn Newell, Michelle Quist, Heather Thuet, Kristin Woods, Elizabeth Wright, Tyler S. Young. (Baldwin, Dick) (Entered: 07/14/2022) |
| 07/14/2022 | 116 | REQUEST to Submit for Decision re 105 MOTION for Certificate of Appealability re 94 Order MOTION to Stay filed by Defendants John W. Bradley, Traci Gundersen, Rick Hoffman, Gregory N. Hoole, Chrystal Mancuso-Smith, Marty Moore, Mark Morris, Andrew Morse, Shawn Newell, Michelle Quist, Heather Thuet, Kristin Woods, Elizabeth Wright, Tyler S. Young. (Baldwin, Dick) (Entered: 07/14/2022) |
| 08/09/2022 | 117 | NOTICE of SUPPLEMENTAL AUTHORITY by John W. Bradley, Traci Gundersen, Rick Hoffman, Gregory N. Hoole, Chrystal Mancuso-Smith, Marty Moore, Mark Morris, Andrew Morse, Shawn Newell, Michelle Quist, Heather Thuet, Kristin Woods, Elizabeth Wright, Tyler S. Young re 105 MOTION for Certificate of Appealability re 94 Order MOTION to Stay (Baldwin, Dick) (Entered: 08/09/2022) |
| 08/10/2022 | 118 | RESPONSE re 117 Notice of Supplemental Authority,, filed by Amy Pomeroy. (Freeman, Scott) (Entered: 08/10/2022) |
| 08/29/2022 | 119 | ORDER AND MEMORANDUM DECISION DENYING MOTION FOR CERTIFICATE OF APPEALABILITY - denying 105 Motion for Certificate of Appealability; denying 105 Motion to Stay ; re 94 Order MOTION to Stay filed by John W. Bradley, Rick Hoffman, Michelle Quist, Kristin Woods, Tyler S. Young, Marty Moore, Gregory N. Hoole, Elizabeth Wright, Heather Thuet, Andrew Morse, Mark Morris, Shawn Newell, Traci Gundersen, Chrystal Mancuso-Smith. See Order for details. Signed by Judge Tena Campbell on 8/29/22. (jrj) (Entered: 08/29/2022) |
| 09/21/2022 | 120 | NOTICE of Appearance by David C. Reymann on behalf of John C. Baldwin, John W. Bradley, Heather Farnsworth, Traci Gundersen, Rick Hoffman, Gregory N. Hoole, Chrystal Mancuso-Smith, Marty Moore, Mark Morris, Andrew Morse, Shawn Newell, Mark Pugsley, Michelle Quist, Tom Seiler, Heather Thuet, Utah State Bar, Kristin Woods, Elizabeth Wright, Tyler S. Young (Reymann, David) (Entered: 09/21/2022) |
| 11/10/2022 | 121 | Joint MOTION for Extension of Time Dispositive Motions Briefing Schedule filed by Plaintiff Amy Pomeroy. (Attachments: # 1 Text of Proposed Order) Motions referred to Jared C. Bennett.(Freeman, Scott) (Entered: 11/10/2022) |

**APP.028**

| | | |
|---|---|---|
| 11/10/2022 | 122 | ORDER granting 121 Motion for Extension of Time re Dispositive Motions. Signed by Magistrate Judge Jared C. Bennett on 11/10/22 (alt) (Entered: 11/10/2022) |
| 11/10/2022 | | **Reset Deadline per 122 Order:** Motions due by 12/14/2022 (alt) (Entered: 11/10/2022) |
| 12/09/2022 | 123 | Stipulated MOTION for Extension of Time of Dispositive Motion and Related Deadlines and Memorandum in Support filed by Defendants Thomas J Bayles, Erik Christiansen, Traci Gundersen, Matthew Hansen, Rick Hoffman, Gregory N. Hoole, Beth Kennedy, Chrystal Mancuso-Smith, Marty Moore, Mark Morris, Andrew Morse, Shawn Newell, Cara Tangaro, Kristin Woods, Elizabeth Wright, Tyler S. Young. (Attachments: # 1 Text of Proposed Order Order Granting Stipulated Motion for Extension of Dispositive Motion and Related Deadlines) Motions referred to Jared C. Bennett.(Baldwin, Dick) Modified on 12/9/2022: updated motion relief to Amended Scheduling Order (alt) (Entered: 12/09/2022) |
| 12/09/2022 | 124 | ORDER granting 123 Motion for Extension of Dispositive Motion and Related Deadlines (Amending Scheduling Order). Motions due by 1/13/2023. Final Pretrial Conference set for 5/22/2023 at 03:00 PM in Rm 3.400 before Judge Tena Campbell. 2-Day Jury Trial set for 6/12/2023 at 08:30 AM in Rm 3.400 before Judge Tena Campbell. Signed by Magistrate Judge Jared C. Bennett on 12/9/22 (alt) (Entered: 12/09/2022) |
| 01/09/2023 | 125 | Stipulated MOTION for Extension of Time Dispositive Motions Briefing Schedule filed by Plaintiff Amy Pomeroy. (Attachments: # 1 Text of Proposed Order) Motions referred to Jared C. Bennett.(Freeman, Scott) Modified on 1/9/2023: updated motion relief to "Amended Scheduling Order" (alt) (Entered: 01/09/2023) |
| 01/09/2023 | 126 | ORDER granting 125 Motion for Amended Scheduling Order deadlines. Motions due by 1/27/2023. Final Pretrial Conference set for 6/5/2023 at 03:00 PM in Rm 3.400 before Judge Tena Campbell. 2-Day Jury Trial set for 6/26/2023 at 08:30 AM in Rm 3.400 before Judge Tena Campbell. Signed by Magistrate Judge Jared C. Bennett on 1/9/23 (alt) (Entered: 01/09/2023) |
| 01/27/2023 | 127 | MOTION for Summary Judgment and Memorandum in Support filed by Plaintiff Amy Pomeroy. (Attachments: # 1 Appendix of Exhibits - Index, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13, # 15 Exhibit 14, # 16 Exhibit 15, # 17 Exhibit 16, # 18 Exhibit 17, # 19 Exhibit 18, # 20 Exhibit 19, # 21 Exhibit 20, # 22 Exhibit 21, # 23 Exhibit 22, # 24 Exhibit 23, # 25 Exhibit 24, # 26 Exhibit 25, # 27 Exhibit 26, # 28 Exhibit 27, # 29 Exhibit 28, # 30 Exhibit 29, # 31 Exhibit 30, # 32 Exhibit 31, # 33 Text of Proposed Order)(Freeman, Scott) (Entered: 01/27/2023) |
| 01/27/2023 | 128 | MOTION for Summary Judgment and Memorandum in Support filed by Defendants Thomas J Bayles, Erik Christiansen, Traci Gundersen, Matthew Hansen, Rick Hoffman, Gregory N. Hoole, Beth Kennedy, Chrystal Mancuso-Smith, Marty Moore, Mark Morris, Andrew Morse, Shawn Newell, Cara Tangaro, Kristin Woods, Elizabeth Wright, Tyler S. Young. (Baldwin, Dick) (Entered: 01/27/2023) |
| 01/27/2023 | 129 | APPENDIX to 128 MOTION for Summary Judgment and Memorandum in Support filed by Defendants Thomas J Bayles, Erik Christiansen, Traci Gundersen, Matthew Hansen, Rick Hoffman, Gregory N. Hoole, Chrystal Mancuso-Smith, Marty Moore, Mark Morris, Andrew Morse, Shawn Newell, Cara Tangaro, Kristin Woods, Elizabeth Wright, Tyler S. Young . (Attachments: # 1 Exhibit 01_Declaration of Elizabeth Wright, Jan. 27, 2023, # 2 Exhibit 02_31 Utah Bar J. no. 3, May-June 2018 (USB003006-73), # 3 Exhibit 03_32 Utah Bar J. no. 3, May-June 2019 (USB003430-97), # 4 Exhibit 04_Email from Dickson Burton to Utah State Bar Members (Feb. 27, 2019) (USB002009, 2033-34), # 5 Exhibit 05_Email from Elizabeth Wright to Larson Frisby (Nov. 12, 2018) |

**APP.029**

(USB002037-2119), # 6 Exhibit 06_Memorandum to the Governmental Relations Committee (2019) (USB002321), # 7 Exhibit 07_Email from Dickson Burton to Bar Commissioners (Mar. 25, 2019) (USB004773), # 8 Exhibit 08_35 Utah Bar J. no. 5, Sept.-Oct. 2022 (USB004698-4769), # 9 Exhibit 09_35 Utah Bar J. no. 4, July-Aug. 2022 (USB035811-82), # 10 Exhibit 10_34 Utah Bar J. no. 3, May-June 2021 (USB004266-337), # 11 Exhibit 11_34 Utah Bar J. no. 2, March-April 2021 (USB004198-4265), # 12 Exhibit 12_32 Utah Bar J. no. 5, Sept.-Oct. 2019 (USB003570-3633), # 13 Exhibit 13_32 Utah Bar J. no. 4, July-Aug. 2019 (USB003286-3357), # 14 Exhibit 14_31 Utah Bar J. no. 6, Nov.-Dec. 2018 (USB003074-3145), # 15 Exhibit 15_31 Utah Bar J. no. 4, July-Aug. 2018 (USB002870-2937), # 16 Exhibit 16_30 Utah Bar J. no. 1, Jan.-Feb. 2017 (USB002394-2461), # 17 Exhibit 17_2022 Governmental Relations Committee Positions (USB004974-78), # 18 Exhibit 18_2021 Governmental Relations Committee Positions (USB004955-61), # 19 Exhibit 19_2020 Governmental Relations Committee Positions (USB004809-19), # 20 Exhibit 20_2019 Governmental Relations Committee Positions (USB004979-81), # 21 Exhibit 21_Utah State Bar Keller Refund Request Policies and Procedures (USB028874-78), # 22 Exhibit 22_FY 2022-2023 Budget (USB029460-89), # 23 Exhibit 23_FY 2021-2022 Budget (USB029638-68), # 24 Exhibit 24_FY 2020-2021 Budget (USB001963-93), # 25 Exhibit 25_FY 2019-2020 Budget (USB001932-62), # 26 Exhibit 26_FY 2018-2019 Budget (USB001902-31), # 27 Exhibit 27_FY 2017-2018 Budget (USB001859-1901), # 28 Exhibit 28_FY 2016-2017 Budget (USB001818-58)) (Baldwin, Dick) (Entered: 01/27/2023)

| 02/21/2023 | 130 | Joint MOTION for Extension of Time to File Response/Reply as to 128 MOTION for Summary Judgment and Memorandum in Support , 127 MOTION for Summary Judgment and Memorandum in Support and Memorandum in Support filed by Defendants Thomas J Bayles, Erik Christiansen, Traci Gundersen, Matthew Hansen, Rick Hoffman, Gregory N. Hoole, Beth Kennedy, Chrystal Mancuso-Smith, Marty Moore, Mark Morris, Andrew Morse, Shawn Newell, Cara Tangaro, Kristin Woods, Elizabeth Wright, Tyler S. Young. (Attachments: # 1 Text of Proposed Order) Motions referred to Jared C. Bennett.(Baldwin, Dick) (Entered: 02/21/2023) |
| 02/21/2023 | 131 | ORDER granting 130 Joint MOTION for Extension of Time to File Response/Reply as to 127 MOTION for Summary Judgment, 128 MOTION for Summary Judgment: Responses/Oppositions due by 3/27/2023. Signed by Magistrate Judge Jared C. Bennett on 2/21/23 (alt) (Entered: 02/21/2023) |
| 03/22/2023 | 132 | Joint MOTION for Extension of Time to File Oppositions to Motions for Summary Judgment and Memorandum in Support filed by Defendants Thomas J Bayles, Erik Christiansen, Traci Gundersen, Matthew Hansen, Rick Hoffman, Gregory N. Hoole, Beth Kennedy, Chrystal Mancuso-Smith, Marty Moore, Mark Morris, Andrew Morse, Shawn Newell, Cara Tangaro, Kristin Woods, Elizabeth Wright, Tyler S. Young. (Attachments: # 1 Text of Proposed Order) Motions referred to Jared C. Bennett.(Baldwin, Dick) (Entered: 03/22/2023) |
| 03/23/2023 | 133 | ORDER granting 132 Motion for Extension of Time. Signed by Magistrate Judge Jared C. Bennett on 3/23/23 (alt) (Entered: 03/23/2023) |
| 04/10/2023 | 134 | RESPONSE to Motion re 127 MOTION for Summary Judgment filed by Defendants Thomas J Bayles, Erik Christiansen, Traci Gundersen, Matthew Hansen, Rick Hoffman, Gregory N. Hoole, Beth Kennedy, Chrystal Mancuso-Smith, Marty Moore, Mark Morris, Andrew Morse, Shawn Newell, Cara Tangaro, Kristin Woods, Elizabeth Wright, Tyler S. Young. (Attachments: # 1 Exhibit 1 - Second Declaration of Elizabeth Wright, # 2 Exhibit 2 - 30 Utah Bar J. no. 2, Mar.-Apr. 2017 (USB002530-93), # 3 Exhibit 3 - 31 Utah Bar J. no. 1, Jan.-Feb. 2018 (USB002802-69), # 4 Exhibit 4 - 32 Utah Bar J. no. 2, Mar.-Apr. 2019 (USB003358-429), # 5 Exhibit 5 - 33 Utah Bar J. no. 2, Mar.-Apr. 2020 (USB003770-845), # 6 Exhibit 6 - 30 Utah Bar J. no. 4, July-Aug. 2017 (USB002462- |

| | | |
|---|---|---|
| | | 529), # [7] Exhibit 7 - 36 Utah Bar J. no. 1, Jan.-Feb. 2023, # [8] Exhibit 8 - Plaintiffs Responses to Defendants Discovery Requests (Oct. 31, 2022), # [9] Exhibit 9 - Order, Crowe v. Oregon State Bar, No. 318-CV-2139-JR (D. Or. Feb. 14, 2023), # [10] Exhibit 10 - Order, Schell v. Darby, No. 519-CV-00281-HE (W.D. Okla. Mar. 1, 2023))(Baldwin, Dick) (Entered: 04/10/2023) |
| 04/10/2023 | [135] | RESPONSE to Motion re [128] MOTION for Summary Judgment filed by Plaintiff Amy Pomeroy. (Freeman, Scott) (Entered: 04/10/2023) |
| 04/20/2023 | [136] | Joint MOTION for Extension of Time to File Response/Reply as to [128] MOTION for Summary Judgment, [127] MOTION for Summary Judgment and Memorandum in Support filed by Defendants Thomas J Bayles, Erik Christiansen, Traci Gundersen, Matthew Hansen, Rick Hoffman, Gregory N. Hoole, Beth Kennedy, Chrystal Mancuso-Smith, Marty Moore, Mark Morris, Andrew Morse, Shawn Newell, Cara Tangaro, Kristin Woods, Elizabeth Wright, Tyler S. Young. (Attachments: # [1] Text of Proposed Order) Motions referred to Jared C. Bennett.(Baldwin, Dick) (Entered: 04/20/2023) |
| 04/21/2023 | [137] | ORDER granting [136] Joint MOTION for Extension of Time to File Response/Reply as to [128] MOTION for Summary Judgment, [127] MOTION for Summary Judgment: Replies due by 5/8/2023. Signed by Magistrate Judge Jared C. Bennett on 4/21/23 (alt) (Entered: 04/21/2023) |
| 05/03/2023 | [138] | Stipulated MOTION to Vacate Trial Date and associated pretrial deadlines and Memorandum in Support filed by Defendants Thomas J Bayles, Erik Christiansen, Traci Gundersen, Matthew Hansen, Rick Hoffman, Gregory N. Hoole, Beth Kennedy, Chrystal Mancuso-Smith, Marty Moore, Mark Morris, Andrew Morse, Shawn Newell, Cara Tangaro, Kristin Woods, Elizabeth Wright, Tyler S. Young. (Attachments: # [1] Text of Proposed Order)(Baldwin, Dick) Modified on 5/4/2023: correct motion relief text (alt) (Entered: 05/03/2023) |
| 05/04/2023 | [139] | ORDER granting [138] Stipulated MOTION to Vacate Trial Date and associated pretrial deadlines: deadlines, as appropriate, will be reset within 14 days of ruling on the summary judgment motions. Signed by Magistrate Judge Jared C. Bennett on 5/4/23 (alt) (Entered: 05/04/2023) |
| 05/04/2023 | | Deadlines/Hearings terminated per [139] Order (alt) (Entered: 05/04/2023) |
| 05/08/2023 | [140] | Plaintiff's REPLY to Response to Motion re [127] MOTION for Summary Judgment filed by Plaintiff Amy Pomeroy. (Freeman, Scott) (Entered: 05/08/2023) |
| 05/08/2023 | [141] | REPLY to Response to Motion re [128] MOTION for Summary Judgment filed by Defendants Thomas J Bayles, Erik Christiansen, Traci Gundersen, Matthew Hansen, Rick Hoffman, Gregory N. Hoole, Beth Kennedy, Chrystal Mancuso-Smith, Marty Moore, Mark Morris, Andrew Morse, Shawn Newell, Cara Tangaro, Kristin Woods, Elizabeth Wright, Tyler S. Young. (Baldwin, Dick) (Entered: 05/08/2023) |
| 05/08/2023 | [142] | REQUEST to Submit for Decision re [135] Response to Motion, [128] MOTION for Summary Judgment, [141] Reply Memorandum/Reply to Response to Motion, filed by Defendants Thomas J Bayles, Erik Christiansen, Traci Gundersen, Matthew Hansen, Rick Hoffman, Gregory N. Hoole, Beth Kennedy, Chrystal Mancuso-Smith, Marty Moore, Mark Morris, Andrew Morse, Shawn Newell, Cara Tangaro, Kristin Woods, Elizabeth Wright, Tyler S. Young. (Baldwin, Dick) (Entered: 05/08/2023) |
| 05/09/2023 | 143 | **NOTICE OF ZOOM HEARING ON MOTIONS** re: [128] MOTION for Summary Judgment, [127] MOTION for Summary Judgment : (Notice generated by Chris Ford) Motion Hearing set for 6/21/2023 at 10:30 AM in Judges Chambers before Judge Tena Campbell. |

**APP.031**

For zoom hearings, counsel MUST:
-Wear professional attire-Zoom hearings are official court proceedings;
-Be in a private professional setting (driving is expressly prohibited as is doing any type of multi-tasking);
-Prior to the hearing test your equipment to ensure proper bandwidth and volume;
-Attend via video and be prepared for the hearing.


Join ZoomGov Meeting

https://www.zoomgov.com/j/1610874450?
pwd=RHY3NmViUGZaK3crMmgzK3NaMVRlUT09

Meeting ID: 161 087 4450
Passcode: 923366
One tap mobile
+16692545252,,1610874450# US (San Jose)
+14154494000,,1610874450# US (US Spanish Line)
Dial by your location
+1 669 254 5252 US (San Jose)
+1 415 449 4000 US (US Spanish Line)
+1 551 285 1373 US
+1 646 828 7666 US (New York)
+1 646 964 1167 US (US Spanish Line)
+1 669 216 1590 US (San Jose)
Meeting ID: 161 087 4450
Find your local number: https://www.zoomgov.com/u/aeryf3OyHW
Join by SIP
1610874450@sip.zoomgov.com
Join by H.323
161.199.138.10 (US West)
161.199.136.10 (US East)
Meeting ID: 161 087 4450
Passcode: 923366

(cff) (Entered: 05/09/2023)

| | | |
|---|---|---|
| 05/10/2023 | 144 | **AMENDED NOTICE OF ZOOM HEARING ON MOTIONS** re: 128 MOTION for Summary Judgment and 127 MOTION for Summary Judgment : (Notice generated by Chris Ford)<br><br>Motion Hearing RESET for 6/29/2023 at 10:30 AM in Judges Chambers before Judge Tena Campbell.<br><br>For zoom hearings, counsel MUST:<br>-Wear professional attire-Zoom hearings are official court proceedings;<br>-Be in a private professional setting (driving is expressly prohibited as is doing any type of multi-tasking);<br>-Prior to the hearing test your equipment to ensure proper bandwidth and volume;<br>-Attend via video and be prepared for the hearing.<br><br>Join ZoomGov Meeting |

**APP.032**

|  |  | https://www.zoomgov.com/j/1610874450?<br>pwd=RHY3NmViUGZaK3crMmgzK3NaMVRlUT09<br><br>Meeting ID: 161 087 4450<br>Passcode: 923366<br>One tap mobile<br>+16692545252,,1610874450# US (San Jose)<br>+14154494000,,1610874450# US (US Spanish Line)<br>Dial by your location<br>+1 669 254 5252 US (San Jose)<br>+1 415 449 4000 US (US Spanish Line)<br>+1 551 285 1373 US<br>+1 646 828 7666 US (New York)<br>+1 646 964 1167 US (US Spanish Line)<br>+1 669 216 1590 US (San Jose)<br>Meeting ID: 161 087 4450<br>Find your local number: https://www.zoomgov.com/u/aeryf3OyHW<br>Join by SIP<br>1610874450@sip.zoomgov.com<br>Join by H.323<br>161.199.138.10 (US West)<br>161.199.136.10 (US East)<br>Meeting ID: 161 087 4450<br>Passcode: 923366<br><br>(cff) (Entered: 05/10/2023) |
| 06/29/2023 | 145 | Minute Entry for proceedings held before Judge Tena Campbell:<br><br>Motion Hearing held on 6/29/2023 re 128 MOTION for Summary Judgment filed by Rick Hoffman, Marty Moore, Gregory N. Hoole, Cara Tangaro, Elizabeth Wright, Andrew Morse, Mark Morris, Matthew Hansen, Chrystal Mancuso-Smith, Kristin Woods, Tyler S. Young, Beth Kennedy, Traci Gundersen, Shawn Newell, Erik Christiansen, Thomas J Bayles and 127 MOTION for Summary Judgment filed by Amy Pomeroy.<br><br>All parties appear via ZOOM.<br><br>The court hears argument on the aforementioned motions and takes them under advisement.<br><br>Attorneys for Plaintiff: Ethan Blevins and Scott Day Freeman.<br>Attorneys for Defendant: Dick J. Baldwin and David C. Reymann.<br><br>Court Reporter: Michelle Gonsalves.<br><br>(cff) (Entered: 06/30/2023) |
| 09/29/2023 | 146 | NOTICE of Updated Office Holder Identities by Thomas J Bayles, Erik Christiansen, Traci Gundersen, Matthew Hansen, Rick Hoffman, Gregory N. Hoole, Beth Kennedy, Chrystal Mancuso-Smith, Marty Moore, Mark Morris, Andrew Morse, Shawn Newell, Cara Tangaro, Kristin Woods, Elizabeth Wright, Tyler S. Young (Baldwin, Dick) (Entered: 09/29/2023) |
| 11/15/2023 | 147 | NOTICE of SUPPLEMENTAL AUTHORITY by Amy Pomeroy (Freeman, Scott) (Entered: 11/15/2023) |

**APP.033**

| 11/22/2023 | 148 | RESPONSE re 147 Notice of Supplemental Authority, filed by Thomas J Bayles, Erik Christiansen, Traci Gundersen, Matthew Hansen, Rick Hoffman, Gregory N. Hoole, Beth Kennedy, Chrystal Mancuso-Smith, Marty Moore, Mark Morris, Andrew Morse, Shawn Newell, Cara Tangaro, Kristin Woods, Elizabeth Wright, Tyler S. Young. (Baldwin, Dick) (Entered: 11/22/2023) |
|---|---|---|
| 11/28/2023 | 149 | NOTICE of Substitution of Parties by Thomas J Bayles, Erik Christiansen, Traci Gundersen, Matthew Hansen, Rick Hoffman, Gregory N. Hoole, Beth Kennedy, Chrystal Mancuso-Smith, Marty Moore, Mark Morris, Andrew Morse, Shawn Newell, Cara Tangaro, Kristin Woods, Elizabeth Wright, Tyler S. Young (Baldwin, Dick) (Entered: 11/28/2023) |
| 01/25/2024 | 150 | NOTICE of Change of Law Firm Affiliation and Address of Dick J. Baldwin by John C. Baldwin, Thomas J Bayles, John W. Bradley, J. Brett Chambers, Erik Christiansen, Kim Cordova, Heather Farnsworth, Traci Gundersen, Matthew Hansen, Rick Hoffman, Gregory N. Hoole, Beth Kennedy, Chrystal Mancuso-Smith, Marty Moore, Mark Morris, Andrew Morse, Shawn Newell, Mark Pugsley, Michelle Quist, John Reese, Tom Seiler, Cara Tangaro, Heather Thuet, Utah State Bar, Kristin Woods, Elizabeth Wright, Tyler S. Young (Baldwin, Dick) (Entered: 01/25/2024) |
| 04/25/2024 | 151 | ORDER AND MEMORANDUM DECISION denying 127 Plaintiff's Motion for Summary Judgment; granting 128 Defendants' Motion for Summary Judgment. Signed by Judge Tena Campbell on 4/25/24 (alt) (Entered: 04/25/2024) |
| 04/25/2024 | 152 | JUDGMENT entered in favor of the Defendants; all of Plaintiff's causes of action are dismissed - CASE CLOSED. Magistrate Judge Jared C. Bennett no longer assigned to case. Signed by Judge Tena Campbell on 4/25/24 (alt) (Entered: 04/25/2024) |
| 05/20/2024 | 153 | NOTICE OF APPEAL as to 152 Judgment, 151 Order on Motion for Summary Judgment,, Memorandum Decision, 94 Order on Motion to Dismiss,, Memorandum Decision, filed by Amy Pomeroy. Appeals to the USCA for the 10th Circuit. Filing fee $ 605, receipt number AUTDC-5067301. (Freeman, Scott) (Entered: 05/20/2024) |
| 05/20/2024 | 154 | TRANSCRIPT REQUEST FORM filed by Amy Pomeroy for proceedings held on 06/29/2023 before Judge Tena Campbell, re 153 Notice of Appeal, (Freeman, Scott) (Entered: 05/20/2024) |
| 05/21/2024 | 155 | Transmission of Preliminary Record to USCA/10CCA re 153 Notice of Appeal (Attachments: # 1 Appendix) (alt) (Entered: 05/21/2024) |
| 05/22/2024 | 156 | USCA Case Number Case Appealed to Tenth Circuit Case Number 24-4054 for 153 Notice of Appeal, filed by Amy Pomeroy. A transcript order form or notice that no transcript is necessary per 10th Cir. R. 10.2. This form must be filed in both the district court and this court. See letter for additional information. (jrj) (Entered: 05/22/2024) |
| 05/28/2024 | 157 | The court reporter(Teena) has filed the Transcript Order Form re 154 Transcript Request - Appeal, 153 Notice of Appeal,. Transcript estimated completion date is 6/20/24. (jrj) (Entered: 05/28/2024) |
| 05/31/2024 | 158 | TRANSCRIPT REQUEST FORM filed by Amy Pomeroy for proceedings held on 6/29/23 before Judge Tena Campbell, re 153 Notice of Appeal, (Freeman, Scott) (Entered: 05/31/2024) |
| 05/31/2024 | 159 | TRANSCRIPT REQUEST FORM filed by Amy Pomeroy for proceedings held on 12/13/2021 before Judge Tena Campbell, re 153 Notice of Appeal, (Freeman, Scott) (Entered: 05/31/2024) |

**APP.034**

| 06/10/2024 | 160 | ~~**RESTRICTED DOCUMENT**~~ NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Motion Hearing held on December 13, 2021, before Judge Tena Campbell, re 153 Notice of Appeal. Court Reporter/Transcriber Teena Green, Telephone number 801-910-4092.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Please review the transcript within 14 days after receiving this notice to determine if personal data identifiers need to be redacted. If redaction is not required, the transcript will be made electronically available 90 days after this notice. If redaction of personal identifies is needed, a party must file a Notice of Intent to Request Redaction within 21 days after receiving this information. The Attorney Filing the Notice of Intent To Request Redaction and Redaction request must send a copy to the court reporter. The court will not send a copy to the court reporter.**<br><br>**Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Request Redaction due 7/1/2024. Redaction Request due 7/22/2024. Redacted Transcript Deadline set for 8/12/2024. Release of Transcript Restriction set for 9/9/2024 (alt) Modified by removing restricted text on 9/9/2024 (kec). (Entered: 06/10/2024)** |
| --- | --- | --- |
| 06/10/2024 | 161 | Transcript Purchased by: Scott Freeman re 160 transcript of 12/13/21 (alt) (Entered: 06/10/2024) |
| 06/20/2024 | 162 | The court reporter(Michelle G.) has filed the Transcript Order Form re 153 Notice of Appeal, 158 Transcript Request - Appeal. Transcript estimated completion date is 6/31/24. (jrj) (Entered: 06/20/2024) |
| 07/08/2024 | 163 | ~~**RESTRICTED DOCUMENT**~~ NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Motion Hearing held on June 29, 2023, before Judge Tena Campbell, re 153 Notice of Appeal. Court Reporter/Transcriber Michelle B. Gonsalves, Telephone number 801-783-8657.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Please review the transcript within 14 days after receiving this notice to determine if personal data identifiers need to be redacted. If redaction is not required, the transcript will be made electronically available 90 days after this notice. If redaction of personal identifies is needed, a party must file a Notice of Intent to Request Redaction within 21 days after receiving this information. The Attorney Filing the Notice of Intent To Request Redaction and Redaction request must send a copy to the court reporter. The court will not send a copy to the court reporter.**<br><br>**Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Request Redaction due 7/29/2024. Redaction Request due 8/19/2024. Redacted Transcript Deadline set for 9/9/2024. Release of Transcript Restriction set for 10/7/2024 (alt) Modified by striking restricted text on 10/7/2024 (mh). (Entered: 07/08/2024)** |
| 07/08/2024 | 164 | Transcript Purchased by: Goldwater Institute re 163 transcript of 6/29/23 (alt) (Entered: 07/08/2024) |
| 07/10/2024 | 165 | Please be advised the Record is complete for purposes of appeal for USCA/10CCA case number 24-4054, re 153 Notice of Appeal (alt) (Entered: 07/10/2024) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 10/17/2024 17:43:27 | | | |
| **PACER Login:** | GWILegal | **Client Code:** | Pomeroy |
| **Description:** | Docket Report | **Search Criteria:** | 2:21-cv-00219-TC |
| **Billable Pages:** | 30 | **Cost:** | 3.00 |

**APP.036**

Jacob Huebert, Bar # 17768
Scharf-Norton Center for Constitutional Litigation at the
**GOLDWATER INSTITUTE**
500 E. Coronado Road
Phoenix, Arizona 85004
Telephone: 602.462.5000
litigation@goldwaterinstitute.org
*Attorney for Plaintiff*

---

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| AMY POMEROY,<br><br>Plaintiff,<br><br>UTAH STATE BAR; JOHN C. BALDWIN, Executive Director, Utah State Bar; HEATHER FARNSWORTH, President, Utah State Bar; HEATHER THUET, President Elect, Utah State Bar; MARTY MOORE, 1st Division Commissioner, Utah State Bar; JOHN W. BRADLEY, 2nd Division Commissioner, Utah State Bar; CHRYSTAL MANCUSO-SMITH, 3rd Division Commissioner, Utah State Bar; MICHELLE QUIST, 3rd Division Commissioner, Utah State Bar; MARK MORRIS, 3rd Division Commissioner, Utah State Bar; MARK PUGSLEY, 3rd Division Commissioner, Utah State Bar; TRACI GUNDERSEN, 3rd Division Commissioner, Utah State Bar; ANDREW MORSE, 3rd Division Commissioner, Utah State Bar; TOM SEILER, 4th Division Commissioner, Utah State Bar; KRISTIN WOODS, 5th Division Commissioner, Utah State Bar; RICK HOFFMAN, Public Member Commissioner, Utah State Bar; SHAWN NEWELL, Public Member Commissioner, Utah State Bar,<br><br>Defendants. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>Civil No. _____<br><br>Judge _____ |

1.      This civil rights lawsuit seeks to protect the First and Fourteenth Amendment rights of Utah attorneys who have been forced to become members of the Utah State Bar ("USB") and the Utah Bar Foundation ("UBF") and to subsidize political and ideological speech by the USB that they do not wish to support.

2.      The State of Utah requires attorneys to join and pay fees to the USB, a bar association, as a condition of being allowed to practice law in the state. *See* Utah Judicial Council Code of Judicial Admin. ("CJA") Rules 14-101, 14-102(a)(1), 14-107, 14-209, 14-802(a).

3.      The State of Utah also makes all attorneys who are USB members automatically members of the UBF. CJA Rule 14-209.

4.      Utah's requirements that attorneys join the USB and UBF violate attorneys' First Amendment rights to free speech and association, and are not necessary to regulate the legal profession or improve the quality of legal services in Utah.

5.      The USB's collection and use of mandatory bar dues to subsidize political and ideological speech without attorneys' affirmative consent violates their First Amendment right to choose what private speech and association they will and will not support, and is not necessary to regulate the legal profession or improve the quality of legal services in Utah.

6.      Further, even if one assumes mandatory bar membership and dues are not inherently unconstitutional, the USB fails to provide essential safeguards to ensure that

1

attorneys' dues are not used for activities that are not germane to the USB's purpose of improving the quality of legal services by regulating the legal profession.

7.      This lawsuit therefore asks this Court to declare mandatory USB and UBF membership unconstitutional and to order Defendants to stop forcing attorneys to join the USB and subsidize its speech without their affirmative consent. Alternatively, at a minimum, this lawsuit asks this Court to order Defendants to stop collecting mandatory fees in the absence of sufficient procedures to protect attorneys from being forced to subsidize USB speech and other activities that are not germane to improving the quality of legal services and regulating the legal profession.

## JURISDICTION AND VENUE

8.      This action is brought under 42 U.S.C. §§ 1983 and 1988.

9.      This Court has subject matter jurisdiction over Plaintiff's claims under 28 U.S.C. §§ 1331 and 1343.

10.     This Court has authority to grant declaratory and other relief under 28 U.S.C. §§ 2201 and 2202.

11.     Venue is appropriate under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

## PARTIES

12.     Plaintiff Amy Pomeroy is a citizen of the United States and resides in Orem, Utah. Plaintiff Pomeroy is a duly licensed attorney under the laws of Utah and is a

2

member of the USB solely because membership is a mandatory prerequisite to practice law in the State of Utah.

13.     Defendant Utah State Bar is a Utah non-profit corporation to which Utah attorneys are compelled to pay an annual fee as a condition of practicing law in Utah.

14.     Defendant John C. Baldwin is Executive Director of the Utah State Bar. As the USB's Executive Director, Defendant Baldwin is responsible for enforcing the state's requirement that attorneys join and pay fees to the USB as a condition of practicing law in Utah. *See* CJA Rule 14-107(b)(2).

15.     Defendant Heather Farnsworth is President of the Utah State Bar. Together with the other members of the Board of Commissioners of Utah State Bar Commissioners ("Board"), Defendant Farnsworth is responsible for enforcing the state's requirement that attorneys become members of, and pay fees to, the USB as a condition of practicing law in Utah. *See* CJA Rule 14-111(a).

16.     Defendant Heather Thuet is President-Elect of the Utah State Bar.

17.     Defendant Marty Moore is a member of the Board, representing the 1st Division.

18.     Defendant John W. Bradley is a member of the Board, representing the 2nd Division.

19.     Defendant Chrystal Mancuso-Smith is a member of the Board, representing the 3rd Division.

APP.040

20.     Defendant Michelle Quist is a member of the Board, representing the 3rd Division.

21.     Defendant Mark Morris is a member of the Board, representing the 3rd Division.

22.     Defendant Mark Puglsey is a member of the Board, representing the 3rd Division.

23.     Defendant Traci Gundersen is a member of the Board, representing the 3rd Division.

24.     Defendant Andrew Morse is a member of the Board, representing the 3rd Division.

25.     Defendant Tom Seiler is a member of the Board, representing the 4th Division.

26.     Defendant Kristin Woods is a member of the Board, representing the 5th Division.

27.     Defendant Rick Hoffman is a "public" member of the Board.

28.     Defendant Shawn Newell is a "public" member of the Board.

29.     All individual Defendants are sued in their official capacities.

APP.041

# FACTS

**Utah's Mandatory Bar Association Membership and Fees**

30.     Utah compels every attorney licensed in Utah to be a member of the USB in order to practice law in the state. CJA Rules 14-101, 14-102, 14-802.

31.     Utah also compels attorneys licensed in the state to pay annual dues to the USB. CJA Rules 14-107, 14-111(a), 14-207, 14-716; *see also In re Discipline of Sonnenreich*, 86 P.3d 712, 718-19 ¶ 17 (Utah 2004) (noting the "clear requirement" that Utah attorneys pay an annual fee to the USB).

32.     If an attorney fails to pay the annual fee to the USB, the USB administratively suspends the attorney's license to practice law, which prohibits the attorney from practicing law in the state. CJA Rules 14-111(a).

33.     As a Utah attorney, Plaintiff Amy Pomeroy is compelled to become a member of the USB and to pay an annual fee to the USB as a condition of engaging in her profession.

34.     Plaintiff Pomeroy has paid annual dues to the USB since approximately 2014.

35.     The USB and the members of its Board—namely, Defendants Farnsworth, Thuet, Moore, Bradley, Mancuso-Smith, Quist, Morris, Pugsley, Gundersen, Morse, Seiler, Woods, Hoffman, and Newell (collectively, the "USB Board Members")—act

**APP.042**

under color of state law to enforce Utah's rules requiring membership and funding of the USB as a condition of practicing law in the State of Utah.

**The USB's Use of Mandatory Fees for Political and Ideological Speech**

36. The USB Board Members use mandatory USB member dues on behalf of the USB, acting under color of state law. CJA Rules 14-109, 14-207(d).

37. The USB uses members' mandatory dues to engage in speech, including political and ideological speech.

38. CJA Rule 14-106(a) "authorize[s] and direct[s]" the Board "to study and provide assistance on public policy issues and to adopt positions of behalf of the Board on public policy issues."

39. Rule 14-106(a) also authorizes the Board to, among other things, "adopt a position in support of or in opposition to a policy initiative, to adopt no position on a policy initiative, or to remain silent on a policy initiative."

40. Under Rule 14-106(a)(1), public policy issues on which the USB may take positions include "issues concerning the courts of Utah, procedure and evidence in the courts, the administration of justice, the practice of law, and matters of substantive law on which the collective expertise of lawyers has special relevance and/or which may affect an individual's ability to access legal services or the legal system."

41. Under these Rules, the USB has advocated for and against both procedural and substantive proposed state legislation.

**APP.043**

42.     The January/February 2021 issue of the USB's *Utah Bar Journal* states: "In recent years, the Bar has played an active role in major public policy debates, such as taxation of legal services, whether the supreme court should regulate the practice of law, and what criteria should be considered when filling judicial vacancies. As our state continues to grow and change, we anticipate there will be other major issues that will require the Bar's input."

43.     In 2019, the USB opposed a proposed "Tax Equalization and Reduction Act" (H.B. 441), which would have modified the state's tax system in various ways, because it would have imposed a tax on legal services.

44.     In the July/August 2019 issue of the USB's *Utah Bar Journal* publication, the USB's then-President stated that "the Bar took a strong stand" against the proposed tax, that the USB "is continuing to be actively involved in monitoring and opposing a sales tax on legal services," and that the USB "ask[s] all of you [USB members] to stay involved and that you encourage your clients to do the same."

45.     The May/June 2018 issue of the *Utah Bar Journal* reported that the USB "had significant influence on the language and structure" of legislation regarding the state attorney general's ability to invoke a potential conflict of interest or the attorney-client privilege to withhold release of an opinion requested by the legislature.

46.     That issue of the *Utah Bar Journal* also stated that "the 2018 General Session [of the Utah State Legislature] was successful for the Utah bar as our leaders

**APP.044**

influenced the language of legislation and enhanced the bar's relationship with lawmakers and staff."

47.     The USB has also opposed measures that would alter the way Utah selects judges, including a 2019 proposed constitutional amendment that would have replaced the state's current method (appointment by the governor from nominees certified by a nominating commission, subject to Utah Senate approval and retention elections) with nonpartisan elections.

48.     The USB engages lobbyists to advocate for and against proposed legislation in the Utah State Legislature.

49.     In advocating for and against proposed legislation, the USB and its lobbyists purport to represent the USB's membership.

50.     Recent issues of the *Utah Bar Journal*, funded with members' mandatory dues, include statements that take or publicize positions on current controversies, including but not limited to an article by the USB's president in the March-April 2021 issue asserting the importance of pursuing "equity" as distinct from "equality"; an article in that same issue calling for courtrooms to include a "safe space" in which allegations of unfairness will not be met with "defensiveness and denial"; an article in that same issue reviewing a book proposing criminal penalties "up to and including incarceration" for any person "who is made aware of a sexual assault but focuses on protecting the

**APP.045**

institution in which it occurs rather than the survivor of the assault"; and articles invoking the concept of "implicit bias."

**The USB's Dues Refund Procedure**

51.     The Utah State Bar occasionally publishes notices of members' right to receive a rebate of the portion of their bar dues used for lobbying and legislative matters—but it does so inconspicuously, buried deep within the *Utah Bar Journal*.

52.     When the *Utah Bar Journal* includes such a notice, nothing on the cover or in the table of contents informs a reader of its presence, and nothing else calls the notice to readers' attention.

53.     In the March-April 2021 *Utah Bar Journal*, the following "Notice of Legislative Positions Taken By Bar and Availability of Rebate" and "Tax Notice" were published on page 56:

**APP.046**

### Notice of Legislative Positions Taken by Bar and Availability of Rebate

Positions taken by the Bar during the 2021 Utah Legislative Session and funds expended on public policy issues related to the regulation of the practice of law and the administration of justice are available at www.utahbar.org/legislative. The Bar is authorized by the Utah Supreme Court to engage in legislative and public policies activities related to the regulation of the practice of law and the administration of justice by Supreme Court Rule 14-106 which may be found at www.utcourts.gov/resources/rules/ucja/view.html?title=Rule 14-106. Lawyers may receive a rebate of the proportion of their annual Bar license fee expended for such activities during April 1, 2020 through March 30, 2021, by notifying

Financial Director Lauren Stout at lauren.stout@utahbar.org.

The proportional amount of fees provided in the rebate include funds spent for lobbyists and staff time spent lobbying; travel for a Bar delegate to the American Bar Association House of Delegates; and Utah legislative lobbyist registration fees for the Bar's Executive Director and Assistant Executive Director. Prior year rebates have averaged approximately $7.80. The rebate amount will be calculated April 1, 2021, and we expect the amount to be consistent with prior years.

### Tax Notice

Pursuant to Internal Revenue Code 6033(e)(1), no income tax deduction shall be allowed for that portion of the annual license fees allocable to lobbying or legislative-related expenditures. For the tax year 2020, that amount is 2.95% of the mandatory license fee.

54.     The "Notice" includes the URL for a website where USB members supposedly can obtain information on positions the USB has taken in 2021; in fact, as of the date of the filing of this Complaint, the page contains no such information, nor does it contain any information about "funds expended" in 2021 or any other year.

55.     Page 55 of the May/June 2020 *Utah Bar Journal* contained the following "Notice of Legislative Positions Taken by Bar and Availability of Rebate," but with no projected rebate amount and no "Tax Notice":

---

### Notice of Legislative Positions Taken by Bar and Availability of Rebate

Positions taken by the Bar during the 2020 Utah Legislative Session and funds expended on public policy issues related to the regulation of the practice of law and the administration of justice are available at www.utahbar.org/legislative. The Bar is authorized by the Utah Supreme Court to engage in legislative and public policies activities related to the regulation of the practice of law and the administration of justice by Supreme Court Rule 14-106 which may be found at www.utahbar.org/utcourts_14-106. Lawyers may receive a rebate of the proportion of their annual Bar license fee expended for such activities during April 1, 2019 through March 30, 2020 by notifying Financial Director Lauren Stout at lauren.stout@utahbar.org.

The proportional amount of fees provided in the rebate include funds spent for lobbyists and staff time spent lobbying; a breakfast meeting with lawyer legislators; travel for the Bar's three delegates to the American Bar Association House of Delegates; travel by Bar leadership to lobby in Washington DC with the American Bar Association; the Bar's contribution to the Utah Center for Legal Inclusion; and Utah legislative lobbyist registration fees for the Bar's Executive Director and Assistant Executive Director. The rebate amount will be calculated April 1, 2020 and we expect the amount to be consistent with prior years.

---

56.     In fact, the URL provided in this Notice did not and does not provide information about "funds expended on public policy issues."  Regarding the 2020 Utah Legislative Session, it only includes a list of proposed items of legislation and whether the USB supported or opposed them.

57.     Page 53 of the March-April 2019 issue of the *Utah Bar Journal* contained the following "Notice of Legislative Rebate" and "Tax Notice" with minimal information about the USB's activities or where readers could learn about them:

---

### Notice of Legislative Rebate

Bar policies provide that lawyers may receive a rebate of the proportion of their annual Bar license fee expended from April 1, 2018 to March 30, 2019 for lobbying and any legislative-related expenses by notifying Executive Director John C. Baldwin, 645 South 200 East, Salt Lake City, Utah 84111 or at jbaldwin@utahbar.org.

---

### Tax Notice

Pursuant to Internal Revenue Code 6033(e)(1), no income tax deduction shall be allowed for that portion of the annual license fees allocable to lobbying or legislative-related expenditures. For the tax year 2018, that amount is 1.65% of the mandatory license fee.

---

58.   The USB published substantially similar notices together under the heading "Notice of Legislative Rebate" in the March-April 2018 *Utah Bar Journal*—in the lower left corner of page 46, which also contained a list of certain Bar Commission activities, a notice of an individual's petition for reinstatement to the Bar, and a notice regarding online license renewal:

12

## State Bar News

### Commission Highlights

The Utah State Bar Board of Commissioners received the following reports and took the actions indicated during the January 12, 2018 Commission Meeting held at the Law & Justice Center in Salt Lake City.

1. The Bar Commission voted to nominate **Herm Olsen** to run for Bar President-elect.

2. The Bar Commission voted to select **Ellen Maycock** to receive the Dorathy S. Merrill Brothers Award.

3. The Bar Commission voted to select **Hon. Augustus G. Chin** to receive the Raymond S. Uno Award.

4. The Bar Commission voted to approve the charge to the Access to Justice Coordinating Committee; to appoint **Retired Justice Christine Durham** as a Co-Chair of the Committee; and provisionally appoint **Amy Sorenson** as a Co-Chair.

5. The Bar Commission voted to appoint **Judge Eve Furse** as the 2019 Summer Convention Co-Chair.

6. The Bar Commission voted to appoint **Josh Player** as NLTP Committee Vice-Chair.

7. The Bar Commission voted to approve LicensedLawyer marketing plan and expenditure.

8. The Minutes of the December 8, 2017 Commission Meeting were approved by consent.

9. The Bar Commission approved the creation of the Entertainment Law Section.

The minute text of this and other meetings of the Bar Commission are available at the office of the Executive Director.

### Notice of Legislative Rebate

Bar policies provide that lawyers may receive a rebate of the proportion of their annual Bar license fee which has been expended during the fiscal year for lobbying and any legislative-related expenses by notifying Executive Director John C. Baldwin, 645 South 200 East, Salt Lake City, Utah 84111 or at jbaldwin@utahbar.org.

The amount which was expended on lobbying and legislative-related expenses in the preceding fiscal year was 1.67% of the mandatory license fees. Your rebate would total: Active Status – $7.09; Active – Admitted Under 3 Years Status – $4.17; Inactive with Services Status – $2.50; and Inactive with No Services Status – $1.75.

### Notice of Petition for Reinstatement to the Utah State Bar by David B. Oliver

Pursuant to Rule 14-525(d), Rules of Lawyer Discipline and Disability, the Utah State Bar's Office of Professional Conduct hereby publishes notice that David B. Oliver has filed an application for reinstatement in *In the Matter of the Discipline of David B. Oliver*, Third Judicial District Court, Civil No. 070909858. Any individuals wishing to oppose or concur with the application are requested to do so within thirty days of the date of this publication by filing notice with the District Court.

### Mandatory Online Licensing

The annual online licensing renewal process will begin June 4, 2018, at which time you will receive an email outlining renewal instructions. This email will be sent to your email address of record. Utah Supreme Court Rule 14-507 requires lawyers to provide their current e-mail address to the Bar. If you need to update your email address of record, please contact onlineservices@utahbar.org.

Renewing your license online is simple and efficient, taking only about five minutes. With the online system you will be able to verify and update your unique licensure information, join sections and specialty bars, answer a few questions, and pay all fees.

No separate licensing form will be sent in the mail. You will be asked to certify that you are the licensee identified in this renewal system. Therefore, this process should only be completed by the individual licensee, not by a secretary, office manager, or other representative. Upon completion of the renewal process, you will receive a licensing confirmation email. If you do not receive the confirmation email in a timely manner, please contact licensing@utahbar.org.

License renewal and fees are due July 1 and will be late August 1. If renewal is not complete and payment received by September 1, your license will be suspended.

APP.050

59.     In the March-April 2017 *Utah Bar Journal*, the USB published the "Tax

Notice" at the bottom of page 42, below a list of USB 2017 Spring Convention sponsors

and exhibitors, and published the "Notice of Legislative Rebate" at the bottom of page

49, below the second page of a list of attorneys recognized for pro bono work:



60.     The USB does not provide a means by which members may prevent their

dues from being used for lobbying and other legislative activities before the fact; it only

offers partial rebates after members' fees have already been used for these activities.

61.     The USB does not provide members with information about how it

determines which expenditures should be classified as for "lobbying and legislative-

related activities."

14

62.     The notices of legislative positions currently on the "Legislative Positions" page of the USB website simply state whether the USB supported or opposed particular items of proposed legislation that were before the Utah Legislature; they do not state the reasons for the USB's positions; nor do they state whether the USB engaged in any advocacy on issues of public policy apart from the listed bills; nor do they state anything about the amount of "funds expended" on such matters, despite the statements in the March/April 2021 and March/April 2020 notices that this information would be provided there.

63.     The USB has not established procedures by which members may object to, or receive a rebate for, USB expenditures other than those the USB has deemed to be "lobbying and legislative-related activities."

64.     The annual budget the USB makes available to members does not identify any specific expenditures the USB has made or proposed to make; it only identifies general categories of expenditures.

65.     The annual budget the USB makes available to members does not state whether any past or proposed expenditures of member dues were or are germane to the purpose of improving the quality of legal services and regulating the legal profession.

66.     The USB does not provide members with detailed information about its expenditures that would allow members to determine whether any past or proposed

15

**APP.052**

expenditures of member fees were or are germane to improving the quality of legal services and regulating the legal profession.

**Plaintiff's Injury**

67.     Plaintiff Amy Pomeroy does not wish to associate with the USB or its political or ideological speech, but she has been required to do so to be allowed to practice law in Utah.

68.     Plaintiff Amy Pomeroy opposes the USB's use of any amount of her mandatory fees to fund any amount of political or ideological speech, regardless of its viewpoint, including but not limited to the examples set forth above, but she has been without effective means to prevent it.

69.     Plaintiff Amy Pomeroy also does not wish to associate with or subsidize the USB's "factual" speech, even if it does not include overt political or ideological advocacy. She wishes to decide for herself which charitable, advocacy, and/or trade organizations she will and will not associate with and contribute to.

70.     The USB declares itself to be the official state organization of the entire legal profession. For example, on its website it identifies itself as "an organization of Utah's 12,000 lawyers and judges" and declares that its "mission [is] representing lawyers in Utah." The website also states that "The membership of the Bar includes active and inactive lawyers, and lawyers who reside within and outside the State of Utah. In order to practice law in the State of Utah, it is necessary to be a member of the Utah

**APP.053**

State Bar." Nothing on the website indicates that there are attorneys such as Plaintiff Pomeroy who dissent from the USB, do not wish to be members of or associated with it, and do not necessarily agree with the positions it takes and opinions it expresses.

71.    Utah's requirement that all attorneys join the USB injures Plaintiff Amy Pomeroy because she does not wish to associate with the USB or with its speech, including but not limited to political ideological speech, and does not wish to subsidize the USB or its speech. But for the requirement, she would not be a member.

72.    Utah's requirement that all attorneys pay dues to the USB injures Plaintiff Amy Pomeroy because she does not wish to fund the USB's speech, including but not limited to political and ideological speech, and other activities. But for the requirement, she would not do so.

73.    The USB's lack of safeguards to ensure that members are not required to pay for political and ideological speech and other activities not germane to regulating the legal profession or improving the quality of legal services injures Plaintiff Amy Pomeroy because she does not want to fund such activities in any amount.

74.    Utah's requirement that all attorneys be members of the UBF injures Plaintiff Amy Pomeroy because she does not wish to associate with the UBF or any political or ideological speech or other activities that it may engage in; she wishes to decide for herself which charitable and advocacy organizations she will and will not

17

**APP.054**

associate with and contribute to.

**Injunctive Relief Allegations**

75.     Due to Defendants' enforcement of the challenged laws and rules described above, Plaintiff and others similarly situated are and will continue to be denied the right to refrain from being members of the USB as a condition of practicing law in Utah and the right to refrain from subsidizing the USB's speech.

76.     If not permanently enjoined by this Court, Defendants and their agents will continue to implement the challenged rules or other similar policies and practices, which deprive Plaintiff of her constitutionally protected rights to free speech and freedom of association.

77.     Thus the challenged laws and rules are causing, and will continue to cause, Plaintiff to suffer irreparable injury, including but not limited to deprivation of her freedom of speech and freedom of association rights. Plaintiff has no plain, speedy, and adequate remedy at law for such an injury.

78.     Accordingly, injunctive relief is appropriate.

**Declaratory Relief Allegations**

79.     An actual and substantial controversy exists between Plaintiff and Defendants as to their respective legal rights and duties. Plaintiff contends, pursuant to 42 U.S.C. § 1983, that both on their face and as applied to Plaintiff, the challenged laws and

**APP.055**

rules violate the First and Fourteenth Amendments. Plaintiff is informed and believes, and on that basis alleges, that Defendants contend otherwise on all counts.

80.    Accordingly, declaratory relief is appropriate.

## FIRST CLAIM FOR RELIEF

**Compelled membership in the USB violates attorneys' First and Fourteenth Amendment rights to free association and free speech.**

81.    The allegations in the preceding paragraphs are incorporated by reference as if fully set forth here.

82.    The First and Fourteenth Amendments protect not only the freedom of association but also the freedom not to associate.

83.    The First and Fourteenth Amendments protect the freedom of speech, which includes the right to avoid subsidizing the speech of other private speakers.

84.    By its very nature, a mandatory bar association such as the USB violates these rights.

85.    Mandating membership in a bar association that engages in political and ideological speech violates the First and Fourteenth Amendment rights to freedom of association, freedom of speech, or both.

86.    In the alternative, mandating membership in a bar association that engages in political and ideological speech that is not germane to improving the quality of legal services or regulating the legal profession violates the First and Fourteenth Amendment right to freedom of association, freedom of speech, or both.

APP.056

87.     Mandatory associations, particularly mandatory associations for expressive purposes, are permissible only when they serve a compelling state interest that the government cannot achieve through other means significantly less restrictive of First Amendment freedoms.

88.     The only state interests that a mandatory bar association can plausibly serve are regulating the legal profession and improving the quality of legal services.

89.     The state can readily use means significantly less restrictive of First Amendment freedoms than mandatory bar association membership to regulate the legal profession and improve the quality of legal services.

90.     For example, the State of Utah could regulate the legal profession directly, or through an agency under its jurisdiction, without requiring attorneys to join or pay a bar association, as at least 18 other states do.

91.     By failing to use means significantly less restrictive of associational freedoms than a mandatory association, Defendants maintain and actively enforce a set of laws, practices, procedures, and policies that deprive Plaintiff Amy Pomeroy of her rights of free speech and free association in violation of the First and Fourteenth Amendments.

92.     This deprivation of constitutional rights is causing Plaintiff Amy Pomeroy to suffer irreparable injury for which there is no adequate remedy at law. Unless this deprivation of rights is enjoined by this Court, Plaintiff will continue to suffer irreparable harm.

**APP.057**

93.     Plaintiff is entitled to declaratory and injunctive relief against Defendants' continued enforcement and maintenance of these unconstitutional laws, practices, procedures, and policies, and is entitled to an award of attorney fees. *See* 28 U.S.C. §§ 2201, 2202; 42 U.S.C. §§ 1983, 1988.

### SECOND CLAIM FOR RELIEF

**The collection and use of mandatory bar dues to subsidize the USB's speech—including its political and ideological speech—violates attorneys' First and Fourteenth Amendment rights to free speech and association.**

94.     The allegations in the preceding paragraphs are incorporated by reference as if fully set forth here.

95.     The USB collects and uses mandatory bar fees to subsidize its speech, including its political and ideological speech as described above, without attorneys' affirmative consent.

96.     The USB provides no way for attorneys to avoid having their fees used to subsidize its speech, including its political and ideological speech, except by seeking a refund after the fact.

97.     The state could readily serve its interest in improving the quality of legal services and regulating the legal profession without forcing attorneys to subsidize the USB's speech, including its political and ideological speech.

98.     The state could improve the quality of legal services and regulate the legal profession without requiring attorneys to fund a bar association at all. It could adopt

21

**APP.058**

measures to improve the quality of legal services and regulate the legal profession directly, or through an agency under its jurisdiction, as at least 18 other states do.

99. Alternatively, Utah could require that the USB use mandatory bar dues only for regulatory activities, as California and Nebraska have done.

100. Because the state could readily serve its interest in improving the quality of legal services in ways significantly less restrictive of free speech and association, the USB violates the First and Fourteenth Amendments by collecting and using mandatory bar dues to subsidize *any* of its speech.

101. Alternatively, the USB violates the First and Fourteenth Amendments by collecting and using mandatory bar dues to subsidize its political and ideological speech.

102. At the very least, the USB violates the First and Fourteenth Amendments by collecting and using mandatory bar dues to subsidize its speech and other activities that are not germane to improving the quality of legal services and regulating the legal profession.

103. At a minimum, to protect members' First Amendment rights, the USB must create an "opt-in" system for attorneys to subsidize its speech and non-germane activities; it cannot require attorneys to opt out. *See Janus v. AFSCME*, 138 S. Ct. 2448, 2486 (2018). Unless an attorney provides affirmative consent, his or her fees cannot be used to subsidize the USB's non-germane activities or its speech, including but not limited to its political and ideological speech.

**APP.059**

104.    Under existing law, Defendants maintain and enforce a set of laws, practices, procedures, and policies that are not adequate to ensure that mandatory dues will not be used for the impermissible purposes described above without affirmative consent.

105.    Accordingly, Defendants are currently maintaining and actively enforcing a set of laws, practices, procedures, and policies that deprive Plaintiff Amy Pomeroy of her rights of free speech and free association in violation of the First and Fourteenth Amendments.

106.    This deprivation of constitutional rights is causing Plaintiff Amy Pomeroy to suffer irreparable injury for which there is no adequate remedy at law. Unless this deprivation of rights is enjoined by this Court, Plaintiff will continue to suffer irreparable harm.

107.    Plaintiff Amy Pomeroy is entitled to declaratory and injunctive relief against Defendants' continued enforcement of these unconstitutional laws, practices, procedures, and policies, and is entitled to an award of attorney fees. *See* 28 U.S.C. §§ 2201, 2202; 42 U.S.C. §§ 1983, 1988.

APP.060

## THIRD CLAIM FOR RELIEF

**The USB violates attorneys First and Fourteenth Amendment rights by failing to provide safeguards to ensure mandatory dues are not used for impermissible purposes.**

108.     The allegations in the preceding paragraphs are incorporated by reference as if fully set forth here.

109.     Plaintiff pleads this claim in the alternative to her first and second claims for relief.

110.     To the extent mandatory bar fees are constitutional at all, the Supreme Court has required bar associations such as the USB to ensure that such fees are used only for activities germane to improving the quality of legal services and regulating the legal profession. *See Keller v. State Bar of Cal.*, 496 U.S. 1, 14 (1990).

111.     To protect the rights of USB members and ensure mandatory member fees are used only for chargeable expenditures, *Keller* requires the USB to institute safeguards that provide, at a minimum: (1) notice to members, including an adequate explanation of the basis for the dues and calculations of all non-chargeable activities, verified by an independent auditor; (2) a reasonably prompt decision by an impartial decision-maker if a member objects to the way his or her mandatory dues are spent; and (3) an escrow for amounts reasonably in dispute while such objections are pending. *Id.*

112.     The USB does not satisfy any of these requirements.

**APP.061**

113.    Although the USB offers members a partial dues refund for amounts it purports to have spent on "lobbying or legislative-related expenditures," it does not offer members any means of objecting to, or receiving refunds for, other USB activities and therefore fails to provide the safeguards that *Keller* requires.

114.    Further, the USB does not provide an adequate explanation of the basis of its dues calculations or its calculations of amounts purportedly spent on "lobbying or legislative-related expenditures" as *Keller* requires.

115.    The USB does not place any amount of a member's fees in escrow before it determines whether the member wants to fund the USB's lobbying and legislative activities.

116.    The refunds USB provides to USB members who object to paying for lobbying and legislative activities do not include interest.

117.    The USB provides no way for members to prevent their mandatory fees from being used for non-germane political and ideological speech and other non-germane activities before the fact, but only offers, at most, partial fee refunds after the fact, upon request.

118.    Therefore—assuming mandatory bar membership and fees are constitutional at all—the USB fails to provide the minimum safeguards required by the First and Fourteenth Amendments before collecting and expending mandatory member dues.

25

**APP.062**

119.    The collection of mandatory dues in the absence of the minimum

safeguards violates the First Amendment rights of the attorneys who are forced to pay

them, including Plaintiff Amy Pomeroy.

120.    For these reasons, Defendants maintain and enforce a set of laws, practices,

procedures, and policies that deprive Plaintiff Amy Pomeroy of her First and Fourteenth

Amendment rights.

121.    This deprivation of constitutional rights is causing Plaintiff Amy Pomeroy

to suffer irreparable injury for which there is no adequate remedy at law. Unless this

deprivation of rights is enjoined by this Court, Plaintiff will continue to suffer irreparable

harm.

122.    Plaintiff Amy Pomeroy is entitled to declaratory and injunctive relief

against Defendants' continued enforcement and maintenance of these unconstitutional

laws, practices, procedures, and policies, and is entitled to an award of attorney fees. *See*

28 U.S.C. §§ 2201, 2202; 42 U.S.C. §§ 1983, 1988.

## <u>FOURTH CLAIM FOR RELIEF</u>

**Compelled membership in the UBF violates attorneys' First and Fourteenth
Amendment rights to free association and free speech.**

123.    The allegations in the preceding paragraphs are incorporated by reference

as if fully set forth here.

124.    Compelling Utah attorneys to become mandatory members of the UBF—

automatically, as a result of their mandatory membership in the USB—violates attorneys'

26

**APP.063**

First and Fourteenth Amendment right not to associate with a private organization and not to associate with a private organization's speech.

125.    Mandatory UBF membership does not serve any compelling governmental interest.

126.    In the alternative, to the extent that UBF membership serves any governmental interest, the government may serve that interest without compelling Utah attorneys to become members of the UBF as a condition of practicing law.

127.    Defendants enforce Utah's rule compelling attorneys to become members of the UBF as a condition of practicing law by enforcing Utah's rules compelling attorneys to join and become members of, and pay fees to, the USB as a condition of practicing law.

128.    By failing to use a means significantly less restrictive of associative freedoms than a mandatory association, Defendants maintain and actively enforce a set of laws, practices, procedures, and policies that deprive Plaintiff Amy Pomeroy of her rights of free association and free speech in violation of the First and Fourteenth Amendments.

129.    This deprivation of constitutional rights is causing Plaintiff Amy Pomeroy to suffer irreparable injury for which there is no adequate remedy at law. Unless this deprivation of rights is enjoined by this Court, Plaintiff will continue to suffer irreparable harm.

130.    Plaintiff is entitled to declaratory and injunctive relief against Defendants'
continued enforcement and maintenance of these unconstitutional laws, practices,
procedures, and policies, and is entitled to an award of attorneys' fees. *See* 28 U.S.C. §§
2201, 2202; 42 U.S.C. §§ 1983, 1988.

## REQUEST FOR RELIEF

Wherefore, Plaintiff respectfully requests that this Court enter judgment in
Plaintiff's favor and:

A.    Declare that Defendants violate Plaintiff's rights to freedom of association
and freedom of speech under the First and Fourteenth Amendments by enforcing rules
that make membership in the USB a condition of practicing law in Utah;

B.    Declare that Defendants violate Plaintiff's rights to freedom of association
and freedom of speech under the First and Fourteenth Amendments by requiring her to
pay fees to the USB as a condition of practicing law in Utah;

C.    Declare that Defendants may not require an attorney to pay mandatory fees
to subsidize the USB's speech, including its political and ideological speech or any of its
non-germane activities, unless the member has affirmatively consented in advance to
having fees used for those purposes, as required by *Janus v. AFSCME*;

D.    Declare that Defendants violate Plaintiff's rights to freedom of association
and freedom of speech under the First and Fourteenth Amendments by enforcing rules
that make membership in the UBF a condition of practicing law in Utah;

28

**APP.065**

E.      Permanently enjoin Defendants and all persons in active concert or participation with them from enforcing CJA Rules 14-101, 14-102, 14-209, and 14-802, which mandate membership in the USB and, by extension, the UBF;

F.      Permanently enjoin Defendants and all persons in active concert or participation with them from enforcing CJA Rules 14-107, 14-207, and 14-716, which require payment of membership fees to the USB;

G.      In the alternative, declare that Plaintiff's rights to freedom of speech and association under the First and Fourteenth Amendments are violated by the USB's failure to implement the minimum safeguards required by *Keller v. State Bar of California,* and preliminarily and permanently enjoin Defendants from collecting mandatory bar fees unless and until the USB adopts the minimum safeguards *Keller* requires;

H.      Award Plaintiff Amy Pomeroy her costs, attorney fees, and other expenses as provided by law, including 42 U.S.C. § 1988; and

I.      Order such additional relief as may be just and proper.

Dated: April 13, 2021.

GOLDWATER INSTITUTE

*/s/ Jacob Huebert*
Jacob Huebert
*Attorneys for Plaintiff*

29

**APP.066**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| AMY POMEROY,<br><br>        Plaintiff,<br><br>v.<br><br>UTAH STATE BAR, et al.,<br><br>        Defendants. | **ORDER AND MEMORANDUM DECISION GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS**<br><br>Case No. 2:21-CV-00219-TC-JCB<br><br>District Judge Tena Campbell<br><br>Magistrate Judge Jared C. Bennett |

In this civil rights suit, Plaintiff Amy Pomeroy, a licensed attorney in Utah, alleges mandatory membership in the Utah State Bar (USB) and Utah Bar Foundation (UBF) violates her First and Fourteenth Amendment rights.  Defendants filed a motion to dismiss Ms. Pomeroy's Complaint.  (ECF No. 68.)  For the following reasons, the court GRANTS IN PART and DENIES IN PART the motion to dismiss.

## BACKGROUND[1]

The USB is a Utah non-profit corporation which Utah attorneys must join and pay an annual fee in order to practice law in Utah.  John C. Baldwin is Executive Director, Heather Farnsworth is President, and Heather Thuet is President-Elect.  Marty Moore, John W. Bradley, Chrystal Mancuso-Smith, Michelle Quist, Mark Morris, Mark Pugsley, Traci Gunderson, Andrew Morse, Tom Seiler, Kristin Woods, Rick Hoffman, and Shawn Newell are members of

---

[1] All factual allegations come from Ms. Pomeroy's Complaint.  The court accepts them as true for purposes of this order.  See Albers v. Bd. of Cnty. Comm'rs, 771 F.3d 697, 700 (10th Cir. 2014).

APP.067

the USB's Board of Commissioners (the Board).[2]  Baldwin and Farnsworth, along with the

members of the Board, are responsible for enforcing the state's requirement that attorneys join

the USB and pay annual fees to the USB to practice law in Utah.  If an attorney fails to pay the

annual fee, "the USB administratively suspends the attorney's license to practice law, which

prohibits the attorney from practicing law in the state."  (Compl. ¶ 32, ECF No. 2.)

Under the Utah Judicial Council Code of Judicial Administration (CJA) Rules, the USB

is "authorize[d]" and "directe[d]" "to study and provide assistance on public policy issues and to

adopt positions on behalf of the Board."  (Compl. ¶ 38, ECF No. 2 (citing CJA Rule 14-106(a).)[3]

The USB has advocated for and against substantive Utah legislation, including taxation of legal

services, whether the state attorney general can invoke a potential conflict of interest or attorney-

client privilege to withhold release of an opinion requested by the legislature, and how Utah

selects judges.  Additionally, the USB uses member dues to fund the *Utah Bar Journal*, which

"take[s] or publicize[s] positions on current controversies," including by touting the importance

of "equity" as distinct from "equality," invoking the concept of implicit bias, calling for

courtrooms to be a "safe space" for allegations of unfairness, and reviewing a book that proposes

criminal penalties for anyone who protects an institution in which a sexual assault occurs.

(Compl. ¶ 50, ECF No. 2.)

---

[2] In Defendants' Reply in Support of Motion to Dismiss, they explain that since the outset of the suit, "five of the individuals holding the official capacities named in the Complaint have been changed. . .  First, Elizabeth Wright became Executive Director of the Utah State Bar, replacing John C. Baldwin.  Second, Heather Thuet because the President, replacing Heather Farnsworth.  Third, Krist[i]n Woods became President-Elect, replacing Heather Thuet. Fourth, Gregory N. Hoole became a 3rd Division Commissioner, replacing Mark Pugsley.  Fifth, Tyler S. Young became a 4th Division Commissioner, replacing Tom Seiler." (ECF No. 78.)

[3] The CJA rules further instruct that the USB may take positions on the following public policy issues: "issues concerning the courts of Utah, procedure and evidence in the courts, the administration of justice, the practice of law, and matters of substantive law on which the collective expertise of lawyers has special relevance and/or which may affect an individual's ability to access legal services or the legal system."  (Compl. ¶ 40, ECF No. 2 (citing CJA Rule 14-106(a)(1)).)

**APP.068**

Within the *Utah Bar Journal*, the USB publishes notice of member-attorneys' right to receive a rebate of the portion of their dues used for lobbying and legislative matters. Members may not prevent their dues from being used for lobbying purposes before the fact, and the USB does not provide information about how it determines which expenditures are classified as lobbying and legislative-related. The USB does not offer a means to object to or receive refunds for other, non-lobbying or legislative USB activities. Nor does the annual budget made available to members identify specific expenditures, only general categories.

Ms. Pomeroy, who lives in Orem, is an attorney duly licensed under the laws of Utah. She is a member of the USB and pays its annual fee solely because it is a mandatory prerequisite to practicing law in Utah. Ms. Pomeroy does not want to associate with the USB or USF and opposes the use of any of her mandatory fees to "fund any amount of political or ideological speech, regardless of its viewpoint." (Compl. ¶ 68, ECF No. 2.) She also objects to the lack of safeguards available to allow attorneys to opt out of paying for political and ideological speech.

On April 14, 2021, Pomeroy filed her Complaint against the USB, Baldwin, Farnsworth, Thuet, and the members of the Board. (ECF No. 2.) The Complaint brings four causes of action under 28 U.S.C. § 2201 and 42 U.S.C. § 1983, alleging the following practices violate her First and Fourteenth Amendment rights to free speech and free association: (1) compelled membership in the USB, (2) the USB's collection of mandatory bar dues, (3) failing to provide safeguards to ensure mandatory dues are not used for impermissible purposes, and (4) compelled membership in the UBF. Defendants now ask the court to dismiss each of Ms. Pomeroy's causes of action. (ECF No. 68.) The court turns to the party's arguments.

/ / /

/ / /

**APP.069**

## LEGAL STANDARDS

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff's complaint "must plead facts sufficient to state a claim to relief that is plausible on its face."  Slater v. A.G. Edwards & Sons, Inc., 719 F.3d 1190, 1196 (10th Cir. 2013) (internal quotation marks omitted) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).  A claim is facially plausible when the complaint contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Burnett v. Mortg. Elec. Registration Sys., Inc., 706 F.3d 1231, 1235 (10th Cir. 2013) (quoting Iqbal, 556 U.S. at 678).  The court must accept all well-pleaded allegations in the complaint as true and construe them in the light most favorable to the plaintiff.  Albers, 771 F.3d at 700.  The court's function is "not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted."  Sutton v. Utah State Sch. for the Deaf & Blind, 173 F.3d 1226, 1236 (10th Cir. 1999) (quoting Miller v. Glanz, 948 F.2d 1562, 1565 (10th Cir. 1991)).

Rule 12(b)(1) motions to dismiss for lack of subject-matter jurisdiction take two forms: facial attacks and factual attacks.  Laufer v. Looper, 22 F.4th 871, 875 (10th Cir. 2022).  A facial attack challenges the sufficiency of the complaint, while a factual attack presents additional evidence.  Muscogee (Creek) Nation v. Okla. Tax. Comm'n, 611 F.3d 1222, 1227 n.1 (10th Cir. 2010).  Defendants bring a facial attack.  In evaluating a facial attack, the court "must accept the factual allegations in the complaint as true," Safe Streets All. v. Hickenlooper, 859 F.3d 865, 878 (10th Cir. 2017) and "apply a standard patterned on Rule 12(b)(6)."  Garling v. EPA, 849 F.3d 1289, 1293 n.3 (10th Cir. 2017).

/ / /

**APP.070**

## ANALYSIS

Defendants argue the Complaint should be dismissed pursuant to Rule 12(b)(1) because the USB is immune from suit under the Eleventh Amendment and Ms. Pomeroy lacks Article III standing because her alleged injury is not redressable. Defendants further argue that even if Ms. Pomeroy establishes standing, she has failed to adequately allege her claims and the Complaint should be dismissed pursuant to Rule 12(b)(6). The court will address the Eleventh Amendment immunity, Article III standing, and Rule 12(b)(6) arguments in turn.

### I.      The USB Has Eleventh Amendment Immunity from Suit

The Eleventh Amendment precludes unconsented suits in federal court against a state or an arm of the state. See, e.g., Wagoner Cnty. Rural Water Dist. No. 2. v. Grand River Dam Auth., 577 F.3d 1255, 1258 (10th Cir. 2009). An arm of the state is an entity created by a state government which operates as an alter ego or instrumentality of the state. See Watson v. Univ. of Utah Med. Ctr., 75 F.3d 569, 574 (10th Cir. 1996). This court has previously held the USB is an arm of the state because it acts as an alter ego of the Utah Supreme Court. Rose v. Utah State, No. 2:09-cv-695-TC, 2009 WL 5066687, at *4 (D. Utah Dec. 16, 2009). In Rose, to determine the USB's arm of the state status, the court considered how state laws characterize the USB. Id. at *3 (citing Sturdevant v. Paulsen, 218 F.3d 1160, 1164 (10th Cir. 2000)). The court held that because the Utah Constitution gives the Utah Supreme Court exclusive authority to govern the practice of law, and because the Utah Supreme Court promulgates the Rules under which the USB functions, the USB was an alter ego of the Utah Supreme Court and, therefore, an arm of the state. Id. at *3–*4 (citing Utah State Bar v. Summerhayes & Hayden, Pub. Adjusters, 905 P.2d 867, 870 (Utah 1995)).

**APP.071**

Ms. Pomeroy nonetheless argues that under <u>Watson</u>, the USB is not an arm of the state because it has relative autonomy from the state since the members elect commissioners, and because it is financed independently from the state treasury.  (ECF No. 74 at 8.)  Defendants respond that despite the fact commissioners are elected, the USB does not enjoy significant autonomy concerning the issues in the suit—mandatory membership and license fee rules— because the Utah Constitution has vested the Utah Supreme Court has "reserved substantial control over the membership and license fee rules challenged in this suit."  (ECF No. 78 at 3.) As to the USB's independent funding, Defendants note entities can retain Eleventh Amendment immunity even if a judgment would have no impact on the state's finances.  (ECF No. 78 at 3 (citing <u>Regents of the Univ. of Calif. v. Doe</u>, 518 U.S. 425, 431 (1997).)

The court agrees with Defendants.  The Tenth Circuit has explained that the central inquiry is whether an entity is more like an arm of the state or a political subdivision.  <u>See</u> <u>Sturdevant</u>, 218 F.3d at 1164.  The factors Ms. Pomeroy relies on, as enumerated in <u>Watson</u>, are simply an "elaborat[ion]" of that central inquiry, which originates from a Supreme Court decision.  <u>Id.</u> (citing <u>Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle</u>, 429 U.S. 274, 280 (1977)).[4]  As the court previously observed in <u>Rose</u>, the Utah Constitution gives the Utah

---

[4] Defendants argue that a more recent arm-of-the-state test applies.  <u>See</u> ECF No. 68 at 11 (citing <u>Couser v. Gay</u>, 959 P.3d 1018, 1024 (10th Cir. 2020)).  Under the <u>Couser</u> test, the court considers: (1) the entity's character under state law, (2) the degree of control exercised by the state, (3) the entity's finances, and (4) whether the entity is primarily concerned with local or state affairs.  <u>Couser</u>, 959 P.3d at 1024.  Defendants argue each of these factors weighs in favor of immunity, and further argue that several circuits have used a similar test to find state bar associations have Eleventh Amendment immunity.  <u>See</u> ECF No. 78 at 1 n.2 (collecting cases).  The <u>Couser</u> test is essentially a more granular version of the <u>Mt. Healthy</u> test, which determines whether the entity is more like an arm of the state or a political subdivision.  <u>Compare</u> <u>Sturdevant</u>, 218 F.3d at 1164 (citing <u>Mt. Healthy</u>, 429 U.S. 274 at 280) <u>with</u> <u>Couser</u>, 959 P.3d at 1024 (citing <u>Mt. Healthy</u>, 429 U.S. at 280)).  Because <u>Couser</u>, <u>Sturdevant</u>, and <u>Watson</u> each apply the <u>Mt. Healthy</u> test, the court does not choose between them but notes that under any breakdown of the factors, the USB would be considered an arm of the state due to its characterization under state law and the high degree of control the Utah Supreme Court maintains over it.  <u>See also</u> <u>Sturdevant</u>, 218 F.3d at 1170 ("Because of the open- ended nature of the arm-of-the-state analysis, it is easy to become caught up in the minutiae of state law . . . These details, however, must not eclipse a fundamental distinction that emerges from <u>Mt. Healthy</u> . . . between alter egos or instrumentalities of states on the one hand, and political subdivisions such as cities and counties on the other.").

**APP.072**

Supreme Court the power to govern the practice of law and promulgates the Rules under which the USB functions, including those rules concerning mandatory membership and fees.  This makes the USB an alter ego of the state and therefore an arm of the state; it is not analogous to a municipality or political subdivision under the <u>Watson</u> test as Ms. Pomeroy argues.  <u>See</u> <u>Rose</u>, 2009 WL 5066698, at *4.  Because the USB is an arm of the State, it is immune from suit under the Eleventh Amendment.  All claims brought against the USB must, therefore, be dismissed.

However, the other defendants will not be dismissed on the basis of Eleventh Amendment immunity, as requested in the motion to dismiss.  While the Eleventh Amendment "does not permit judgments against state officers declaring they violated federal law in the past," the <u>Ex parte Young</u> exception allows a suit against state officials in their official capacities to prevent the ongoing violation of federal law.  <u>See, e.g.</u>, <u>Johns v. Stewart</u>, 57 F.3d 1544, 1554–55 (10th Cir. 1995) (citing <u>Ex parte Young</u>, 209 U.S. 123, 159–60 (1908)).  Because Ms. Pomeroy seeks to enjoin the future enforcement of the USB's rules concerning mandatory membership and fees, Eleventh Amendment immunity does not apply to the remaining defendants.

## II.     Ms. Pomeroy Has Standing to Challenge the Remaining Defendants

To survive a 12(b)(1) motion to dismiss based on standing, a plaintiff must demonstrate that: "(1) she has suffered an injury in fact; (2) there is a causal connection between the injury and the conduct complained of; and (3) it is likely that the injury will be redressed by a favorable decision."  <u>Winsness v. Yocom</u>, 433 F.3d 727, 731–32 (10th Cir. 2006) (citation omitted). Defendants argue Ms. Pomeroy has not alleged the third prong: redressability.  To determine whether the redressability prong is adequately alleged at the pleading stage, without "prejudging the merits," the court must determine whether a favorable decision on the merits could redress

**APP.073**

the alleged injuries on the facts alleged, accounting for the flexibility of injunctive relief.

Petrella v. Brownback, 697 F.3d 1285, 1294–95.

A defendant must have authority to enforce a challenged statute or rule to meet the redressability prong.  See Bronson v. Swensen, 500 F.3d 1099, 1111 (10th Cir. 2007).  Whether Defendants have enforcement authority is "related to whether, under Ex parte Young, they are proper state officials for suit."  Kitchen v. Herbert, 755 F.3d 1193, 1201 (10th Cir. 2014) (internal quotation marks and citation omitted).[5]  "Under Ex parte Young, a state defendant sued in his official capacity must have some connection with the enforcement of a challenged provision. An officer need not have a special connection to the allegedly unconstitutional statute; rather, he need only have a particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty."  Id. (internal quotation marks and citations omitted).

Defendants argue Ms. Pomeroy lacks standing to sue because the injuries she alleges cannot be redressed by a ruling enjoining the USB officials from enforcing the rules concerning membership and payment of license fees.  Rather, USB officials "merely administer the rules as agents of the Utah Supreme Court, which retains ultimate enforcement authority."  (ECF No. 68 at 16.)  Ms. Pomeroy responds that an injunction against the Defendants would prevent enforcement of the mandatory membership and fee rules, redressing the injury she has alleged.

The court agrees with Ms. Pomeroy.  In Kitchen, the Tenth Circuit found plaintiffs had standing to sue a county clerk for refusing to issue marriage licenses because an injunction prohibiting enforcement of a state constitutional amendment (which, at the time, prohibited same-sex marriage) would redress their alleged injuries by requiring the clerk to issue

---

[5] Defendants argue that Ms. Pomeroy's reliance on cases in the Ex parte Young line is "inapposite" because Article III standing and the Ex parte Young exception to Eleventh Amendment immunity are "distinct constitutional doctrines."  (ECF No. 78 at 4.)  However, as Kitchen makes clear, these distinct constitutional doctrines employ related considerations which the court may properly weigh.

**APP.074**

certificates. <u>Kitchen</u>, 755 F.3d at 1201–02. Notably, the <u>Kitchen</u> court also determined plaintiffs had standing to sue the Utah Governor and Attorney General because they had legal authority to ensure county clerks enforced the law. <u>Id.</u> at 1202–04. However, the <u>Kitchen</u> court did not hold that because the governor and attorney general had "ultimate enforcement authority," they were the *only* proper defendants, as the Defendants here imply as to the Utah Supreme Court. Rather, for purposes of standing analysis, the redressability prong is met as long as the official in question has "clearly . . . assisted or currently assist in giving effect to the law." <u>Id.</u> at 1204 (citing <u>Prairie Band Potawatomi Nation v. Wagnon</u>, 476 F.3d 818, 828 (10th Cir. 2006)).

Here, Ms. Pomeroy has alleged Defendants enforce the rules she challenges by administratively suspending the licenses of attorneys who fail to pay annual membership fees. Notably, Defendants echo this characterization. (ECF No. 68 at 17.) Therefore, on the facts alleged, an injunction against the Defendants would prevent the enforcement of the USB's membership and fees requirements against Ms. Pomeroy, redressing her alleged injuries. At the motion to dismiss stage, these allegations are sufficient. Accordingly, Ms. Pomeroy has adequately alleged standing against the individual Defendants, and the claims against them will not be dismissed pursuant to Rule 12(b)(1).

### III.    Ms. Pomeroy's Complaint Adequately States Two Causes of Action

Ms. Pomeroy's complaint states four causes of action, each seeking declaratory and injunctive relief under 28 U.S.C. §§ 2201, 2202 and 42 U.S.C. §§ 1983, 1988 for violations of the First and Fourteenth Amendment rights to free speech and association. Her first claim concerns compelled membership in the USB. Her second claim concerns the USB's collection of mandatory bar dues. The third claim concerns the USB's failure to provide safeguards to prevent mandatory dues from being used for impermissible purposes. The fourth claim concerns

**APP.075**

compelled membership in the UBF.  The Defendants move to dismiss each claim under Rule 12(b)(6).  The court will discuss each claim in turn.

### A.  Ms. Pomeroy's Claim Based on Compelled Membership in the USB Survives

Under Keller v. State Bar of California, conditioning the right to practice law on bar membership is not itself a free speech or association violation: a state bar may "constitutionally fund activities germane to those goals out of the mandatory dues of all members." Keller v. State Bar of California, 496 U.S. 1, 14 (1990).  An activity or expenditure is germane under Keller if it pertains to "regulating the legal profession" or "improving the quality of the legal service available to the people of the State." Id. at 14 (internal quotation marks omitted) (citing Lathrop v. Donahue, 367 U.S. 820, 843 (1961).  As such, a state bar may not "fund activities of an ideological nature which fall outside those [germane] areas of activity." Id.  A plaintiff may bring a First Amendment challenge to mandatory bar membership where she has alleged "at least some of a state bar's actions might not be germane to regulating the legal profession and improving the quality of legal services in the state." Schell v. Chief Just. & Justs. of Okla. Sup. Ct., 11 F.4th 1178, 1194 (10th Cir. 2021).  The parties disagree as to whether Ms. Pomeroy has adequately alleged the USB has funded non-germane activities or speech, as necessary to allege a First Amendment violation arising from her compelled membership in the USB.[6]

The lobbying and legislative activities of the USB that Ms. Pomeroy identifies as non-germane include: (1) lobbying against a proposed state tax on services which would have applied to legal services, (2) lobbying against legislation affecting the attorney general's ability to invoke

---

[6] Ms. Pomeroy also argues that because Keller relied on logic from Abood v. Detroit Bd. of Ed., 431 U.S. 209 (1977), which was overruled in 2018 by Janus v. Am. Fed'n of State, Cnty., and Mun. Emps., Council 31, 138 S. Ct. 2448 (2018), Keller no longer controls and the court should apply strict scrutiny to the association claim, as in Janus. However, the Tenth Circuit has since held that because the Supreme Court has yet to reconsider Keller, it is still binding law.  See Schell, 11 F.4th at 1190.  Accordingly, this court uses the framework explicated in Keller.

APP.076

a conflict of interest or attorney-client privilege to withhold release of an opinion requested by the legislature, and (3) lobbying against a proposal to change Utah's merit-based judicial selection to one based on non-partisan elections.  Ms. Pomeroy additionally alleges that certain articles published and statements made in the *Utah Bar Journal*, which is funded by the USB with member dues, were non-germane, including: (1) a statement from the USB's president on the importance of equity as distinct from equality, (2) articles invoking the concept of implicit bias, (3) an article calling for courtrooms to be safe spaces for allegations of unfairness, and (4) a review of a book which advocates punishing those who become aware of a sexual assault and protect the institution where the assault occurs.  (Compl. ¶¶ 42–50, ECF No. 2.)

At the motion to dismiss stage, construing all facts in the light most favorable to Ms. Pomeroy, she has adequately alleged the USB has funded non-germane activities through its lobbying activities and publication of statements in the *Utah Bar Journal*.  The Tenth Circuit recently held in Schell that plausible allegations two articles in a state bar journal "strayed from the germane purposes of the [bar association] and discussed matters in an ideological matter" were sufficient to support a freedom of association challenge.  Schell, 11 F.4th at 1194.  The Schell court explained, "views on the appropriateness of 'big money and special interest groups' in elections . . . often break along political lines."  Id.  Therefore, an article invoking the topic of "big money and special interest groups" plausibly had "an ideological tinge," especially in context of other allegations in the complaint.  Id.  In contrast, the Schell court found articles encouraging attorneys to warn the public about the harms of politics in the judicial system, responding to criticism of the merit-based process for selecting judges, and discussing the role of attorneys in the state legislature were germane to the goal of improving the quality and availability of legal services.  Id. at 1193.

11

**APP.077**

Viewing the allegations in the light most favorable to Ms. Pomeroy, the Complaint plausibly identifies articles in the March/April 2021 Utah Bar Journal that could be non-germane.  Invoking the concept of implicit bias, discussing the important of equity as a distinct concept from equality, and reviewing a book which advocates punishing people who protect an institution where a sexual assault occurred are all topics that could plausibly be seen as having an "ideological tinge," and express viewpoints that could "break along political lines." These topics plausibly stray from the goals of regulating the legal profession and improving the quality of legal services by taking ideological positions and addressing broader public policy issues.[7]

In addition, Ms. Pomeroy plausibly alleges some of the USB's legislative activities are non-germane.  For example, she identifies the USB's opposition to the "Tax Equalization and Reduction Act."  (Compl. ¶ 43, ECF No. 2.)  The Act proposed a new tax on services broadly in the state of Utah, which would include legal services.  Ms. Pomeroy argues, and the court agrees, this is not necessarily germane because the tax does not directly pertain to regulating the legal profession or the quality of legal services, but only the cost of legal services, an argument which could be used to allow the USB to lobby for or against the imposition of any generally applicable tax.  Additionally, Ms. Pomeroy plausibly alleges that taking a position on proposed legislation affecting the attorney general's ability to invoke a potential conflict of interest or attorney-client

---

[7] The statements fare no better in context.  See ECF No. 68-1: Utah Bar Journal March-April 2021.  For instance, Ms. Pomeroy's allegation about an article "calling for courtrooms to include a 'safe space'" comes from an article titled "The Road to Solutions: Systemic Racism and Implicit Bias in Prosecution," an article which heavily invokes the concepts of implicit bias and institutional racism.  Id. at 26–27.  Opinions on these concepts often "break along political lines," and the article has at least an "ideological tinge" in calling for prosecutors to examine their implicit biases, even if prosecution is obviously related to the practice of law.  See Schell, 11 F.4th at 1194.  While this article was written by contributors, Ms. Pomeroy alleges the USB publishes the Bar Journal with member fees.  At the motion to dismiss stage, this is sufficient to plausibly allege bar officials have funded non-germane activities. See id. at 1184, 1194 (allegations a state bar used mandatory member dues to "publish political and ideological speech" sufficient at the motion to dismiss stage); see also GFF Corp. v. Associated Wholesale Grocers, Inc., 130 F.3d 1381, 1385 (10th Cir. 1997) (a document referred to in a complaint may be considered on a motion to dismiss without converting it to a motion for summary judgment).

APP.078

privilege was non-germane.  Defendants argue without analysis this proposed legislation was "a direct regulation of the legal profession."  (ECF No. 68 at 22.)  However, the attorney general is an elected official in Utah, and proposed legislation affecting the attorney general's practices vis-à-vis the Utah State Legislature goes far beyond regulating the legal *profession*, and instead affects the office of a separate public official.[8]  As such, Ms. Pomeroy has plausibly alleged the USB engages in lobbying activities that go beyond public policy issues affecting the regulation of the legal profession or the quality of legal service.[9]

In summary, Ms. Pomeroy has sufficiently alleged that the Defendants engage in non-germane activities.  Therefore, she has sufficiently stated a claim for violation of her freedom of speech and freedom of association rights based on mandatory membership in the USB.

## B.  Ms. Pomeroy's Claim Concerning the USB's Mandatory Bar Dues Fails

In Opposition, Ms. Pomeroy acknowledges this claim would be foreclosed if the Tenth Circuit denied rehearing in <u>Schell</u>,[10] which considered a challenge to the Oklahoma State Bar's mandatory fees and found they were permitted by the First Amendment.  <u>See</u> Opposition at 17

---

[8] The court agrees with Defendants that Ms. Pomeroy's third identified legislative position—the USB's position on Utah's merit-based system for selecting judges—does relate to the regulation of the legal profession.  <u>See</u> <u>Schell</u>, 11 F.4th at 1193 (article responding to criticism of state's merit-based process for selecting judges is germane to regulating the legal system).  However, because Ms. Pomeroy has plausibly identified other non-germane activities, the fact that some are germane means she has adequately stated a claim under <u>Keller</u>.  <u>See</u> <u>id.</u> at 1194 (holding <u>Keller</u> does not foreclose freedom of association challenge where some activities are germane and some are not).

[9] The Defendants' arguments to the contrary are unavailing.  In their motion, Defendants rely heavily on <u>McDonald v. Longley</u>, a recent Fifth Circuit case which, at summary judgment, determined the publication of the *Texas Bar Journal* was germane under <u>Keller</u>.  4 F.4th 229, 251–52 (5th Cir. 2021).  Putting aside the fact that <u>McDonald</u>'s analysis is not binding and arises in a different procedural posture, that case does not contain a detailed analysis of the germaneness of articles as <u>Schell</u> does, and Defendants cite parts of the opinion which pertain to diversity efforts, not bar journal articles.  See ECF No. 68 at 25 (citing <u>McDonald</u>, 4 F.4th at 249 (discussing the State Bar of Texas's diversity initiatives)).  Similarly, Defendants argue that the *Utah Bar Journal* should be designated as a non-public forum and the speech in the journal can only be attributed to the bar if it "determines the content" of the speech.  (ECF No. 68 at 24–25 (citing <u>Rosenberg v. Rector & Visitors of the Univ. of Va.</u>, 515 U.S. 819, 833 (1995)).)  But Ms. Pomeroy's Complaint contains allegations the USB funds the *Utah Bar Journal*, publishes statements from the USB's president in the *Journal*, and engages in political and ideological speech using the Bar Journal.  This is sufficient at the pleading stage to allege the USB "determines the content" of the *Utah Bar Journal*.

[10] 2 F.4th 1312 (10th Cir. 2021), <u>opinion withdrawn and superseded on reh'g</u>, 11 F.4th 1178 (10th Cir. 2021).

n.5.  A week after Ms. Pomeroy's opposition was filed, the Tenth Circuit granted in part the petition for rehearing to the extent its opinion was modified in a revised opinion, but denied the petition for rehearing en banc.  See Schell, 11 F.4th at 1182.  The modified opinion did not change the holding concerning mandatory bar dues.  Id. at 1194 n.10.  Accordingly, the second claim for relief is foreclosed, a fact Ms. Pomeroy acknowledged at oral argument.  Having been conceded, the second claim for relief is dismissed (though the court notes Ms. Pomeroy has preserved this issue for appellate review).

### C.  Ms. Pomeroy's Claim for Lack of Procedural Safeguards Survives

Because integrated bars cannot use compulsory dues to fund non-germane activities, Keller held integrated bars must provide a refund mechanism for non-germane activities.  Keller, 496 U.S. at 16–17.  The Keller court held integrated bars satisfy this obligation when they adopt a procedure modeled on Teachers v. Hudson, 475 U.S. 292 (1986) which outlined a "minimum set of procedures by which a union in an agency-shop relationship could meets its requirement under Abood," namely: "an adequate basis for the fee, a reasonably prompt opportunity to challenge the amount of the fee before an impartial decisionmaker, and an escrow for the amounts reasonably in dispute while such challenges are pending."  Keller, 496 U.S. at 16–17 (internal quotation marks and citations omitted).  The Keller court reserved the question of whether an alternative procedure would satisfy that obligation because it did not have a fully developed record on which to consider the question.  Id. at 17.  But regardless of what type of procedure might be appropriate,[11] because Defendants concede they do not provide any refund mechanism for non-lobbying activities, the motion to dismiss the third claim must be denied.

---

[11] In the decades since Keller was decided, the Supreme Court has not returned to the issue, and the Tenth Circuit has not provided guidance on refund mechanisms.  The Ninth Circuit recently held an integrated bar did not need to strictly follow the Hudson procedures because that bar "provide[d] procedures adequately tailored to minimize the infringement of its members first amendment rights."  Crowe v. Oregon State Bar, 989 F.3d 714, 726 (9th Cir.

In their motion, Defendants argue because the USB will refund any member's pro rata share of bar dues spent on legislative and lobbying activities, not just non-germane legislative and lobbying, it is "over-inclusive" about the speech that triggers a refund, and therefore need not comply with the strictures of Hudson.  (ECF No. 68 at 27.)  In opposition, Ms. Pomeroy argues that while the USB offers a refund for lobbying or legislative-related activities, it does not provide a means of objecting to, or receiving refunds for, non-lobbying USB activities that may not be germane, nor does it provide a mechanism to dispute whether activity is properly deemed lobbying or legislation-related. (ECF No. 74 at 21, citing Compl. ¶ 113.)  In reply, Defendants concede: "Pomeroy is correct that the [USB]'s refund policy does not allow refunds for non-germane non-lobbying activities."  ECF No. 78 at 10.  However, they argue that Pomeroy has "alleged no such activities," and thus would be seeking an advisory opinion.

But in fact, as discussed above, the court already concluded that Pomeroy sufficiently alleged the USB engages in non-germane activities by funding the *Utah Bar Journal*, which, she alleges, contains non-germane speech.  See also Schell, 11 F.4th at 1194 (holding publication of bar journal can constitute non-germane activity.)  Defendants therefore concede that they provide no mechanism whatsoever to seek refunds for that potentially non-germane activity.  As such, they fail to meet the baseline requirement created by Keller that refunds be made available for non-germane activities.  Accordingly, the court need not determine at this stage what sort of refund procedure is adequate under Keller as Defendants have conceded they provide no refund policy for non-germane non-lobbying activities.  Because the Defendants admit they do not

---

2021), cert. denied sub nom. Gruber v. Oregon State Bar, 142 S. Ct. 78, 211 L. Ed. 2d 15 (2021), and cert. denied, 142 S. Ct. 79, 211 L. Ed. 2d 15 (2021) (internal quotation marks and citation omitted).  The Fifth Circuit disagrees, finding the Hudson procedures are "the Constitutional floor" that an integrated bar must meet.  Boudreaux v. Louisiana State Bar Association, 3 F.4th 748, 758 (5th Cir. 2021).

**APP.081**

comply with the Supreme Court's guidance concerning refund procedures, this argument fails and the third claim will not be dismissed.

### D.  Ms. Pomeroy's Claim for Compelled Membership in UBF Fails

The legal standards discussed <u>supra</u> regarding compelled membership in the USB apply equally to Ms. Pomeroy's allegations concerning the UBF.  As such, to state a claim for relief, Ms. Pomeroy must allege the UBF has funded activities that are not germane to its valid goals and purposes.  <u>See</u> <u>Schell</u>, 11 F.4th at 1192.  However, the Complaint is devoid of any specific factual allegations concerning the UBF.  The only paragraph which contains any UBF-related allegations states: "Utah's requirement that all attorneys be members of the UBF injures [Ms. Pomeroy] because she does not wish to associate with the UBF or any political or ideological speech or other activities that it may engage in; she wishes to decide for herself which charitable and advocacy organizations she will and will not associate with and contribute to."  (Compl. ¶ 74, ECF No. 2.)  This paragraph does not allege any factual content describing the "political or ideological speech or other activities" the UBF engages in.  In opposition, Ms. Pomeroy argues that it is "beyond dispute that the UBF is a 501(c)(3) nonprofit organization, separate from the USB, that makes donations to various other organizations," and further explains discovery is necessary to determine which organizations the UBF has supported as that information has been removed both from the UBF website and past archived versions of the website.  ECF No. 78 at 24 n.7.  However, these allegations appear nowhere in the Complaint.

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice [to state a claim]."  <u>Iqbal</u>, 556 U.S. at 678 (internal citation omitted.)  Without alleging any facts that could allow the court to make the inference that the UBF has engaged in non-germane activities, the claim fails and must be dismissed.

APP.082

## **CONCLUSION**

For the reasons stated above, the Defendants' Motion to Dismiss (ECF No. 68) is

GRANTED IN PART and DENIED IN PART.  All claims brought against the Utah State Bar

are dismissed.  The second claim for relief against the remaining defendants is dismissed per Ms.

Pomeroy's concession.  The fourth claim for relief brought against the remaining defendants is

dismissed for failure to state a claim pursuant to Rule 12(b)(6).  The first and third claims

brought against the remaining defendants are not dismissed.

SO ORDERED this 4th day of April, 2022.

BY THE COURT:

_Tena Campbell_

TENA CAMPBELL
United States District Judge

Troy L. Booher (9419)
Dick J. Baldwin (14587)
Caroline Anais Olsen (18070)
ZIMMERMAN BOOHER
341 South Main Street, Fourth Floor
Salt Lake City, Utah 84111
tbooher@zbappeals.com
dbaldwin@zbappeals.com
colsen@zbappeals.com
(801) 924-0200

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| AMY POMEROY, | **ANSWER** |
| Plaintiff, | |
| v. | Case No. 2:21-cv-00219-TC-JCB |
| | District Judge Tena Campbell |
| UTAH STATE BAR, et al., | Magistrate Judge Jared C. Bennett |
| Defendants. | |

The remaining Defendants (collectively, "State Bar Defendants") respectfully answer the April 13, 2021 Complaint for Declaratory and Injunctive Relief [Doc 2] filed by Plaintiff Amy Pomeroy ("Plaintiff" or "Pomeroy"), and for their defenses assert as follows.

Each and every allegation of the Complaint not expressly admitted or otherwise responded to herein is denied. State Bar Defendants respond to the separately numbered paragraphs of the Complaint as follows:

1.    Paragraph 1 contains Pomeroy's characterization of this action to which no response is necessary. Paragraph 1 also contains legal conclusions to which no response is

necessary. To the extent paragraph 1 contains factual allegations or a response is otherwise deemed necessary, State Bar Defendants deny the allegations of paragraph 1.

2.       State Bar Defendants allege that the text of the rules referenced in paragraph 2 speak for themselves and deny all allegations inconsistent with them.

3.       State Bar Defendants allege that the text of the rule referenced in paragraph 3 speaks for itself and deny all allegations inconsistent with it.

4.       The allegations contained in paragraph 4 of Pomeroy's Complaint constitute legal conclusions to which no response is necessary. To the extent a response is deemed necessary, State Bar Defendants deny the allegations of paragraph 4.

5.       The allegations contained in paragraph 5 of Pomeroy's Complaint constitute legal conclusions to which no response is necessary. To the extent a response is deemed necessary, State Bar Defendants deny the allegations of paragraph 5.

6.       The allegations contained in paragraph 6 of Pomeroy's Complaint constitute legal conclusions to which no response is necessary. To the extent a response is deemed necessary, State Bar Defendants deny the allegations of paragraph 6.

7.       State Bar Defendants admit that Pomeroy seeks relief but deny the remaining allegations in paragraph 7 that suggest Pomeroy should be awarded such relief.

## JURISDICTION AND VENUE

8.       State Bar Defendants admit the allegations contained in paragraph 8 of Pomeroy's Complaint.

**APP.085**

9.      The allegations contained in paragraph 9 of Pomeroy's Complaint constitute legal conclusions to which no response is necessary. To the extent a response is deemed necessary, State Bar Defendants admit that this Court has subject-matter jurisdiction.

10.     The allegations contained in paragraph 10 of Pomeroy's Complaint constitute legal conclusions to which no response is necessary. To the extent a response is deemed necessary, State Bar Defendants deny the allegations of paragraph 10.

11.     The allegations contained in paragraph 11 of Pomeroy's Complaint constitute legal conclusions to which no response is necessary. To the extent a response is deemed necessary, State Bar Defendants admit that venue is proper but deny any allegation suggesting that State Bar Defendants engaged in any acts that give rise to valid claims or that otherwise form the factual predicate of paragraph 11.

## **PARTIES**

12.     State Bar Defendants admit that Pomeroy is a duly licensed attorney under the laws of Utah and is a member of the Utah State Bar, but lack sufficient knowledge to either admit or deny the remaining allegations of paragraph 12 of Pomeroy's Complaint and therefore deny the same.

13.     State Bar Defendants admit that the Utah State Bar is registered with the State of Utah as a non-profit corporation. The remaining allegations contained in paragraph 13 of Pomeroy's Complaint are legal conclusions to which no response is necessary. To the extent a response is deemed necessary, State Bar Defendants deny the allegations of paragraph 13 of Pomeroy's Complaint or allege that the Utah Supreme Court's Rules of Professional Practice speak for themselves and deny all allegations inconsistent with them.

**APP.086**

14.     State Bar Defendants deny that John C. Baldwin currently holds the position of Executive Director of the Utah State Bar. The remaining allegations contained in paragraph 14 of Pomeroy's Complaint are legal conclusions to which no response is necessary. To the extent a response is deemed necessary, State Bar Defendants allege that the referenced rule speaks for itself and deny all allegations inconsistent with it.

15.     State Bar Defendants deny that Heather Farnsworth currently holds the position of President of the Utah State Bar. The remaining allegations contained in paragraph 15 of Pomeroy's Complaint are legal conclusions to which no response is necessary. To the extent a response is deemed necessary, State Bar Defendants allege that the referenced rule speaks for itself and deny all allegations inconsistent with it.

16.     State Bar Defendants deny the allegations contained in paragraph 16 of Pomeroy's Complaint.

17.     State Bar Defendants admit that Marty Moore is presently a member of the Board of Commissioners, representing the 1st Division.

18.     State Bar Defendants admit that John W. Bradley is presently a member of the Board of Commissioners, representing the 2nd Division.

19.     State Bar Defendants admit that Chrystal Mancuso-Smith is presently a member of the Board of Commissioners, representing the 3rd Division.

20.     State Bar Defendants admit that Michelle Quist is presently a member of the Board of Commissioners, representing the 3rd Division.

21.     State Bar Defendants admit that Mark Morris is presently a member of the Board of Commissioners, representing the 3rd Division.

**APP.087**

22.     State Bar Defendants deny the allegations contained in paragraph 22 of Pomeroy's Complaint.

23.     State Bar Defendants admit that Traci Gunderson is presently a member of the Board of Commissioners, representing the 3rd Division.

24.     State Bar Defendants admit that Andrew Morse is presently a member of the Board of Commissioners, representing the 3rd Division.

25.     State Bar Defendants deny the allegations contained in paragraph 25 of Pomeroy's Complaint.

26.     State Bar Defendants admit that Kristin Woods is presently a member of the Board of Commissioners, representing the 5th Division.

27.     State Bar Defendants admit that Rick Hoffman is presently a "public" member of the Board of Commissioners.

28.     State Bar Defendants admit that Shawn Newell is presently a "public" member of the Board of Commissioners.

29.     The allegations contained in paragraph 29 of Pomeroy's Complaint are legal conclusions to which no response is necessary. To the extent a response is deemed necessary, State Bar Defendants admit the allegations of paragraph 29.

**FACTS**

**Utah's Mandatory Bar Association Membership and Fees**

30.     The allegations contained in paragraph 30 of Pomeroy's Complaint are legal conclusions to which no response is necessary. To the extent a response is deemed necessary,

State Bar Defendants allege that the referenced rules speak for themselves and deny all allegations inconsistent with them.

31.     The allegations contained in paragraph 31 of Pomeroy's Complaint are legal conclusions to which no response is necessary. To the extent a response is deemed necessary, State Bar Defendants allege that the referenced rules and court opinion speak for themselves and deny all allegations inconsistent with them.

32.     The allegations contained in paragraph 32 of Pomeroy's Complaint are legal conclusions to which no response is necessary. To the extent a response is deemed necessary, State Bar Defendants allege that the referenced rule speaks for itself and deny all allegations inconsistent with it.

33.     The allegations contained in paragraph 33 of Pomeroy's Complaint are legal conclusions to which no response is necessary. To the extent a response is deemed necessary, State Bar Defendants allege that the Utah Supreme Court's Rules of Professional Practice speak for themselves and deny all allegations inconsistent with them.

34.     State Bar Defendants admit that Pomeroy's annual licensing fees have been paid since approximately 2014 but lack sufficient knowledge to admit or deny the remaining allegations in paragraph 34 of Pomeroy's Complaint and therefore deny the same.

35.     The allegations contained in paragraph 35 of Pomeroy's Complaint are legal conclusions to which no response is necessary. To the extent a response is deemed necessary, State Bar Defendants admit that the Utah State Bar and members of the Board of Commissioners act under color of state law to administer the Utah Supreme Court's admission requirements but deny the remaining allegations of paragraph 35.

**APP.089**

**The USB's Use of Mandatory Fees for Political and Ideological Speech**

36.    The allegations contained in paragraph 36 of Pomeroy's Complaint are legal conclusions to which no response is necessary. To the extent a response is deemed necessary, State Bar Defendants admit that the Board of Commissioners acts under color of law and uses annual licensing fees on behalf of the Utah State Bar, but also asserts that the referenced rules speak for themselves and deny all allegations inconsistent with them.

37.    State Bar Defendants admit that the Utah State Bar engages in very limited speech funded by annual licensing fees, including publishing various announcements in the *Utah Bar Journal*, but deny the remaining allegations of paragraph 37 of Pomeroy's Complaint.

38.    State Bar Defendants admit that the quoted language appears in the rule referenced in paragraph 38 of Pomeroy's Complaint. But State Bar Defendants allege that the rule speaks for itself and deny all allegations inconsistent with it.

39.    State Bar Defendants admit that the quoted language appears in the rule referenced in paragraph 39 of Pomeroy's Complaint. But State Bar Defendants allege that the rule speaks for itself and deny all allegations inconsistent with it.

40.    State Bar Defendants admit that the quoted language appears in the rule referenced in paragraph 40 of Pomeroy's Complaint. But State Bar Defendants allege that the rule speaks for itself and deny all allegations inconsistent with it.

41.    The allegations contained in paragraph 41 of Pomeroy's Complaint contains legal conclusions to which no response is necessary. To the extent a response is deemed necessary, State Bar Defendants admit it has advocated for and against proposed legislation but deny the remaining allegations of paragraph 41.

**APP.090**

42.     State Bar Defendants admit that the quoted language appears in an article published in the issue of the *Utah Bar Journal* referenced in paragraph 42 of Pomeroy's Complaint. But State Bar Defendants allege that the issue of *Utah Bar Journal* referenced in paragraph 42 of Pomeroy's Complaint speaks for itself and deny all allegations inconsistent with it.

43.     State Bar Defendants admit that the Utah State Bar opposed the proposed tax on legal services contained in 2019's House Bill 441, titled the Tax Equalization and Reduction Act, but deny the remaining allegations contained in paragraph 43 of Pomeroy's Complaint.

44.     State Bar Defendants admit that the quoted language appears in the issue of the *Utah Bar Journal* referenced in paragraph 44 of Pomeroy's Complaint. But State Bar Defendants allege that the issue of the *Utah Bar Journal* referenced in paragraph 44 of Pomeroy's Complaint speaks for itself and deny all allegations inconsistent with it.

45.     State Bar Defendants admit that the quoted language appears in the issue of the *Utah Bar Journal* referenced in paragraph 45 of Pomeroy's Complaint. But State Bar Defendants allege that the issue of the *Utah Bar Journal* referenced in paragraph 45 of Pomeroy's Complaint speaks for itself and deny all allegations inconsistent with it.

46.     State Bar Defendants admit that the quoted language appears in the issue of the *Utah Bar Journal* referenced in paragraph 46 of Pomeroy's Complaint. But State Bar Defendants allege that the issue of the *Utah Bar Journal* referenced in paragraph 46 of Pomeroy's Complaint speaks for itself and deny all allegations inconsistent with it.

47.     The allegations contained in paragraph 47 of Pomeroy's Complaint relate to claims that have been dismissed, and to which a response is therefore not necessary. To the

**APP.091**

extent a response is deemed to be necessary, State Bar Defendants admit that the Utah State Bar opposed the judicial selection proposal referenced in paragraph 47 of Pomeroy's Complaint.

48.     State Bar Defendants admit that the Utah State Bar retains lobbyists to advocate about proposed legislation in the Utah State Legislature but deny any suggestion in paragraph 48 of Pomeroy's Complaint that the Utah State Bar engages in lobbying efforts on issues that are not germane within the meaning *Keller v. State Bar of California*, 496 U.S. 1 (1990).

49.     State Bar Defendants admit that the Utah Supreme Court has directed the Utah State Bar to adopt positions on behalf of the Board of Commissioners on public policy issues and deny the remaining allegations of paragraph 49.

50.     State Bar Defendants admit that the quoted language appears in the issue of the *Utah Bar Journal* referenced in paragraph 50 of Pomeroy's Complaint. But State Bar Defendants allege that the issue of the *Utah Bar Journal* referenced in paragraph 50 of Pomeroy's Complaint speaks for itself and deny all allegations inconsistent with it.

**The USB's Dues Refund Procedure**

51.     State Bar Defendants admit that they publish notices in the *Utah Bar Journal* explaining licensees' right to receive a refund of a portion of their annual dues for lobbying and legislative matters but deny the remaining allegations of paragraph 51 of Pomeroy's Complaint.

52.     State Bar Defendants admit that the *Utah Bar Journal*'s cover and table of contents do not specifically identify the rebate notice but deny all remaining allegations of paragraph 52.

53.     State Bar Defendants admit that the quoted language appears in the issue of the *Utah Bar Journal* referenced in paragraph 53 of Pomeroy's Complaint. But State Bar Defendants

**APP.092**

allege that the issue of the *Utah Bar Journal* referenced in paragraph 46 of Pomeroy's Complaint speaks for itself and deny all allegations inconsistent with it.

54.     State Bar Defendants admit the allegations of paragraph 54 of Pomeroy's Complaint.

55.     State Bar Defendants admit that the quoted language appears in the issue of the *Utah Bar Journal* referenced in paragraph 55 of Pomeroy's Complaint. But State Bar Defendants allege that the issue of the *Utah Bar Journal* referenced in paragraph 55 of Pomeroy's Complaint speaks for itself and deny all allegations inconsistent with it.

56.     State Bar Defendants admit that the URL provided in its Notice of Legislative Position includes information about proposed items of legislation and whether they were supported or opposed by the Utah State Bar but deny the remaining allegations of paragraph 56 in Pomeroy's Complaint.

57.     State Bar Defendants admit that the quoted language appears in the issue of the *Utah Bar Journal* referenced in paragraph 57 of Pomeroy's Complaint. But State Bar Defendants allege that the issue of the *Utah Bar Journal* referenced in paragraph 57 of Pomeroy's Complaint speaks for itself and deny all allegations inconsistent with it.

58.     State Bar Defendants admit that notices appear in the issue of the *Utah Bar Journal* referenced in paragraph 58 of Pomeroy's Complaint. But State Bar Defendants allege that the issue of the *Utah Bar Journal* referenced in paragraph 58 of Pomeroy's Complaint speaks for itself and deny all allegations inconsistent with it.

59.     State Bar Defendants admit that the quoted language appears in the issue of the *Utah Bar Journal* referenced in paragraph 59 of Pomeroy's Complaint. But State Bar Defendants

**APP.093**

allege that the issue of the *Utah Bar Journal* referenced in paragraph 59 of Pomeroy's Complaint speaks for itself and deny all allegations inconsistent with it.

60.     State Bar Defendants admit that the Utah State Bar's refund policy only permits a licensee to obtain a refund for dues that were used for lobbying and legislative activities after the pro-rata portion has been calculated. State Bar Defendants deny all other allegations contained in paragraph 60 of Pomeroy's Complaint.

61.     State Bar Defendants admit the allegations contained in paragraph 61 of Pomeroy's Complaint.

62.     State Bar Defendants admit that the notice of legislative positions on the Utah State Bar website provides information about whether the Utah State Bar opposed or supported the identified proposed legislation and does not detail the reasoning supporting that decision or itemize expenditures on individual proposals. State Bar Defendants also allege that the notices in the *Utah Bar Journal* referenced in paragraph 62 of Pomeroy's Complaint speak for themselves and deny all allegations inconsistent with them. State Bar Defendants deny all remaining allegations of paragraph 62.

63.     State Bar Defendants admit the allegations contained in paragraph 63 of Pomeroy's Complaint.

64.     State Bar Defendants deny the allegations contained in paragraph 64 of Pomeroy's Complaint.

65.     State Bar Defendants admit the allegations contained in paragraph 65 of Pomeroy's Complaint.

**APP.094**

66.     State Bar Defendants deny the allegations contained in paragraph 66 of Pomeroy's Complaint.

**Plaintiff's Injury**

67.     State Bar Defendants lack sufficient knowledge to admit or deny allegations contained in paragraph 67 of Pomeroy's Complaint and therefore deny the same. The remaining allegations contained in paragraph 67 of Pomeroy's Complaint are legal conclusions to which no response is necessary. To the extent a response is deemed necessary, State Bar Defendants allege that the Utah Supreme Court's Rules of Professional Practice speak for themselves and deny all allegations inconsistent with them.

68.     State Bar Defendants lack sufficient knowledge to admit or deny allegations contained in paragraph 68 of Pomeroy's Complaint and therefore deny the same.

69.     State Bar Defendants lack sufficient knowledge to admit or deny allegations contained in paragraph 69 of Pomeroy's Complaint and therefore deny the same.

70.     State Bar Defendants admit that the quoted language appears on the Utah State Bar website, as referenced in paragraph 70 of Pomeroy's Complaint. But State Bar Defendants allege that the text of the Utah State Bar's website referenced in paragraph 70 of Pomeroy's Complaint speaks for itself and deny all allegations inconsistent with it.

71.     State Bar Defendants lack sufficient knowledge to admit or deny allegations contained in paragraph 71 of Pomeroy's Complaint and therefore deny the same. The remaining allegations contained in paragraph 71 of Pomeroy's Complaint are legal conclusions to which no response is necessary. To the extent a response is deemed necessary, State Bar Defendants deny the remaining allegations of paragraph 71.

**APP.095**

72.     State Bar Defendants lack sufficient knowledge to admit or deny allegations contained in paragraph 72 of Pomeroy's Complaint and therefore deny the same. The remaining allegations contained in paragraph 72 of Pomeroy's Complaint are legal conclusions to which no response is necessary. To the extent a response is deemed necessary, State Bar Defendants deny the remaining allegations of paragraph 72.

73.     State Bar Defendants lack sufficient knowledge to admit or deny allegations contained in paragraph 73 of Pomeroy's Complaint and therefore deny the same. The remaining allegations contained in paragraph 73 of Pomeroy's Complaint are legal conclusions to which no response is necessary. To the extent a response is deemed necessary, State Bar Defendants deny the remaining allegations of paragraph 73.

74.     The allegations contained in paragraph 74 of Pomeroy's Complaint relate to a claim that has been dismissed, and to which a response is therefore not necessary. To the extent a response is deemed to be necessary, State Bar Defendants lack sufficient knowledge to admit or deny allegations contained in paragraph 74 of Pomeroy's Complaint and therefore deny the same. The remaining allegations contained in paragraph 74 of Pomeroy's Complaint are legal conclusions to which no response is required. To the extent a response is deemed necessary, State Bar Defendants deny the allegations of paragraph 74.

**Injunctive Relief Allegations**

75.     The allegations contained in paragraph 75 of Pomeroy's Complaint are legal conclusions to which no response is necessary. To the extent a response is deemed necessary, State Bar Defendants deny the allegations of paragraph 75.

**APP.096**

76.     The allegations contained in paragraph 76 of Pomeroy's Complaint are legal conclusions to which no response is necessary. To the extent a response is deemed necessary, State Bar Defendants deny the allegations of paragraph 76.

77.     The allegations contained in paragraph 77 of Pomeroy's Complaint are legal conclusions to which no response is necessary. To the extent a response is deemed necessary, State Bar Defendants deny the allegations of paragraph 77.

78.     The allegations contained in paragraph 78 of Pomeroy's Complaint are legal conclusions to which no response is necessary. To the extent a response is deemed necessary, State Bar Defendants deny the allegations of paragraph 78.

**Declaratory Relief Allegations**

79.     State Bar Defendants admit that they disagree with the contentions asserted in paragraph 79 of Pomeroy's Complaint. The remaining allegations contained in paragraph 79 of Pomeroy's Complaint are legal conclusions to which no response is necessary. To the extent a response is deemed necessary, State Bar Defendants deny the allegations of paragraph 79.

80.     The allegations contained in paragraph 80 of Pomeroy's Complaint are legal conclusions to which no response is necessary. To the extent a response is deemed necessary, State Bar Defendants deny the allegations of paragraph 80.

## FIRST CLAIM FOR RELIEF

### Compelled Membership - First and Fourteenth
### Amendment rights to free association and free speech

81.     In response to paragraph 81 of Pomeroy's Complaint, State Bar Defendants incorporate their responses set forth above.

**APP.097**

82.     The allegations contained in paragraph 82 of Pomeroy's Complaint are legal conclusions to which no response is necessary. To the extent a response is deemed necessary, State Bar Defendants admit the allegations of paragraph 82.

83.     The allegations contained in paragraph 83 of Pomeroy's Complaint are legal conclusions to which no response is necessary. To the extent a response is deemed necessary, State Bar Defendants admit the allegations of paragraph 83 as a general principle but deny the allegations insofar as they conflict with precedent permitting subsidized speech in certain contexts.

84.     The allegations contained in paragraph 84 of Pomeroy's Complaint are legal conclusions to which no response is necessary. To the extent a response is deemed necessary, State Bar Defendants deny the allegations of paragraph 84.

85.     The allegations contained in paragraph 85 of Pomeroy's Complaint are legal conclusions to which no response is necessary. To the extent a response is deemed necessary, State Bar Defendants deny the allegations of paragraph 85.

86.     The allegations contained in paragraph 86 of Pomeroy's Complaint are legal conclusions to which no response is necessary. To the extent a response is deemed necessary, State Bar Defendants deny the allegations of paragraph 86.

87.     The allegations contained in paragraph 87 of Pomeroy's Complaint are legal conclusions to which no response is necessary. To the extent a response is deemed necessary, State Bar Defendants allege that the binding precedent of *Lathrop v. Donohue*, 367 U.S. 820 (1991), *Keller v. State Bar of California*, 496 U.S. 1 (1990), and *Schell v. Chief Justice of the*

**APP.098**

*Oklahoma Supreme Court*, --- F.4th ---, 2021 WL 2657106 (10th Cir. Aug. 25, 2021), speaks for itself and State Bar Defendants deny allegations inconsistent with those precedents.

88.     The allegations contained in paragraph 88 of Pomeroy's Complaint are legal conclusions to which no response is necessary. To the extent a response is deemed necessary, State Bar Defendants deny the allegations of paragraph 88.

89.     The allegations contained in paragraph 89 of Pomeroy's Complaint are legal conclusions to which no response is necessary. To the extent a response is deemed necessary, State Bar Defendants deny the allegations of paragraph 89.

90.     State Bar Defendants lack sufficient knowledge to admit or deny allegations contained in paragraph 90 of Pomeroy's Complaint and therefore deny the same.

91.     The allegations contained in paragraph 91 of Pomeroy's Complaint are legal conclusions to which no response is necessary. To the extent a response is deemed necessary, State Bar Defendants deny the allegations of paragraph 91.

92.     The allegations contained in paragraph 92 of Pomeroy's Complaint are legal conclusions to which no response is necessary. To the extent a response is deemed necessary, State Bar Defendants deny the allegations of paragraph 92.

93.     The allegations contained in paragraph 93 of Pomeroy's Complaint are legal conclusions to which no response is necessary. To the extent a response is deemed necessary, State Bar Defendants deny the allegations of paragraph 93.

**APP.099**

## SECOND CLAIM FOR RELIEF

**Mandatory Dues - First and Fourteenth
Amendment rights to free association and free speech**

94.     In response to paragraph 94 of Pomeroy's Complaint, State Bar Defendants incorporate their responses set forth above.

95.     The allegations contained in paragraph 95 of Pomeroy's Complaint relate to a claim that has been dismissed, and to which a response is therefore not necessary. To the extent a response is deemed to be necessary, State Bar Defendants deny the allegations of paragraph 95 of Pomeroy's Complaint.

96.     The allegations contained in paragraph 96 of Pomeroy's Complaint relate to a claim that has been dismissed, and to which a response is therefore not necessary. To the extent a response is deemed to be necessary, State Bar Defendants admit that the Utah State Bar's refund policy only permits a licensee to obtain a refund for dues that were used for lobbying and legislative activities after the pro-rata portion has been calculated and deny the remaining allegations of paragraph 96 of Pomeroy's Complaint.

97.     The allegations contained in paragraph 97 of Pomeroy's Complaint relate to a claim that has been dismissed and contains legal conclusions, and to which a response is therefore not necessary. To the extent a response is deemed to be necessary, State Bar Defendants deny the allegations of paragraph 97 of Pomeroy's Complaint.

98.     The allegations contained in paragraph 98 of Pomeroy's Complaint relate to a claim that has been dismissed, and to which a response is therefore not necessary. To the extent a response is deemed to be necessary, State Bar Defendants lack sufficient knowledge to admit or

**APP.100**

deny allegations contained in paragraph 98 of Pomeroy's Complaint and therefore deny the same.

99.     The allegations contained in paragraph 99 of Pomeroy's Complaint relate to a claim that has been dismissed, and to which a response is therefore not necessary. To the extent a response is deemed to be necessary, State Bar Defendants lack sufficient knowledge to admit or deny allegations contained in paragraph 99 of Pomeroy's Complaint and therefore deny the same.

100.     The allegations contained in paragraph 100 of Pomeroy's Complaint relate to a claim that has been dismissed and contains legal conclusions, and to which a response is therefore not necessary. To the extent a response is deemed to be necessary, State Bar Defendants deny the allegations of paragraph 100 of Pomeroy's Complaint.

101.     The allegations contained in paragraph 101 of Pomeroy's Complaint relate to a claim that has been dismissed and contains legal conclusions, and to which a response is therefore not necessary. To the extent a response is deemed to be necessary, State Bar Defendants deny the allegations of paragraph 101 of Pomeroy's Complaint.

102.     The allegations contained in paragraph 102 of Pomeroy's Complaint relate to a claim that has been dismissed and contains legal conclusions, and to which a response is therefore not necessary. To the extent a response is deemed to be necessary, State Bar Defendants deny the allegations of paragraph 102 of Pomeroy's Complaint.

103.     The allegations contained in paragraph 103 of Pomeroy's Complaint relate to a claim that has been dismissed and contains legal conclusions, and to which a response is

**APP.101**

therefore not necessary. To the extent a response is deemed to be necessary, State Bar Defendants deny the allegations of paragraph 103 of Pomeroy's Complaint.

104.    The allegations contained in paragraph 104 of Pomeroy's Complaint relate to a claim that has been dismissed and contains legal conclusions, and to which a response is therefore not necessary. To the extent a response is deemed to be necessary, State Bar Defendants deny the allegations of paragraph 104 of Pomeroy's Complaint.

105.    The allegations contained in paragraph 105 of Pomeroy's Complaint relate to a claim that has been dismissed and contains legal conclusions, and to which a response is therefore not necessary. To the extent a response is deemed to be necessary, State Bar Defendants deny the allegations of paragraph 105 of Pomeroy's Complaint.

106.    The allegations contained in paragraph 106 of Pomeroy's Complaint relate to a claim that has been dismissed and contains legal conclusions, and to which a response is therefore not necessary. To the extent a response is deemed to be necessary, State Bar Defendants deny the allegations of paragraph 106 of Pomeroy's Complaint.

107.    The allegations contained in paragraph 107 of Pomeroy's Complaint relate to a claim that has been dismissed and contains legal conclusions, and to which a response is therefore not necessary. To the extent a response is deemed to be necessary, State Bar Defendants deny the allegations of paragraph 107 of Pomeroy's Complaint.

### **THIRD CLAIM FOR RELIEF**

**Safeguards for License Fees – First and Fourteenth
Amendment rights**

108.    In response to paragraph 108 of Pomeroy's Complaint, State Bar Defendants incorporate their responses set forth above.

**APP.102**

109.     Paragraph 109 of Pomeroy's Complaint characterizes the alternative nature of Pomeroy's third claim for relief, which does not require a response. To the extent a response is required, State Bar Defendants admit the allegations of paragraph 109.

110.     The allegations contained in paragraph 110 of Pomeroy's Complaint are legal conclusions to which no response is necessary. To the extent a response is deemed necessary, State Bar Defendants allege that the referenced court opinion speaks for itself and deny all allegations inconsistent with it.

111.     The allegations contained in paragraph 111 of Pomeroy's Complaint are legal conclusions to which no response is necessary. To the extent a response is deemed necessary, State Bar Defendants allege that the referenced court opinion speaks for itself and deny all allegations inconsistent with it.

112.     The allegations contained in paragraph 112 of Pomeroy's Complaint are legal conclusions to which no response is necessary. To the extent a response is deemed necessary, State Bar Defendants deny the allegations of paragraph 112.

113.     State Bar Defendants admit that the Utah State Bar's refund policy only permits a licensee to obtain a refund for dues that were used for lobbying and legislative activities. The remaining allegations of paragraph 113 of Pomeroy's Complaint contain legal conclusions to which no response is necessary. To the extent a response is deemed necessary, State Bar Defendants deny the remaining allegations of paragraph 113.

114.     The allegations contained in paragraph 114 of Pomeroy's Complaint are legal conclusions to which no response is necessary. To the extent a response is deemed necessary, State Bar Defendants deny the allegations of paragraph 114.

**APP.103**

115.     State Bar Defendants admit the allegations of paragraph 115 of Pomeroy's Complaint.

116.     State Bar Defendants admit the allegations of paragraph 116 of Pomeroy's Complaint.

117.     State Bar Defendants admit that the Utah State Bar's refund policy only permits a licensee to obtain a refund for dues that were used for lobbying and legislative activities after the pro-rata portion has been calculated. State Bar Defendants deny all remaining allegations contained in paragraph 117 of Pomeroy's Complaint.

118.     The allegations contained in paragraph 118 of Pomeroy's Complaint are legal conclusions to which no response is necessary. To the extent a response is deemed necessary, State Bar Defendants deny the allegations of paragraph 118.

119.     The allegations contained in paragraph 119 of Pomeroy's Complaint are legal conclusions to which no response is necessary. To the extent a response is deemed necessary, State Bar Defendants deny the allegations of paragraph 119.

120.     The allegations contained in paragraph 120 of Pomeroy's Complaint are legal conclusions to which no response is necessary. To the extent a response is deemed necessary, State Bar Defendants deny the allegations of paragraph 120.

121.     The allegations contained in paragraph 121 of Pomeroy's Complaint are legal conclusions to which no response is necessary. To the extent a response is deemed necessary, State Bar Defendants deny the allegations of paragraph 121.

**APP.104**

122.     The allegations contained in paragraph 122 of Pomeroy's Complaint are legal conclusions to which no response is necessary. To the extent a response is deemed necessary, State Bar Defendants deny the allegations of paragraph 122.

### FOURTH CLAIM FOR RELIEF

**Compelled Membership in UBF – First and Fourteenth
Amendment rights to free association and speech**

123.     In response to paragraph 123 of Pomeroy's Complaint, State Bar Defendants incorporate their responses set forth above.

124.     The allegations contained in paragraph 124 of Pomeroy's Complaint relate to a claim that has been dismissed and contains legal conclusions, and to which a response is therefore not necessary. To the extent a response is deemed to be necessary, State Bar Defendants deny the allegations of paragraph 105 of Pomeroy's Complaint.

125.     The allegations contained in paragraph 125 of Pomeroy's Complaint relate to a claim that has been dismissed and contains legal conclusions, and to which a response is therefore not necessary. To the extent a response is deemed to be necessary, State Bar Defendants deny the allegations of paragraph 125 of Pomeroy's Complaint.

126.     The allegations contained in paragraph 126 of Pomeroy's Complaint relate to a claim that has been dismissed and contains legal conclusions, and to which a response is therefore not necessary. To the extent a response is deemed to be necessary, State Bar Defendants deny the allegations of paragraph 126 of Pomeroy's Complaint.

127.     The allegations contained in paragraph 127 of Pomeroy's Complaint relate to a claim that has been dismissed and contains legal conclusions, and to which a response is therefore not necessary. To the extent a response is deemed to be necessary, State Bar

**APP.105**

Defendants allege that the Utah Rules of Professional Practice referenced in paragraph 127 speak for themselves and State Bar Defendants deny allegations inconsistent with them.

128.    The allegations contained in paragraph 128 of Pomeroy's Complaint relate to a claim that has been dismissed and contains legal conclusions, and to which a response is therefore not necessary. To the extent a response is deemed to be necessary, State Bar Defendants deny the allegations of paragraph 128 of Pomeroy's Complaint.

129.    The allegations contained in paragraph 129 of Pomeroy's Complaint relate to a claim that has been dismissed and contains legal conclusions, and to which a response is therefore not necessary. To the extent a response is deemed to be necessary, State Bar Defendants deny the allegations of paragraph 129 of Pomeroy's Complaint.

130.    The allegations contained in paragraph 130 of Pomeroy's Complaint relate to a claim that has been dismissed and contains legal conclusions, and to which a response is therefore not necessary. To the extent a response is deemed to be necessary, State Bar Defendants deny the allegations of paragraph 130 of Pomeroy's Complaint.

## <u>REQUEST FOR RELIEF</u>

State Bar Defendants admit that Pomeroy seeks the relief requested in subparagraphs A-I of the "Request for Relief" section of Pomeroy's Complaint but deny her entitlement to the same.

State Bar Defendants assert the following affirmative and separate defenses. By asserting a defense herein, State Bar Defendants do not intend to assume any burden of proof or persuasion it may not otherwise have according to law.

**APP.106**

**FIRST DEFENSE**

Pomeroy's Complaint fails to state a claim upon which relief may be granted.

**SECOND DEFENSE**

State Bar Defendants have acted in good faith, without malice, and its acts were justified and reasonable under the circumstances.

**THIRD DEFENSE**

State Bar Defendants have not engaged in any non-germane activity.

**FOURTH DEFENSE**

The *Utah Bar Journal* is a non-public forum, in which speech is attributable to the Utah State Bar only when it has decided the content of the speech.

**FIFTH DEFENSE**

Pomeroy lacks standing to bring some or all of her claims.

**SIXTH DEFENSE**

Some or all of the claims asserted by Pomeroy are unripe.

WHEREFORE, State Bar Defendants request that the court dismiss Pomeroy's Complaint and that Pomeroy take nothing thereby.

DATED this 18th day of April, 2022.

ZIMMERMAN BOOHER

s/ Dick J. Baldwin
Troy L. Booher
Dick J. Baldwin
Caroline Anais Olsen
*Attorneys for Defendants*

**APP.107**

**Certificate of Service**

This is to certify that on the 18th day of April, 2022, I caused the foregoing to be served

on the following via CM/ECF:

Scott D. Freeman                          Ethan W. Blevins
GOLDWATER INSTITUTE                        839 West 3600 South
500 East Coronado Road                     Bountiful, UT 84010
Phoenix, AZ 85004                          eblevins@pacificlegal.org
litigation@goldwaterinstitute.org

*Attorneys for Plaintiff Amy Pomeroy*

s/ Dick J. Baldwin

**APP.108**

## President's Message

# The Utah Center for Legal Inclusion

*by Robert O. Rice*

**P**ermit me to introduce you to a new organization, the Utah Center for Legal Inclusion (UCLI), co-chaired by Utah Supreme Court Justice Christine Durham and Parsons Behle & Latimer attorney Fran Wikstrom. UCLI is a new organization dedicated to promoting diversity in Utah's law schools, in its Bar, and on its bench. Its aim is to reach deep into the community to touch the lives of young and diverse children and students to be sure that they have among their hopes and dreams the prospect of attending law school and making a mark on our profession. Perhaps the seeds for UCLI were first planted 150 years ago, when Utah welcomed its first women and African American lawyers into the practice of law, decades before others in our profession would do the same.

For example, one of Utah's first woman lawyers, Cora Georgiana Snow, learned the law at the side of her father, Zerubbabel Snow, who later became an associate justice on the Utah Supreme Court and Attorney General for the Utah Territory. Brooke Edwards, *Voices From the Past: Georgia Snow – 1st Utah Female Lawyer*, Aspiring Mormon Women (July 6, 2015), *available at* http://aspiringmormonwomen.org/2015/07/06/voices-from-the-past-georgia-snow-1st-lds-female-lawyer/. Ms. Snow was admitted to the practice of law along with Utah's second woman lawyer, Phoebe W. Couzins, who was the first woman in the country to graduate from law school. Katharine T. Corbett, *In Her Place: A Guide to St. Louis Women's History* (1999).

Ms. Snow and Ms. Couzins earned their law licenses in 1872. Utah State Bar, Honoring Utah's Women Trailblazers in the Law (Sept. 7, 2011), *available at* http://www.utahbar.org/utah-bar-journal/article/honoring-utahs-women-trailblazers-in-the-law/. It would be another 36 years before the American Bar Association, formed in 1878, began accepting women members, in 1918. American Bar Association, ABA Timeline, http://www.americanbar.org/about_the_aba/timeline.html (last visited Feb. 1, 2017).

The first African American lawyer to be admitted to the practice

of law in Utah, Lawrence Marsh, was sworn in in 1909. Angie Welling, *Minority Bar Hails Pioneers*, Deseret News, Oct. 16, 2005. The ABA did not allow African American members until 1943. Katie Johnston, *Paulette Brown to Take Reins of American Bar Association*, Boston Globe (Sept. 7, 2014), *available at* https://www.bostonglobe.com/business/2014/09/06/paulette-brown-become-first-african-american-woman-head-american-bar-association/dFc460FXfVoONC0AAcAWWJ/story.html.

It's not surprising that in the dawn of Utah's legal community, the state was leading the nation in welcoming diversity in our profession. Utah was founded in part by individuals who understood how it was to be viewed as an outsider. Still today, Utah Governor Gary Herbert recognizes how Utah has supported those who don't necessarily look like the rest of us. Commenting on President Donald Trump's executive order banning certain immigrants from entering the United States, Governor Herbert remarked that "'Utah has always been a very welcoming state for refugees, for immigrants,'" he said. "'We appreciate the diversity they bring, and certainly they are part of the fabric of our state.'" Lee Davidson, *Utah Gov. Herbert not on Board with Trump's Refugee, Immigrant Actions*, The Salt Lake Tribune (Jan. 27, 2017), *available at* www.sltrib.com/news/4872517-155/utah-gov-herbert-not-on-board.

But since Ms. Snow, Ms. Couzins, and Mr. Marsh entered the practice of law in Utah, the number of women and minority lawyers in our community has increased slowly. It took until 1976 before there had been 100 women lawyers in Utah. *Women Lawyers of Utah, Women Trailblazers in the Law: First 100 Women Lawyers*, (May 15, 2014), *available at* http://utahwomenlawyers.org/programs/women-trailblazers-in-the-law-first-100-women-lawyers/. And it was not until the 1990s that Utah had 100 minority lawyers in the state. Linda Thomson &



**APP.109**
**USB000012**

President's Message

Deborah Bulkeley, DESERET NEWS, Oct. 14, 2005, *available at* http://www.deseretnews.com/article/635153215/Utahs-first-minority-lawyers-saluted.html.

Still today, the number of women and minority lawyers practicing in the Salt Lake legal market is a fraction of the number of white, male lawyers, and hardly comparable to the number of women and minority Utahns in the population at large. *See* National Association for Law Placement, Inc., 2016 Report on Diversity in U.S. Law Firms (2017), *available at* www.nalp.org/uploads/2016NALPReportonDiversityinUSLawFirms.pdf (NALP Report). The NALP annually surveys demographics in major legal markets, including Salt Lake City. The NALP analyzed Salt Lake City's legal market with respect to the percentage of women, minority and minority women among partners and associates, finding the following:

- 12.78% of partners are women

- 5% of partners are minority

- 1.11% of partners are minority women

- 29.27% of associates are women

- 8.13% of associates are minority

- 3.25% of associates are minority women

NALP Report, Table 3. With regard to the total number of women and minority lawyers at law firms in Salt Lake City, the NALP found as follows:

- 22.2% are women

- 5.98% are minority

- 1.71% are minority women

NALP Report, Table 4.

When it comes to women and minority representation on our bench, the statistics perhaps deserve even more attention. Utah ranks 51 of 51 with respect to women or minorities as a percentage of state court judges. Tracey E. George & Albert H. Yoon, *The Gavel Gap, Who Sits in Judgment of State Courts*, AMERICAN CONSTITUTIONAL SOCIETY FOR LAW AND POLICY, at 27 (2016),

*available at* gavelgap.org/pdf/gavel-gap-report.pdf. This statistic, notwithstanding, Governor Herbert has made great progress toward closing this gap. Governor Herbert deserves many accolades for his efforts to appoint women and minority lawyers to the bench, having appointed at least twenty women and four minority lawyers to the bench during his tenure. I've appeared before many of Herbert's appointments, and I can attest to their strong qualifications and to the fact that the governor has appointed the most qualified applicants possible in every instance.

Still, there is work to be done. Racial and ethnic minorities are estimated to be 18% of the Utah population, 24% in Salt Lake County, and 35% for the U.S. in 2007. By 2050, these proportions are expected to increase to 30%, 41%, and 54% respectively. Pamela S. Perlich, *Utah's Demographic Transformation: A View into the Future*, 68 UTAH ECON. & BUS. REV. 3 (2008), *available at* gardner.utah.edu/wp-content/uploads/2015/08/UEBRVolume68Number3-1.pdf. And Utah is hardly alone in facing this dilemma. According to Bureau of Labor statistics, law is one of the least racially diverse professions in the nation. Deborah L.



Mediator–Arbitrator

# JOHN KENNEDY
JUDGE (RET.)

## Complex Federal & State Civil and Administrative Disputes



Helping parties find resolutions through skill, insight and experience

To schedule a Mediation or Arbitration with Judge Kennedy please contact:

Utah ADR Services at
801-943-3730 or mbstrassberg@msn.com

Direct Phone: 801-230-1385 | www.johnkennedymediation.com

APP.110

USB000013

Rhode, *Law is the Least Diverse Profession in the Nation. And Lawyers Aren't Doing Enough to Change that*, THE WASHINGTON POST (May 27, 2015), *available at* https://www.washingtonpost.com/posteverything/wp/2015/05/27/law-is-the-least-diverse-profession-in-the-nation-and-lawyers-arent-doing-enough-to-change-that. Eighty-eight percent of lawyers are white. *See id*. According to the NALP,

> [m]inority women and Black/African-American men and women continue to be the least well represented in law firms, at every level, and law firms must double down to make more dramatic headway among these groups most of all. And, while the relatively high level of diversity among the summer associate classes is always encouraging, the fact that representation falls off so dramatically for associates, and then again for partners, underscores that retention and promotion remain the primary challenges that law firms face with respect to diversity.

NALP Report at 3.

Enter UCLI, which will be a 501(c)(3) nonprofit organization dedicated to advancing diversity and inclusion goals in the legal profession through education, community outreach, research and accountability, and by helping the Utah bar and minority-focused legal organizations accomplish their diversity and inclusion goals. UCLI will provide law firms, bar associations, schools, and government agencies with tools to help eliminate discrimination in the workforce, manage implicit biases in hiring and operational decision, and promote inclusive policies so that all levels of the legal profession can benefit from diversity in race, ethnicity, culture, sex, gender identity, sexual orientation, and religion.

UCLI is the brainchild of several exceptionally hard-working lawyers, Kristen Olsen and Melinda Bowen, and the Utah Minority Bar Association (UMBA), who worked tirelessly to build a framework for a successful organization. UCLI made a huge splash at the Utah Bar's 2016 Fall Forum, when Justice Durham and Ms. Bowen, joined by Governor Herbert, announced the creation of UCLI and introduced its program to Utah Bar members.

UCLI is already hard at work recruiting members and forming subcommittees to work on the important tasks before it – such as building a pipeline of young and diverse students throughout the state who are inspired to attend law school. UCLI's education committee is focused on building programs at the K-12 level to ensure children consider a career in law. The Community Outreach Committee is busy identifying groups and individuals who have a stake in ensuring our profession is diverse and well-represented. The Professional Development Committee is tasked with ensuring CLE programs take diversity into account and promote diversity. The Coordination and Promotion Committee is working on a UCLI Business Board of Governors who will help show companies and organizations how to set diversity and inclusion standards in the law and how to encourage UCLI membership and accountability.

One bold initiative UCLI is considering is a certification program that asks Utah law firms and legal employers to certify adequate participation in UCLI's efforts to promote diversity in our profession. To assist in the certification process, UCLI is laying plans to assist firms with diversity and inclusion audits and the preparation of individualized plans for promoting diversity and inclusion programs at the firm level. This effort will require buy-in from large and small firms alike, and will ask firms to make specific promises regarding how to improve diversity and inclusion in their work place. A certification process like this will require some soul searching, accountability, and a sustained effort in our legal community. But success cannot be achieved and progress cannot be made, unless firms make the kinds of commitments that will help UCLI, and our profession, promote a vision of a diverse and inclusive Utah Bar.

UCLI is following in the footsteps of UMBA, Women Lawyers of Utah (WLU), and LGBT & Allied Lawyers of Utah (LALU) to assist in growing a more diverse and inclusive Bar. UMBA, WLU, and LALU have worked extensively to mentor diverse lawyers and develop attorneys into strong and viable candidates to the bench. UCLI looks forward to working closely with UMBA and WLU to make further inroads with respect to diversity in the law.

But UCLI needs your help. Visit www.utahcli.org for information about how you can help. Importantly, visit UCLI's website to find out how to make your donation to this 501(c)(3) organization. Plainly speaking, UCLI cannot successfully launch for free; it needs not only your moral support, but also you financial support.

## Article

# *The Times They Are A Changin'*

*by Learned Ham*

I know, I know, the electoral college wasn't just a prank that sounded like a cool idea to James Madison after one of his all-nighters with Ben Franklin and the wild and crazy Pinckney cousins (Charles and Charles). What happens in Philadelphia stays in Philadelphia. It was a necessary inducement to the smaller states and a wise bulwark against mob rule in a future out-of-control democracy. But still.

As long as this is going to be a history lesson, let's go back to December 19, 1980. San Diego, California. Jack Murphy Stadium. Stick with me, I promise I'm not just changing the subject. You know the story. It's the Miracle Bowl. Jim McMahon and the Coogs come up with 21 points in the last two minutes and 33 seconds to beat SMU 46 to 45 on a Hail Mary to Clay Brown as the clock expires. BYU wins.

It makes a great story, which gets retold at least as often as the one about how "This is the Place," but let's do a quick recount – applying the rules of the electoral college.

Who cares who gets the most points? The final score doesn't mean anything. The game is divided into four quarters. There must be a reason for that. Those quarters are really important. If the lights on the scoreboard at the end of the game are all that matter, why not just skip the first 58 minutes and free up a couple of hours for everyone involved? No, the thought makes reason stare. The first three quarters are no less important than the last one. Just like Delaware is no less important than Virginia. And we must safeguard the integrity of the game by protecting against the possibility that a team gets unbelievably lucky in the last two minutes. Each quarter gets a point, and it takes three points to win.

SMU wins. And if you voted for Donald Trump or George W. Bush or Benjamin Harrison or Rutherford B. Hayes or John Quincy Adams, you'll see the logic behind that and join me in petitioning Kevin J. Worthen to FedEx the 1980 Holiday Bowl trophy to Dallas. No whining, it's for the good of the game.

OK, I admit it. The analogy is flawed. Football is not an election; I'm the one doing the whining; and it isn't fair to compare the BYU football team to Hillary Clinton. I doubt that either of them would appreciate it.

Because I'm all about being fair and balanced, here's the argument for the other side. There are plenty of examples in sports where the player with the most points loses, and it never occurs to anyone that there's anything wrong with that.

One example: tennis. On three occasions the Wimbledon men's singles champion actually won fewer games in the final match than his opponent. In 2009 Roger Federer won 38 games to Andy Roddick's 39. Federer was the champion. In 1948 Bob Falkenburg won 23 games; John Bromwich 24. Falkenburg won. In 1887 Ernest Renshaw took 23 games to Herbert Lawford's 21. Guess who got the first dance at the Champions Ball with Lottie Dod? Not Ernie. It's happened twice on the women's side. In 1993 Steffi Graf took 14 games from Jana Novotna. Jana won 16, but Steffi got the crown. In 1949 Louise Brough won the right to dance with Ted Schroeder, even though Margaret Osborn Dupont won 22 games to Louise's 21.

Did Margaret or Jana or Ernest or John or Andy throw a fit (and a racket) and demand that someone change the rules? Of course not. Everybody knew the rules from the start and were happy to play by them. Where's the injustice in that? Game, set,

|  | 1st Quarter | 2nd Quarter | 3rd Quarter | 4th Quarter | FINAL SCORE |
|---|---|---|---|---|---|
| **SMU** | 19 | 10 | 9 | 7 | 3 |
| **BYU** | 7 | 6 | 6 | 27 | 1 |

APP.112
USB000022

and match to Mr. Trump. And if you want to press the Holiday Bowl analogy, who pulled off the amazing come-from-behind win? Trump to Pence with no time on the clock.

The interesting part is what comes next (after the Inaugural Ball, not the Champions Ball). The peaceful transition of power. Desk drawers will be emptied and offices will be vacated. New faces will be in charge of new policies and procedures, which will thrill some folks and horrify others. A new portrait will hang in every post office.

It should feel familiar to anyone who's been through a corporate acquisition.

The company I work for was recently bought. A "liquidity event" is what the former owners called it. We had other names for it, most of them apocalyptic. You thought I was going to say "obscene" didn't you? But you were as wrong as Nate Silver. We're past that. We roll with the punches. I was commiserating with the former head of "business development" – Rajeev – who wonders about his future now that we have become a checked box on someone else's business development plan. "Rajeev" isn't remotely close to his real name, by the way, just like the company

today isn't anything like the same place it was pre-closing. The tumbleweeds in the hallways are just the beginning.

I tell Rajeev my theory, which is that this is simply what happens when you're owned by a private equity group. They exist to sell businesses, not run them. They don't manufacture goods, just EBITDA, and there are other people out there willing to buy EBITDA. And when somebody comes along and buys your EBITDA, that is the culmination of an exit strategy that precipitates a liquidity event. The banks get their loans paid back and the old owners walk away with some of the money the new owners borrowed from the same banks. Then the cycle begins again, like the first robin of spring. The new owners, who are often another private equity group, turn the place upside down looking for EBITDA. They hire consultants. They squeeze employees. They sell any asset bigger than a three-quarter inch binder clip. The result is an income statement overflowing with EBITDA (which somehow dries up before turning into net income), and a balance sheet composed mostly of goodwill created by overpaying for acquisitions. And that, my friends, is a sure sign of another liquidity event on the horizon.

Rajeev also happens to be the treasurer of the local Hindu temple, and I compare our plight to the cycle of death and

   

| Dani N. Cepernich | Steven W. Beckstrom | Melinda K. Bowen | Margaret B. Vu |

Snow Christensen & Martineau is pleased to announce the following new shareholders: **Dani N. Cepernich** and **Steven W. Beckstrom**.

We welcome **Melinda K. Bowen** back to the firm following her clerkship with Tenth Circuit Court of Appeals Judge Carolyn B. McHugh. And we welcome our newest associate **Margaret B. Vu**.



SNOW CHRISTENSEN & MARTINEAU

801.521.9000 | www.scmlaw.com

APP.113
USB000023

rebirth that will bring both of us closer to nirvana. He thinks I'm wrong, and explains it to me:

> For the last ten years we've been doing this to other people – buying their companies, outsourcing their jobs, upstreaming their cash, holding board meetings in Dublin and faking those Irish accents. Now it's our turn. It's not synergies and reorgs and tax treaties and transfer pricing and efficient capital allocation and exit strategies. It's just karma. And the fact that we're so bummed out about it probably means we're farther away from nirvana, not closer.

The transition to new management can be awkward, and I think there might be a couple of lessons here for Donald Trump, although the truth is, I'm pretty sure he's already seen these a time or two.

### 1. Show them who's in charge.

Act decisively. No equivocation. At least I think that's a good idea. I'm not completely sure about this… Years ago, I was in a meeting at another company I used to work for that had just been bought. The president of the local subsidiary where I worked (we'll call him Walter, because that isn't anything close to his real name) had just finished explaining to the president of the acquiror

(we'll call him Attila) that his EBITDA target for the coming year was probably not achievable. Attila listened patiently and responded, "Don't #!*)&%$$#@#!!! with me, Walter, or there'll be blood all over the floor, and it won't be mine." I doubt very much that Walter had ever been addressed quite like that in the boardroom before. At least, he certainly looked surprised. Roll with the punches. Attila, on the other hand, sounded like he was reciting a well-rehearsed line, something he'd said more than once. "Tone from the top" I think they call it.

### 2. Don't bother with press conferences.

Complete waste of time – they never go well. A few years after Atilla's mentoring of Walter, I was in another meeting at a different company that had just been bought. It was one of those "town hall" meetings to get to know the new management, and seemed to go pretty smoothly until the Q&A, which apparently went on a little longer than the conquering CEO wanted. Finally, after one too many ill-advised questions implying less than unbridled enthusiasm for upcoming synergies, the CEO announced, "This was an acquisition, not a merger. Meeting adjourned."

### 3. No hesitation.

Don't drag out the transition. Get your people in, and their people out ASAP. A temporary transition services agreement with the seller for six months or so might seem necessary while you get the back-office support figured out, but you'll both come to hate it. An earnout provision where the seller gets additional consideration in the future triggered by the business hitting certain EBITDA targets – and which therefore means the seller sticks around to run your business during that period – always ends badly. You will threaten to sue each other before it's over, with a good chance someone isn't just bluffing. I would share some of the details of the distribution business we bought from those thieves in that country run by a gang of thugs, but the confidentiality and non-disparagement clauses of the settlement agreement won't let me. The lesson for Donald Trump? Thank Mr. Obama sincerely for his generous offer to be of continuing assistance, then lose the cell phone number. Offer his people a bonus for clearing out by 3:00 p.m.

And life goes on. Ownership comes and goes. Policies and procedures change. Moving vans jam the streets of Washington, D.C. Roll with it, Walter. Abandon those desires and attachments. If you do, nirvana is closer than you think. Or just celebrate. Why not? Maybe your guy won, and even if she didn't, BYU did win the Miracle Bowl, and even the losers at Wimbledon still get invited to the Champions Ball. They just have to wait for the second dance. Meeting adjourned.

# Auctioneers & Appraisers

Erkelens & Olson Auctioneers has been the standing court appointed auction company for over 30 years. Our attention to detail and quality is unparalled. We respond to all situations in a timely and efficient manner, preserving assets for creditors and trustees.

**Utah's Leading Auction & Appraisal Service**



*3 Generations Strong!*

**Rob, Robert & David Olson
Auctioneers, CAGA Appraisers**

# 801-355-6655
**www.salesandauction.com**

**Article**

# Script for Mock Board Meeting of Pure Play, Inc.

*by James U. Jensen*

## INTRODUCTION

This meeting is for board training purposes. The Play illustrates legal, ethical, and governance issues encountered by private companies that have taken in outside capital. Embedded numbers lead to points of discussion by counsel during the "intermissions." This is not legal advice. Attendees should seek separate legal advice on any matter discussed here.

## PLAYERS

**Able Meister:** Independent Director and Chair; holds common, Series A, and options

**Betcher Pay:** CEO Director; a founder; holds common and options

**Carol Singer:** Independent Director; holds Series A and options

**Dag Namit:** Independent Director/Investor; holds Series B shares

**Esher B. Good:** The Sr. VP & General Counsel (GC); holds common and options

**Fran Tastic:** The Sr. VP & CFO; holds common and options

**Grinn N. Barrett:** Independent Director; holds Series A and options

## ACT I

*[The Meeting begins with Able, Carol, and Grinn seated at the table. Waiting nearby are Betcher, Dag, Fran, and Esher.]*

**ABLE:** OK, let's get started. Carol and Grinn, we comprise an Executive Session of the Board meeting. [1] Generally, we have not recorded minutes for these sessions, and I just give a summary report into the full meeting minutes. Let's start with Board nominees. Carol?

**CAROL:** I know that our new investment contract gave us needed cash and gave Deep Pockets the right to name a Director, [2] but I was surprised that Deep's long time CEO, Amazon Grace, was not named. I don't know Dag Namit, although I hear good things about him. I just ask if we should go back to Deep and ask for Amazon himself.

**ABLE:** Well, I checked with Esher, our General Counsel, and the Agreement gives Deep the sole right to appoint. Grinn, what do you think?

**GRINN:** Well, as you requested earlier, I have not kept my notes from the previous board meeting [3] when we addressed the term sheet for the Deep deal. But I recall that it included a "Director Nominee" provision. I know both of these folks. Candidly, I think Dag will fit our board culture [4] better than Amazon, anyway. Amazon has a well-earned reputation of being occasionally wrong but never in doubt.

**CAROL:** Well, we also have pending the request from Betcher, our CEO, that we add to the board Betcher's favorite consultant. What's the name? Flatter Ing. I take the position that a nominee from the CEO is not an "independent Director" so appointment of Flatter would violate our policy of having only one Director from management. [6]

**GRINN:** I accept your point, Carol. But we already have a mix of a "working Board" and an "oversight Board" because each of the three of us is engaged to some degree, with assisting management. So our pure role of oversight is compromised in that regard. [7] Moreover, Deep Pockets is known to stay close to management in practice and to contract for control of various decisions by written agreement. [8] And I agree that adding Flatter wouldn't add a new perspective to the Board.

**ABLE:** I agree, and I see no need to act now. I want us to do a self-assessment [9] to identify the talents and skills we have now so we'll know what to add to our Board. We can just expand the Board by motion and get an election with the next



*JAMES U. JENSEN practices at ClearWater Law & Governance Group. He has served on several for-profit and non-profit boards. He was a founder of the Green River Conference on Corporate Governance, the Utah Ronald McDonald House, and the MountainWest Capital Network.*

APP.115
USB000368

shareholders' meeting, and we need to be sure that Betcher and the other officers support this approach. Our early "Angel Investors" accepted the fact that none of them would be on our Board and that we would add people as the need arose. [10]

In building the agenda with Betcher for the full Board meeting, [11] I suggested to Betcher that I thought the Board would decline to add anyone else at this time. So I expect that Betcher is OK with that approach.

**CAROL:** OK. I will accept your suggestion.

**GRINN:** I'm fine, too.

**ABLE:** Great. Before we bring in the others, let's discuss compensation for Dag. [12] I think it is fairly common that a contracted member is not compensated. If you will permit me, I will discuss it off-line with our GC. So we can keep moving, I will bring it back to a further Executive Session meeting if [13] it appears that compensation is expected. Will that be acceptable?

**CAROL:** That sounds find.

**GRINN:** Good.

*[End of Act I – the lights go down.]*

**STATION BREAK:** The Narrator, Players, and guests will discuss legal, ethical, and governance issues presented in Act One:

1. Executive Session and committee meetings frequently have no minutes. Their recommendations are summarized into the regular meeting minutes. Audit Committee minutes are common, however.

2. Investors frequently negotiate for the right to appoint a Director. Delaware cases have confirmed the full fiduciary Director duties for such Directors.

3. Private notes of Board meetings are discouraged and can be troublesome in litigation.

4. The writings address the advantages and disadvantages of Director Board terms, and the writers discuss productive Board culture vs. downside of imbedded attitudes.

5. Board diversity is much in the news. Some European countries have mandated minimum female representation as high as 20% to 40% for public companies.



# Does a denied insurance claim have you up against the ropes?

*Let us fight this battle*

**THE LAW FIRM OF
BRIAN S. KING**

*we speak insurance*

**Phone: 801-532-1739
Toll Free: 866-372-2322
www.erisa-claims.com**

Life Insurance Claims
Medical Insurance Claims
Disability Insurance Claims

6. SEC rules require a majority of outside Directors (and exclusively outside Directors on the Audit Committee). Many private companies have moved in that direction too.

7. Note the trade-off that exists between traditional views of Board oversight and activist views of a working Board. Note the challenge to independence where Directors create (and execute) corporate strategy.

8. Some professional investors contract to move some decisions from the Board to shareholders or to require super majority votes on some issues. This compromises the traditional view of Board oversight.

9. Board self-assessment (required by SEC rules for public companies) is commonly integrated with Director selection.

10. This discussion demonstrates that this Company lacks specific representation for minority shareholders.

11. An independent Board chair frequently helps to build the Board agenda.

12. Directors set their own compensation. But some litigation and "say-on-pay" developments have put a light on potential for self-serving activity. Recent Delaware cases reflect the challenge of "interested Director" issues when setting Director compensation.

13. An effective chair can manage some matters off-line when trusted by the other Directors.

### ACT II
*[The lights come up. Betcher, Dag, Fran, and Esher have joined Able, Carol, and Grinn.]*

**ABLE:** Welcome, Dag. And welcome Betcher, Fran, and Esher. Dag, I believe that you met everyone as part of your due diligence. Esher, will you take minutes of the meeting? We are now in full session. The minutes will reflect that all Board members are present and that they have received and reviewed the Board materials ahead of the meeting. [1]

Will you please reflect in the minutes, Esher, that the three Independent Directors held an Executive Session before this meeting. Based on our review and the Company's contractual obligations, this ad hoc committee recommends that the Board expand its positions by one and that Dag be named to fill that vacancy. The Chair will entertain a motion.

**CAROL:** I move the Board adopt the recommendation of the Independent Directors and that Dag be added to the Board to fill a newly created vacancy.

**BETCHER:** I'll second.

**ABLE:** All in favor.

*[The 4 Directors, Able, Betcher, Carol, and Grinn say "aye".]*

**DAG:** Thank you. I look forward to working with you to help the Company reach the potential we see.

**ESHER:** Able, I have just one clean-up item. Dag, will you stay after the meeting for a few minutes to get your "Board Book." [2] And we can work on adding you to our D & O insurance coverage. [3] Oh, and one more thing; you will need to sign the Company's standard "Director's Service Agreement." [4]

**DAG:** Thanks. I will be happy to. I was going to work with Betcher on another matter, [5] so I will just come by your office after that.

**ABLE:** Betcher, we are also recommending that we conduct a form of self-assessment before we seek further nominees. Esher will drive the process, and everyone will respond to Esher's memo.

**BETCHER and DAG:** Fine.

**ABLE:** Esher, please put that in the minutes then. Yes, Betcher?

**BETCHER:** I assumed we were headed in that direction, and Fran and Esher have already begun. But I have asked Esher to address the question of confidentiality in this sensitive area of self-assessment.

**ESHER:** Briefly, it is fairly common for counsel to collect and consolidate the several responses on a Board self-assessment drill. And it is fairly common that no copies of the document be retained, except the final consolidation. [6] This will be our approach.

**CAROL:** Is there anything sinister about that?

**ESHER:** No, not at all. It is just careful house-keeping – just as the official minutes are the only record of the Board's deliberations, we will take the same approach here.

**DAG:** That is my understanding from other Boards we work with. And the Nav-gri recommends this approach too.

**CAROL:** Nav-gri?

Articles

Script for Mock Board Meeting

**DAG:** You know, the National Association of Very Greedy and Rich Investors. Nav-gri [7] has some good materials on self-assessment for private companies, and I will send a reference to Betcher.

**ABLE:** Good. Let's turn to agenda item number 2. Approval of the minutes. You have all read the draft minutes. [8] Are there any corrections?

**BETCHER:** Fran has raised with me the issue of our Equity Incentive Plan as addressed in the contract with Deep Pockets. [9] Fran?

**FRAN:** You may have noticed that the minutes fail to mention Deep's veto rights on any changes in the plan. I think the minutes should reflect this right, and Esher has some simple added text to cover this.

**ABLE:** Good. Assuming that is acceptable to everyone, are there any other corrections? Hearing none, may I have a motion?

**CAROL:** I move approval as amended.

**BETCHER:** Seconded.

**ABLE:** All in favor? Dag will abstain as he was not then on the Board.

*[All Directors say "aye".]*

**ABLE:** Then the minutes will be finalized as approved and filed with the records of the Company. Let's move to agenda item number 3: the business and financial presentations. Betcher, you have the floor.

**BETCHER:** I wanted you to hear from our Sales Vice President, but [10] I made the hard call to send the Sales Vice President to an important client meeting today. So I call your attention to Tab 3. The trends continue. Last quarter our sales were on target with 2% over the prior quarter and up by 12% over the same quarter year-on-year. But the sales cycle is further extended, receivables are now about sixty-six days, and our quantity purchases of raw materials have improved our gross margin, but are putting a real pinch on cash. We have had to delay many needed promotional items and cut back on R & D to find the cash. So even with the Deep Pockets' cash, our growth is hampered with cash constraints. [11] Fran, what more do you want the Board to see?

**FRAN:** Just this one note. We continue to be talent constrained. As you read in the next item, the issue of human resource



*Proudly Celebrating Our*

# 15TH ANNIVERSARY

SMITH HARTVIGSEN PLLC

ATTORNEYS AT LAW

**Visit us at our new space:**
**257 East 200 South, Suite 500, Salt Lake City, UT 84111**
**Tel. 801.413.1600 | www.SmithHartvigsen.com**

APP.118

USB000371

management at our semi-autonomous subsidiary, [12] Easy Does It, Inc., continues to soak up senior management time. But I am getting ahead of myself. So please just look at page 19, [13] sources and uses of cash. We will experience our largest cash shortage out nine months in the amounts shown there. [14] Then it starts to turn around.

But….

**BETCHER:** Fran, that sets the table nicely for the next item on the agenda. Much of what Fran was describing was operational, and I don't want to bother the Board with it. So can we move to Tab 4?

**ABLE:** Assuming that's acceptable, Esher, will you just reflect in the minutes on this item that the Board considered the materials and heard a presentation from the CEO and CFO? [15]

**ABLE:** At this point, then, let's move to Tab 4 – the proposed funding. Betcher, you have the floor.

**BETCHER:** Thank you. Based on our need for more cash, I propose a convertible debt offering [16] using Deep Pockets [17] as our lead investor. We can do it quickly and the convertible debt will delay the need to strike a "valuation" for the Company, [18] even if for just a few months, so no need to think about a "down-round." Fran or Esher?

**FRAN:** I will just add that the proposed term sheet in the Board materials was jointly prepared by us and Deep Pockets. We are really pleased to have this Deep Pockets cash.

**ABLE:** Betcher, will you briefly describe the other approaches that you considered?

**CAROL:** Just a minute, everyone. Should we discuss these items without the help from Dag for the time being – since he is potentially on the other side?

**ABLE:** Good point Carol. Dag, will you step out for a bit, so we can consider your proposal openly. [19]

**DAG:** That is as it should be. I will just answer some calls while I wait. You know, as a VC, I have a short attention span anyway.

*[Dag rises and moves toward the door. The lights fade.]*

**STATION BREAK:** The Narrator, Players, and guests will discuss legal and governance issues from Act II;

1. It is best practice to send Board materials to Directors in advance.

2. The electronic Board Book is one of several tools to keep Directors informed.

3. Management and Board work together on the scope of D&O Insurance and any double coverage questions.

4. Opinions differ on the merits of using a Director's signed agreement versus reliance on the known fiduciary duties of Directors.

5. Every Board should address the ways in which Directors stay informed and interact with company personnel,

6. The Company will have its own records retention policy, but Board members may have a separate rule concerning their separate notes.

7. There are many sources of information and expectations of information sharing.

8. It is common to have Boards express timely approval of minutes. But this practice can produce complications and its implications should be understood.

9. One of the major demands on Boards is their role in equity issuances, valuations, and pricing. Complications can arise in the interplay between pricing of common and pricing of preferred.

10. This discussion illuminates a source of management information and the potential for CEO filtering. Director access to other executives is also shown. See also note 7.

11. Note the separate roles of management and Board in strategic planning.

12. A Board can lose some oversight by allowing the Board of a subsidiary to be populated only by executives.

13. Voluminous materials can force the Board to deal with the urgent at the expense of the essential.

14. Cash short fall must certainly be an important Board matter.

15. Minutes must balance brevity with thoroughness. Unanimous consent resolutions are not eligible for the protection of the "business judgment rule" because they reflect no Board deliberations.

16. Convertible debt is another major Board issue with many subtle and vexing implications-sole funding by an existing

investor is replete with issues.

17. Different funding from the same investor presents thorny conflicts issues and tough oversight challenges.

18. The use of convertible debt can delay company valuation until a later event is completed, but it brings other challenges.

19. This is just another example of the subtle ways in which a Board can encounter a potential Director conflicting interest transaction.

## ACT III

*[The lights come up; Dag is absent.]*

**CAROL:** May I start? This is as weak as water. I have grave concerns about this proposal. I see the potential that the Company can get deeply into negotiations with Deep, no pun intended. They must have a back-up alternative.

**ABLE:** Don't hold back, Carol. Tell us how you really feel. But candidly, I, too, have concerns about this approach. I see at least these complications: (1) Deep's interest in their current Series B, (2) Deep's possible investment in a new Series C, and (3) the competing potential for Deep to have a collateral position in the convertible preferred.

**GRINN:** We have an additional complication. Deep may expect to liquidate its second fund soon. So dependence on them, when we may be facing a long-term climb under current market conditions, could put the Company in a risky situation. [1]

**FRAN:** Well, there may be something to that, and I expect that Deep would like to postpone adding a new professional investor to provide a market "valuation" so as to avoid any potential of a down round. [2] I see that, but I would hate to lose this option-even with its limitations.

**CAROL:** Betcher, do you feel that you are too close to Deep Pockets and Dag? [3] I could help by playing Bad-Cop.

**BETCHER:** Thanks, Carol, but I will be just fine. This is not my first county fair. What we really need from the Directors here is clarity of strategic objectives. I recognize the dilemma. But I need the cash yesterday.

**GRINN:** I can see a situation where only the late arriving investors will get anything because of the liquidation preferences. I want assurances that potential increased risk [4] will benefit the common, not just the VCs who negotiate for liquidation preferences and

perhaps even security interests in the assets of the Company. There may be much more risk here than we first thought.

**ABLE:** All right everyone. Let's sit back in our seats. Grinn and Carol make good points. The Board needs to confirm a strategic vision, and we can take into account the interests of each of the investor groups and management. [5] Esher, I know Dag can't vote on his funding proposal, but will he be eligible to vote on the strategic vision matter?

**ESHER:** I believe that the state statute on Director conflicting interest transactions is applicable to the Deep proposal, but not applicable to the strategic planning matter. I would want to do more research before giving you definitive legal guidance. But I am not the right place to go for the question of fairness of a Deep deal – that is the work of the Directors to consider an evaluation of terms AND price. Of course, the Board can get expert advice on this matter and the Board is entitled to rely on that advice. [6] Carol raised an important issue of terms that are still to be negotiated, and we have not yet addressed the question of fairness in the valuation, the price.

**GRINN:** I have some concerns that management assessment of cash flow short-fall can use some more rigor. Betcher, if you



## Mediator–Arbitrator
# JOHN KENNEDY
### JUDGE (RET.)

## Complex Federal & State Civil and Administrative Disputes

Helping parties find resolutions through skill, insight and experience

*To schedule a Mediation or Arbitration with Judge Kennedy please contact:*
Utah ADR Services at
801-943-3730 or mbstrassberg@msn.com

Direct Phone: 801-230-1385 | www.johnkennedymediation.com

APP.120
USB000373

took another look at it, might you find some options that you have discounted because of the attraction of easy money? [7]

**CAROL:** We have time constraints today; so I suggest that we appoint a subcommittee comprised of Betcher and me? We will call on Fran and Esher for support. Our charge will be to come back to the Board with a recommendation of the priority of our strategic interests, our appetite for risk, and our optimum time horizon for a liquidity event. With that, the full Board, or the Board excluding Dag, will then be enabled to adopt a favored funding approach and an acceptable alternative approach.

**ABLE:** You didn't mention Dag on the subcommittee. Would you be willing to include Dag on the subcommittee? Is that acceptable?

**ESHER:** From a corporate governance perspective, each Director must discharge a fiduciary duty to all the shareholders, not just to his class or her series, so, in that sense, Dag has the same duty as you other Directors. [8] And, if you separate the establishment of strategic interests from tactical approaches, Dag would probably not be disqualified any more than any other Director or officer.

**CAROL:** OK. Add Dag.

**BETCHER:** I am willing to take Carol's approach, provided it doesn't take too long. I have a business to run here.

**FRAN:** Betcher, I think we will be all right. As you know, we have been working on a long-range business plan, and I think much of the work the Directors want has already been done.

**ABLE:** Let's take Carol's suggestion as a motion. Do I have a second?

**BETCHER:** Second.

**ABLE:** With my vote, that is unanimous as to the Directors present, at least. Esher, will you invite Dag to come back into the meeting.

*[Dag enters and takes a seat at the table.]*

**ABLE:** Dag, you will be pleased to know that you have joined a subcommittee of Directors, with Carol and Betcher, to recommend our long-range strategic plan objectives. This approach will better enable us to sift through alternative financing ideas. And if we have clarity on that, we will be in a better spot to consider the Deep Pockets generous offer. Assuming agreement from all, at this point, then, I propose that we move to Tab 5 in the agenda and in the Board materials – the proposed management change

at our subsidiary, Easy Does It, Inc.

Recall that the Board materials separately presented the Easy financials, so you all know that it is contributing to earning at an even higher rate than it contributes to sales. Esher?

**ESHER:** Remember, we are the sole shareholder of Easy, so we have absolute authority to control. As Able directed, I have arranged that our Board is also the Board for Easy. We meet simultaneously, and [9] I do the minutes that way.

**ABLE:** Thanks, Esher. Betcher?

**BETCHER:** You know that Billy Bob and Waldorf, the two young Turks at Easy Does It, Inc. have an uneasy truce. Billy Bob is southern right down to the sand between his toes. Waldorf moved to Boston when he was young, but his German heritage is still quite dominant. Neither really likes living in Fargo at corporate headquarters, but they travel a great deal because suppliers and customers are so spread out. They are each capable and opportunistic. Right now, I need them both. Neither is quite ready. So I propose to continue as CEO, and we will appoint them as co-Presidents. That way, they can each have a strong business card to carry and they will both be building a good resume. I think this approach will help us continue an evaluation of their work and that a winner should emerge in time. So that is my proposal. The compensation implications are in the Board materials. [10]

**CAROL:** Betcher, this is the craziest proposal I ever heard. You are creating a two-headed monster. If they are that good, why don't you just bring one of them up to headquarters and leave the other one there to run the store?

**ABLE:** Moving right along, Dag, I think you met these folks in your due diligence. What do you think?

**DAG:** Well, I agree with Betcher that they are capable and ambitious. It might work. I usually think we should leave management decisions to the CEO and defer to him or her.

**GRINN:** Carol is right that there is little evidence that this works over a long period of time. Betcher, how long would it go on?

**BETCHER:** I'm not sure about timing. It may depend on the decision about funding. And I think you will see that they continue to perform as they have been doing. If we can keep them.

**GRINN:** And what about the idea of bringing one of them up to headquarters?

**APP.121**
**USB000374**

**BETCHER:** Thanks, but no thanks. I don't need another spitfire here. I need them both there.

**ABLE:** May I suggest that we postpone decision on this proposal until we have the work of the strategic interests subcommittee? It is quite possible that the subcommittee's work will provide needed clarity on this issue.

**CAROL:** I so move.

**DAG:** Second.

**ABLE:** Betcher, can you accept this approach?

**BETCHER:** Not really; I have made commitments to these fellows. I will just have to see what I can do. I would prefer to get a unanimous supporting vote today.

**CAROL:** Well that's not going to happen.

**BETCHER:** OK, Carol.

**ABLE:** Well, let's just record this as a majority vote. In the interest of time, I propose that we pass to Tab 6 in the agenda and in the Board materials – the proposed amendment to the equity incentive plan.

**ABLE:** Management is proposing an amendment to the equity incentive plan. [11] And management has proposed an allocation formula for distribution of new options to management and to Directors. Betcher?

**BETCHER:** The Board materials show what we think the market place is doing on equity compensation today. And I think there is broad support among our leadership for the proposal.

**CAROL:** It would be easy to be very supportive of this proposal. I like the idea that the Directors are getting a substantial boost in the number of options. But I don't want to feel "bought-off." Moreover, I am concerned that the distribution seems top-heavy and fails to adequately reward the employees generally. Senior management seems to be taken care of very nicely here; thank you very much. [12]

**ABLE:** Any other comments?

**FRAN:** The contract with Deep Pockets governs the grant for Betcher and the other members of senior management. So it may be that the Board has a contractual obligation to grant these options to management. [12] The other options are just filling out the dance card. Right, Esher?

**ESHER:** True, the management numbers are in the Deep contract. But the agreement contains this proviso: "Except as the Board of the Company shall specifically find that good governance conditions require otherwise…." So I believe the Board can make a determination that some other numbers are required under current conditions.

**GRINN:** What does that mean? What is "good governance conditions" in this context?

**ESHER:** Well, it is pretty much what you say it is. If you discharge your duty of good faith, and your duty of care, and assuming that you have made yourselves adequately informed, your determination is final. [13]

**DAG:** Look, Deep Pockets negotiated for the numbers that Betcher has in his proposal because we don't want to have to deal with disgruntled management any time during our ownership. And we don't really expect the Board to be better informed than we are on these subjects, since we deal with management incentives all the time. [14]

**ABLE:** Well, actually, you have just joined a Board that is determined to do its best to discharge its duties and we are not accustomed to contracting out the performance of our statutory



# Auctioneers & Appraisers

Erkelens & Olson Auctioneers has been the standing court appointed auction company for over 30 years. Our attention to detail and quality is unparalled. We respond to all situations in a timely and efficient manner, preserving assets for creditors and trustees.

**Utah's Leading Auction & Appraisal Service**

### Erkelens & Olson
Auctioneers & Appraisers

*3 Generations Strong!*

**Rob, Robert & David Olson Auctioneers, CAGA Appraisers**

Call us for a free Consultation

# 801-355-6655
www.salesandauction.com

APP.122

USB000375

**Articles**

Script for Mock Board Meeting

duties. So, Dag, I think you will have to set aside what you felt you wanted as a contracting party. We expect that all Directors will be discharging their duties to the Company. [14] We are very pleased to hear of your other experiences, and we trust you will use that learning to help us do our work. OK?

**DAG:** OK. So maybe I overstated our position. We invested in the Company because of the people and the potential. We are committed to helping both succeed.

**ABLE:** Well, this is a very interesting topic, and we need to come to a conclusion. But we are out of time now, so we will put it on the agenda for the next meeting.

**ABLE:** Tab 7 calls for a recess at this point. Without objection, I declare the meeting recessed.

*[The lights come up.]*

**STATION BREAK:** Here the Narrator, Players, and guests will discuss legal and governance issues from Act III:

1.  It is always a matter for Director concern to match the time horizon and capability of an investor or investors with the business plan of the Company.



2.  Down rounds can be procrastinated but with increased pressure on the Directors to watch for conflicting interests and discharge of duties.

3.  Directors may be tempted to "help," but notice that the oversight function will be compromised by such working contributions.

4.  Risk discussions are all the rage since Dodd-Frank, but evaluation of ERM is a complex project that deserves off-meeting work and further meeting consideration.

5.  For our Company, the discussion of a strategic vision seems to be arriving late, but better late than never.

6.  Fairness and valuation are two prominent examples of matters where the Board can seek expert advice.

7.  This is a good example of Director skepticism of management numbers and an appropriate first request for further evaluations.

8.  This statement of Directors' duties to all shareholders is sometimes overlooked by Directors representing a particular class of shares.

9.  Of course this dual Board meeting is not the only way to govern a subsidiary. Frequently, only management comprises the Board of a subsidiary and sometimes it is only the CEO – a much more fluid approach.

10. Directors have a special duty to provide for CEO evaluation and succession. It is possible that Betcher would never tolerate a co-CEO at his level.

11. It is the Board's duty to determine executive compensation, and it can be a very imperfect science.

12. The Company has previously agreed with Deep about the options for the CEO, this is not uncommon, but it can receive less attention than it deserves when it is packaged as part of an external financing deal or as part of an acquisition.

13. The Business Judgment Rule is still good law and applicable when all the necessary steps are taken.

14. It is not uncommon for an "investor-appointed Director" to assume that the investor's contractual rights give it more control than the law. But sometimes those rights are actually contracted away.



**Commentary**

# Legal History in the Utah Desert, Reflecting on Topaz

*by Steffen Thomas*

Photo credit: Steffen Thomas, 5/19/18 Topaz, UT

Beneath the sprawling shadow of Swasey Peak, there is a place in the central Utah desert that stands as a living memorial to one of the most significant decisions in American legal history: *Korematsu v. United States*. What was once home to more than 11,000 Japanese Americans is now a collection of fragments. What's left of Topaz is stitched together by roads made from black volcanic stone. The ground surrounding these makeshift roads is littered. Amongst the nails, brush, and blow snakes are the aged bric-a-brac of everyday life. Buttons, shower heads, rings, furnace legs, and bottles are all evidence of the lives that Japanese Americans made for themselves within the barbed wire boundaries of their concentration camp.

The ACLU of Utah, in partnership with the Constitutional Law, Appellate Practice, and Litigation Sections of the Utah State Bar, brought a group of Utah attorneys, law students, and their families together this spring for a day trip to the Topaz Museum and concentration camp in Delta, Utah. The plan was that the group would visit the site, take a tour of the Topaz Museum, and attend a screening of the film *Never Give Up! The Minoru Yasui Story*. This group, which included former internee Judge Raymond Uno, the first ethnic minority to serve in the judiciary in Utah, came together to reflect on one of the most significant legal proceedings in our nation's history from the location where in 1944, more than 11,000 Japanese Americans were stripped of their fundamental rights and left to combat the elements of the unfamiliar Utah desert.

*STEFFEN THOMAS is a 2L at the University of Utah, former ACLU Utah legal intern, and Pro Bono Initiative Fellow.*



APP.124
USB000705

## Never Give Up! The Minoru Yasui Story

The day began with the film and a panel discussion with Holly Yasui, the director and daughter of the film's hero. The film told the story of Min Yasui, a Japanese-Oregonian attorney who, in an effort to bring test litigation challenging the constitutionality of Executive Order 9066, violated the curfew imposed by the order itself. As a result of the violation, Min Yasui spent nine months in solitary confinement before being sent to camps like the one at Topaz. Like many of his peers in camp, Min was not only loyal to his country but wanted to join the war effort like many other Japanese American men who were drafted and served honorably. However, because of Min's curfew violation he could not be accepted for renewed military service. This contradiction served as a major theme in the discussion that followed.



Photo credit: Steffen Thomas, 5/19/18 Topaz, UT

After the film, Holly hosted a short panel discussion where she explained the patriotism that drove Japanese Americans to serve their country despite their confinement behind barbed wire fences. Holly also spoke about George Takei's involvement (narration) and how they themselves are evidence of the lasting generational impacts of internment.

## The Internment Site: Beauty and Brilliance, Dust and Death

The Topaz Museum offers a glimpse into the lives of the interned by showcasing oil paintings, charcoal illustrations, tools, and diaries. Artists like Chiura Obata depicted the lunar-like landscape of Topaz in surreal and beautiful ways. One of the most memorable pieces included a young girl's diary which jumped between everyday childhood desires and her ongoing discovery of the strange plants and creatures that inhabited her new desert home.

A short video marked the beginning of the official tour. The fuzzy video was an excerpt from footage secretly shot by Dave Tatsuno during his internment at Topaz. His film is one of the only two American home videos to be included in the library of congress. Sean Means, *Film Shot by WWII Internee at Topaz Going to Library of Congress*, The Salt Lake Tribune (Sep. 10, 2012), *available at* http://archive.sltrib.com/article.php?id=54851348&itype=cmsid. The room where we watched the film was flanked by two glass cabinets brimming with colorful shell art. The cabinets housed a range of keepsakes such as jewelry boxes, necklaces, brooches, and ornaments. Apparently, internees were occasionally given the opportunity to visit nearby hot springs where they would collect colorful shells that they would repurpose and use for jewelry. The colorful shells were twisted and manipulated to look like blooming glass flowers that would be more at home in the British Museum than amongst the dusty artifacts left behind at Topaz.

## Coram Nobis, Korematsu, and the Anti-Canon

During our time in the museum's room dedicated to constitutional law we were joined via Skype by Professor Lorraine Bannai of Seattle University School of Law. She was part of a group of attorneys who worked on the writ of *coram nobis* seeking to correct the fundamental error of fact on which the government's argument in *Korematsu* was based. The *coram nobis* writ is available to correct the erroneous exclusion of relevant evidence to a criminal conviction and prevent injustice where another remedy like a writ of habeas corpus would be moot. *Korematsu v. United States*, 584 F. Supp. 1406, 1411, (N.D. Cal. 1984). Professor Bannai explained that this writ was so important because it would not only expunge Fred Korematsu's criminal conviction, but it would strike the military report that served as justification for the government's argument in the original *Korematsu* ruling. This effort to correct the record made sense to me: standing there in the wing of the museum dedicated to the law, one could not help but look for some sort of explanation for how the courts could justify their decisions in the internment cases.

The original case that led to Fred Korematsu's internment, *Korematsu v. United States*, 323 U.S. 214 (1944), was a landmark ruling where the court first established the doctrine of strict scrutiny. Pursuant to Justice Harlan's footnote 4 in *U.S. v. Carolene Products Co.*, 304 U.S. 144 (1938), the court in *Korematsu* acknowledged an increased level of scrutiny for laws curtailing the rights of a single racial group, "not to say that all such restrictions are unconstitutional. It is to say that

Articles

Reflecting on Topaz

courts must subject them to the most rigid scrutiny." *Korematsu*, 323 U.S. at 215. This rigid scrutiny, considered by many to be the first application of such a standard by the court, was only overcome because the court "could not reject the finding of the military authorities that it was impossible to bring about an immediate segregation of the disloyal from the loyal that we sustained the validity of the curfew order as applying to the whole group." *Id*. at 219. This first application of strict scrutiny remains one of the few where the government action challenged was able to meet the bar raised by strict scrutiny. Justice Frankfurter's landmark dissent points to the president's executive order as a violation of the equal protection clause and goes so far as to characterize the holding as the "legalization of racism." *Id*. at 242 (Frankfurter, J., dissenting).

The backlash to *Korematsu* came to a head in 1984, when a team of attorneys from Seattle petitioned in federal court for a writ of *coram nobis* based on government misconduct in suppressing and destroying evidence. The government tried to end the case with a procedural move meant to vacate the conviction but also avoid court scrutiny of the government's actions. *Korematsu v. United States*, 584 F. Supp. 1406, 1410 (N.D. Cal. 1984). Fred Korematsu's team successfully rebuffed the effort; Korematsu

stated that it was he who ought to be pardoning the government. Brian Niiya, *Coram Nobis Cases* (2018). A writ of *coram nobis* is the appropriate remedy to correct an error in criminal conviction and prevent injustice where other remedies like habeas corpus might be moot. *Korematsu*, 584 F. Supp. at 1411. The court was reluctant to reopen the partially healed wounds left by such a disfavored case, but it acknowledged that "there are few instances in our judicial history when courts have been called upon to undo such profound and publicly acknowledged injustice." *Id*. at 1413.

Using the findings of the 1984 Commission on Wartime Relocation and Internment of Civilians, the *coram nobis* team showed that at the time of the executive order, there had been substantial credible evidence contradicting a report by General J.L. DeWitt. General DeWitt's *Final Report, Japanese Evacuation from the West Coast* (1942), stated that "military necessity justified exclusion and internment of all persons of Japanese ancestry without regard to individual identification of those who may have been potentially disloyal." *Id*. at 1416. A Department of Justice report at the time directly contradicted Dewitt's report, stating that it

> makes flat statements concerning radio transmitters
> and ship-to-shore signaling which are categorically





Jonathan G. Miller  |  801.322.9298
jgm@scmlaw.com

Tyler B. Bugden  |  801.322.9322
tbb@scmlaw.com

Snow Christensen & Martineau is pleased to welcome **Jonathan G. Miller** to the firm as an associate.  His practice focuses on estate planning, probate, guardianship, and business and real estate transactions.  We also congratulate **Tyler B. Bugden** on his admission to the Utah State Bar and welcome him to the firm.



SNOW
CHRISTENSEN
& MARTINEAU

801.521.9000 | www.scmlaw.com

APP.126
USB000707

denied by the FBI and by the Federal Communications Commission…[S]tatements made by General DeWitt are not only contrary to our views but they are contrary to detailed information in our possession and we ought to say so.

*Id.* at 1424. The Court found for the petitioners, granting *coram nobis* and providing vindication for the many Americans who had objected to the *Korematsu* ruling since the day it was handed down.

Many considered the *coram nobis* Court's conclusion that the original *Korematsu* ruling had been based on misinformation to be a final nail in the coffin for that case. Some, like legal scholar Richard Primus, have called the original *Korematsu* decision "anti-canon." "Anti-canon" is what some scholars call a group of disfavored cases including *Plessy*, *Lochner*, and *Dred Scott* that, because of the ethically repugnant positions they took, represent "land mines of the American constitutional order" which subsequent courts should carefully avoid and strongly refute. Jamal Greene, *The Anticanon*, 125 HARV. L. REV. 379, 381 (2011). To say that *Korematsu* is disfavored or that it is "anti-canon" is nothing new: Justice Jackson considered it disfavored at the time it was handed down. Recent discussion surrounding *Korematsu*, however, suggests that others anticipate it may see a repeat. Justice Antonin Scalia stated in 2014, "Well,



**MARGY CAMPBELL**
C O N S U L T I N G

*Expert Witness Testimony:*
*Guardianship/Conservatorship Cases*

*Personal Representative Appointments*

*Family Elder Care Mediation*

*Private Visitation Monitoring*

**LCSW, CFP, NMG EMERITUS**
margy@margycampbellconsulting.com
801-231-2018
**margycampbellconsulting.com**

of course, *Korematsu* was wrong,…and I think we have repudiated it in a later case. But you are kidding yourself if you think the same thing will not happen again," referencing the war time panic surrounding the executive order. Cassens Weiss, Scalia: Korematsu *Was Wrong, But 'You Are Kidding Yourself' If You Think It Won't Happen Again*, ABA JOURNAL (2014), *available at* http://www.abajournal.com/news/article/scalia_korematsu_was_wrong_but_you_are_kidding_yourself_if_you_think_it_won/ (last visited Aug. 7, 2018). He went on to say, "I would not be surprised to see it happen again, in time of war." *Id.* Indeed, when our group spoke to Professor Bannai, she raised the alarm that some are currently trying to again elevate war powers to suppress the rights of vilified minorities, pointing specifically to the Trump administration's various travel bans on people from several countries and the resulting challenges that are winding their way through the courts.[1] While the current consensus strongly disfavors *Korematsu*, it has not been formally overruled, raising the specter that a future court, facing national tragedy, could recognize *Korematsu* as precedent.

## More Than a Ghost Town

Walking through the remnants of Topaz, where a town had been erected and hauled off in the blink of an eye, the possibility of it all happening again does not feel all that remote. While the remaining buildings of Topaz now serve as barns, guest houses, and classrooms for the community of Delta, the site is easily identified by the large flattened plots and the almost perfectly intact western fence of the camp. As we passed through the site, the feeling of exposure was immediate. There is nothing to guard against the oppressive desert. The low brush that had grown in since the time of the camp did little to prevent the stinging wind of dust storms. It was hard to imagine what it might be like for a young kid from Oakland or Seattle to find himself or herself suddenly transported to this strange landscape. Time has passed, but the landscape of Topaz has not changed. Anyone can go into the desert and feel for himself or herself what it was like to suddenly find yourself at the wrong end of one of the most monumental judicial rulings in this country's history.

A visit to the Topaz site ought to be a pilgrimage for any Utah attorney. Tucked away in the central Utah desert is one of the most unique, relevant, and haunting pieces of American legal history. Two-and-a-half hours away from Salt Lake City, the moral, ethical, and legal advancements of the last seventy-six years disappear and one is left with the very same whipping winds and desert sun endured by more than 11,000 patriotic Japanese Americans.

---

1.   While some were quick to assume that the majority opinion in *Trump v. Hawaii*, 585 U.S. ___ (2018), overturned *Korematsu*, the decision does not explicitly do so.

APP.127
USB000708

## Views from the Bench

# *Judicial Independence and Freedom of the Press*

*by Judge Paul C. Farr*

> *If angels were to govern men, neither external nor internal controls on government would be necessary. In framing a government which is to be administered by men over men, the great difficulty lies in this: you must first enable the government to control the governed; and in the next place oblige it to control itself.*

**J**ames Madison, the fourth President of the United States and the "Father of the Constitution," published these words on February 8, 1788 in the Federalist, No. 51. Two primary protections the Founders put in place to ensure control of government include the freedom of the press as enshrined in the First Amendment and an independent judiciary as outlined in Article 3 of the U.S. Constitution.

In December 2018, judges Reuben Renstrom, Jeanne Robison, and I attended a conference in Washington D.C. sponsored by the National Judicial College (NJC) entitled, "Contemporary Threats to Judicial Independence and Freedom of the Press." The faculty included distinguished state and federal judges, journalists, law professors, and government advisors. This course addressed the importance of a free press and an independent judiciary to a healthy and vibrant democracy as well as current and historical threats to these institutions.

In its description for this course the NJC states:

> We have many reasons to celebrate America's court system and its role in preserving our democracy, especially as we observe as other countries struggle to introduce the rule of law. However, there are many threats to the independence of our judiciary: some overt, some subtle, all designed to undermine public trust and confidence in our system of justice. In their purest form and in an ideal world, courts would not be subject to improper influence from other branches of government or from private or partisan

interests. This timely course explores threats to judicial independence in the United States, emphasizing current threats in the context of historical lessons. The course will also explore ways in which judges can appropriately and ethically respond to these threats. Participants will also examine the First Amendment, and the media's role in supporting democracy.

While there was much more information presented than can be shared in this short article, I did want to share some of the highlights with the Utah Bar.

### The Judiciary and the Press: Bulwarks of Democracy

An informed citizenry is essential in a democracy. A free press gives citizens information on which they can act, including information about their government. While the press is essential, it isn't always popular. Sometimes the information reported includes negative or unpopular views. Disagreement and frustration with such reporting are understandable. However, it is the free exchange of information and ideas that is so important to a healthy democracy. If there is disagreement with something that is reported or said, the remedy is the freedom to be able to say or report opposing views.

Sometimes individuals that disagree with, or are frustrated by, the press resort to statements and actions that attempt to silence, intimidate, or undermine the legitimacy of the press as an institution. This is something that should be carefully guarded against by a democratic society. While silencing an opponent may



*JUDGE PAUL C. FARR is a full-time justice court judge serving the cities of Sandy, Herriman, and Alta. He is a member of the Utah Judicial Council.*

APP.128
USB000850

seem like a "win" or a good idea in the short term, over time it may have the effect of damaging democracy and the rule of law.

An independent judiciary, and respect for the decisions of judges, are also necessary to support the rule of law in a democracy. It is to the courts that individuals and institutions turn for relief from government overreach. Just as information published by the press may be unpopular, judicial decisions may also be unpopular. Again, disagreement and frustration over particular decisions are understandable, and even expected. We have processes in place to handle such disagreements (appeals, for example). However, statements and actions that attempt to influence a judge's decision, or undermine the legitimacy and authority of the courts, are problematic in a democracy. The judiciary doesn't control the police or the military. It doesn't control the budget. The judiciary relies on the respect and trust of the citizenry and the other branches of government to comply with its orders. Anything that erodes that respect and trust erodes the authority of the judiciary.

The NJC course addressed circumstances in other countries, both historical and current, where efforts at democracy have stalled or failed. In such circumstances it is often an attack on, or a weakening of, the judiciary and the press that precedes a collapse of a democracy. These attacks may come from other branches of government, such as from an overreaching executive. They may come from outside influences and foreign governments. They may come from a dissatisfied public or an aggrieved party. No matter the source or the cause, a democracy's fall is often preceded by the failure of an independent judiciary and free press.

### Examples of Attacks on the Press

Each year since 1927, *Time* magazine has annually selected a "Person of the Year." For 2018 *Time* selected a group it calls "Guardians." This group includes journalists who had been imprisoned and killed in 2018 for doing their job. The course discussed this type of physical violence and oppression and the effect it has on freedom and the rule of law. While we often think such violence occurs in other parts of the world, it occurs here in the U.S. as well. Some of the individuals recognized as "Guardians" include five journalists working for the Capital Gazette in Annapolis, Maryland in June 2018. The shooter was upset by a 2011 article. He subsequently filed a defamation suit, which was dismissed. He resorted to violence and killed these five journalists. The *Time* article provides additional details on this and other circumstances in which journalists have been targeted in an attempt to silence or marginalize them.

Attacks against the press can include more than just physical violence. The course discussed criticisms and verbal attacks on the press by members of the executive branch of governments around the world. One member of a panel discussion on this topic was Laura Weffer, a journalist and native of Venezuela who covered the career of Hugo Chavez for ten years. In the 1960's Venezuela was a healthy democracy, serving as a model for other countries in the region. Venezuela subsequently suffered from official corruption and a poor economy. In 1998 Hugo Chavez was democratically elected as president. He served until his death in 2013. Chavez called for a political revolution and specifically targeted courts and the press. The Chavez administration effectively seized control of the Supreme Court and lower courts by dismissing judges, creating new court seats, and packing courts with loyal supporters.

According to Ms. Weffer, President Chavez often criticized, marginalized, and limited the freedoms of the press in Venezuela in his efforts to strengthen the power and authority of the executive. This has resulted in a significant erosion of the



Mediator–Arbitrator
# JOHN KENNEDY
### JUDGE (RET.)

## Complex Federal & State Civil and Administrative Disputes



Helping parties find resolutions through skill, insight and experience

*To schedule a Mediation or Arbitration with Judge Kennedy please contact:*
Utah ADR Services at
801-943-3730 or mbstrassberg@msn.com

Direct Phone: 801-230-1385 | www.johnkennedymediation.com

APP.129
USB000851

Views from the Bench

freedom of press there. In fact, a December 28, 2017 article in *Forbes* by Kenneth Rapoza, entitled "Press Freedom is Dying in Venezuela," documents the conditions faced by the press in Venezuela, including the arrest of sixty-six journalists and editors who covered anti-government protests earlier in the year. These efforts have resulted in Venezuela transforming from a model democracy to something much closer to a dictatorship.

Another presenter, Frank Cohn, was thirteen years old when he and his parents fled the Nazi regime in Breslau, Germany in 1938. He subsequently served in the U.S. Army, rising to the rank of Colonel. Cohn described the deteriorating conditions in Germany during Adolph Hitler's rise to power. Hitler and the Nazis also came into power through democratic elections. Under their reign Germany quickly descended from a democracy to a totalitarian regime. Their attacks on the judiciary and the press during their rise to power are well documented.

Though not to the same extent, the United States has also seen political and verbal attacks on the press, even some by government officials. Again, we are not talking about disagreement or frustration but rather efforts to limit access or attempts to undermine the credibility of the press. One example that was frequently cited at the conference was President Trump's repeated labeling of the news media as "the enemy of the people." However, such attacks are not reserved just to the current president or to a specific political party. For example, in a 2010 interview with *Rolling Stone* magazine President Obama called Fox News "destructive" and said it is "masquerading as the news." President Richard Nixon included members of the media on his "enemies list." There are many other examples.

While responsible people readily agree that in a civilized society physical violence against the press shouldn't be tolerated, people are much more likely to condone these types of verbal or political attacks when they align with their own political or ideological views. However, all such attacks pose a danger to democracy and the rule of law.

### Examples of Attacks on the Judiciary

As with the press, attacks on the judiciary may include physical violence, even here in the U.S. For example, in 2004 U.S. District Court Judge Joan H. Lefkow held a white supremacist,





Adam M. Pace  |  801.322.9265
amp@scmlaw.com

Kylie Cox Orme  |  801.322.9325
kco@scmlaw.com

Congratulations to Adam M. Pace on becoming a shareholder. Adam's practice focuses on contract and property litigation, insurance defense, and appellate work.

Snow Christensen & Martineau welcomes Kylie Cox Orme back to the firm following her clerkship with the Honorable David N. Mortensen, Utah Court of Appeals.



SNOW
CHRISTENSEN
& MARTINEAU

801.521.9000 | www.scmlaw.com

APP.130
USB000852

Views from the Bench

Matthew Hale, in contempt of court. He was subsequently convicted of trying to have the judge killed. One year later in 2005, Judge Lefkow arrived home to find her husband and mother dead. It was later discovered that this had nothing to do with Hale. Rather, an unemployed electrician, Bart Ross, whose case had previously been dismissed, left letters admitting to the murders and also his intent to kill the judge. He took his own life before being caught by authorities.

Some attacks against the judiciary include coordinated efforts by government officials to intimidate and silence. Another member of the panel discussion referenced above was Sukru Say, a former tax court judge in Instanbul, Turkey. Since a failed coup in 2016, hundreds of Turkish judges have been detained and many have been tortured. Mr. Say was engaged in graduate studies in the U.S. at the time of the coup and so escaped a similar fate. He has been warned that he will be arrested if he returns to his country. Judge Say discussed how the ruling party, in seeking more power and control in the executive branch, first sought to eliminate the judiciary as a check on that power.

It was a common theme throughout the case studies we explored that an ambitious executive often looks to marginalize, intimidate, silence, or remove a judiciary that it views as standing in the way of its desires.

While physical attacks on the judiciary do happen, political and verbal attacks are more common, both from government officials and also the public. One of the panels included Judge James Robart of the U.S. District Court for the Western District of Washington. Judge Robart was nominated by President Bush in 2003 and has served as a federal judge since that time. After issuing a decision blocking a controversial travel ban, President Trump in February of 2017 criticized "the opinion of this so-called judge." Along similar lines, the President has tweeted at various times that our court system is "broken," "unfair," and "a joke." Presenters expressed concern with what is perceived to be not just disagreement with individual court decisions, but statements on the legitimacy of the judiciary and individual judges.

Again, these attacks are not limited to this particular president





Ruth A. Shapiro  |  801.322.9169
ras@scmlaw.com

Jeremy S. Stuart  |  801.322.9170
jss@scmlaw.com

Erika M. Larsen  |  801.322.9171
eml@scmlaw.com

Snow Christensen & Martineau is pleased to have Ruth A. Shapiro and Jeremy S. Stuart join the firm as shareholders, and Erika M. Larsen join as an associate. Ruth's practice focuses on complex personal injury defense and employment matters. Jeremy's practice focuses on complex commercial disputes and catastrophic injury cases. Erika's practice focuses on personal injury defense and employment matters.



SNOW
CHRISTENSEN
& MARTINEAU

801.521.9000 | www.scmlaw.com

APP.131
USB000853

Views from the Bench

or any one political party. One of the more concerning examples of an attack on the judiciary here in the U.S. was President Franklin D. Roosevelt's court packing scheme in 1937. Roosevelt sought to increase the number of justices on the U.S. Supreme Court so that he could appoint friendly judges who would support his New Deal legislation, some of which the Court ruled unconstitutional. Roosevelt was labeled by some as a dictator and a fascist. Ultimately the court packing plan failed. However, in this example we see an executive that sought to undermine the authority of the judiciary based on a disagreement with particular decisions. There are many other examples of presidents and other officials criticizing the judiciary based upon unfavorable rulings.

Again, while it is understandable and expected that some will disagree with a judge's decision, we see a trend in recent decades of not just questioning a decision, but attacks on the legitimacy and role of the judiciary as an institution. These attacks can result in a weakening of the credibility of the judiciary and subsequently in the rule of law.

### Underlying Concerns

Presenters and panel members provided opinions on what they believe may be some of the underlying causes of these attacks on the press and judiciary here in the U.S. One of the concerns frequently cited was the increasing polarization of our society. As we drift further apart politically, we are more likely to see and treat the "other side" as an enemy. Both sides may see a "win" over an enemy as the goal, even if the ultimate result is to weaken democratic institutions or the rule of law. Similarly, we see an increase in the lack of civility and respect in social and public discourse.

Presenters also raised concerns about the increasing politicization of the judicial selection process at the federal level and a lack of



*Judges Paul C. Farr, Jeanne Robison, and Reuben Renstrom visit the United States Supreme Court.*

understanding of the appropriate role and responsibility of judges. The politicized and divisive U.S. Supreme Court nomination proceedings are highly publicized and visible. The public sees judges being selected on what appears to be their political and ideological leanings. This view can also be further perpetuated when they see U.S. Supreme Court decisions on hot political topics routinely decided by 5–4 majorities split down predictable political lines. The public talks about members of the Supreme Court as liberal judges or conservative judges. More and more it appears that judges are deciding these hot political cases not based on the law but upon their own ideology. This results in less confidence in the judiciary and the rule of law which can further erode democracy.

As a society we have also done a poor job in recent years of communicating and demonstrating what the rule of law means and what the appropriate role of a judge, as an independent and unbiased arbiter, ought to be. Many presenters lamented the decline of civics instruction in schools throughout the country. While science, math, and technology have been supported as the basis for a strong economy and future, instruction and understanding in government and civics are seen as less important.

### Conclusion

I came away from this conference with a greater respect for the role of the press and also the pressures its members face. I also have a greater understanding of the importance of an independent judiciary and the role it plays in perpetuating the rule of law in a healthy democracy. As judges, and as a bar, we can do a better job of setting an example and also educating the public about the importance of the rule of law and the proper role of the judiciary. To ensure the continued health and vitality of our democracy we should carefully guard the health and vitality of the press and the judiciary.

APP.132
USB000854

# Article

## *Why Can't I Self-Check Out My Percocet?:*
## Evaluating Current Drug Pricing Proposals through the Lens of the Opioid Crisis

*by Cami Schiel, RN, JD, MBA*

**A**PwC Health Research Institute study found that prices, and not utilization, are pushing up healthcare costs. *Medical cost trend: Behind the numbers 2020*, PwC Health Res. Inst., 42 (June 2019) *available at* https://www.pwc.com/us/en/industries/health-industries/assets/pwc-hri-behind-the-numbers-2020.pdf.

One of the highest price categories is prescription drugs. *Id.* In 2019, drug companies raised the prices of over 3,400 drugs at an average rate of 10.5%. Aimee Picchi, *Drug prices in 2019 are surging, with hikes at 5 times the rate of inflation*, CBS News (July 1, 2019), *available at* https://www.cbsnews.com/news/drug-prices-in-2019-are-surging-with-hikes-at-5-times-inflation/. That's five times the rate of inflation. *Id.* Rx Savings Solution reports that near forty-one drugs have boosted prices by over 100%. *Id.* Politicians have proposed solutions to reign in these out-of-control prices.

### CURRENT DRUG PRICING PROPOSALS

### Elijah E. Cummings Lower Drug Costs Now Act of 2019.
This bill recently passed in the House would:

- Permit the Centers for Medicare and Medicaid Services (CMS) to negotiate prices for as many as 250 of the most expensive drugs, including insulin, for Medicare Part D, something currently prohibited by law.[1] H.R.3, 116th Cong. (2019). CMS could impose hefty monetary penalties if drug manufacturers refuse to negotiate. *Id.*

- The negotiated price may not exceed 120% of the average price in Australia, Canada, France, Germany, Japan, and the United Kingdom. *Id.* Other countries pay sometimes a half or a third of what the U.S. pays for certain drugs, such as the patented Humira, that don't yet have a generic version competing for market share. Selena Simmons-Duffin, *How An 'International Price Index' Might Help Reduce Drug Prices*, NPR (Sept. 19, 2019), *available at* https://www.npr.org/sections/health-shots/2019/09/19/762435585/how-an-international-price-index-might-help-reduce-drug-prices.

- Require drug companies to rebate any price increases that exceed inflation. Congress.gov *supra*.

- Limit out-of-pocket drug spending for Medicare beneficiaries. *Id.*

- Require drug companies to offer the prices negotiated by HHS to all commercial plans. *Id.*

### Prescription Drug Pricing Reduction Act.
This bill recently approved by the Senate Finance Committee is very similar and, among other things, would:

- Focus on lowering prices of drugs that face minimal competition.

- Establish a new $3,100 out-of-pocket cap on drug spending for Medicare Part D plans, effectively limiting what patients would be charged for their drugs and eliminating the "donut hole." Loren Adler, Paul B. Ginsburg, & Steven M. Lieberman, *Understanding the bipartisan Senate Finance prescription drug reform package*, Brookings (Oct. 3, 2019), *available at* https://www.google.com/amp/s/www.brookings.edu/blog/usc-brookings-schaeffer-on-health-policy/2019/10/03/understanding-the-bipartisan-senate-finance-prescription-drug-reform-package/amp/.

- Require manufacturers to rebate drug prices in Part D and Part B plans that grow faster than inflation.

*CAMI SCHIEL, RN, JD, MBA is an alumna of BYU and recently completed a fellowship at the Rocky Mountain Innocence Center. She works at Utah Valley Hospital in the Same Day Surgery and Neuro-Renal departments as well as at Provo Rehabilitation and Nursing.*



APP 133
USB001273

- Change federal reinsurance from 80% to 20% for brand name drugs and 40% for generic drugs, thereby incentivizing plans to shift usage to less costly alternatives.

- Eliminate "spread pricing" that lets Pharmacy Benefit Managers (PBMs) retain a large portion of the drug payments by limiting PBMs' ability to mask a source of their revenue.

- Establish "Drug Pricing Dashboards" through which the public can review drug spending and utilization information.

### Foreign Importation of Pharmaceuticals.

Some politicians have championed foreign importation of drugs to introduce competition and push prices downward. They claim these drugs are identical to those in America, but sell for 50, 60, or 70% lower abroad. Thomas Barrabi, *Trump to Florida: Go to Canada to import cheaper prescription drugs*, Fox Bus. (Nov. 26, 2019), *available at* https://www.foxbusiness.com/politics/trump-florida-prescription-drug-plan-canada. However, not all foreign drugs have the same identifying marks on the individual pills and shipping cases that match our databases here in the United States, so this legislation would have to also provide protections for counterfeit drugs. Adam J. Fein & Dirk Rodgers, *State drug importation laws undermine the process that keeps our supply chain safe*, Stat News (July 11, 2019), *available at* https://www.statnews.com/2019/07/11/state-drug-importation-laws-undermine-supply-chain-safety/.

### Price Transparency.

Some efforts have been made to require drug companies to include prices in their television ads, with limited success. *Id*.



### Profit Ratios.

Medical Loss Ratio regulation targets health insurers and requires them to rebate any profits that exceed a specific threshold back to consumers. This guardrail limits the amount they can spend on marketing, administrative expenses, and profits while promoting transparency and allowing for some profits. Rachel Fehr & Cynthia Cox, *Data Note: 2019 Medical Loss Ratio Rebates*, Kaiser Family Found. (Sept. 10, 2019), *available at* https://www.kff.org/private-insurance/issue-brief/data-note-2019-medical-loss-ratio-rebates/. In 2019 the total rebates reached nearly $1.3 billion. *Id*. If applied to the pharmaceutical industry, especially for drugs still under patent, similarly substantial rebates might be possible and would also allow pharmaceutical companies to make a profit, unlike a strict price cap. Yet some adjustment is required given drug companies' enhanced ability to manipulate expenses.

Evaluating the effectiveness of these proposals requires understanding why drug prices rise virtually unrestrained in the first place. Interestingly, the opioid crisis illustrates some of the abnormal market factors that contribute to lofty drug price hikes. Analyzing the opioid crisis provides insight into the drug market and thus the potential effectiveness of these drug pricing proposals.

### OPIOID CRISIS

In the late 1990s drug manufacturers claimed that opioids were not addictive. *Opioid Overdose Crisis*, Nat. Inst. on Drug Abuse (Jan. 2019), *available at* https://www.drugabuse.gov/drugs-abuse/opioids/opioid-overdose-crisis. Thus, healthcare providers began to prescribe them at increasing rates for pain. *Id*. However, in reality, these substances were highly addictive and their increased distribution eventually led to widespread diversion and misuse before their addictive nature could be fully recognized. *Id*. In 2017, President Trump officially declared the opioid crisis a public health emergency. *Ending America's Opioid Crisis*, The White House, *available at* https://www.whitehouse.gov/opioids/. A 2018 cost estimate of the opioid crisis was over $1 trillion through 2017; this is estimated to increase by $500 billion by 2020. *Economic Toll of Opioid Crisis in U.S. Exceeded $1 Trillion Since 2001*, Altarum (Feb. 13, 2019), *available at* https://altarum.org/news/economic-toll-opioid-crisis-us-exceeded-1-trillion-2001. This includes the costs of lost productivity, addiction treatment, healthcare, and criminal justice involvement. The U.S. Bureau of Labor and Statistics notes that unintentional overdoses at work increased 25% between 2016 and 2017. Dep't of Labor, *National Census of Fatal Occupational Injuries* (Dec. 18, 2018), *available at* https://www.bls.gov/news.release/pdf/cfoi.pdf. Utah is above average for opioid deaths – in 2017 Utah's rate of deaths was 15.5

Articles

Why Can't I Self-Check Out My Percocet?

per 100,000 persons; the national average was 14.6. *Utah Opioid Summary*, NAT'L. INST. ON DRUG ABUSE (Mar. 2019), *available at* https://www.drugabuse.gov/opioid-summaries-by-state/utah-opioid-summary. While state-wide efforts have started reversing this trend of death, this loss of human life and potential is immeasurable. *Id.*

Understanding how the "opidemic," and by extension prescription drug prices, have reached such crisis proportions requires understanding the nature of the pharmaceutical industry. In general, the pharmaceutical industry lacks many forces that facilitate free market competition.

## PERFECT COMPETITION

In a theoretical perfect competition, multiple sellers offer a product to multiple buyers while price and product information is freely and symmetrically available to each participant. *Perfect Competition*, INVESTOPEDIA, *available at* https://www.investopedia.com/terms/p/perfectcompetition.asp. No market has perfect competition, but one that comes close is supermarkets. *Id.* Supermarkets generally offer a variety of similar products, all clearly price-marked (price transparency) and easily researchable (information symmetry). *See id.* In order to purchase any of the products, from tomatoes to bleach, all a buyer must do is walk into the store, observe and compare prices of various products, take one off the shelf, and pay for it at the checkout stand. Prices and product information are similar and transparent, and the buyer can act independently. All of these perfect competition aspects manage affordability, making a grocery store's products accessible to just about everyone.

## OPIOID MARKET

The drug market, specifically the opioid drug market, lacks all of these perfect market factors. There is limited price transparency and comparison, information is not freely available for all, and buyers have fairly inconsequential market power.

### Limited Price Transparency

Unlike prices in a grocery store, drug and hospital prices are not transparent, other than perhaps an insurance copay. Patients rarely see the total price until after they have bought everything in their proverbial grocery cart.

Partly, this is because not even providers know ultimate costs ahead of time. Services such as surgeries and the subsequent opioid pain management are not advertised because the hospital does not know ahead of time how much medication and care each patient will need. The surgery and medication doses will be individualized down to the weight and medical conditions of the patient. Pain medications (be it IV Fentanyl or Dilaudid in surgery or oral Flexeril or Percocet after surgery)

## MacArthur, Heder & Metler

*is pleased to announce that*

Stephanie O'Brien has been named as a Senior Partner, Ryan Petersen and Trevor Berrett as Junior Partners and Brent Johnson as Head of Negotiations for Personal Injury.



**STEPHANIE L. O'BRIEN**
**SENIOR PARTNER**
Stephanie joined the firm in April of 2017. She focuses her practice in the areas of Civil Litigation, Probate Litigation, Adoption Litigation, Contracts, Probate, Guardianships and Conservatorships, Estate Planning and Real Property. Stephanie received her Juris Doctorate from the University of Utah, SJ Quinney College of Law.



**RYAN D. PETERSEN**
**JUNIOR PARTNER**
Ryan joined the firm in January 2014. His Family Law practice includes Divorce, Custody Disputes, Child Support, Divorce Modifications, Orders to Show Cause, Contempt, Protective Orders, Child Custody Cases, and Adoptions. Ryan earned this law degree from the University of Tulsa College of Law.



**TREVOR F. BERRETT**
**JUNIOR PARTNER**
Trevor joined the firm in July 2012 and works in the Personal Injury Department with a focus on litigation. Trevor received his Juris Doctorate from Seton Hall School of Law in 2009.



**BRENT H. JOHNSON**
**HEAD OF NEGOTIATIONS – PI**
Since joining the firm in May 2018, Brent quickly made his way to head of the negotiations for the Personal Injury Department. Brent received his law degree from the University of Dayton School of Law.

The firm congratulates each of them on their achievements and is confident of their continued success.



MACARTHUR.HEDER.METLER
ATTORNEYS AT LAW

Articles

Why Can't I Self-Check Out My Pancreas?

affect each patient differently and their effectiveness depends on many factors outside the healthcare providers' control. Furthermore, if the patient has complications during surgery, perhaps an unknown drug allergy, or unusually large kidney stones, or even if the patient takes a long time to wake up and is overly nauseous, she may accrue substantial additional costs. It is next to impossible to tell a patient exactly how much their surgery or medications will cost ahead of time.

Compounding this is that the payment plans with incentives that push prices down are the outcome-based plans, where payment depends on the quality of care provided and the state of the patient after care is provided.[2] By definition, the amount charged per patient cannot be determined until *after* the care is provided. Thus, forecasting prices is virtually impossible.

Furthermore, physicians rarely discuss every medication and associated price – often because they themselves are usually unaware. The hospital manages prices of medications in the hospital, not providers. During surgery patients are completely unaware of the medications administered by the anesthesiologist, much less consent to and price compare each one on an individual basis. Providers go to years of schooling to understand and appropriately prescribe medications; a quick doctor's visit or pre-op discussion may not be enough time to discuss each medication's purpose and price. Price transparency for hospital procedures is extremely difficult.

Even in an outpatient setting, price transparency is difficult. When a patient wants to fill a post-surgical opioid prescription, the patient will rarely find the price on a website, or even by calling the pharmacy. The answer is all too often, "it depends on your insurance." Pharmacies often do not and cannot post prices of these prescriptions, because two different patients can walk out of the pharmacy with the exact same prescription paying two different prices. A person's copay may be the only consistent instance of price transparency for medications, one the insurer advertises to the patient at the initiation of the plan. Yet this copay is only a fraction of the true cost of the medication.

The largest barrier to price transparency in the pharmaceutical industry is insurance. The total price paid by the insurance company will depend on the complex drug formulary arrangement between the insurer, pharmacy, and drug manufacturer; the deductible size; and many other variables. Laura Entis, *Why Does Medicine Cost So Much? Here's How Drug Prices Are Set*, Time (Apr. 9, 2019), *available at* https://time.com/5564547/drug-prices-medicine/. The patient is notably excluded from these negotiations. And the insurers themselves may not know ahead of time how much they will charge the patients for the cost of care. With enormous variety of contracts between suppliers, doctors, nurses, lawyers, IT staff, and drug manufacturers a hospital's expenses may not be practically calculatable ahead of time for the hospital to know the price. Even more variable is the expected income. The amount charged to private insurance will be affected by the mix of Medicaid, Medicare, and private payers over a period of time. In fact, healthcare's complex reimbursement arrangements, such as per diem and percentage reimbursement, bundled payments, and particularly value-based payment models mean that hospitals don't know how much income they'll receive or retain until after patients' outcomes are known. *See generally* Complaint, *Am. Hospital Assoc. et al. v. Azar*, No. 1:19-cv-03619 (D.D.C. Dec. 4, 2019), *available at* https://www.aha.org/system/files/media/file/2019/12/hospital-groups-lawsuit-over-illegal-rule-mandating-public-disclosure-individually-negotiated-rates-12-4-19.pdf%20.pdf. This makes forecasting prices next to impossible. In fact, hospitals argue that the manpower and coordination required to gather and advertise rate information, as required in the recent proposed HHS rule, constitutes a "substantial burden" and will "overwhelm many hospitals," which increases costs. *Id.* Consequently, if hospitals don't know their costs, it is impossible for the patients. This information asymmetry in healthcare significantly cripples normal buyer power.

### Limited Price Comparison

Without price transparency, price comparison is impossible. Unlike mom scanning over the prices of laundry detergent until she finds the one that fits her budget, patients cannot survey the opioid aisle until they find the generic pain pills. Moreover, price comparison for many parts of healthcare is almost unethical. Few persons would stop a surgery or emergency medical attention to price compare drugs – and they literally have no power to do that when they are under sedation. And when price comparison tools do exist, they are rarely used (3% of consumers). Shelby Livingston, *Is the Price Right? Solving Healthcare's Transparency Problem*, Mod. Healthcare, *available at* http://www.modernhealthcare.com/reports/achieving-transparency-in-healthcare/#!/. When they are used, patients frequently pick the pricier care that signals higher quality. *Id.*

And again, insurance frustrates price comparison. An insurer-determined copay negates the need to compare prices at different pharmacies if every pharmacy will just charge the insurer's same copay. And if a certain hospital is "out-of-network" it doesn't matter how much that hospital advertises its reduced prices; patients can rarely afford to pay to go out of their insurance network. And advertising prices to consumers may actually have unintended consequences. For example, healthcare systems could reduce prices of drugs and care in shoppable services (colonoscopies, knee scopes, MRIs, etc.) but make up the difference by raising the prices of more emergent care – such

as ER visits or ICU hospitalizations. Thus, advertising hospital prices may not have the desired price-reducing effect.

For patented drugs, price comparison isn't even an option – there is no generic competition with which to compare. By their very design, patents exclude competition from other sellers in order to recoup research and development costs. The manufacturers of these patented drugs, more than any others, hold monopoly power and can engage in price gouging.

Overall, the nature of healthcare services, insurance companies, and drug patents all severely limit a patient's ability to price compare this industry's products and drastically weaken the buyer power in the healthcare market.

### Information Asymmetry

The opioid crisis stems heavily from the information asymmetries that are inherent in our healthcare system. Information asymmetry is where either the buyer or seller has significantly more information regarding the product or demand.

### Patients' Information

Pain is subjective. Each individual quantifies and exhibits pain differently, and this is not always communicated to prescribers.

Pain may have various causes and can be physical or emotional. The twenty or so percent of the population suffering with chronic pain often depend on pain medications to function and thus build up tolerances and require larger doses during surgery compared to the average patient. Nell Greenfieldboyce, *How To Teach Future Doctors About Pain in the Midst of the Opioid Crisis*, NPR (Sept. 11, 2019), *available at* https://www.npr.org/sections/health-shots/2019/09/11/756090847/how-to-teach-future-doctors-about-pain-in-the-midst-of-the-opioid-crisis. A prescriber cannot always tell a patient's true motivation for an opioid prescription, be it physical pain, euphoria, or escape from emotional pain like guilt or isolation. Only the patient knows.

### Prescribers' Information

Patients can only (legitimately) obtain opioids with a prescription from a licensed provider. Opioids are indicated for a variety of reasons, yet prescribers have access to other resources that may be more effective and less addictive than opioids.

Tylenol (acetaminophen), Advil (ibuprofen), and other non-steroidal anti-inflammatory drugs (NSAIDs), work well at managing more minor pain, such as a sprained ankle, or even some surgeries. Ice and elevation of an operated limb also reduce swelling and pain, occasionally more effectively than opioids.



**Michael Best**

### 2020 Utah Legal Elite
UTAH BUSINESS MAGAZINE

Michael Best is proud to honor our 12 Utah Legal Elite™ recipients this year.

- Richard F. Ensor
- Stuart A. Fredman
- Brad R. Jacobsen
- Steve J. Joffee
- James R. Kruse
- Melinda A. Morgan
- Lyndon L. Ricks
- Jason D. Rogers
- Judson D. Stelter
- Evan S. Strassberg
- Kevin C. Timken
- Betsy T. Voter

Congratulations to all recognized attorneys!

**michaelbest.com**

Michael Best & Friedrich LLP

APP.137

USB001277

Articles

Why Can't I Self-Check Out My Percocet?

Opioids help significantly following back and brain surgeries, however, muscle relaxants such as Flexeril (cyclobenzaprine) and Robaxin (methocarbamol), or even benzodiazepines such as Valium (diazepam), can also significantly reduce pain – especially when prescribed with opioids. However, concurrent usage has also increasingly been linked to opioid-related deaths. Nat'l Inst. of Drug Abuse, *Overdose Death Rates* (Jan. 2019), *available at* https://www.drugabuse.gov/related-topics/trends-statistics/overdose-death-rates. Benzodiazepines are also highly addictive, and the withdrawal symptoms can be lethal. Long term use of opioids and/or benzodiazepenes is not recommended, given that chronic pain can frequently be managed with other alternatives. Neurontin (gabapentin) and Lyrica (pregabalin) target nerve pain. Methotrexate and Adalimumab (Humira) address arthritis. Oxybutynin and phenopyrazidine help bladder and urinary tract pain. Effective migraine cocktails often include caffeine. Diathermy and massage can help deep tissue pain. Human connection and therapy can get to the root of emotional pain. Yet despite all these options, sometimes only opioids can manage chronic foot wounds or bed sores and so providers can prescribe them. Yet all this nuanced information is not readily ascertainable to the general public – one of the reasons why patients see doctors.

But even prescribers may not know about alternative therapies and will write inappropriate prescriptions for opioids. One study showed that those who sprain their ankle and go to the ER have a 25% chance of leaving with an opioid prescription, something that might more appropriately be treated with NSAIDs, ice, and elevation. Jamie Ducharme, *A New Study Shows Just How Much Doctors Prescribe Opioids*, Time (July 28, 2018), *available at* https://time.com/5351906/opioid-prescritions-sprained-ankles/. In fact, about a decade ago U.S. medical schools were providing less than an hour of opioid-related instruction on average. *See* Greenfieldboyce, *supra*. This fuels the question, what do doctors and other professionals actually understand about opioids?

### Other Professionals' Information
While prescribers play an important role in managing pain, sometimes the administration of opioids can be spread out among the other professionals. Not every prescriber receives education on the vast array of pain management options. Nor do prescribers always monitor patients after pain medication administration to evaluate effectiveness – that usually falls on nurses or family members. And prescribers' understanding of effectiveness of a medication is usually dwarfed by that of the pharmacist, whose training concentrates on drugs, their interactions, and their effectiveness. Additionally, anesthesiologists, whose main role is to manage sedation and pain, are easily forgettable as a main source of opioid prescriptions. Similarly, rheumatologists specialize in

pain in joints, muscles, ligaments, bones, etc. including arthritis, and may also contribute to the administration of opioid prescriptions. *See Rheumatology*, Univ. of Utah Healthcare, *available at* https://healthcare.utah.edu/rheumatology/. Interestingly, dentists are the main prescribers of opioids for individuals aged ten to nineteen years. Nora D. Volkow & Thomas A. McLellan, *Characteristics of Opioid Prescriptions in 2009*, JAMA (Apr. 6, 2011), *available at* https://jamanetwork.com/journals/jama/fullarticle/896134. Yet, sometimes these professions are forgotten in the opioid crusade. Pain management information is spread out among the medical professionals, making it even harder for patients to access.

### Drug Manufacturers' Information
The current nation-wide opioid litigation hinges on the idea that drug manufacturers had information regarding the safety and addictive properties of opioids that they failed to share with prescribers. Attorneys general from around the nation, together with advocates and doctors, claim that pharmaceutical companies intentionally spent tens of millions of dollars downplaying addiction concerns, marketing exaggerated benefits of their opioid prescriptions, and lobbying doctors to increase prescriptions. Nicole Fisher, *Opioid Lawsuits on Par to Become Largest Civil Litigation Agreement in U.S. History*, Forbes (Oct. 18, 2018), *available at* https://www.forbes.com/sites/nicolefisher/2018/10/18/opioid-lawsuits-on-par-to-become-largest-civil-litigation-agreement-in-u-s-history/#1b83ff8b7fb4. As the researchers and developers of opioids, drug manufacturers are in the best position to understand a drug, its effects, its effectiveness, its addiction potential, and much more information. Prescribers can spend time searching for this information. However, it is hard for providers to counter the manufacturers' substantial marketing and promotion budgets.

Ultimately, information is spread out among many sources and the resulting information asymmetry skews the drug market.

### Very Limited Buyer Power
In the opioid market, sellers and middlemen wield significantly greater power than consumers.

### Addictive Nature of Opioids Limits Buyer Power
Some basic understanding of the addictive nature of opioids has always been apparent to healthcare providers – which is why opioids are controlled substances. Between 21 and 29% of patients given an opioid prescription for chronic pain misuse the opioids. Opioid Overdose Crisis, *supra*. Startlingly, adolescents have a 33% increased risk of opioid abuse than adults. Richard Meich et al., *Prescription Opioids in Adolescence and Future Opioid Misuse*, Am. Acad. of Pediatrics (Nov. 2015), *available at* https://pediatrics.aappublications.org/content/136/5/e1169.

Articles

Why Can't I Self-Check-Out My Percocet?

Once addicted to opioids, many are willing to pay steep prices and go to great lengths to obtain narcotics. Out of desperation, addicts may isolate, even engage in criminal behavior to obtain more opioids. Johns Hopkins Med., *Signs of Opioid Abuse*, *available at* https://www.hopkinsmedicine.org/opioids/signs-of-opioid-abuse.html. While the level of criminal desperation may be limited to opioids, other medications (insulin, heart meds, anti-rejection meds) are just as necessary for survival and tip the power further in the hands of the drug makers. The consequences from refraining from tomatoes are not nearly as serious as refraining from opioids and insulin. Thus, buyers have little, if any, power to refrain from participation in the drug market.

**Complex System Limits Buyer Power**
Opioid buyers do not legitimately buy directly from opioid sellers. Several players intervene before a patient may purchase an opioid prescription. Unlike the grocery store, a patient may not just walk into a pharmacy, compare the generic hydromorphone with the branded Dilaudid, grab one, and whisk it out the door via the self-check-out stand.

**The Insurer:** Perhaps the most important player is the insurance company. The insurer often determines preferred providers within a network. The insurer contracts with providers who write prescriptions, pharmacies who sell drugs, pharmacists who dispense the drugs, and the hospitals with the nurses who administer the drugs. This complexity is necessary for safety but leaves much of the price negotiation and decision-making far outside the reach of the patient.

Insurers take steps to lower drug prices, yet even their hands are tied. By law, the Secretary of Health and Human Services (including Medicare Part D drugs) is prohibited from negotiating the prices of medications with drug companies.

Insurers can get creative. For example, insurance companies have adopted strategies to address the opioid crisis through "utilization management" rules of quantity limits, step therapy, and prior authorization. John Hopkins Bloomberg Sch. of Pub.Health, *Health Insurance Plans May Be Fueling the Opioid Epidemic*, *available at:* https://www.jhsph.edu/news/news-releases/2018/health-insurance-plans-may-be-fueling-opioid-epidemic.html. Quantity limits restrict the number of pills that a pharmacy may dispense – usually a thirty-day supply. However, the CDC recommends a shorter supply since the likelihood of addiction and chronic use are associated with the duration of early prescriptions. *Id*. "Step therapy" refers to only prescribing opioids after attempting less addictive and risky alternatives, like NSAIDs. *Id*. However this is rare among insurance plans, possibly because patients usually attempt those alternatives before scheduling expensive doctor's appointments. "Prior authorization" requires a prescriber to contact the insurer and obtain approval before the insurer will pay for a medication. *Id*. While the impact of these utilization management tools is unclear, they illustrate the myriad ways insurers may interfere with the buyer-seller relationship.

**Pharmacy Benefit Managers:** As a background, pharmacy benefit managers (PBMs) are "giant buying networks" of payers and employers. John Arnold, *Are pharmacy benefit managers the good guys or bad guys of drug pricing?*, Stat News (Aug. 27, 2018), *available at* https://www.statnews.com/2018/08/27/pharmacy-benefit-managers-good-or-bad/. They use their substantial



## Mediation and Arbitration Services

Justice Michael D. Zimmerman (Ret.)
Experienced Neutral

Contact Miriam Strassberg at Utah ADR Services
801.943.3730 or mbstrassberg@msn.com



ZIMMERMAN BOOHER
APPELLATE ATTORNEYS

APP.139

USB001279

Articles

Why Can't I Self Check Out My Percocet?

buying power in aggregate as demand leverage in the drug market to lower costs for their buyers. *Id*. While the buyers' net price is often lower than the list price (the price set by the drug manufacturer) after the PBMs finish negotiating, the opaque nature of PBMs poses some problems, specifically, how much they actually lower drug costs. *Id*.



Figure 1. The Role of Pharmacy Benefit Managers

Courtesy of: Colorado Health Institute
https://www.coloradohealthinstitute.org/research/understanding-pharmacy-benefit-managers

PBMs' profits come from fees from the buyers, retained rebates from drug manufacturers, and pharmacy "spreads," or the difference between what the insurer pays them and what they pay the pharmacy. *Id*. Insurers claim that PBMs are not passing enough rebate revenue back to the payer clients – keeping up to 26% of the list price.[3] *Id*.

Unlike at a supermarket, the (legitimate) opioid market lacks price transparency and comparison, is heavily burdened by information asymmetries, and buyers have little, if any, buying power. The opioid market is not a normal market. Consequently, solutions to the opioid crisis must extend beyond normal market solutions.

## OPIOID CRISIS SOLUTIONS FOR UTAH ATTORNEYS

### Promote an Awareness of Resources

#### Naloxone (Opioid Overdose Antidote)

Naloxone reverses opioid overdose. *Id*. Utah has a standing order for naloxone prescriptions, meaning anyone may obtain it from a pharmacy without a prescription. *Id*. If a pharmacy does not have naloxone in stock they usually have the ability to order it. *Id*. Law

firms might consider keeping some on hand for attorneys or clients with known substance abuse problems. If a lawyer's client or family member has a known substance abuse problem the lawyer may consider encouraging the family to purchase naloxone. Employers may consider including naloxone in their insurance benefits. Without insurance coverage the cost of naloxone may be anywhere between $50–$200. *Id*. The only side effect to naloxone is opioid withdrawal, which may include fast heartbeat, aggression, high blood pressure, and pain. *Id*. Naloxone wears off after about thirty to ninety minutes, so another dose may be required, which is why it is important to stay with a person experiencing an overdose. *Id*.

### The University of Utah's Comprehensive Crisis Program

The University of Utah recently received a federal grant to provide opioid addicts with evidence-based care. Instead of emergency room providers leaving addicts to follow up with their primary care doctor in a few weeks, this grant allows ER providers to give an immediate prescription for buprenorphine to treat opioid withdrawal symptoms and schedule a guaranteed appointment at the University Neuropsychiatric Institute (UNI). Users are paired with a case manager and a peer support coach who has successfully overcome addiction. UNI then provides thirty days of free treatment. At the conclusion of treatment, UNI contacts a community partner for housing and other community resources. This comprehensive and collaborative approach has been shown to meet addicts' needs and drastically reduce opioid usage of addicts and long-term sobriety. Utah Office of the Att'y Gen., *U of U Emergency Opioid Use Disorder Program* (Oct. 25, 2019), *available at* https://attorneygeneral.utah.gov/tag/opioid-epidemic/. This approach should be promoted so that additional grants can increase this program's availability at other locations.

### Alternatives to opioid medications

There are a wide variety of pain management options. Reach out to pain management clinics, specialists, rheumatologists, pharmacists at your local pharmacy, and others if you are dealing with chronic pain; opioids may not be the best option. Furthermore, engage other professionals in opioid-crisis discussions. Other activities such as stretching, exercise, acupuncture, diathermy, and dieting may also alleviate pain.

APP.140
USB001280

Articles

Why Can't I Self-Check Out My Pension?

**Reduce the Infusion of Opioids in the Community**

Utah's yearly Take Back Day amasses tens of thousands of pounds of unneeded prescription drugs. Utah Office of the Att'y Gen., *Utah! Take back your unused drugs on April 27th* (Apr. 19, 2019), https://attorneygeneral.utah.gov/tag/utah-take-back/. Physicians should be encouraged to limit the quantity prescribed. Patients should be encouraged to limit filling prescriptions if they don't need them, and then discard them appropriately.

**Therapy**

GE Appliances reported that making behavioral health services more available decreased opioid prescriptions. PwC HEALTH RESEARCH INST., *supra* at 15. Law firms can provide and encourage therapy and other behavioral health services to employees. Firms can also invest thought and money into simple process improvements that reduce workload and stress – even as simple as improved communication and coordination. Attorneys can encourage their clients to get therapy when needed. Attorneys can also set aside time (as minimal as five minutes a day) for relaxation or mindfulness exercises to help cope with heavy workloads.

**Counsel clients**

**Warn against dangers of chronic opioid use**

As a general rule, if you're not in pain, don't take opioids. Unlike antibiotics, it is not necessary to finish an entire prescription of opioids. These are only to be taken if needed. In fact, opioids should ideally be reserved for pain that limits mobility and usual daily activities.

**Signs of an Overdose**

Opioids inhibit the natural drive to breathe and an overdose results in a lack of oxygen to the brain and other vital organs. This may result in brain damage and even death. If friends or family members see these symptoms call 911, check for breathing and pulse, administer naloxone if available, perform rescue breathing, and place the individual on their side. *Signs and Symptoms of an Overdose*, STOP THE OPIDEMIC, *available at* https://www.opidemic.org/overdose/.

**Protection from Liability**

Utah law protects an individual who calls 911 from legal charges concerning the person who has overdosed, the overdose, and any

side effects, provided the individual stays with the overdose victim and cooperates with responding medical providers and law enforcement providers. Utah Code Ann. § 58-37-8(16)(a). Furthermore, drug possession has been changed from a third-degree felony to a Class A misdemeanor, significantly reducing the chances that reporters of overdoses will be arrested. *Signs and Symptoms of an Overdose, supra.*



Signs of an OVERDOSE
- Small, Pinpoint Pupils
- Blue or Purple Fingernails & Lips
- Won't Wake Up, Limp Body
- Shallow or Stopped Breathing
- Faint Heartbeat
- Gurgling or Choking Noise

## DRUG PRICING SOLUTIONS

Like solutions for the opioid crisis, solutions to skyrocketing drug prices must extend beyond normal market forces in order to sufficiently counter the titan pharmaceutical seller power. While price transparency and foreign competition may be helpful in some instances, they will not be sufficient to increase drug affordability as a whole. As long as insurance plays such a large role in healthcare, only efforts that give insurers more buying power will have any real sway over drug makers. At the very least, Medicare should be permitted to negotiate with drug manufacturers – which will only work if Medicare has some teeth in the fight, such as threatened price ratios or caps. Out-of-pocket maximums should be reduced. Incentives should be aligned, like in the Senate's bill, so that drug manufacturers get higher reimbursement for cheaper drugs. Reforms should anticipate drug makers and PBMs gaming the system and somehow constrain them – including the PBM "spreads." And drug pricing proposals should focus on those drugs most at risk of being exploited – such as the patented drugs with no competition.

Ultimately, solutions exist to both the opioid and drug pricing crises, but they must extend beyond normal market forces since these are not normal supermarkets.

1. Li Zhou, *House Democrats just introduced an ambitious plan to take on prescription drug prices*, VOX (Sept. 19, 2019), *available at* https://www.vox.com/2019/9/19/20856948/house-democrats-prescription-drug-prices.

2. Bryan Oshiro, *The Top Success Factors for Making the Switch to Outcomes-Based Healthcare*, HEALTH CATALYST (May 17, 2016), *available at* https://www.healthcatalyst.com/Outcomes-Based-Healthcare-Top-Success-Factors.

3. Aaron Vandervelde & Eleanor Blalock, *The Pharmaceutical Supply Chain: Gross Drug Expenditures Realized by Stakeholders*, BERKELEY RESEARCH GR., 13 (Jan. 2017), *available at* https://www.thinkbrg.com/media/publication/863_863_Vandervelde_PhRMA-January-2017_WEB-FINAL.pdf.

APP.141
USB001281

# President's Message

## We've Come A (Little) Way, Baby.

by Heather Farnsworth

**D**iversity, Inclusion, and Equity: These may seem like the latest "corporate buzz words" but in reality, the Utah State Bar has been formally dedicated to improving diversity among its Board of Bar Commissioners and among bar membership for decades. This began with creating ex-officio positions on the Board of Bar Commissioners for the Utah Minority Bar in 1992 and Women Lawyers of Utah in 1993,[1] and more formally by adopting the Utah State Bar Statement on Diversity and Inclusion on December 2, 2011. The statement is as follows:

> The Bar values engaging all persons fully, including persons of different ages, disabilities, economic status, ethnicities, genders, geographic regions, national origins, sexual orientations, practice settings and areas, and races and religions. Inclusion is critical to the success of the Bar, the legal profession, and the judicial system. The Bar shall strive to:
>
> 1. Increase members' awareness of implicit and explicit biases and their impact on people, the workplace, and the profession;
>
> 2. Make Bar services and activities open, available, and accessible to all members;
>
> 3. Support the efforts of all members in reaching their highest professional potential;
>
> 4. Reach out to all members to welcome them to Bar activities, committees, and sections; and
>
> 5. Promote a culture that values all members of the legal profession and the judicial system.

*Utah State Bar Statement on Diversity and Inclusion*, Utah State Bar (Dec. 2, 2011), https://www.utahbar.org/bar-operations/#policies. Diversity, in this policy, relates to gender, race, and sexual orientation as one might expect, but also reflects a commitment of the Bar to promote diversity with respect to geographic regions, practice settings, etc. This is reflected in practice as the Bar strives to include members from each Division and from a variety of practice areas when forming committees or evaluating awards, and so on.

While diversity is important, simply giving someone a seat at the table is not enough. In order to promote inclusion and to truly benefit from diversity, we must encourage and promote diverse candidates to fully participate. Vernā Myers explains it best, "Diversity is about who is represented in the organization, whereas inclusion speaks more to who is respected, expected and integrated into an institution." *Diversity and Inclusion*, The Vernā Myers Company, *available at* https://www.vernamyers.com/diversity-training/ (last visited Feb. 16, 2021). She further describes it in these terms: "Diversity is being invited to the party. Inclusion is being asked to dance." *Id*.

At the time the Bar's policy for Diversity and Inclusion was adopted, the Board of Bar Commissioners included twenty-one members, eleven men and ten women, with only two members who were not Caucasian. Further, of the fifteen voting members only six were female and only one member was not Caucasian. Bar Leadership was fairly reflective of Bar membership. In a 2011 survey, Bar members identified themselves as 76% male and 24% female. *2020 Utah State Bar Member Survey*, Utah State Bar (Apr. 8, 2020), at 96, https://www.utahbar.org/wp-content/uploads/2020/11/Bar-Survey.pdf [hereinafter Bar Study]. Bar membership was 91% Caucasian, 2% Hispanic/Latinix, 2% Multiracial, 1% Asian/Pacific Islander, 0% American Indian/Native American, 0% Black/African American, 1% other, and 2% preferring not to disclose. The Bar's demographics differed significantly from Utah's demographics at the time, especially regarding gender. According to the United States Census Bureau, population estimates in 2010 showed an estimated 49.6% of the population reported as female. Quickfacts: Utah, U.S. Census (Dec. 2, 2011), https://www.census.gov/quickfacts/fact/table/UT/PST040219#PST040219 (last visited Feb. 16, 2021). The Bar's population more closely reflected the Utah Population with respect to race; however, there was a significant disparity in the amount of Hispanic/Latinix lawyers when compared with the overall population. In 2010 Utah's population was 77% Caucasian, 14.4% Hispanic/Latinix, 2.6% Multiracial, 2.7% Asian, 1.1% Native Hawaiian or Pacific Islander, 1.5% American Indian/



APP.142
USB001677

Native American, and 1.5% Black/African American.

The Bar's most recent survey shows some slight improvement, with female membership increasing from 24% to 29%, while the 2021 Utah population estimates shifted only .1% to 49.7% female. *Bar Study* at 5; *Utah Population 2021*, WORLD POPULATION REVIEW https://worldpopulationreview.com/states/utah-population (last visited Feb. 16, 2021). However, with respect to race, there is still a significant discrepancy between the demographics of the population of the Bar's members and Utah's general population, with little change in any of the reported numbers: Hispanic/Latinix members increased from 2% to 3%, Asian/Pacific Islanders increased from 1% to 2%, American Indian/Native American members increased from 0% to 1%, as did Black/African American members, and those preferring not to disclose increased from 2% to 5% *Bar Study* at 9. However, multiracial members decreased from 2% to 1%. *Id*.

Currently, the Board of Bar Commissioners more closely reflects Utah's general population with respect to gender. The Board is comprised of twenty-seven members: thirteen of whom identify as male and fourteen of which identify as female (51.85%). Bar leadership reflects a similar make up: the executive committee is comprised of three identifying as male and four identifying as female (57.15%). However, some disparity remains with voting members of the Bar Commission, as nine identify as male and only six identify as female (40%). Regarding race, the Board of Bar Commissioners has much room for improvement with approximately 88.89% of its members, and 93.33% of voting members, being Caucasian.

This is where the concept of equity comes in to play. If equality is the goal, equity is the means to achieve this. Equality is typically defined as treating everyone the same and giving everyone the same access to opportunities. *Equality*, DICTIONARY.COM, https://www.dictionary.com/browse/equality (last visited Feb. 16, 2021). Workplace equality does not take demographic related needs into account, while equity strives to identify the specific requirements of an individual's needs based upon ethnicity, age, gender identity, economic status, and so on. *The Important Difference between Workplace Equity and Equality*, KELLY (July 15, 2021) https://www.kellyservices.us/us/business_services/business-resource-center/managing-employees/the-important-difference-between-workplace-equity-and-equality.

In a recent CLE on the subject, ABA President Patricia Lee Refo explained equity with this example: Suppose Ms. Refo, a woman who stands at five feet something and Mr. LeBron James, a professional basketball player who stands at six feet and nine inches are each trying to see over the top of a nine-foot-tall fence. If both persons are given an equal stool measuring two feet and

six inches, only Mr. James is able to see over the fence. If we take into account that Ms. Refo and Mr. James are not at the same starting point with respect to height and we provide Ms. Refo a step-ladder measuring three feet six inches instead, we have achieved equity as both individuals may now see over the fence.

So, why is equity important? Equity is important in the workplace as it has been demonstrated to improve cognitive diversity in decision-making, to drive engagement by employees, and to prevent dissatisfaction and employee attrition, all of which result in an improved bottom line. Chiradeep BasuMallick, *5 Reasons to Focus on Workplace Equity Alongside Diversity and Inclusion*, HR TECHNOLOGIST (Mar. 27, 2020), https://www.hrtechnologist.com/articles/diversity/workplace-equity-diversity-inclusion/. More importantly, equity is an essential concept in ensuring access to justice. Increased access to justice depends on public confidence in the justice system. *Necessary Condition: Access to Justice*, U.S. INST. OF PEACE, https://www.usip.org/guiding-principles-stabilization-and-reconstruction-the-web-version/rule-law/access-justice (last accessed Feb. 16, 2021). Public confidence in the justice system is more likely to increase with a judiciary and bar that reflects the make-up of the public.

Historically, the legal profession has been one of the least diverse professions in the nation, and it continues to be so. *Diversity in the Law: Who Cares*, AM. BAR ASSOC. (Apr. 30, 2016), https://www.americanbar.org/groups/litigation/committees/diversity-inclusion/articles/2016/spring2016-0416-diversity-in-law-who-cares/. According to the ABA,

> diversity in the legal profession is necessary to demonstrate that our laws are being made and administered for the benefit of all persons. Because the public's perception of the legal profession often informs impressions of the legal system, a diverse bar and bench create greater trust in the rule of law.

*Id*.

The ABA argues, "Beyond the public perception and confidence in our system diversity affects the quality of legal services and judicial decisions." *Id*. The ABA finds "A diverse legal profession is more just, productive, and intelligent because diversity, both cognitive and cultural, often leads to better questions, analysis, solutions, and processes." *Id*.

So how do we, as a Bar, become more representative of our membership and our general population? Again, the answer is equity. We need to take the initiative to provide opportunities to diverse populations to give that extra boost of encouragement. To harken back to Ms. Myers's analogy, we need to not only

President's Message

invite people to the party, but invite them to dance, and to participate on the party planning committee. As a result of the results of the survey, the Bar has created the Bar Committee on Early Diversity Outreach, chaired by third division representative Mark Morris, who is working in conjunction with the Utah Center for Legal Inclusion to introduce young kids to lawyers of all backgrounds to encourage them to consider pursuing a legal education. In addition, we have created a new position, Director of Diversity, Inclusion, and Equity, to be held by the Bar's CLE director Michelle Oldroyd, to ensure the Bar offers educational programing consistent with these ideals.

In my relatively short time on the Bar Commission, I have felt a shift demonstrated beyond the numbers, with respect to Bar leadership. I joined the commission as an ex-officio representative of the Women Lawyers of Utah in 2012. When I noticed the lack of female voting commissioners, I decided to run to represent the third division. At the time, a female colleague, who was also heavily involved with the Women Lawyers of Utah, planned to run as well. Though there were multiple positions available, there was concern that two women running might somehow dilute the vote for each of us. Admittedly, I too believed this may be a problem, and felt some relief when my colleague elected

not to run for other reasons. In retrospect, I am embarrassed and ashamed of this thinking, but at the time, it seemed a valid concern. When I ran for President-Elect, in 2019, the consensus seemed to be in part, that it was "time" for a woman to be president again. When I was elected, I became the sixth female president of the Utah State Bar. The current President-Elect, Heather Thuet, and I will be the first two women to serve consecutive terms. Now, the current candidate for President-Elect, Katie Woods, will mean three women will serve in a row, and we are getting closer to the distinction becoming less about our gender. Ms. Woods, for example, is a small firm attorney from St. George, adding an entirely different level of diversity. I might add, there was little to no discussion over the gender of these candidates, at least that I knew of, and the discussion focused on the years of service each offered to the Board of Bar Commissioners and their plan of leadership going forward. The culture is shifting at this level, and my hope is that this shift will soon pass to the general membership of the bar so that we may more accurately reflect the general population of Utah in our legal community, to ensure access to justice is justice for all.

1.   In 2016, an ex-officio position was added to the Board for the LGBT & Allied Lawyers of Utah. This Affinity Bar was formed in 2014.



zealous advocates

WE TAKE GREAT PRIDE IN LGBTQ EQUALITY.
Dorsey understands that fairness, equality and respect are not just fundamental to the law. They are fundamental to productive workplaces and peaceful communities. We are zealous advocates of the Human Rights Campaign. We're proud to be named a HRC "Best Places to Work for LGBTQ Equality" for 15 consecutive years.

DORSEY™
always ahead

dorsey.com

APP.144
USB001679

## Commentary

# The Road to Solutions: Systemic Racism and Implicit Bias in Prosecution

by Margaret Olson and Ivy Telles

**T**his article explores an uncomfortable topic. Not least among the incredible events of 2020, our country and our state saw an outpouring of outrage, protest, and even violence in the aftermath of the murder of George Floyd, Ahmaud Arbery, Breonna Taylor, and others. The undersigned authors, like many, tried to stay quiet and do some listening. To understand. To rethink all we previously believed and open the commonly accepted narrative to new information and perspectives. We have endeavored to listen with humility to the pain, suffering, and loss our communities of color continue to endure.

It's easy to resort to defensiveness. To be a racist is a bad thing. No one wants to think of him or herself as a racist. We throw up the usual defense mechanisms: *I was raised better than that. I have BIPOC friends. I don't see color.* Now, we humbly attempt to set these impulses aside and start down a difficult road to solutions.

As prosecutors, we believe we have both an opportunity and a responsibility to start this conversation and shine light on the criminal justice system's role in these problems. We must name it. We must identify areas in which prosecutors are part of the problem. As professionals who have devoted our careers to the criminal justice system, we must be willing to examine our current and historical roles in institutionalized racism, not rush to justify them. We offer the following thoughts about how prosecutors can be part of the solution in this dawning era.

First, we must acknowledge and combat unconscious bias within ourselves. What are our implicit biases?  What experiences have we had with people that have influenced how we see, react, respond, or deal with a situation?  What is our mindset?  How are we approaching the day?

Second, have we, as prosecutors, failed to challenge a judge, police officer, or co-worker for fear of risking the relationship? Have we failed to follow up invidious examples of bias and discrimination because we were not personally involved? How many missed opportunities for training and meaningful discussion have been lost because we mind our own business and "stay in our lane"? How many times have we failed to critically examine new information presented by defense counsel because [fill in 100 reasons here]. Have we sat, silent, at counsel table while an unrepresented person of color was treated differently?

These are hard questions, but we must ask them. We must reflect upon and take responsibility for our honest answers. We must commit to heightened standards for ourselves, now.

Third, we must combat institutional racism inside a broken system. We need to be ready to have the uncomfortable and potentially ugly conversations with our partners in the justice system, identify where the system is failing and what actions we can take to counter those failures. One crucial component in



*MARGARET OLSON Summit County Attorney. She practices in the Silver Summit Courthouse in Park City.*



*IVY TELLES is a Summit County Prosecuting Attorney.*

APP.145
USB001689

Systemic Racism and Implicit Bias in Prosecution

this is to better fund indigent criminal defense. Our able opponents on the other side of the courtroom should have comparable salaries, benefits, job security, and investigator/expert resources as we prosecutors do. Next, we must actively cultivate more diversity in prosecutor offices. Law school admissions deans and the legal community should encourage this as well. An informal canvas of this state's prosecutors reveals very few persons of color working as prosecutors and almost none in positions of leadership in the prosecution community. The same observation goes for Utah's judiciary. It is no wonder people of color are distrustful of a system that has, despite lofty ideals, failed to serve or represent entire communities and demographics. Very few attorneys administering justice understand or empathize with the harsh reality communities of color face upon entering the justice system. We must commit to fulfill the ideal of Justice For All, now.

Fourth, we need to create a safe space in the courtroom for raising these real issues. Everyone in the courtroom should be free to be anti-racist, not "color blind," and to shine a light on unconscious bias or racial inequities without the fear of backlash. Raising fundamental fairness issues must be normalized in our profession. Instead of meeting such difficult moments with defensiveness and denial, let us learn to pause, reflect, and course correct. We must commit to a better standard of being open and direct on this issue, now.

Lastly, we need to look outward. Justice is bigger than the single dimension of prosecution. It will take more than what prosecutors can do alone. We need our local and state governments, law enforcement agencies, partners in defense, and many other social services to help battle the systemic issues and racial disparities we see in the justice system. When truly seeking justice, prosecutors and defense attorneys are not inherently at odds. Justice comes in many different forms and always must be considered on a case-by-case basis. A prosecutor's job is not to convict. We are ministers of justice and protectors of the community: the whole community. We as prosecutors should be looking for racial disparities at every stage of a case. We should confront law enforcement officers with apparent prejudices and biases when we see them. If, upon case review, a citizen's constitutional rights have been violated, prosecutors must decline to file, explain why, conduct further training, and close the loop with command staff. When law enforcement officers fail to police themselves on issues of race, the next line of

defense is prosecutors. When we fail, we leave it to defense attorneys, who already have a difficult job in the many roles they play for their clients. We add to their workload by failing to do our part in screening out bad stops and searches and cases that hint towards racial bias. We must commit to a better standard of prosecution, now.

Summit County is small (~41,000 residents). Our prosecution team is very close and committed to excellence. We have not had any officer involved critical incidents during our tenure and have not experienced large scale race-based conflict, but this is in large part because we do not have large minority populations (.7% African American and an admittedly underreported 12.4% Hispanic). Our law enforcement partners are among the finest and most professional in the country and we are proud to say that they are committed to doing the hard work of embarking on this journey of critical self-examination with us. As enforcers of the law, we must partner with law enforcement to recognize this movement as an opportunity for training and improvement. We recognize now more than ever that we must work harder to level the field when it comes to racial disparities in our justice system the same way our office has endeavored to level the field with the wealth and power disparities in the justice system. While our office prides itself on "taking out its own trash," and not filing cases in which there are obvious evidentiary problems, unlawful stops, or illegal searches, we recognize that there is room for improvement. We will examine all use-of-force cases with heightened scrutiny prior to filing. We have instructed our office paralegals not to enter the race of any suspect, witness, or complainant until after a case is closed, and only then for data-gathering purposes. Since this national racial reckoning began, our office has canvassed our own prior case dispositions to account for unconscious bias, potential police misconduct, and racial injustice. It cannot be a task that will be completed quickly if we are to undertake this issue with the seriousness that the moment demands. As we continue to listen and grow in understanding, our office commits to redefining equity and justice in America.

We are here to get it right, not to be right. We commit to listening and to being part of the accountability and change America has so long needed and for which communities of color have so long been deprived. We invite our fellow prosecutors (and fellow lawyers) to join this commitment.

UTAH STATE BAR®

# 2021 SUMMER CONVENTION



**JULY 28-31**



JOIN US IN **SunValley** OR JOIN US BY ZOOM!

**A hybrid, in-person/Zoom event, honoring our annual tradition**

**Judicial panel discussions, skills-based training, well-being suggestions, and equity and inclusion dialogue sessions**

**Panel discussion from Women Lawyers of Utah – *GOOD Guys (Guys Overcoming Obstacles to Diversity)***

**Keynote session featuring a follow up on the *Police Use of Lawful & Unlawful Force* series**

**Online registration and full agenda available Monday, May 17**

**MCLE accreditation pending**

**PLEASE NOTE: If a restriction on gathering size is in place in Sun Valley at the time of the Convention, in-person registration and attendance may be limited.**

APP.147
USB001783

## Views from the Bench

# Silver Linings of the Pandemic

by The Hon. Gregory K. Orme

Let me get this out of the way right off the bat: The COVID-19 pandemic has been a horrible scourge on the world, and we would have all been much better off without it. As dark clouds go, this is the darkest most of us have known. But always something of an optimist, I recognize the validity of the old adage that every cloud has a silver lining.

I don't intend to treat the ancillary benefits of the pandemic that apply more generally. These are familiar to all of us by now. Wearing masks out in public has become acceptable as a public health tool. Even post-pandemic, it is to be hoped that people who do not feel well, or who are coming off a cold, etc., will thoughtfully don a mask when going to the store or getting on an airplane. Many families benefited considerably from the bonding opportunities presented by spending so much time at home together. (But not all. Domestic violence and child sexual abuse cases were up in many places.) Pet adoptions from shelters increased significantly, at least for a while. Many parents and guardians, some of whom had not been involved in their children's education beyond inquiring, "Have you done all your homework?," at some point in the evening, came to have a deep appreciation for educators after being required to take a much more active, daily role in helping to manage online education. Families, like mine, who are dispersed all around the country came to learn about Zoom and similar technologies, and the opportunities they afford to stay in better touch than via group texting. I suspect my extended family, even after the pandemic is behind us, will continue our Monday night Zoom get-together. My sainted mother certainly hopes that will be the case, as do I.

In this essay, I want to identify the silver linings that are somewhat unique to our profession. I recently participated in the annual conference of the Council of Chief Judges of the State Courts of Appeal – via Zoom, of course – and I can say with some confidence that, in varying degrees, these silver linings have national relevance. And I hasten to add that appellate judges universally recognize how much easier it is to hoe our row as compared to the much more significant challenges faced by our colleagues on the trial bench. Reading briefs and getting a couple of lawyers together for fifteen-minute arguments is a thousand times easier than managing a busy trial docket and trying to hear from witnesses and empanel juries. (That may sound like hyperbole, but I did the math.) So please understand that, aside from the next paragraph, most of what I have to say is true of only appellate courts.

The first silver lining is not as big a deal as the other two, perhaps, but it is a personal favorite of mine. The unsanitary practice of exchanging viruses and bacteria while grabbing hold of the hands of not only dear friends, but also newly introduced strangers, and giving those hands a vigorous shake – of all things – is behind us at last. Over the last year, we have all gotten out of that habit. So why start it up again? It was always kind of gross. Those who feel the need for an actual touch in this situation can continue with the elbow tap or fist bump, although I personally see no reason why we couldn't simply give a nod or little bow and offer a verbal greeting as a perfectly fine substitute for the traditional exchange of germs.

The two more significant silver linings are what we learned about the feasibility of working remotely and what we learned about conducting proceedings and meetings in a virtual format, rather than requiring everyone to always come to the courthouse.

I personally had a real awakening about working remotely. I always did a good deal of work outside of the office, finding that home was a more conducive environment than the office for reading briefs and spending quality time revising my opinions and reviewing the opinions of my colleagues. But I always felt like my law clerks should be in the office where they had ready access to books, the appellate record, and desktop computers with all the right programs loaded and with the assurance of



*JUDGE GREGORY K. ORME was appointed to the Utah Court of Appeals by Governor Norm Bangerter when the court was established in 1987. He serves as the judicial advisor for the* Utah Bar Journal.

**APP.148**
**USB001680**

online security appropriate to our work. To be sure, much of this had already changed over the course of my 30+ year career as an appellate court judge. Everybody has a laptop. Virtual personal network capability came into existence. The record in most cases can now be accessed electronically. Those of us who prefer reading statutes or cases in hardbound books are becoming few and far between. And the digests, encyclopedias, and Shepard's have either moved to online formats or been rendered obsolete by Westlaw and LexisNexis.

Long story short, I was absolutely amazed, and more than a little surprised, how seamlessly we made the shift from in-person work to all but exclusively working remotely. During the conference with my colleagues from across the country, I went so far as to suggest that my experience was that our productivity actually went up – not down – when we switched to working from home. This perspective was not unanimous, but it was the overwhelming consensus.

So, if everyone is happy working at home and productivity has been enhanced, why will we all hurry back to the office? I suspect we won't. Those who live some distance from the courthouse save money on gas and public transportation fares by working from home. Those with young kids have found ways to juggle their schedules so as to obviate, or greatly reduce, the need for childcare. Our poor air quality and traffic congestion will only be improved if more people telecommute. One judge from the Midwest is very much looking forward to things getting back to normal and having everyone back in the office, but he anticipated there would be some resistance to implementing that directive

now that everyone is comfortable with a different arrangement.

To be sure, there are some negatives to working exclusively from home. There are some downsides in the broader societal context, including negative impacts on commercial real estate and leasing; decreased utilization of downtown bars, restaurants, gyms, and retail stores, many of which have had to close; unemployed daycare and hospitality workers, etc. But even in my specific work context, there are some drawbacks to working exclusively from home, including the loss of personal contact, the chance to go to lunch or for a drink spontaneously, and really getting to know people in a way that you simply cannot do via cell phone and computer screen. I had the good fortune of continuing throughout the pandemic to work with two excellent law clerks whom I knew well and got along with fabulously when the pandemic hit. We already understood each other's quirks and had our routines in place, and it was quite easy to shift all of that to a virtual platform. I know that my colleagues who brought on a new law clerk during the pandemic were challenged in getting acquainted with them, getting them trained, and integrating them into the broader Court of Appeals family.

There will be considerable variation from office to office and courthouse to courthouse, but after we are all vaccinated and the pandemic is waning, I envision leaving it up to my law clerks whether they will work from home or in their courthouse offices, with just a couple of exceptions. We will plan to be at the office to celebrate a birthday, on days when we are scheduled to have oral arguments, and for our quarterly staff meetings (if those are reinstituted). Otherwise, I am happy to let them decide where they can work most comfortably and productively.



## Expert Mediation and Arbitration Services

Justice Christine Durham (Ret.)
Experienced Neutral

Justice Michael D. Zimmerman (Ret.)
Experienced Neutral

Contact Miriam Strassberg at Utah ADR Services
801.943.3730 or mbstrassberg@msn.com



ZIMMERMAN BOOHER
APPELLATE ATTORNEYS

APP.149
USB001681

Views from the Bench

For myself, I can foresee settling into a routine that has me in the office two days a week and working remotely the rest of the time, and, quite honestly, those office days would have more to do with the social opportunities thereby presented and the opportunity to combine a day in the office with an appointment with the dentist, doctor, or barber than because I can work so much more effectively at the office. That just isn't true for me and my staff, and it took a real sea change, like the pandemic, to bring that lesson home.

The consensus of my colleagues nationally was much less charitable to virtual hearings as an effective substitute for in-person arguments than to remote work as a meaningful way to take care of how we spend most of our time, namely, reading briefs, drafting opinions, and reviewing and critiquing the opinions circulated by our colleagues. This has lots to do with decorum. Talking heads on a computer screen, even if the technology cooperates fully, simply does not offer the same dignity as proceedings in a real courtroom. Virtual eye contact is not the same as real eye contact. A legitimate ceremonial function is served by attorneys, their clients, and the occasional interested member of the press or public coming to the Matheson Courthouse and having their cases heard by three judges, seated together in robes on an elevated bench, with the

flags of the United States and Utah and the court's seal on display behind them. In short, while I believe that remote work will continue to be a feature of the Court of Appeals' evolving culture, I think we will enthusiastically look forward to returning to the courthouse for the vast majority of our oral arguments as soon as we can responsibly do so.

Notice I said "vast majority." Now that we all know how to do it, I suspect that we will make selective continued use of virtual hearings. Most winters we end up having to cancel oral arguments on one or two bad snow days. It is often a challenge to reschedule those hearings, and of course counsel and their clients are inconvenienced by reason of counsel having to prepare twice for oral argument. In the future, I don't think we would cancel those hearings. I think we would move them to our virtual platform and carry on. Last year, we had to continue a hearing because an attorney had an accident and unexpected knee surgery, rendering the attorney unable physically to make his way to the courthouse. Going forward, I suspect we would shift such an argument to WebEx, assuming the attorney had had adequate time to prepare notwithstanding the unexpected medical difficulties and provided that he or she was not under the influence of strong painkillers or too uncomfortable to prepare for and present his or her argument. There is one other situation where I would expect that we would hold a virtual hearing. Over the years, I have worried about the financial implications of requiring, for example, an attorney from Logan and an attorney from St. George to come to the Matheson Courthouse to present their respective fifteen-minute oral arguments. Occasionally, such attorneys have waived the oral argument opportunity we extended them out of concern for the financial hit their clients would take. Those attorneys should, in my opinion, have the opportunity, instead, to present their argument virtually.

The pandemic will eventually be over, but it won't be over in the same definitive way that a personal illness or bad snowstorm might be over. For years to come, I suspect, "before the pandemic" and "during the pandemic" will be phrases that will regularly pepper our speech and qualify our comments. COVID-19 will have changed – and permanently – lots of what was once taken for granted, or at least that which was familiar and comfortable. It will have wrought much more that was negative than positive. But providing us the collective opportunity to embrace remote working and master the holding of hearings and meetings without everyone needing to gather at the courthouse are among the few benefits our profession has been able to derive from this plague on all our houses. Oh. And also seeing handshaking relegated to cultural anthropology textbooks and their virtual equivalents.




**MCBB** is pleased to announce that

**Trevor J. Lee** has become MCBB's newest Partner. Mr. Lee's practice focuses on appellate law, business litigation, intellectual property & technology, and labor & employment law. Mr. Lee has experience litigating civil rights violations, and constitutional issues and is a licensed patent attorney.

136 East South Temple, Suite 1300
Salt Lake City, Utah 84111
801.363.5678 · Facsimile: 801.364.5678
www.mc2b.com

**APP.150**
**USB001682**



AMOS N. GUIORA

# Book Review

## Armies of Enablers:
## Survivor Stories of Complicity and Betrayal in Sexual Assaults

by Amos Guiora

Reviewed by Anna Rossi

Professor Amos Guiora's latest book, *Armies of Enablers: Survivor Stories of Complicity and Betrayal in Sexual Assaults*, is a passionate argument for the development of legislation criminalizing those who turn a blind eye to sexual assault within the institutions for which they work. Guiora is a law professor at the University of Utah and has previously published works focused on those who witness wrongs occurring and do nothing, notably his book on bystander accountability, *The Crime of Complicity: The Bystander in the Holocaust*. Prof. Guiora takes the accountability argument one step further in *Armies of Enablers*, and asserts that the enabler – the person who is made aware of a sexual assault but focuses on protecting the institution in which it occurs rather than the survivor of the assault – should be punished criminally in order to deter future enabling behavior within institutions.

The thesis of *Armies of Enablers* is that those who are made aware of abuse occurring within their institutions and choose to do nothing, thereby protecting the institution and abandoning the survivor, should be subject to criminal penalties up to and including incarceration. The crux of Prof. Guiora's argument is that the enabler's abandonment causes further harm to individuals who have already been victimized by the perpetrator of the physical or sexual abuse, and that only through criminal-ization of enabling behavior can we deter future offenders. Criminalization, Prof. Guiora argues, will achieve two goals: it will protect known victims from further harm and prevent the victimization of others. The idea raises interesting questions for the reader: Can we criminalize the behavior of someone who fails to act when they know someone is being harmed? And if so, should we? Prof. Guiora acknowledges the complexity of this issue, and recognizes that he is very much prioritizing the needs of survivors in making his argument. This book is not an unbiased examination of the pros and cons of criminalizing enabling behavior; it is a persuasive piece written with the intent to convince its reader that enablers deserve to be punished criminally. As such, the book contains valuable information in support of criminalization, but does not discuss alternatives that may focus more on root or societal causes that are of interest to those involved in criminal justice reform.

Prof. Guiora justifies criminalization of enabling behavior expertly in the 200-plus pages of this book, using his own expertise and the lived experiences of survivors. He takes care to ensure that he does not simply recount the details of survivors' stories but includes an appropriate amount of detail so as to educate the reader as to the harm suffered at the hands of their abusers. He also repeatedly names those perpetrators in the chapters, including Larry Nassar, Jerry Sandusky, and several Catholic priests – names recognizable to anyone who has read the news surrounding these types of scandals over the years. The discussion of the underlying offenses committed by the primary perpetrator in these cases serves as a necessary backdrop for the argument that the enabler should face criminal consequences, as it is the enabler who causes this additional trauma for survivors through inaction, abdication of responsibility, and breaking of trust – the actual sexual abuse

*ANNA ROSSI has two decades of experience working in and toward a criminal legal system that is fair and just for all.*



APP.151
USB001706

often being the less traumatizing event for the survivors. Prof. Guiora explains that many survivors make it through the initial abuse only to be forced through a second wave of suffering at the hands of the enabler when the people to whom they report – their coaches, athletic trainers, athletic directors, university counselors, Title IX offices, or clergy – dismiss their complaints in an effort to protect the institution. This dismissal leaves the survivor feeling abandoned and victimized a second (and potentially third, fourth, fifth…) time by the people charged with protecting them. Prof. Guiora asserts that lack of protection is a second justification for criminalization of enablers – a failure of a duty to protect those for whom they are responsible. Prof. Guiora argues that the only way to deter future enablers from the ignorance of duty and abandonment of survivors is to criminalize this deliberate indifference.

Whether or not one agrees with the idea that enablers should face criminal prosecution, the "how" of that process is less clear in Prof. Guiora's book. He identifies the existing mechanisms that may be used to hold enablers liable, such as bystander laws that have been enacted in several states, mandatory reporting laws that exist in others (including Utah), Title IX processes and procedures, and other civil remedies, but asserts that none of those do quite enough to effectively address and deter the behavior of an enabler. There is no real discussion of the obvious slippery slope that criminalization of enabling behavior would create, given the layers of bureaucracy and the potentially dozens of individuals with varying levels of knowledge of assault reports within large institutions, not to mention those outside of those institutions who may have knowledge and do nothing. One issue here is what constitutes "knowledge" for purposes of culpability. What is required of the coach who hears whispers in the locker room but does nothing to investigate them? Does "knowledge" mean "actual knowledge" of wrongdoing or would it require reporting of unverified information? Depending on the level of culpability for individuals with varying levels of knowledge, there is a potential that reports will be made out of an abundance of caution where no abuse has occurred or been actually alleged, leading to the possibility of unnecessary investigations that could cause severe damage to the individuals

targeted and others involved. Additionally, there is a very real possibility that the prosecution of individuals within an institution, especially a large one like a public university, could involve dozens of indictments, something that most prosecutorial agencies do not have the resources to address.

Prof. Guiora also acknowledges in his book that there is room for a discussion surrounding the effects that social structures and conditioning have on the lack of reporting, such as children being taught to respect authority and feeling like they have no voice to report sexual abuse. He does not, however, delve into those societal failures or how macro changes might be made that could render punishment of the enabler unnecessary. To be fair, this isn't the point of the book, but the disempowerment of females and youth is a very real issue in our society, and one that deserves attention in relation to this particular subject. It warrants discussion of the concept that raising children – boys and girls alike – in a society that holds open and honest conversations about bodies, sex, and power, as well as encourages open dialogue around sexual assault rather than shaming victims into silence, could potentially prevent these institutional situations from occurring in the first place. As criminal justice reform discussions shift the narrative away from calls for more incarceration of more individuals for more crimes and toward root causes and prevention, those topics cannot be ignored in this discussion.

> *Armies of Enablers:*
> *Survivor Stories of Complicity and*
> *Betrayal in Sexual Assaults*
> **by Amos Guiora**
> **Publisher: American Bar Association**
> **(2020)**
> **Pages: 258**
> **Available in paperback**

Prof. Guiora's support for the criminalization of enabling sexual offenses within institutions is passionate and clearly comes from a valid concern for the well-being of survivors of sexual assault and sexual harassment. *Armies of Enablers* is incredibly helpful in understanding the arguments made in support of legislation criminalizing the behavior of enablers but does not delve deeply enough into the procedural issues and practical shortcomings surrounding the proposed law, nor does it provide information for readers who seek societal and community solutions that would steer away from further incarceration as the solution to societal ills. Though a thorough conversation on both sides of the issue is needed, Prof. Guiora does an excellent job of introducing and inviting his readers to the discussion.

APP.152
USB001707

## Views from the Bench

# *Civility in a Time of Incivility*

*by Judge J. Frederic Voros, Jr.*

***EDITOR'S NOTE:*** *The following remarks were given by Judge Voros at a CLE sponsored by the J. Reuben Clark Law Society in the Joseph Smith Memorial Building, Salt Lake City, on June 15, 2016. We republish them here with the author's permission. To avoid disrupting the flow of Judge Voros's remarks, while providing our readers with citations to the many resources on which Judge Voros draws, we suspend our usual limitation on endnotes.*

I appreciate the opportunity to speak at this CLE sponsored by the J. Reuben Clark Law Society. I graduated from the J. Reuben Clark Law School and am in fact the first – but not the only one – of its graduates to serve on a Utah appellate court. I also taught at the S.J. Quinney College of Law for 10 years. So today I'm wearing my "game-day tie" – blue and red stripes – proclaiming my dual allegiance to our two great law schools.

My topic today is Civility in a Time of Incivility. I understand that you are here in large part to earn ethics CLE hours, even though earning those hours requires you to listen to a judge talk about civility. I hope to persuade you today that civility is not as dull a topic as you might think – and also that eschewing incivility is in everyone's best interest.

The Utah Supreme Court has added compliance with the Utah Standards of Professionalism and Civility to the Attorney's Oath. So you younger lawyers have taken an oath to act civilly. Our supreme court has also incorporated the Standards of Professionalism and Civility into the Utah Rules of Professional Conduct. So now an "egregious violation or a pattern of repeated violations of the Standards of Professionalism and Civility" may support a finding that a lawyer has committed misconduct.[1] In addition, the Judicial Council has adopted Utah Standards of Judicial Professionalism and Civility.[2] We judges should be setting a good example. More on that in a moment.

Today I would like to focus on one rule of attorney civility in particular, Rule 3:

Lawyers shall not, without an adequate factual basis, attribute to other counsel or the court improper motives, purpose, or conduct. Lawyers should avoid hostile, demeaning, or humiliating words in written and oral communications with adversaries. Neither written submissions nor oral presentations should disparage the integrity, intelligence, morals, ethics, or personal behavior of an adversary unless such matters are directly relevant under controlling substantive law.

The rule is not difficult to understand: give others the benefit of the doubt; no name-calling; don't make it personal. Treat others as you want to be treated.

But you would be wrong to think these simple rules of good conduct command universal support in America today. When I googled "Is civility," Google suggested the following searches: "Is civility dead," "Is civility dead today show," and "Is civility dead in America." Apparently Google users are wondering if civility is dead in America. And who would blame them?

What a presidential season it has been! Mocking an opponent's physical characteristics; accusations of pants-wetting; name-calling such as "little baby," "spoiled brat without a properly functioning brain," "a person with no natural talent," and "delusional narcissist." As you know, I'm not making this stuff up.

To be fair, though, politics in America has long been a contact sport. President Lincoln was castigated by the press and his political opponents as a "monster," a "perjurer," an "ignoramus," a "buffoon,"

*JUDGE J. FREDERIC VOROS, JR. has served on the Utah Court of Appeals since 2009. He will retire from the court on August 1. He is the co-recipient of this year's Judge of the Year award.*



**APP.153**

**USB002483**

a "butcher," and a "devil." He was accused of behaving "like a thief in the night," of being a "miserable tool of traitors and rebels," and of being "adrift on a current of racial fanaticism."[3] Lin-Manual Miranda, creator of the Broadway hit *Hamilton*, reminds us that in the election of 1800, Jefferson called Adams "a blind, bald, crippled, toothless man who is a hideous hermaphroditic character with neither the force and fitness of a man, nor the gentleness and sensibility of a woman."[4] Adams responded that Jefferson was "a mean-spirited, low-lived fellow, the son of a half-breed Indian squaw, sired by a Virginia mulatto father."[5] And an atheist.[6] And dead, so don't waste your vote on him.[7]

I wish this phenomenon were limited to politicians, and usually it is, but some judges have also acted in a way we would have to call uncivil. To be honest, I think it started at the top. Consider these gems from the late Justice Antonin Scalia, a brilliant jurist, but one often criticized as an example of incivility:

> The [majority] opinion is couched in a style that is as pretentious as its content is egotistic....

> If, even as the price to be paid for a fifth vote, I ever

joined an opinion for the Court that began: "The Constitution promises liberty to all within its reach, a liberty that includes certain specific rights that allow persons, within a lawful realm, to define and express their identity," I would hide my head in a bag.[8]

In another opinion he wrote, "Even accepting Justice Breyer's rewriting of the Eighth Amendment, his argument is full of internal contradictions and (it must be said) gobbledy-gook."[9] He concluded by stating, "Justice Breyer does not just reject the death penalty, he rejects the Enlightenment."[10]

How did Justice Scalia do under Rule 3? "Hostile, demeaning, humiliating"? I think so. Disparaging the intelligence of another? Again, I think so. I leave you to decide whether the pejorative "gobbledy-gook" in fact "must be said" in a judicial opinion. So even if you look to Justice Scalia as a model in other ways, please do not imitate his tone of incivility.

But others have. Consider this in-court exchange between Chief Judge Edith Jones and Judge James L. Dennis of the United States Court of Appeals for the Fifth Circuit:



#EIDELIKE
I'D LIKE AN INNOVATIVE APPROACH TO EDISCOVERY MANAGEMENT

Revolutionize your eDiscovery Management process with a firm that offers true computer forensic investigative skills backed by a cost-effective data processing protocol.

**801.456.5957** | forensics.eidebailly.com



EideBailly
CPAs & BUSINESS ADVISORS

Years
EST. 1917

APP.154
USB002484

JUDGE JONES: [slams her hand down on the table] Would you like to leave?

JUDGE DENNIS: Pardon? What did you say?

JUDGE JONES: I want you to shut up long enough for me to suggest that perhaps…you should give some other judge a chance to ask a question.[11]

Hostile? Yes. Demeaning? Yes. Attributing improper conduct? Yes. Where do you suppose Judge Jones got the idea that she could talk to a colleague, a fellow judge, that way right there in the courtroom?

But even Justice Scalia and Judge Jones must, if the reports are true, take a back seat to Justice David Prosser of the Wisconsin Supreme Court. In a closed-door debate he called former Wisconsin Chief Justice Shirley Abrahamson a "bitch" and threatened to "destroy" her.[12] He later described his tirade as "entirely warranted" on the ground that she had goaded him into it.[13]

That's bad, but things got worse. In a separate incident, Wisconsin Supreme Court Justice Ann Walsh Bradley told the *Milwaukee Journal Sentinel*, "I was demanding that he [Justice Prosser] get out of my office and he put his hands around my neck in anger in a chokehold"; another source – I'm not sure who, but this incident happened in the presence of four other supreme court justices – said, "She charged him with fists raised," and he "put his hands in a defensive posture" and "blocked her."[14] In doing so, the source said, he made contact with Justice Bradley's neck. The source almost literally said that she hit him in the fist with her face.[15]

Let's take a brief time-out, step back, and think how grateful we are to practice law in Utah, where nothing remotely like this happens. (There is a structural reason for that – aside from the fact that we in Utah generally prize civility – but that is a topic for another day.)

Anyway, we see a lot of incivility today from politicians and even judges. The former, at least, is not new. But what strikes me as perhaps somewhat new is the current challenge to the notion of civility itself.

That civility is a positive civic virtue seems self-evident. But it is not. Some see it as another word for "political correctness," and see political correctness as repressive self-censorship. Bruce Thornton, a scholar at the Hoover Institution, recently authored an essay entitled "Three Cheers for Political Incivility,"

in which he contended that incivility is neither new nor unwelcome. He argued that "trying to moderate or police, based on some subjective notions of 'civility' or decorum, the clashing expressions of passionate beliefs often is an attempt to limit the freedom to express those beliefs, and a way to benefit one faction at the expense of others."[16] Historian and author Craig Shirley recently published an essay entitled "In Defense of Incivility," in which he wrote, "The elites always talk about civility in politics. That is a way to control the citizenry, by shaming them into silence."[17] And a student at the University California at Irvine – not Berkeley, mind you, but *Irvine* – recently argued that civility "as an ideology is a pillar of white supremacist imperialism."[18] And of course the deadly terrorist attack on the satirical magazine *Charlie Hebdo* in France ignited a debate here at home about the positive role in our public discourse for offensive – thus arguably uncivil – satire.

Furthermore, online publications – *Reuters*, *Popular Science*, and the *Chicago Sun-Times* to name a few – are increasingly phasing out comments sections because, in the words of one commentator, "when Internet users are allowed to post their thoughts anonymously, online discussions inevitably deteriorate into uncivil flame wars."[19] Maybe you are familiar with "Godwin's Law": "As an online discussion grows longer, the probability of a comparison involving Hitler approaches 1."[20] More on that later.

I understand that the powerless, those without a platform, sometimes have to scream to be noticed – Dr. Martin Luther King said that "a riot is the language of the unheard."[21] Incivility is, in a sense, a cousin of civil disobedience, which has a long moral pedigree. Democracy is messy and impolite,[22] and "mockery is a leveller."[23] Maybe sometimes mockery or another form of incivility – however impolite – is your only weapon, your only voice.

But that's not true for us lawyers and judges. We are not powerless. We have voices. We need not and should not resort to incivility. And I would like to suggest three reasons why not.

First, incivility is bad for the administration of justice. Hammurabi said he enacted his code "so that the strong should not harm the weak."[24] An important purpose of law, perhaps its fundamental purpose, is to protect the weak from the strong; in a lawless environment, the strong have their way. They take what they want; only those even stronger can stop them. But in our system, the law limits the dominance of the powerful.

I understand that we live in a world of relative haves and have-nots, of rich and poor – a state of affairs, by the way, that the man whose name adorns this building described as "sin."[25] But sinful,

virtuous, or morally neutral, in this world of relative haves and have-nots, the former can afford more justice than the latter. If you want equal justice for all, that's a flaw in our system, not a feature – a necessary one, perhaps, but a flaw nonetheless.

Anyway, we aspire to a system in which legal outcomes flow from the impartial application of neutral rules, not from the threats of bullies. And make no mistake, the conduct condemned by Rule 3 – hostile, demeaning, and humiliating words and personal attacks – is not just uncivil, but bullying and abusive. And to seek a result in our system of justice by bullying is to repudiate the rule of law. It relies on might, not right.

Your presence at a presentation on civility suggests that you are probably more often on the receiving end, rather than dispensing end, of abusive language. What is your appropriate response? I can tell you what Justice Kennedy and Justice Breyer did when Justice Scalia mocked their writing and reasoning. They ignored it. And that is the approach I have usually taken. I was a young lawyer filing an unlawful detainer action against a business tenant when my opposing counsel screamed at me, "If you go through with this, I will have your freaking bar license!" (Only he didn't say freaking). I ignored his tantrum and proceeded with the eviction. (And, as it turned out, as little as I knew, I knew more about unlawful detainer than he did. His bluff, like so many bluffs, was borne of ignorance and insecurity.)

But in retrospect, I believe – or at least think I believe – that the better response would be to step out of the frame of the conversation and have a meta-conversation: "Whoa, there's no need to shout or get abusive. Can we discuss this civilly, or are we done here?" In fact, I offer this to you as a ready-made response for use in these situations: "Counsel, can we discuss this civilly?"

Second, you should avoid incivility because it is bad advocacy. Remember Godwin's Law? "As an online discussion grows longer, the probability of a comparison involving Nazism or Hitler approaches 1."[26] It comes with a corollary: "Once such a comparison is made, the thread is finished, and whoever mentioned the Nazis has automatically lost whatever debate was in progress." In other words, by playing the Hitler card you admit you have no better card.

Two years ago my court addressed the risk of abusive litigation tactics. An attorney had described a judge's minute entry as "a complete fabrication" and, without factual basis, accused opposing counsel and the judge of collaboration. In the end these tactics hurt, not helped, the lawyer's case. Our opinion stated:

Assigning Machiavellian motives to errors of judges and lawyers is improper and usually inaccurate. And aside from implicating the Rules of Professional Conduct and the Standards of Professionalism and Civility, inflammatory language and personal accusations undermine the position they ostensibly support. Knowledgeable readers understand that those with persuasive arguments based on law and logic rarely resort to ad hominem attacks.[27]

Abusive language in a brief betrays weakness.

Another reason incivility is bad advocacy is that it causes the judge to identify with the lawyer you attack. When one person attacks another, we humans tend to sympathize with the victim. So if you accuse your opposing counsel of "cheating on the facts" or "mischaracterizing the record," the reader – the judge – may instinctively feel you must be exaggerating or perhaps even feel that you are a bad person for having accused another lawyer so brazenly. So as much as you want to vent, as much as you want to express your outrage, my advice is: don't.

Instead, I offer this practice pointer. Instead of venting, instead of expressing your outrage, just give the judge the facts and let the judge experience the outrage first-hand. For example, suppose you are briefing a negligence case in which liability depends on whether the traffic light was red or green just before the collision. And suppose that the testimony is conflicting on what color the light was. You're on appeal or briefing a JNOV motion, and your opponent writes that witness X testified that the light was green. But she didn't! You know she didn't! And you know your opponent knows she didn't! How could they say that? In a just world, they should pay a price for mischaracterizing the record! I agree; they should pay a price. So what's your play?

You could play it like a 2016 presidential candidate and call your opponent "lyin' Fred." You could play it like Justice Scalia and say that even with opposing counsel's rewriting of the record, their argument is full of (it must be said) gobbledy-gook, and you'd sooner put a bag over your head than make that argument. Or you could play it like Justice Prosser is alleged to have done, and grab your opponent's neck. But let me propose a response that is not only more civil, but, I believe, better advocacy. And – bonus – one that lets you be a better person and a better lawyer at the same time.

I suggest that you don't call your opponent anything. Make this about their argument – their words – not their character. You cannot judge another's character; but you can test the accuracy

APP.156
USB002486

Views from the Bench

of their words. So don't say your opposing counsel misrepresented the record, twisted the witness's words, or anything like that. Don't frame yourself as the victim. Instead say, "[the opposing party] states that Witness X testified, quote, the light was green [cite to opposing brief]. In fact, the witness testified, quote, the light was red [cite to record]." Done. No outrage, at least on your part. But the judge will feel it, because now you have framed the judge as the victim of the mischaracterization. You are just pointing it out. You won that exchange.

A third and final reason to avoid incivility is that uncivil attacks are often factually wrong. I understand that lawyers and clients lie. Still, in this particular case, are you sure your opposing counsel, or their client, lied, rather than misremembered? Hanlon's Razor often applies: Never attribute to malice what is adequately explained by stupidity. It, too, comes with a corollary: Don't rule out malice. But I don't think I'm being naïve in believing that we as lawyers and judges err more than we cheat. Your opponent may be deliberately lying, but then again, they may be careless, sloppy, or overworked. So while I believe we need to face down bullies and refute false statements by showing them to be false, our rules of civility remind us, and I think it's sensible advice, to be cautious about casting aspersions. Let's start, at least, by judging others as we would want to be judged.

In sum, I hope I have convinced you that civility is less boring than you thought. Incivility is practiced even by public figures who should know better, and more people than you might think applaud that trend. But those of us in the law should not follow their lead. To quote my favorite songwriter, "You and I, we've been through that, and this is not our fate."[28]

We should reject incivility as bad policy, bad advocacy, and – usually – factually wrong. Besides, incivility is hardly risk-free: if we try to be good lawyers without also being good people, we run the risk of being neither. Thank you.

1.  Utah R. Prof. Conduct 8.4, comment 3a.

2.  Utah Rules of Jud. Admin. 11-301.

3.  Geoffrey R. Stone, *Obama Faces Vile insults Like No Other President Has*, CHICAGO TRIBUNE (Dec. 11, 2014), http://www.chicagotribune.com/news/opinion/commentary/ct-obama-lincoln-bin-laden-muslim-perspec-1212-jm-20141211-story.html [https://perma.cc/H2TE-Y75M].

4.  Mark Binelli, *'Hamilton' Creator Lin-Manuel Miranda: The Rolling Stone Interview*, ROLLING STONE (Jun. 1, 2016), http://www.rollingstone.com/music/features/hamilton-creator-lin-manuel-miranda-the-rolling-stone-interview-20160601?page=4 [https://perma.cc/TXZ5-HV4A]; Chris Altman, *Smear Tactics: The Dirties Tricks in American Politics* (Apr. 27, 2015), http://all-that-is-interesting.com/dirtiest-us-presidential-campaign-tactics [https://perma.cc/SAB3-YSVF].

5.  Altman, *supra* note 4.

6.  Kerwin Swint, *Founding Fathers' Dirty Campaign*, CNN (Aug. 22, 2008), http://www.cnn.com/2008/LIVING/wayoflife/08/22/mf.campaign.slurs.slogans/ [https://perma.cc/5W5A-LKE3].

7.  Binelli, *supra* note 4.

8.  *Obergefell v. Hodges*, 135 S. Ct. 2584, 2630 & n.22 (2015) (Scalia, J., dissenting).

9.  *Glossip v. Gross*, 135 S. Ct. 2726, 2747 (2015) (Scalia, J., concurring).

10. *Id.* at 2751.

11. *In re Charges of Judicial Misconduct*, 769 F.3d 762, 768 (D.C. Cir. 2014).

12. Jessie Opoien, *Wisconsin Supreme Court Justice David Prosser to Retire, Replacement Will Serve Until 2020*, CAPITAL TIMES (Apr. 27, 2016), http://host.madison.com/ct/news/local/govt-and-politics/election-matters/wisconsin-supreme-court-justice-david-prosser-io-retire-replacement-will/article_fbd6c7ea-a7e7-535f-8954-2d17c94836af.html [https://perma.cc/8U89-96Z5].

13. *Id.*; Patrick Marley, *Supreme Court Tensions Boil Over*, MILWAUKEE JOURNAL SENTINEL (Mar. 19, 2011), http://archive.jsonline.com/news/statepolitics/118310479.html [https://perma.cc/J5RD-2LC7].

14. Crocker Stephenson et al., *Justices' Feud Gets Physical*, MILWAUKEE JOURNAL SENTINEL (Jun. 25, 2011), http://www.jsonline.com/news/statepolitics/124546064.html [https://perma.cc/H8DM-J9M3].

15. *Id.*

16. Bruce Thornton, *Three Cheers for Political Incivility*, HOOVER INSTITUTION (Sept. 22, 2015), http://www.hoover.org/research/three-cheers-political-incivility [https://perma.cc/X4VZ-KCV9].

17. Craig Shirley, *In Defense of Incivility*, POLIZETTE (Jul. 30, 2015), http://www.lifezette.com/polizette/in-defense-of-incivility/ [https://perma.cc/K8MR-LUXC].

18. *Suggestions of Civility Promote Campus Censorship*, NEW UNIVERSITY (May 24, 2016), http://www.newuniversity.org/2016/05/opinion/suggestions-of-civility-promote-campus-censorship/ [https://perma.cc/2J9V-NQKW].

19. Kevin Wallsten & Melinda Tarsi, *It's Time to End Anonymous Comments Sections*, WASHINGTON POST (Aug. 19, 2014), https://www.washingtonpost.com/news/monkey-cage/wp/2014/08/19/its-time-to-end-anonymous-comments-sections/ [https://perma.cc/6G93-5KL9].

20. *Godwin's law*, Wikipedia, https://en.wikipedia.org/wiki/Godwin%27s_law [https://perma.cc/2TTC-H5X5] (last visited Mar. 29, 2017).

21. Dr. Martin Luther King, Jr., *The Other America* (Mar. 14, 1968), *available at* http://www.gphistorical.org/mlk/mlkspeech/. [https://perma.cc/K256-DUWH].

22. Roy Peter Clark, The Frames of Incivility, Poynter (May 17, 2007), http://www.poynter.org/2007/the-frames-of-incivility/82374/ [https://perma.cc/X48R-L6MJ].

23. Tony Curzon Price, *Six (Possibly) Civilising Uses of Incivility*, openDemocracy (Jan. 10, 2015), https://www.opendemocracy.net/tony-curzon-price/six-possibly-civilising-uses-of-incivility [https://perma.cc/LMQ7-YMJN].

24. *The Code of Hammurabi*, CONSTITUTION SOCIETY, http://www.constitution.org/ime/hammurabi.htm [https://perma.cc/5XXE-LBA9] (last visited Mar. 29, 2017).

25. *The Doctrine and Covenants of The Church of Jesus Christ of Latter-day Saints* 49:20 ("But it is not given that one man should possess that which is above another, wherefore the world lieth in sin.")

26. *Godwin's law*, Wikipedia, https://en.wikipedia.org/wiki/Godwin%27s_law [https://perma.cc/2TTC-H5X5] (last visited Mar. 29, 2017).

27. *In re C.M.*, 2014 UT App 234, ¶ 8, 336 P.3d 1069.

28. *All Along the Watchtower*, Bob Dylan (Dwarf Music 1996) (1968) *available at* https://www.bobdylan.com/songs/all-along-watchtower/ [https://perma.cc/V6vX-KMSP].

APP.157

USB002487

# Article

# Cryptocurrency – Cryptoscam – Why Regulation, Deposit Insurance, and Stability Matter

by George Sutton

Cryptocurrency has stirred more than its fair share of controversy and confusion. It starts with calling it "crypto*currency*," which really means "crypto*money*." Both terms are misleading because it isn't money except as used by some criminals to conceal their identity and prevent tracking their money. Some advisors have stopped using the term "crypto" and "currency" and now call these things a "digital asset." But cryptomoney isn't an asset as that term is commonly understood. It is bits of otherwise worthless software called "tokens" that generate no income of their own and have no real purpose other than being traded by investors in the hope that they become a fad.

The lack of regulation allows promoters to attract investors with a lot of ridiculous hype and misinformation. Trading has thus far produced some big short-term profits for promoters and early investors, but it is usually followed by big losses that lately have increased into what is called "crypto winter." Some losses resulted from the failure of several poorly or dishonestly run exchanges and businesses that held the tokens or served the market in other ways. Selling these tokens is often called a Ponzi or pyramid scheme because new investors are the only source of new money to bid up prices and earn profits for the promoters. How this can be happening baffles most traditional investors.

## The Rhetoric

Many prominent financial experts haven't held back in their criticisms. Warren Buffett, Berkshire Hathaway chairman, recently called Bitcoin, the leading cryptomoney token, "rat poison squared."[1] Charlie Munger, Berkshire Hathaway's vice chairman, said Bitcoin is "stupid and evil" and has compared it to a venereal disease.[2] Bill Gates describes cryptomoney as "an asset class that's 100% based on some sort of Greater Fool Theory."[3] While testifying before Congress in September, Jamie Dimon, the CEO of JPMorgan Chase, called cryptomoney "decentralized Ponzi schemes, and the notion that it's good for anybody is unbelievable."[4] In July 2022, Paul Krugman, a *New York Times* columnist and Nobel Prize winning economist, said Bitcoin is "a postmodern pyramid scheme" and "[t]he [crypto investment] industry lure[s] investors in with a combination of technobabble and libertarian derp."[5]

On June 3, 2022, the Federal Trade Commission reported a crime wave infesting cryptomoney markets, stating:

> Since the start of 2021, more than 46,000 people have reported losing over $1 billion in crypto to scams – that's about one out of every four dollars reported lost, more than any other payment method .... $575 million of all crypto fraud losses reported to the FTC were about bogus investment opportunities, far more than any other fraud type.[6]

Additional fraud losses have been reported in several crypto companies with recent reports finding total worldwide crypto fraud losses during the first half of 2022 are nearly $1.9 billion.[7] Krugman points out that the fraud losses only cover criminal acts and don't include the many investments in worthless tokens and companies.[8] An example is the crypto "bank," Celsius Networks, which recently filed for bankruptcy owing 1.7 million customers $4.7 billion.[9] In August, the Treasury Department sanctioned Tornado Cash – a system that conceals the identity of parties in cryptomoney transactions – for laundering $7 billion, including money stolen by North Korean hackers to help fund North Korea's nuclear program.[10]

*GEORGE SUTTON recently retired after a forty-five year career that included being Utah Commissioner of Financial Institutions and a shareholder at Jones Waldo.*



**APP.158**

Articles

Cryptocurrency — Cryptoscam

Promoters insist tokens are not securities, but Gary Gensler, the chairman of the U.S. Securities and Exchange Commission (SEC), stated:

> most crypto tokens involve a group of entrepreneurs raising money from the public in anticipation of profits – the hallmark of an investment contract or a security under our jurisdiction. Some, probably only a few, are like digital gold; they may not be securities. Even fewer, if any, are actually operating like money.[11]

If a court ever agreed that tokens are securities, the current markets could be largely wiped out overnight for failing to register and provide required disclosures.

The U.S. Labor Department, which oversees management of retirement accounts, said it has "grave concerns" about investing retirement funds in anything crypto and warned administrators about the risk of breach of fiduciary duty if they do.[12]

A surprisingly large number of investors disagree or ignore these warnings.

Libertarian ideologues and anarchists are among cryptomoney's biggest promoters. They say it is created only by those who use it, and only they control it, which to them is freedom. Peter Thiel, PayPal co-founder, billionaire fintech investor, and self-described libertarian, has promoted cryptomoney since the 1990s. Thiel predicts cryptomoney will inevitably replace government issued money, which is commonly referred to as "fiat" money. Thiel also describes Bitcoin as "like bars of gold in a vault that never move, and it's a sort of hedge … against the whole world … falling apart."[13] Thiel sees Bitcoin's rise in value as an indication that the central banks such as the Federal Reserve are bankrupt, and "we're at the end of the fiat money regime."[14] Thiel has stated that cryptomoney will become "something where you have a choice between different currencies, and the choice is not left to the sovereign but to the individual, and in a sense, the individual becomes sovereign and is able to make choices regarding which currency they want to take."[15]



noteworthy
performance

BRIGHT IDEAS, QUICK THINKING AND CREATIVITY ARE SOME OF OUR BEST PRACTICES. ALL DELIVERED BY TALENTED TEAM PLAYERS WITH YEARS OF EXPERIENCE DELIVERING NOTEWORTHY RESULTS.

DORSEY™
always ahead

dorsey.com

Articles

Cryptocurrency — Cryptocism

Nick Black, an alternative asset specialist blogging at Money Morning, is another cryptomoney evangelist who is part of the movement to privatize all finance. Black responded to critics like Krugman by saying they don't understand that:

> a good chunk of the population is *completely* mistrustful of the system of fat cats and plutocrats who, since forever, have been telling us where, how, and in what form we get to hold value . . . . I certainly don't trust unelected government "economists" to manage the value of the "currency units" in *my* bank account . . . . The big, central proposition – the bet – with Bitcoin and cryptocurrency as a whole is [that] the algorithmic integrity it provides us with is worth more than the lack of integrity of government policymakers. That's a bet I'll take all day, every day.[16]

These libertarian fiscal ideologues are a fringe group. If it was just them, crypto tokens would barely exist. The broader crypto market, which is surprisingly large, mostly consists of investors hoping to profit as the price of tokens are bid up by new investors. Many hear the hype that Bitcoin and other coins are the money of the future, and some may believe it, but most don't much care. They invest for fun and profit and the geeks among them get to do lots of computer stuff like mining for Bitcoins. A virtual world, metaverse, video game vibe is unmistakable in this part of the market.

## The Reality – Cryptomoney is Not Money

Bitcoin was first introduced in 2009, but it has not even started to catch on as money anywhere except in ransomware extortion. There is a growing realization it is all hype and no currency. Black acknowledged:

> Bitcoin isn't the money of the future because Bitcoin isn't money . . . . If you look at the structure of Bitcoin, it becomes pretty clear that it's just not cut out to be a currency. "*But Nick*," I hear you say, "*it's a currency, and it says that right on the box: cryptocurrency*." True enough, but on the street, the word doesn't quite match the reality.[17]

Instead, Black describes it as "the most successful asset of all time in terms of appreciation." That may or may not be true, but Bitcoin could also be described as one of the riskiest investments. Just ask anyone who bought Bitcoin in November 2021 and watched the price drop by 70% over the next eight months. Bank of America recently found that the drop in Bitcoin's market value is the fifth largest in history.[18]

Black is correct that the difference between money and an investment is the key to understanding cryptomoney. Sound money requires stable values while speculative investments need prices to fluctuate, and prices of cryptomoney tokens fluctuate more than just about all other traded assets. Dramatic price increases have been the key to cryptomoney's current success. If they became mainstream money, this volatility would wreck the economy.

Real money in a modern economy is a transferable store of value and a standard to measure the value of other things, supported by a broad social contract and government backing. It is also the foundation of a national economy that has developed beyond bartering. The only social contract involving cryptomoney is among the traders and investors who want prices to fluctuate, and criminals who only want to conceal their identity and prevent law enforcement from tracing their money. That is why neither Bitcoin nor any other kind of private money have developed into real money, and for the reasons described below, it never will, at least on a scale envisioned by some promoters such as Facebook's abandoned cryptocurrency project called Libra.

The only potential legitimate use of cryptomoney as money may be as part of new payment systems using blockchain technology. Some developers are exploring payment systems that would use

## Criminal Forensic Evaluations



**JONATHAN BONE, PsyD**
**Salt City Psychology**

With his advanced, specialized training in Forensic Psychology, Dr. Bone is uniquely qualified to assist with your criminal cases. His services include:

- consultations
- communication with difficult clients
- prepping clients for trial
- mental health defense strategies
- prosecutorial assistance
- evaluations and more



**801.758.7370  |  www.saltcitypsychology.com**

a form of cryptomoney in a limited way, such as sending money internationally more efficiently and cheaply than current systems. These systems are in an early stage of development and nothing noteworthy has emerged thus far, at least in financial services. For now, most banks avoid dealing in cryptomoney because that market is infested with fraud and crime and promoting tokens likely qualifies as illegal Ponzi schemes.

Token sellers are essentially saying, "I am offering this cool thing that has no value, what will you pay for it?" – hence Gates' reference to the greater fool theory. It turns out there are a lot of greater fools. According to the Pew Research Center, forty million Americans – 16% of American adults and 43% of men aged eighteen to twenty-nine – have invested in crypto tokens.[19] At its height, investments in tokens rose in value to $3 trillion, but have recently declined to less than $1 trillion. The Pew Research Center also notes that most of the investors in this market are younger people, mostly men. They are attracted to the fads, not metrics. Some also enjoy playing with the technology, which is fairly sophisticated.

For many investors the big draw isn't just profits, it is fun. The array of tokens has grown exponentially. Hundreds of different kinds of cryptomoney now trade along with new kinds of tokens that do not claim to be money but are just clever absurdities like the Bored Ape Yacht Club and other "non fungible tokens" that may contain something such as a work of art that only exists in a virtual world.

A good example of how frivolous this market can become is Dogecoin, which started as a joke to spoof token trading but to the surprise of the creators inspired a whole internet community trading "meme" coins. Doge is a meme featuring the Shiba Inu dog. In 2021, the value of Dogecoins reached a market cap over $85 billion.

A lot of grifters and scammers are drawn to crypto tokens because they are unregulated and it is easier to manipulate prices when tokens have no other value that can affect pricing. Many have set up shop as specialized crypto investment banks, trading platforms, venture capital funds, and uninsured depository banks. It is easier to attract new investors when the hucksters are free to spread hype rather than provide full and honest disclosures about the nature and risks of a token. Thus far, they have gotten away with ridiculous claims that cryptomoney will create a financial revolution and replace the dollar, and it works better and is safer than dollars. Many

promoters acknowledge that full disclosure of the nature and risks of investing in a token would kill their business. It is a tacit admission of how much they depend on the hype and lies. Therein lies a huge legal risk few investors realize is growing.

Insisting that tokens are not securities is mostly intended to avoid registration, disclosure requirements, and potential liability under securities laws, but that doesn't insulate a seller from liability for common fraud if they misrepresent what they are selling. And there is a growing trend to classify at least some tokens as securities. The SEC recently classified some individual tokens as securities when the promoters committed to directly support the tokens' value in promotional materials. Gary Gensler, the chairman of the SEC, has now gone further and said the "vast majority" of the nearly 10,000 crypto tokens currently traded qualify as securities because investors are "expecting profits derived from the efforts of others in a common enterprise."[20]

For now, tokens exist in a gray area in terms of what they are and what regulatory requirements apply. Until this muddle is resolved by the courts or new laws, the legal risk for investors is huge. If a court rules that certain tokens are unregistered securities, trading of those securities would stop immediately and without trading a token becomes worthless.

Another legal issue is that cryptomoney tokens are arguably illegal Ponzi or pyramid schemes. In Utah, the most commonly cited definition of a Ponzi scheme is "an investment scheme in



## ANNE CAMERON MEDIATION
ATTORNEY | MEDIATOR | COLLABORATIVE PROFESSIONAL

VIRTUAL AND IN PERSON
MEETINGS AND MEDIATIONS

PARK CITY, SALT LAKE CITY
AND ZOOM LOCATIONS

FOCUSING ON FAMILY LAW

DOCUMENT DRAFTING FOR
PRO SE DIVORCE, CUSTODY,
AND FAMILY LAW

1526 UTE BLVD., SUITE 206, PARK CITY, UT 84098
5200 S. HIGHLAND DR. STE. 303, SLC, UT 84117

435-640-2158 | 435-659-8732

ANNE@AACLAWUTAH.COM
WWW.AACLAWUTAH.ORG
WWW.UTAHCOLLABDIVORCE.COM

which returns to investors are not financed through the success of the underlying business venture, but are taken from principal sums of newly attracted investments." *In re Independent Clearing House Co.*, 41 B.R. 985 (Bankr. D. Utah 1984), *rev'd in part*, 60 B.R. 985 (Bankr. D. Utah 1986). Tokens fit neatly in this definition. One difference is that most Ponzi schemes also misrepresent that they hold assets when they are shells. Token investors actually buy tokens. The fraud is misrepresenting that they are money.

A pyramid scheme is prohibited in Utah Code Sections 13-11-4(2)(a) and (n) and sections 76-6a-3 and -4. The definition of a "pyramid scheme" in Utah Code Section 76-6a-2(4) is:

> any sales device or plan under which a person gives consideration to another person in exchange for compensation or the right to receive compensation which is derived primarily from the introduction of other persons into the sales device or plan rather than from the sale of goods, services, or other property.

This section was obviously designed to cover multi-level marketing schemes, but it could apply to cryptomoney promotions if a court found the tokens did not qualify as "goods … or other property" because they are intrinsically worthless, a fraud in themselves.

The problem in a Ponzi or pyramid scheme is that you may win if you invest early enough, but if you don't you are sure to lose. Relying on new investors for all new money means the crypto market is a closed system in which all profits depend on equivalent losses by later investors. There are always losers, and they are usually misled about the real nature of the scheme.

In addition to trading losses and hacking thefts, a large number of non-trading losses have occurred when several organizations in the market failed, often after their principals looted them. Three Arrows Capital is a good example. It was a leveraged crypto hedge fund based in Singapore and incorporated in the British Virgin Islands that at one time managed $10 billion in assets but closed in July 2022 owing $3.5 billion to creditors. Like most grifters, the principals lived large then vanished leaving an unlocked office and the furniture. Another example is Celsius Networks. It filed bankruptcy in August 2022 after its CEO, an Israeli citizen, withdrew millions for himself.

In November, the third largest crypto exchange, FTX, suspended withdrawals and filed Chapter 11 bankruptcy. The first CEO of FTX resigned after the bankruptcy filing and was replaced by a restructuring specialist that previously liquidated Enron. Shortly after taking over, the new CEO said, "Never in my career have I seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information as occurred here."[21] Reports say the collapse was caused in part by an illegal transfer of customer money to a related investment company that in turn made a $1 billion personal loan to the former CEO and large loans to other executives. After filing bankruptcy and resigning, the former CEO showed he remained an unrepentant libertarian by tweeting that he still opposed regulation because "regulators, they make everything worse."[22]

Customers and investors in those cases can only file claims with the bankruptcy court. Another unpleasant surprise for people who deposited tokens in Celsius is that they are general creditors and have no priority. It turns out investors have priority, which is the inverse of depositor priority when an FDIC-insured bank fails.

In addition to the courts, Congress and state legislatures are considering enacting new laws to address these problems, a process that has only just begun. Current discussions about possible new laws include regulating the reserves backing stablecoins after the backing for some coins were found to be nonexistent, inadequate, or useless. Other laws would expressly classify tokens as securities or at least require the same inclusive and accurate disclosures as a security. The United Kingdom just passed a law imposing regulation on crypto firms and requiring broad disclosures for tokens. China has banned crypto altogether.

Financial measures in the U.S. comes in many forms, each with its own laws, regulations, and regulators. Cryptomoney could fall into one of three major areas, commodities, securities, or the banking system. For now, the big issue is whether tokens are commodities or securities and whether gaps need to be filled. The biggest controversy beyond that has been efforts of some cryptomoney promoters to get into the banking system through laws in states like Wyoming and Utah.

Real money is regulated primarily through the banking system by a separate group of bank, credit union, and monetary regulators with the goal of ensuring trust and stability in the system, the dollar, and the economy. Unlike securities, disclosure is not a primary goal of these regulators. They rely on comprehensive oversight of banking and other key financial

Articles

Cryptomoney—Cryptoscam

systems by examiners and economists. Regulators require well developed and viable business plans with a strong emphasis on identifying and controlling risks. They also examine the banks to ensure their records are complete and accurate. Finally, regulators do not allow real banks to support Ponzi schemes, make false claims, or ignore risks. That kind of oversight is prudent whenever a company is entrusted with the care and safekeeping of other peoples' money under any scheme. Fraud and grift will almost always happen otherwise.

Currently, many of the companies in the crypto markets are not regulated unless their stock trades on U.S. exchanges, and then only their stock is regulated. Celsius Networks promoted itself as a cryptomoney bank, but no outside auditor or regulator reviewed what it told customers and the public, examined its books, evaluated its business plan and risk controls, or did anything else to verify its honesty and viability as a business. It is getting that kind of attention now that it filed bankruptcy and, like FTX, the emerging story shows the company failed owing billions of dollars to millions of customers due to pervasive

dishonesty and incompetence. Our regulatory system has not worked perfectly, but it usually works well enough for the real banks to prevent disasters like Celsius and FTX.

## Cryptomoney Cannot Develop into Real Money

Some cryptomoney advocates predict the current problems will subside as the tokens become more widely accepted as money, but that cannot happen for several reasons.

The only transactions that can happen in an economy with volatile money are current purchases of consumable goods like food and clothing. Savings don't work if the purchasing power of the money drops by huge amounts in a short period. Valuing assets is fundamental to risk analysis and financial planning and that is not possible if the measure of value changes constantly. Credit cannot be extended if the lender doesn't know the value of the money used to repay the loan or assets securing it.

The impact volatility would have on credit is especially important because credit drives the U.S. economy today. Make

# Welcome to the Team

Rocky Mountain Advisory, LLC would like to announce
the addition of three new professionals to our firm.



Gavin Harris CPA, CFE, MBA



Jennifer Yakumo CPA



Katelyn Swasey

Forensic Accounting & Investigation | Business Valuation | Dispute Analysis & Receivership
Bankruptcy & Restructuring | Business Workout & Turnaround | Economic Damage Analysis

## Rocky Mountain ADVISORY   R M A

801.428.1600  rockymountainadvisory.com

CERTIFIED PUBLIC ACCOUNTANTS
FORENSIC & FINANCIAL CONSULTANTS

credit impossible to reliably underwrite, and the U.S. economy would contract to a small fraction of its current size resulting in catastrophic economic harm.

The hype increases when promoters say Bitcoin is designed to avoid volatility by limiting its quantity. The limits don't work because the value of nothing is nothing, regardless of the quantity, and it has had no apparent effect on Bitcoin prices. It is nonsensical besides because Bitcoin tokens represent fractional interests in a coin and there is no limit on how much a single Bitcoin can be divided. The number of Bitcoin tokens is actually unlimited.

Stablecoins are supposed to address the volatility problem by backing them with collateral, but many of those have proven as unstable as other tokens. Some reserves turned out to be nonexistent or misrepresented. Some purported stablecoins utilize algorithms that have turned out to be ineffective. Recently a token named Luna was touted as one of the leading stablecoins and supposedly provided a floor value for another coin named TerraUSD. Luna collapsed in value along with the TerraUSD coin from $106 per token in March 2022 to about two cents in

May, setting off a chain reaction of failures among companies that held the LUNA and TerraUSD coins.

In addition to not being stable, stablecoins make no practical sense, especially if the collateral is dollars or government securities. Why layer a cryptomoney on those assets instead of just using the dollars? And why not own the collateral directly instead of trusting an unregulated company to hold it and give you a token in return? Promoters have tried to work around this by offering interest at rates like 18% and 20%, but that usually indicates a Ponzi scheme.

Another reason cryptomoney cannot work better than dollars and maintain comparable stability is the lack of security and a safety net such as deposit insurance. Cryptomoney will never be federally insured, and the paramount importance of safety and unrestricted access to deposits will never change. Everyone who understands the risks and worries about protecting their money will almost always deposit it in a federally insured bank or credit union or buy government securities.

The importance of deposit insurance for the stability of the economy and the protection of peoples' money cannot be overstated. Creating the Federal Deposit Insurance Corporation (FDIC) was needed to end a national economic paralysis during the worst part of the Great Depression. Bank runs sparked by a nationwide panic forced President Roosevelt to order all banks to temporarily close. This happened in his second day in office. Congress passed the Federal Deposit Insurance Act creating the FDIC as part of a broader banking bill a short time later. Insuring deposits stopped the runs and made it possible for payments to flow again. It marked the turning point to recovery. Since then, federal deposit insurance programs have paid billions to people who otherwise would have lost that money when their bank or credit union or savings and loan failed.

The importance of this insurance was demonstrated again in Utah in the late 1980s when I was the state's regulator of financial institutions. Up to that time, many Utah credit unions operated as a closed, state-regulated group with private deposit insurance. An increase in credit union failures depleted the insurer's reserves, and it became insolvent. The risk of that triggering a run on the credit unions it insured meant regulators had to prepare to freeze all the accounts depositors thought were insured but no longer were, which would have included one third of all the consumer checking accounts in the state. The accounts would have remained frozen until each credit union obtained federal insurance or was closed and liquidated.



# Auctioneers & Appraisers

Erkelens & Olson Auctioneers has been the standing court appointed auction company for over 35 years. Our attention to detail and quality is unparalled. We respond to all situations in a timely and efficient manner, preserving assets for creditors and trustees.

**Utah's Leading Auction & Appraisal Service**

## Erkelens & Olson
Auctioneers & Appraisers

45th YEAR

*3 Generations Strong!*

**Rob, Robert & David Olson**
**Auctioneers, CAGA Appraisers**

Call us for a free Consultation

## 801-355-6655
www.salesandauction.com

**New Location: 954 S 4400 W, Suite 390 in SLC!**

The impact on those people and the state economy would have been disastrous. This was avoided when a federal agency that insured credit union deposits agreed to do an overnight conversion of all those accounts to the federal insurance. No depositor lost money or access to their accounts, and the credit unions themselves survived, which most would not if accounts had been frozen. It turned out to be a non-event, just as regulation is supposed to work.

Private deposit insurance is not an option. Private deposit insurers used to operate in many states but all of them failed in the 1980s and 1990s, and many of the banks and credit unions they insured also failed after they were not able to qualify for federal insurance. Some depositors lost access to their money for a time and a portion of their deposits. These private insurers all failed because it isn't feasible to hold reserves large enough to cover problems affecting the whole industry without government backing.

Another reason cryptomoney will not work as money is that the nation's economic stability depends on managing the nation's money supply and only the government can do that, and then only if it creates the money. A thriving economy depends on a healthy balance between the amount of money available to pay for the goods and services the economy can supply. Government plays a vital role in maintaining that balance. Too little money in the economy idles farms and businesses, raises unemployment and causes a recession or depression. Too much demand bids up prices and causes inflation. It isn't possible to regulate the money supply if there is no means to quickly respond to cycles by injecting new money in a downturn and reducing spending and raising interest rates and taxes when the economy heats up too much.

Creating dollars only requires Congress passing an appropriations bill or the Federal Reserve buying assets in the market. In contrast, most kinds of cryptomoney are created in ways that have no connection to economic conditions. Private money is created by entities with no obligation or ability to monitor nationwide economic conditions and adjust money flows for maximum economic stability. Nor is there a mechanism to inject cryptomoney into the economy when conditions such as the quarantine imposed by the COVID pandemic cause a sudden disruption in employment and



## Experienced Litigators

### Davis County's Premier Litigation Law Firm

Personal Injury | Real Estate | Defamation
Family | Employment | Criminal | Business

*Thank you for all the referrals!*
*– Michael K. Hepworth*

**HL HEPWORTH** L E G A L

801-872-2222 | HepworthLegal.com

spending. The federal government can quickly inject money into the economy through programs such as unemployment compensation and ramping up infrastructure construction programs. New Bitcoins go only to the miners.

Mining Bitcoin is also unworkable because of the enormous amounts of electrical power it requires. Some estimates say Bitcoin mining currently uses as much electricity as entire nations (Pakistan, Venezuela, and Finland have all been mentioned, as have all the homes in Houston, Texas). Cryptomoney that can be created without restriction relies on trust that unregulated money creators will resist the temptation to flood markets for quick profits.

Use by criminals for untraceable payments is another major problem. Cryptomoney promoters frequently mention that private money is exchanged without banking and government authorities monitoring deposits and payments. Only criminals and privacy zealots care about that. Following the money is a critical law enforcement tool to identify and stem criminal activity. It also enables the government to sanction other governments by restricting their ability to engage in commerce through the banking system. Allowing Bitcoin or other cryptomoney to operate as money at its current minimal level has already resulted in increased criminal activity, while eliminating cryptomoney would probably limit or even eliminate ransomware attacks and some, and perhaps a lot of money laundering.

## The Future?

Instability in the crypto markets is growing at a remarkable rate and there may be no bottom short of complete collapse. That is because the whole market is a virtual construct with no real substance. Look through the façade, and there are just grifters and geeks having a party. It seems most likely that cryptomoney will continue to exist for a time as investments, but fads come and go and court decisions or new laws could cause sudden and catastrophic changes at any time. How long will the investment fad last? No one can really be sure. Whether it can develop into some kind of limited use money is yet to be seen. In the meantime, for those enjoying the fads, keep having fun and don't invest money you can't afford to lose. For those investing for other reasons, caveat emptor.

1. *See* Paul R. La Monica, *Warren Buffett Says Bitcoin is 'Rat Poison,'* CNN BUSINESS (May 8, 2018), https://money.cnn.com/2018/05/07/investing/warren-buffett-bitcoin/index.html.

2. *See* Erin Prater, *Bitcoin 'Stupid and Evil,' Berkshire Hathaway Vice Chair Munger Says*, FORTUNE (Apr. 30, 2022), https://fortune.com/2022/04/30/bitcoin-stupid-evil-berkshire-hathaway-vice-chair-munger-says-warren-buffett-cryptocurrency/.

3. *See* Kevin Helms, *Bill Gates: Crypto is 100% Based on Greater Fool Theory – 'I'm Not Involved in That,'* BITCOIN.COM (June 15, 2022), https://news.bitcoin.com/bill-gates-crypto-is-100-based-on-greater-fool-theory-im-not-involved-in-that/#:~:text=He%20clarified%2C%20%E2%80%9CI'm,for%20it%20than%20it%20do.

4. *See* Chloe Taylor, *Jamie Dimon Calls 'Dangerous' Crypto a 'Decentralized Ponzi Scheme' that's Not 'Good for Anybody,'* FORTUNE (Sept. 22, 2022), https://fortune.com/2022/09/22/jpmorgan-jamie-dimon-dangerous-crypto-decentralized-ponzi-scheme-not-good-for-anybody/.

5. Paul Krugman, Opinion, *Crypto is Crashing. Where Were the Regulators?*, N.Y. TIMES (July 11, 2022), https://www.nytimes.com/2022/07/11/opinion/cryptocurrency-federal-reserve.html.

6. Emma Fletcher, *Reports Show Scammers Cashing in on Crypto Craze*, F.T.C. DATA SPOTLIGHT (June 3, 2022), https://www.ftc.gov/news-events/data-visualizations/data-spotlight/2022/06/reports-show-scammers-cashing-crypto-craze.

7. *See* Gertrude Chavez-Dreyfuss, *Losses from crypto hacks surged 60% to $1.9 billion from January to July, Chainalysis says*, REUTERS (Aug. 16, 2022), https://www.reuters.com/markets/us/losses-crypto-hacks-surged-60-19-bln-jan-july-chainalysis-2022-08-16/#:~:text=NEW%20YORK%2C%20Aug%2016%20(Reuters,firm%20Chainalysis%20released%20on%20Tuesday.

8. Krugman, *supra* note 5.

9. *See* Soma Biswas & Vicky Ge Huang, *Celsius Owes Users More Than $4.7 Billion*, WALL STREET JOURNAL (July 14, 2022), https://www.wsj.com/articles/celsius-owes-users-more-than-4-7-billion-11657841826.

10. *See* Press Release, U.S. Dep't of the Treasury, U.S. Treasury Sanctions Notorious Virtual Currency Mixer Tornado Cash (Aug. 8, 2022), https://home.treasury.gov/news/press-releases/jy0916.

11. U.S. Sec. & Exch. Comm'n, *Prepared Remarks of Gary Gensler on Crypto Markets*, Penn Law Capital Markets Assoc. Annual Conference (April 4, 2022), https://www.sec.gov/news/speech/gensler-remarks-crypto-markets-040422.

12. *See* Tara Siegel Bernard, *The Labor Department Wants to Investigate Crypto in Retirement Plans*, N.Y. TIMES (Mar. 10, 2022), https://www.nytimes.com/2022/03/10/business/the-labor-department-wants-to-investigate-crypto-in-retirement-plans.html.

13. *See* Kate Rooney, *Peter Thiel is Betting on Bitcoin Because One Cryptocurrency Will Become the 'Online Equivalent to Gold,'* CNBC (Mar. 15, 2018), https://www.cnbc.com/2018/03/15/peter-thiel-is-betting-on-bitcoin-to-be-the-online-equivalent-to-gold.html.

14. *See* Abram Brown, *Peter Thiel Pumps Bitcoin, Calls Warren Buffett A 'Sociopathic Grandpa,'* FORBES (Apr. 7, 2022), https://www.forbes.com/sites/abrambrown/2022/04/07/peter-thiel-crypto-bitcoin-blockchain-miami/?sh=525f15f946e7.

15. Independent Institute, *Peter Thiel and Richard Rahn: Virtual Money, Privacy, and the Internet*, YOUTUBE (Oct. 20, 1999), https://www.youtube.com/watch?v=e-X8D1gOU1E&t=2701s.

16. Nick Black, *Paul Krugman Is Dead Wrong About Crypto – Here's What to Do About It*, MONEY MORNING (June 1, 2022), https://moneymorning.com/2022/06/01/paul-krugman-is-dead-wrong-about-crypto-heres-what-to-do-about-it/.

17. Nick Black, *Bitcoin Isn't Money . . . And That's How It Will Make You Rich*, MONEY MORNING (Aug. 23, 2022), https://moneymorning.com/2022/08/23/bitcoin-isnt-money-and-thats-how-it-will-make-you-rich/.

18. *See* Alena Botros, *The Historic Crypto Bubble: Bitcoin is Now the Fifth-biggest Wipeout of all Time, BofA Says, With a Shocking Chart of the Last 50 Years in Finance*, FORTUNE (Nov. 11, 2022), https://fortune.com/2022/11/11/crypto-bubble-bitcoin-fifth-biggest-all-time-bofa-ftx/.

19. *See* Andrew Perrin, *16% of Americans Say They Have Ever Invested In, Traded or Used Cryptocurrency*, PEW RESEARCH CENTER (Nov. 11, 2021), https://www.pewresearch.org/fact-tank/2021/11/11/16-of-americans-say-they-have-ever-invested-in-traded-or-used-cryptocurrency/.

20. Speech of Gary Gensler, U.S. Sec. & Exch. Comm'n, *Kennedy and Crypto* (Sept. 8, 2022), https://www.sec.gov/news/speech/gensler-sec-speaks-090822.

21. *See* Allison Morrow, *'Complete Failure:' Filing Reveals Staggering Mismanagement Inside FTX*, CNN BUSINESS (Nov. 18, 2022), https://www.cnn.com/2022/11/17/business/ftx-ceo-complete-failure/#:~:text=%E2%80%9CNever%20in%20my%20career%20have,2000s%2C%20among%20other%20bankruptcy%20cases.

22. *See* Danny Nelson, *Bankman-Fried Praises Regulators Hours After Saying 'F*** Regulators'*, YAHOO (Nov. 16, 2022), https://www.yahoo.com/video/bankman-fried-praises-regulators-hours-232918348.html.

Log in                                                    Sign up

University of Utah and Utah State Bar

💬 3                    🔁 6                    ♡ 39                    ⬆️

🔁 **Utah State Bar Retweeted**

**Utah Law** @sjquinney · Sep 12, 2022

"Change is happening, and I am excited to be a part of that shift and to help mentor future attorneys, advocates, and policymakers.

Abby Dizon-Maughan (Utah Law '12) was honored with a Living Color Award at the annual Living Color Gala last week.



bit.ly/SJQAlumLivingC...

**APP.167**



 

*tah Business* and Living Color Utah are proud to present our fourth-annual Living Color Gala—a night to honor those individuals who have made it their mission to attract and foster diversity and inclusion initiatives throughout the state of Utah.

### A black-tie gala to celebrate diversity

In partnership with the Black Chamber of Commerce, the Utah Asian Chamber of Commerce, the Suazo Business Center, the Utah LGBTQ+ Chamber of Commerce, the Utah Muslim Civic League, the Pacific Island Chamber of Commerce (formerly the SL Pacific Business Alliance), and Young Professionals Salt Lake City, *Utah Business* hosts this black-tie event to bring awareness to the changing business landscape in Utah and create a foundation upon which further recruiting efforts can be built.

**To submit a nomination for the 2023 Living Color Gala, fill out the form below. Nominations are accepted now – June 16th, 2023.**

**APP.168**



## 2023 Living Color Gala Nominations

schlottkris@gmail.com   Switch account

* Required

---

Email *

Your email

---

Nominator Name *

Your answer

---

Nominator Company/Organization *

Your answer

---

Nominator Email Address *

Your answer

---

Nominee Name *

Your answer

---

Nominee Email *

Your answer

---

Nominee Phone *

Your answer

---

Nominee Company/Organization *

Your answer

---

Nominee Job Title *

**APP.169**

### About Living Color

Your answer

Living Color Utah is a project commissioned by Salt Lake City Corporation to provide resources for Utah's diverse population. The project is supported by the state's ethnic chambers with the goal of supporting diverse communities at Utah organizations. Watch the video below to learn more about Living Color Utah.

Nominee Category *

○ Community Involvement

**We are Living Color Utah**



SPONSORED BY





# Utah stories you won't find anywhere else.

**Subscribe for the latest:**

Email

SUBSCRIBE

Privacy Policy | Terms of Use

Copyright © 2023 Utah Business. All Rights Reserved.

 **Utah State Bar Retweeted**

 **Kimberly Rasmussen Watkins** @sniktawymmik · Jul 30, 2021 ···
Listening to @DrWilliamASmith at the @UtahStateBar summer convention. Racism is a public health crisis. Racism is an act of violence. What are the perceptions of African American men?

         1         8        

**APP.172**

 **Utah State Bar** @UtahStateBar · Jan 22, 2020   ...

Strong public support for admitting DREAMers into the Utah State Bar.
bit.ly/2RfB7SK

                                   ♥ 2

# ABA Wide 21-Day National Native American Heritage Equity Habit Building Challenge ©

Share:

    

> *"Every day is the right time to honor Native culture, strength and fortitude. Every day is an opportunity to tell the world: We are here. We are still here. And there is much cause for celebration."*

> *- First Nations Development Institute*

The ABA Diversity and Inclusion Advisory Council is proud to launch a 21-Day Native American Heritage Equity Habit Building Challenge syllabus in honor of National Native American Month. This Challenge is modeled after the "21-Day Racial Equity Habit-Building Challenge©," which was conceived several years ago by diversity expert Dr. Eddie Moore, Jr. to advance deeper understandings of the intersections of race, power, privilege, supremacy, and oppression. We are grateful to Dr. Moore for publicly sharing and encouraging others to use this 21-day framework as an educational tool, including to advance learning across myriad diverse communities.

We invite ABA members and non-members to participate in this Equity Habit-Building Challenge. This Challenge is the forth ABA Challenge following the syllabus created to commemorate Black History Month in February 2021, Asian American Pacific Islander Heritage Month in May 2021, Pride Month in June 2021, and Hispanic Heritage Month in September/October 2021. That first ABA-wide Challenge followed the 21-Day Challenge syllabus launched by the ABA Section of Labor and Employment Law last year.

We are making improvements to our user experience and offering more transparency and control over cookies. By clicking "Accept All Cookies," you agree to the storing of cookies on your device to enhance site navigation, analyze site usage, and assist in marketing efforts. Click on "Customize Settings" to learn more about individual cookies and choose settings by category. Privacy policy

Cookies Settings

Accept All Cookies

**APP.174**

## How it Works

It is, of course, completely voluntary to do, and participation in the Challenge shall not be construed as agreement with every word of every assignment nor a commitment by any person to a particular professional position or strategy. Further, participants are free to opt-out of participating along the way. There is no grade at the end of the Challenge. While it is not the intention of the Challenge to cause offense, some participants may be offended by some language or images used in the lessons.

The Challenge invites participants to complete a syllabus of 21 daily, short assignments (typically taking 15-30 minutes), over 21 consecutive days, that includes readings, videos, or podcasts. The assignments seek to expose participants to perspectives on elements of Native American histories, identities, and cultures. This Challenges cannot possibly highlight all of the diversity of experiences and opinions within the Native American community itself, much less substitute for learnings about any other community. This syllabus is but an introduction to what we hope will be a rewarding journey that extends far beyond the limits of this project.

## Access the Syllabus

See a day-by-day breakdown of the Syllabus below, or you can access the full syllabus, including reflection/discussion questions, additional links from ABA entities, and ABA entity-recommended resources at this link.

*21-Day Racial Equity Habit-Building Challenge is the registered copyright of America & Moore, LLC. 2014.*

## Sign Up to Join the Challenge!

- If you would like to pledge to join the Challenge, click here (ABA affiliation is not required to

We are making improvements to our user experience and offering more transparency and control over cookies. By clicking "Accept All Cookies," you agree to the storing of cookies on your device to enhance site navigation, analyze site usage, and assist in marketing efforts. Click on "Customize Settings" to learn more about individual cookies and choose settings by category. **Privacy policy**

**APP.175**

## DAY 1 | What is Native American Heritage Month

○ Happy National Native American Heritage Month!, U.S. Department of the Interior (November 11, 2021). *[1:43 minute video]*

○ A guide to Indigenous land acknowledgment, Native Governance Center (October 22, 2019). *[4 minute read]*

○ *Native-Land.ca | Our home on native land*, Native Land is a resource to learn more about Indigenous territories, languages, lands, and ways of life.

○ America, I Sing Back by Allison Adelle Hedge Coke - Poems | poets.org , Poets.org (1958). *[2 minute read]*

## DAY 2 | Who is Native American?

○ U.S. Perceptions of Indigenous Peoples: The Epic Mistory | Jodi Gillette | TEDxBismarck, YouTube: TEDx Talks (September 13, 2016). *[17:01 minute video]*

○ "What does it mean to be a Native American today?", YouTube: Native Opinion (May 1, 2018). *[6:09 minute video]*

○ 'Native American' or 'American Indian'? How to Talk About Indigenous People of America, Healthline.com (March 15, 2021). *[8 minute read]*

○ Young, Black Native activists say it's time to appreciate Indigenous diversity, NPR ( October 11, 2021). *[3 minute read]*

## DAY 3 | Alaska Natives and Native Hawaiians

We are making improvements to our user experience and offering more transparency and control over cookies. By clicking "Accept All Cookies," you agree to the storing of cookies on your device to enhance site navigation, analyze site usage, and assist in marketing efforts. Click on "Customize Settings" to learn more about individual cookies and choose settings by category. **Privacy policy**

**APP.176**

- ○ [Native Hawaiians Divided on Federal Recognition](#), Voice of America (February 07, 2019). *[8 minute read]*

- ○ [Native Hawaiians to Deb Haaland: 'We're not Native Americans'](#), Indian Country Today (April 12, 2021). *[5 minute read]*

## DAY 4 | Where Native Americans Live

- ○ [American Experience | The Relocation of Native Americans | Season 21 | Episode 9](#), PBS (May 11, 2019). *[1:51 minute video]*

- ○ [Relocation - National Council of Urban Indian Health](#)

- ○ [Most Native Americans live in cities, not reservations. Here are their stories](#), The Guardian (September 4, 2017). *[16 minute read]*

## DAY 5 | Federal (and State) Recognition

- ○ [What makes someone Native American? One tribe's long struggle for full recognition](#), The Washington Post (August 20, 2018). *[25 minute read]*

- ○ [25 CFR § 83.11 - What are the criteria for acknowledgment as a federally recognized Indian tribe?](#), Legal Information Institute *[8 minute read]*

## DAY 6 | Sovereignty

- ○ [Tribal identity: A question of sovereignty](#), YouTube: Brookings Creative Lab (April 8, 2019). *[3:16 minute video]*

- ○ [Doctrine of Discovery](#), YouTube: TreeTV/ N2k Need to Know (September 16, 2015). *[5:59*

We are making improvements to our user experience and offering more transparency and control over cookies. By clicking "Accept All Cookies," you agree to the storing of cookies on your device to enhance site navigation, analyze site usage, and assist in marketing efforts. Click on "Customize Settings" to learn more about individual cookies and choose settings by category. **Privacy policy**

**APP.177**

- Memorandum on Tribal Consultation and Strengthening Nation-to-Nation Relationships, Whitehouse.gov (January 26, 2021). *[4 minute read]*

## DAY 7 | Treaties

- The "Indian Problem", YouTube: SmithsonianNMAI (May 2, 2015). *[12:31 minute video]*

- Why Treaties Matter | NPR , YouTube: NPR (November 22, 2017). *[5:20 minute video]*

- American treaties: What it would mean if the US honored them, Vox.com (September 23, 2019). *[11 minute read]*

## DAY 8 | Criminal Jurisdiction

- Supreme Court Rules Tribal Police Can Detain Non-Natives, But Problems Remain, NPR (June 9, 2021). *[3 minute listen] [5 minute read]*

- McGirt v. Oklahoma, Wikipedia.com *[12 minute read]*

- Q&A: What does McGirt ruling mean?, Indian Country Today (July 9, 2020 ) *[4 minute read]*

- Native Americans, State Leaders Grapple With Legal Uncertainty in Oklahoma, Voice of America (July 31, 2021). *[5 minute read]*

## DAY 9 | Assimilation and Boarding Schools

- A century of trauma at US boarding schools for Native American children, National Geographic (July 9, 2021). *[11 minute read]*

- Native Boarding Schools: Behind The Fight To Repatriate Indigenous Remains : Code Switch, NPR (August 28, 2021) *[4 minute listen] [6 minute read]*

We are making improvements to our user experience and offering more transparency and control over cookies. By clicking "Accept All Cookies," you agree to the storing of cookies on your device to enhance site navigation, analyze site usage, and assist in marketing efforts. Click on "Customize Settings" to learn more about individual cookies and choose settings by category. **Privacy policy**

**APP.178**

- Native American women face an epidemic of violence. A legal loophole prevents prosecutions, NBC News (June 30, 2021). *[8 minute read]*

- Ending Violence Against Native Women, Indian Law Resource Center *[8 minute read]*

- Tribal VAWA: Much Remains Undone, YouTube: National Congress of American Indians (June 10, 2015). *[6:53 minute video]*

- Gabrielle Petito Coverage Looks Like Racist Clickbait To Some Native Americans, NPR (September 21, 2021). *[2 minute listen] [1 minute read]*

## DAY 11 | Child Welfare

- Indian Child Welfare Act - Educational Resource Video, YouTube: Native American Rights Fund (August 9, 2013). *[19:07 minute video]*

- SWhat we don't know about child welfare, but should, Soundcloud. *[13:37 minute listen]*

- Understanding the battle over the Indian Child Welfare Act, PolitiFact (November 1, 2021). *[7 minute read]*

## DAY 12 | Public Lands

- American Indians Were Pushed Off Their Land to Create National Parks | The Takeaway, WNYCS Studios (August 17, 2020). *[11:53 minute listen] [8 minute read]*

- "We want to tell our own stories": Public Lands and Indigenous Histories • The National Wildlife Federation Blog, National Wildlife Federation's Blog (September 26, 2019). *[6 minute read]*

- How Returning Lands to Native Tribes Is Helping Protect Nature, YaleEnvironment360 (June

We are making improvements to our user experience and offering more transparency and control over cookies. By clicking "Accept All Cookies," you agree to the storing of cookies on your device to enhance site navigation, analyze site usage, and assist in marketing efforts. Click on "Customize Settings" to learn more about individual cookies and choose settings by category. **Privacy policy**

**APP.179**

- The Standing Rock resistance and our fight for Indigenous rights, TedTalks (2017). *[10:55 minute video]*

- Forced relocation of Native Americans has made them more vulnerable to climate change, study finds, WBUR (November 11, 2021). *[10:46 minute listen] [5 minute read]*

## DAY 14 | Food Sovereignty

- Native American food traditions: A renewed drive to keep them alive, Christian Science Monitor (Febryary 22, 2021). *[10 minute read]*

- Winona LaDuke - Seeds of Our Ancestors, Seeds of Life, YouTube: TedxTC (March 4, 2012). *[16:36 minute video]*

## DAY 15 | NAGPRA

- "Bones of Contention": Battling for Human Dignity at the Salina Indian Burial Pit, YouTube: SjoborHammer (October 21, 2009). *[10:01 minute video]*

- NAGPRA, YouTube: National NAGPRA Program (March 19, 2012). *[20:20 minute video]*

## DAY 16 | Land

- Removing Native Americans from their Land , Library of Congress *[2 minute read]*

- Native Americans are buying back land that was stolen from them , YouTube: PBS NewHour (October 16, 2021). *[7:57 minute video]*

- American Lands | Ownership and Governance , U.S. Department of the Interior *[8 minute read]*

We are making improvements to our user experience and offering more transparency and control over cookies. By clicking "Accept All Cookies," you agree to the storing of cookies on your device to enhance site navigation, analyze site usage, and assist in marketing efforts. Click on "Customize Settings" to learn more about individual cookies and choose settings by category. **Privacy policy**

**APP.180**

More than Mascots: It's Time to End Cultural Appropriation of Native Americans in Sports, Nielsen (May 16, 2021). *[6 minute read]*

Indigenous Peoples in Maine are Not Mascots | Maulian Dana | TEDxDirigo, YouTube: TEDx Talks (December 13, 2019). *[13:23 minute video]*

From teepees to headdresses, pictures define Native American cultural appropriation, National Geographic (December 2018). *[10 minute read]*

## DAY 18 | Appropriation and Intellectual Property

New York Fashion Week Designer steals from Northern Cheyenne/Crow artist Bethany Yellowtail, nativeappropriations.com (Feburary 18, 2015). *[8 minute read]*

Minnetonka CEO apologizes for appropriating Native American culture, NPR (October 12, 2021). *[3 minute read]*

Crimes of Fashion: Intellectual Property and Indigenous Dress | Glocal Notes, University of Illinois at Urbana-Champaign , (April 13, 2016) *[6 minute read]*

How Can the Design Industry Avoid Appropriation?, Architectural Digest (August 21, 2018) *[8 minute read]*

Dulaney-Browne Library: Intellectual Property Rights of Indigenous People: Introduction

## DAY 19 | Religion

Native Americans and Freedom of Religion, National Geographic (April 27, 2020). *[3 minute read]*

Native Perspectives on the 40th Anniversary of the American Indian Religious Freedom Act,

We are making improvements to our user experience and offering more transparency and control over cookies. By clicking "Accept All Cookies," you agree to the storing of cookies on your device to enhance site navigation, analyze site usage, and assist in marketing efforts. Click on "Customize Settings" to learn more about individual cookies and choose settings by category. **Privacy policy**

**APP.181**

## DAY 20 | Language Preservation

- Native American Culture - Language: the Key to Everything | Ron (Muqsahkwat) Corn, Jr, TEDxOshkosh *[11:57 minute video]*

- Reading, Writing and Preserving: Native Languages Sustain Native Communities | NMAI Magazine, American Indian (Summer 2017). *[7 minute read]*

- Preserving Native Languages: No Time to Waste | The Administration for Children and Families, Administration for Children and Families *[3 minute read]*

- Native American Languages Act: Twenty Years Later, Has It Made a Difference?, Cultural Survival (July 18, 2012). *[7 minute read]*

## DAY 21 | Allyship

- Changing the Narrative About Native Americans - Guide for Allies, illuminatives.org *[30 minute read]*



The 2023 C-Class. AБA AMERICAN BAR ASSOCIATION  Make your move ▶  — Mercedes-Benz — STAR ACCESS

## Additional Resources

- National Native American Heritage Month

- 'Poet Warrior' Joy Harjo Wants Native Peoples To Be Seen As Human , NPR (September 22, 2021). [31 minute read]

- Acknowledgement Guide, landacknowledgments.org (2018). [4 minute read]

We are making improvements to our user experience and offering more transparency and control over cookies. By clicking "Accept All Cookies," you agree to the storing of cookies on your device to enhance site navigation, analyze site usage, and assist in marketing efforts. Click on "Customize Settings" to learn more about individual cookies and choose settings by category. **Privacy policy**

**APP.182**

- Tribes And COVID-19: Hundreds Of Federally Unrecognized Groups Struggle

- People of the outside: The Environmental Impact of Federal Recognition of American Indian Nations, 42 B.C. Envtl. Aff. L. Rev. 507 (2015)

- HR2758 - 117th Congress (2021-2022): Lumbee Recognition Act | Congress.gov | Library of Congress

- Professor Breaks Down Sovereignty and Explains its Significance (7 min.)

- Professor Breaks Down Sovereignty and Explains its Significance

- Myths and Realities of Tribal Sovereignty: The Law and Economics of Indian Self-Rule

- Understanding Tribal Sovereignty: Definitions, Conceptualizations, and Interpretations, American Studies, Vol. 46, No. 3/4, Indigeneity at the Crossroads of American Studies (Indigenous Studies Today, Issue 1, Fall 2005/Spring 2006) (Fall/Winter 2005), pp. 115-132 (18 pages)

- Sovereignty with Oren Lyons Pt. 1

- Sovereignty with Oren Lyons Pt. 2

- Nation to Nation: Treaties Between the United States and American Indian Nations

- The National Archives holds hundreds of thousands of U.S. Government records relating to Native Americans, from as early as 1774 through the mid-1990s including every treaty signed with Native Americans.

- Uncovering The 'Unspoken Traumas' Of Native American Boarding Schools (47 min.)

We are making improvements to our user experience and offering more transparency and control over cookies. By clicking "Accept All Cookies," you agree to the storing of cookies on your device to enhance site navigation, analyze site usage, and assist in marketing efforts. Click on "Customize Settings" to learn more about individual cookies and choose settings by category. **Privacy policy**

**APP.183**

- Human rights violations at American Indian boarding schools must be investigated, ABA House says (3 min.)

- The Indian Child Welfare Act Faces Its Biggest Challenge Yet, NPR [31 minute listen]

- Independent Lens: Dawnland [56 min.]

- State Statutes Related to the Indian Child Welfare Act. National Conference of State Legislatures

- Bureau of Indian Affairs, Indian Child Welfare Act website

- Guidelines for Implementing the Indian Child Welfare Act

- FAQ in Final Rule: Indian Child Welfare Act, [20 min]

- A Practical Guide to the Indian Child Welfare Act

- Understanding the battle over the Indian Child Welfare Act (7 min.)

- Native American Women Are Facing a Crisis, NYT [3 minute]

- Safety for Our Sisters: Ending Violence Against Native Women

- The Search For Missing And Murdered Indigenous Women (35 min.)

- Integrating Tribes and Culture Into Public Land Management, (20 min.)

- Barry Lopez—A Way Out of Our Predicament (6 min.)

- Winona LaDuke: Environmental Justice from a Native Perspective (2012)

We are making improvements to our user experience and offering more transparency and control over cookies. By clicking "Accept All Cookies," you agree to the storing of cookies on your device to enhance site navigation, analyze site usage, and assist in marketing efforts. Click on "Customize Settings" to learn more about individual cookies and choose settings by category. **Privacy policy**

**APP.184**

- Walter Echo-Hawk lecture on N.A.G.P.R.A (Native American Graves Protection and Repatriation Act) (90 min.)

- On July 8, 2021, the Department of Interior invited Tribal leaders and Native Hawaiian Community leaders to consult on a draft proposal of revised NAGPRA regulations.

- https://www.nps.gov/subjects/nagpra/regulations.htm

- Winona LaDuke + Naomi Klein: Land Rights and Climate Change,

- Indigenous In Plain Sight | Gregg Deal | TEDxBoulder, (13 min.)

- Tribal Intangible Cultural Property: IP or Something More? (25 min.)

- Baker, KaDeidra (2018) "Indigenous Appropriation and Protections Provided by Intellectual Property Law," North Carolina Central University Science & Intellectual Property Law Review: Vol. 11 : Iss. 1 , Article 4.

- Shabalala, Dalindyebo Bafana (2017) "Intellectual Property, Traditional Knowledge, and Traditional Cultural Expressions in Native American Tribal Codes," Akron Law Review: Vol. 51 : Iss. 4 , Article 5.

- Arts, Literature, Music: Joy Harjo on the Diverse, Groundbreaking World of Indigenous Poetry [12 min]

- Free, Prior and Informed Consent (FPIC) [3 minute video]

- A specific right that pertains to indigenous peoples and is recognised in the United Nations Declaration on the Rights of Indigenous Peoples (UNDRIP). It allows them to give or withhold consent to a project that may affect them or their territories. Once they have given their

We are making improvements to our user experience and offering more transparency and control over cookies. By clicking "Accept All Cookies," you agree to the storing of cookies on your device to enhance site navigation, analyze site usage, and assist in marketing efforts. Click on "Customize Settings" to learn more about individual cookies and choose settings by category. Privacy policy

**APP.185**

- Native American Languages Act of 1990 [10 minute read]

- 'Race against time': Pandemic propels fight to save Native American languages [14 minute read]

- Indian Gaming Regulatory Act [54 minute read]

- How the Indian Gaming Regulatory Act improved tribal sovereignty [2 minute video]

- The Indian Gaming Regulatory Act and Its Effects on American Indian Economic Development, Journal of Economic Perspectives, Vol. 29, No. 3 (2015). (55 mins.)

> "For years, the lives and experiences of Indigenous peoples have often been introduced or described from a negative perspective. This may be well- intentioned because the narrative draws attention to the many challenges and incredible needs faced by Native peoples, but this narrative reinforces stereotypes and implies hopelessness. Native peoples are deeply hopeful and have an abundance of cultural knowledge that is positive. A better narrative is one that reclaims the truth of our positive values and relationships."
>
> — Cheryl Crazy Bull (Sicangu Lakota), President and CEO, American Indian College Fund

*More content to come.*

## Become a Member

### As a ABA Member, you have access to many new benefits including the free CLE Member Benefit Library, the ABA Journal, Member Groups, networking

We are making improvements to our user experience and offering more transparency and control over cookies. By clicking "Accept All Cookies," you agree to the storing of cookies on your device to enhance site navigation, analyze site usage, and assist in marketing efforts. Click on "Customize Settings" to learn more about individual cookies and choose settings by category. **Privacy policy**

**APP.186**



**Utah State Bar**
379 followers
10mo

Spencer Cox · 3rd+
18th Governor of Utah
10mo

+ Follow

Each year, we hold a few ceremonial bill signings to spotlight pieces of legislation
that align with the goals outlined in our #OneUtah Roadmap.
...see more

Gov. Cox holds ceremonial signing of law enforcement and mental health bills
governor.utah.gov · 1 min read

👍 Like      💬 Comment      🔁 Repost      ➤ Send

Be the first to comment on this

## Legislative Update

# 2021 Legislative Session Primer

by Doug Foxley, Frank Pignanelli, and Stephen Foxley

**W**ith the global COVID-19 pandemic still causing impacts across government, the Utah State Bar is offering members an update of what changes are in store for the legislative season as the Utah Legislature prepares to convene for the 2021 General Session. We also wish to remind readers of the process that guides the Bar's advocacy.

The General Legislative Session will begin earlier than prior years, with a new commencement date of Tuesday, January 19, 2021. This is due to the passage of Constitutional Amendment F that allows the legislature to set a start date anytime in January by statute. Anticipating passage of this constitutional amendment, the legislature adopted S.B. 156 in the 2020 session, which provides, "The annual general session of the Legislature shall begin the first Tuesday after the third Monday in January."

You can expect several new limits on lobbying activity at the Capitol. For example, unlike in years past, lawmakers will not leave the House and Senate floors to speak with the public. The ability to send in blue and green notes to lawmakers from outside legislative chambers will also be eliminated. However, the legislature is still working to conduct as much business as possible in person and to allow public participation. The State Office Building just north of the Capitol is undergoing retrofitting to allow for committee hearings in large spaces that can accommodate greater social distancing. Throughout 2020, lawmakers also conducted several special sessions and interim hearings with a mixture of in-person and online participation. That hybrid will likely continue during the General Session. Other ideas have also been proposed, such as making on-demand COVID-19 testing available at the Capitol or establishing an NBA-style "Bubble."

In terms of a legislative agenda, expect the COVID-19 response, gubernatorial powers, and economic development to be front and center. Legislative leadership has expressed a desire for members to limit legislation outside of these areas to prioritize bills and issues that were addressed by committees over the past year to address the issues Utahns have experienced over the past

year as a result of the pandemic. Adjusting the state's budget will also be a priority. November estimates of total collections are surprisingly strong. General and Education Funds are up by more than 32.6%. Sales tax numbers are especially strong, more than 10.2% above the prior year. Gas tax revenues are also up. The biggest growth came from the income tax, which is up by 51.8%. That eye-popping number comes primarily from the later income tax filing date, which shifted tax collections from the prior fiscal year into 2021. The current target is for revenue growth of 16.8% for the current fiscal year.

Another development for 2021 will be how Governor-elect Spencer Cox and his new administration interact with the legislature. Cox was the liaison with the legislature as Lieutenant Governor and given his experience in the legislature, there will likely be some changes from the Herbert administration. We also look forward to Governor-elect Cox continuing to name attorneys to the bench that have made our judiciary one of the best in the nation.

The Bar's legislative activities are limited by design and follow United States Supreme Court precedent outlined in *Keller v. State Bar of California*, 496 U.S. 1 (1990). When the Utah Supreme Court adopted rules that directed the Utah State Bar to engage in legislative activities, it identified specific guardrails to align with the limitations expressed in *Keller*. These defined areas

*Doug Foxley, Frank Pignanelli, and Stephen Foxley are licensed attorneys and lobbyists for the Utah State Bar. They can be reached at foxpig@fputah.com.*



**APP.188**
**USB001608**

of the Bar's involvement in legislative activities include matters concerning the courts, rules of evidence and procedure, administration of justice, the practice of law, and access to the legal system. Public policy positions are determined by the Bar commissioners after receiving input from the Government Relations Committee (GRC). The Bar may also grant section authority to advocate a position on its behalf if it is a matter where the section has a particular interest or expertise.

The GRC is led by Jaqualin Peterson and Sara Bouley, and each section of the Bar has a designated representative. The GRC meets weekly during the legislative session, with meetings conducted online this year to allow for sufficient social distancing. The Bar posts its positions to the public on its website so members may have transparency and clarity into this process. Please contact your section leaders if you are interested in pursuing involvement with the committee or would like the Bar to take a position on a particular bill.

The recent elections delivered the dynamic of a high number of law-trained legislators. (Of course, the more lawyers the better!). In the House, there are fifteen lawyer-legislators, including three new members (Doug Owens, Jordan Teuscher, and Nelson Abbott), and in the Senate, there are five. Mike McKell joins the Senate after previously serving in the House, while Lyle Hillyard is retiring after forty years and Dan Hemmert will be joining Governor-elect Cox's administration as the Director of the Governor's Office of Economic Development.

Please note, several non-attorney lawmakers also play a major role in issues that may be relevant to your practice.

In recent years, the Bar has played an active role in major public policy debates, such as taxation of legal services, whether the supreme court should regulate the practice of law, and what criteria should be considered when filling judicial vacancies. As our state continues to grow and change, we anticipate there will be other major issues that will require the Bar's input.

We know that 2021 presents unique challenges and opportunities for the legislature and will require attorneys who interact in the legislative process to be creative and adaptive in their advocacy efforts. If you have any questions about how we can help, please feel free to reach out to the Bar or your lobbyists.

**Sara Pfrommer's** experience speaks for itself. In Los Angeles, she was a partner in an AmLaw 100 firm, where she litigated bankruptcy and financial fraud. In Utah, Sara honed in on appeals and has argued numerous family law and child welfare appeals in both Utah appellate courts. She has received the Parental Defense Alliance's Appellate Lawyer of the Year Award.

We welcome her.



THE
APPELLATE GROUP
theappellategroup.com



SARA PFROMMER

APP.189
USB001609

## President's Message

# *Thank You*

*by H. Dickson Burton*

*How did it get so late so soon?*
*It's night before it's afternoon.*
*December is here before it's June.*
*My goodness how the time has flewn.*
*How did it get so late so soon?*
– Dr. Seuss

We all experience the sensation of time flying by, and such has been this full and eventful year as Bar President. We have had challenges both expected and unexpected, from exploring ways to address disruption and change in our profession, to addressing lawyer and judge well-being, to responding to a surprise effort to impose a sales tax on attorneys' fees – to name a few of the larger issues before us. And with the heartfelt effort of so many great members of our Bar, we continue to make progress on all fronts. Of course as always, much remains to be done. But progress will continue, better than ever, under the leadership of incoming Bar President Herm Olsen and President-elect Heather Farnsworth.

### Disruption in the Legal Profession

As has been frequently discussed in recent years, the profession is changing rapidly and for various reasons, such as an evolving economy, shifting needs and social pressures, and rapidly advancing technology. We face unique and exciting challenges, but at times they seem daunting and intimidating. Even so, the change is real and not going away, and the best way to deal with it is meeting it head on and with a willingness to adapt. Indeed, disruption comes with great opportunity to those who make the effort to understand, adapt, and thrive.

One resource I suggest to you, for better understanding the changing legal landscape, is our Innovation in Law Practice Committee. Consider attending its upcoming day-long symposium on August 28, 2019, which will include, among other things, hands-on technology training and insightful speakers addressing new ways to manage and run a law practice.

I also urge you to follow the efforts of our Utah Supreme Court and a work group it established, at the request of the Utah State Bar, addressing regulatory reform. This work group has been chaired by Justice Deno Himonas of the Utah Supreme Court and our immediate Past-President, John Lund. It has been active since last fall, and its purpose is to study and make recommendations to the court for adapting Utah's regulatory structure for legal services in this "Age of Disruption." The goal is to better use market forces to foster innovation and increase access to legal services. An upcoming report from the work group will make some remarkable, ground-breaking proposals that present an opportunity to significantly advance access to legal services (and therefore access to justice) and to advance the legal profession itself. We are grateful to Justice Himonas for his foresight and leadership of this seminal work group.

### Lawyer Well-Being

Disruption also presents new anxieties and stresses as we learn to cope with change. Of course well-being issues such as depression, anxiety, and substance abuse are not new and have, unfortunately, long been with us. Thankfully there has been a new willingness in recent years to recognize well-being as something important to address in our profession. We are particularly grateful for Chief Justice Matthew Durrant's leadership in having the Utah Supreme Court and the Utah State Bar jointly establish an Attorney and Judge Well-being Task Force, made up of attorneys from different types of practices, law school deans, judges, and counseling professionals. This task force just recently issued a report that includes recommendations for legal employers, judges, the law schools, and the Bar. Pursuant to those recommendations, the Bar and the courts are making new efforts to recognize, talk about, and directly address well-being issues that are around us every day in our profession. We want to provide additional resources for those who need help. Just as importantly, we want to break down the



APP.190
USB000974

false narrative of the invincible warrior-attorney who can never show weakness and eliminate the stigma that has too often prevented us from seeking help when we need it.

## Sales Tax on Legal Services?

Disruption and change is also, apparently, impacting the state government's revenue collection. Our governor and legislature have been pushing to broaden the sales tax base to include most professional services, including attorney services, apparently because our increasingly service-based economy is threatening decreased sales tax revenues over time. While we believe it is a well-intentioned effort to address a perceived problem in our tax structure, we as a Bar did not agree with the particular proposal made near the end of the 2019 legislative session through House Bill 441. Indeed, the Bar took a strong stand against a sales tax on legal services because such a tax would add a new burden on people's access to lawyers – and therefore their access to justice.

As attorneys, we already spend a tremendous amount of effort, including by making significant donations of time and money to pro bono programs and legal aid organizations, to try to close the huge access to justice gap in Utah. In spite of often heroic contributions from many members of the Bar, far too many Utahns still do not have access to legal help when they need it most. Indeed, when individuals and families need lawyers, it is almost always at a time of crisis in their lives when they may be faced with losing their jobs, their homes, their families – or even their freedom. At these difficult times, government should not make it even more difficult for Utahns to get an attorney by adding an additional tax burden. And when one considers the cost to society when someone is evicted or loses a job or goes to jail, sometimes only because they did not have timely and adequate legal assistance, it is clearly bad public policy to add to the difficulty of getting such assistance in the first place by imposing a sales tax.

As you know, HB 441 was pulled by legislative leaders at the last minute before the recent legislative session ended. I am proud to say that it was lawyers who led the way in opposing the new sales tax. We have heard from many legislators that they heard more from lawyers than from any other group. Thank you! I know



# CONYERS & NIX

## CRIMINAL DEFENSE ATTORNEYS



**Kate Conyers**



**Jesse Nix**

*We welcome your referrals and
the opportunity to work with you.*

**ALL FELONIES & MISDEMEANORS | DISTRICT COURTS & JUSTICE COURTS**

KATE@CONYERSNIX.COM   |   *WWW.CONYERSNIX.COM*   |   JESSE@CONYERSNIX.COM
405 SOUTH MAIN STREET, SUITE 930, SALT LAKE CITY, UTAH 84111   |   801-839-4649

APP.191
USB000975

**President's Message**

many of you also encouraged your clients to become involved. And many law firm leaders were at the center of the discussions with the legislature. And we have had (and continue to have) tremendous guidance along the way from the Bar's lobbyists, Frank Pignanelli, Doug Foxley, and Stephen Foxley. Thank you to all.

We are grateful to the governor and legislature for ultimately deciding to take a step back, but we are apparently not done with this fight. When the tax bill was pulled, the legislature announced a task force to explore the perceived need for reform and to study options for best addressing any change in tax policy. So, though HB 441 itself is no longer on the table, the options being considered by the task force still include a sales tax on professionals. Accordingly, the Bar is continuing to be actively involved in monitoring and opposing a sales tax on legal services. And we ask that all of you stay involved and that you encourage your clients to do the same. The task force is holding town hall hearings around the state this summer. Please look at their schedule and attend one near you, and let it (and your legislators) know how you feel about an added tax on individuals and families accessing justice.

## MINDI HANSEN
### DOMESTIC MEDIATOR

**Mindi is a partner at Hanks & Peterson with experience in all aspects of family law cases.**

- **Understanding**: sensitive to the unique dynamics of family law;
- **Personable**: able to work with challenging personalities;
- **Affordable**: low rates to ease the burden of expensive litigation;
- **Accessible**: willing to travel to your office, or host mediation at her office.



to schedule mediation online, visit:
**hplawslc.com/mediation**



Judge Building | 8 East Broadway, Suite 740 | SLC, UT 84111
801-363-0940 | mindi@hplawslc.com

### Summer Convention in Park City!!

One last delightful challenge we have faced this Bar year is one we have been very excited about and planning for a long time: our first Summer Convention at a Utah venue in over thirty years! I wrote more in depth about the upcoming convention in Park City in the previous issue of the *Bar Journal*, but let me say again that this should be our best Summer Convention ever.

Under the leadership of convention chairs Judge Eve Furse and Jon Hafen, the committee has planned not only amazing speakers and breakout sessions but fabulous social and networking events for everyone. You will find our traditional opening reception (at a beautiful mountain location), law school gatherings, and a family picnic/carnival, but there will also be a new Park City foodies tour, a nighttime ghost tour, and a Young Lawyer event at Jupiter Bowl. And because of our great location in Park City, we are offering a larger variety of outdoor events, activities, and adventures than we could ever offer before.

Luxury accommodations are still available (for less than half the cost of the cheapest rooms in Sun Valley) and the cost of convention registration itself is less than we have been able to offer in many years. PLEASE make an effort to join us, and bring your families. You (and they) will be glad you did. Whether you have never been to a Summer Convention, or are a regular convention-goer, you should visit www.utahbar.org/cle/utah-bar-conventions/ to register now, book a room, and come!

### Thank you

Finally, as I finish my year as President, I want to thank all of you, Bar members, for your support of the Bar, your hard work as attorneys, and the good you do for your clients and the profession every day. Thank you to the hundreds of attorneys who volunteer their time in many types of Bar service, including in the various sections and committees of the Bar. Thank you to the Bar Commissioners with whom I have had the privilege of serving. They are exceptional people and great friends. And a special thanks to those who regularly provide critically important community and pro bono service, usually very quietly and without recognition. You help make our profession truly noble and honorable.

And thank you to an exceptional, dedicated, and highly professional Bar staff, from our Executive Director John Baldwin and Assistant Executive Director Richard Dibblee, right down to the newest Bar employee. They make the job of Bar President go smoothly and (most of the time 🙂) pleasantly.

See you in Park City!

**APP.192**
**USB000976**

## Utah Law Developments

# *Legislative Update*

*by Douglas Foxley, Frank Pignanelli, and Steve Foxley*

One of the implied fundamentals of American democracy is that the legislative branch enacts laws in reaction to forces and dynamics impacting their constituents. The lawmakers also readily respond to events that affect their institutions and perceived individual political prowess. This was on full display during the 2018 General Legislative Session. Because some of these bills had a direct influence on the legal profession, your Utah State Bar was involved in their deliberations and progress.

Readers may recollect the battle between the legislature, Governor Gary Herbert, and Attorney General Sean Reyes last summer. Third Congressional District Congressman Jason Chaffetz had resigned, triggering the need for a replacement. The United States Constitution, article I, section 2, and Utah Code section 20A-1-502 mandate that in the event there is a vacancy for the United States House of Representatives, the governor shall call a special election.[1]

Utah has never before had a special election for a vacancy in the United States House of Representatives, and therefore there was no precedent for how it should be administered. Furthermore, the state was in the midst of a well-publicized fight with the Utah Republican Party over whether it could require access to a party primary by gathering signatures, in addition to the longstanding caucus and convention system. The legislature and governor differed on how the special election was to be implemented and whether to include the new signature-gathering option allowed under a general election.

Despite having its own counsel pursuant to Utah Constitution article VI, section 32, the legislature requested an opinion regarding this issue from the attorney general under Utah Code Subsection 67-5-1(7). The governor and lieutenant governor were already being advised by the attorney general. At this point, both branches of government could be considered clients of the attorney general, pursuant to Utah Code Subsection 67-5-1(7) and Utah Constitution article VII, section 16, on an issue where they were adverse to one another.

The attorney general did construct an opinion for the legislature but refused to release it to any party. This prompted swift reactions from the legislature, which considered legal action. In the meantime,

the lieutenant governor developed a scheme for the special election, which allowed both the delegate/convention and signature-gathering routes to the primary election. Thus, during the course of the 2017 Special Election and even afterwards, there were intense emotions among state officials over the issue of the attorney general's opinion.

This frustration resulted in H.B. 198, *Attorney General Responsibility Amendments*, being sponsored during the 2018 General Session. Under the bill, the attorney general would not be able to invoke a potential conflict of interest, or the attorney-client relationship, to withhold release of an opinion requested by the legislature. As enrolled, it also requires adherence to certain screening procedures where a potential conflict might arise within the attorney general's office.

John Lund, acting as President of the Utah State Bar, met with legislative counsel and the lawyer-legislators sponsoring H.B. 198. He expressed deep concerns with legislation that held the attorney general to a different, and arguably lower, standard than what is required of lawyers generally under the Utah Rules of Professional Conduct. The original legislation provided a completely separate structure for addressing conflicts of interest, but the bar was able to convince legislators to require the attorney general to undertake a pre-conflict analysis before fulfilling the requirement to represent both parties. Although the bar continues to have reservations about the bill, particularly the inability for the attorney general to decline to represent either party in the event of severe and unwaivable conflicts, our organization and its officers provided articulate arguments that had significant

*DOUGLAS FOXLEY, FRANK PIGNANELLI, and STEVE FOXLEY are registered lobbyists for the Utah State Bar.*

  

**APP.193**
**USB000502**

influence on the language and structure of the legislation.

Despite the differences of opinion, representatives of the bar were impressed with the openness, thoughtfulness, and legal acumen of the sponsors, Representative Merrill Nelson and Senator Lyle Hillyard, and that of the Office of Legislative Research and General Counsel.

H.B. 198 wasn't the only issue lawmakers addressed during the 2018 General Session. Certain individuals had become increasingly frustrated that the attorney general would enter into arrangements with private parties that challenged state law or not intervene to defend laws that the legislature believed should be upheld. In 2017, the legislature passed S.B. 257, *Case Status Updates*, which required an annual update to the legislature by the attorney general of lawsuits challenging the constitutionality of state law, including any "settlements reached, consent decrees entered, or judgments issued." But many believed more needed to be done. Still frustrated, in 2018, legislators introduced S.B. 171, *Intervention Amendments*. This bill gives the legislature an unconditional right to intervene in a state court action that challenges the constitutionality of a state statute, the validity of legislation, or any action of the legislature.

The Bar Commissioners, after a recommendation by the Government Relations Committee, voted to oppose 2018 S.B. 171. Generally, the Utah bar takes a position on legislation where the practice of law is impacted or there is a denial of access to justice. In contrast, here the bar determined that granting extraordinary rights to the legislature could be problematic to the administration of the courts and blurred the executive branch's authority to enforce legislation.

Outside of the separation of powers issues that impacted the legal profession, the bar also took interest in an issue receiving attention nationally and locally. Businesses and property owners have seen increasing actions from plaintiffs alleging violations of the federal Americans with Disabilities Act (ADA). These business interests allege that certain lawyers, in conjunction with professional plaintiffs, are sending an unreasonable number of demand letters for *de minimis* violations of the ADA.

Representative Norman Thurston, upon hearing of these problems in Utah, reached out to the Utah State Bar and the Administrative Office of the Courts, seeking action from these entities to prevent this alleged abuse of the process. For a number of reasons, including these organizations' concerns about interfering with federal law and uncertainty over their appropriate roles in



A HELPING HAND

A MEDIATOR YOU CAN TRUST
• 40+ years of family law litigation experience
• 10+ years of mediation experience
• Understanding
• Creative
• Multivalent thinking
• Confidential

CALL: 435.752.2610 or EMAIL: receptionist@hao-law.com

HAO
Hillyard ■ Anderson ■ Olsen
ATTORNEYS AT LAW
A Professional Corporation

APP.194
USB000503

coming up with specific steps to limit this behavior, Representative Thurston and other lawmakers became frustrated by the pace and results of these conversations. In response, he proposed H.J.R. 3, *Proposal to Amend Utah Constitution – Regarding the Practice of Law*. This resolution would have placed on the 2018 general election ballot a proposed change to the Utah Constitution to remove supervision of lawyers from the Utah Supreme Court, unless they were practicing before a Utah court. No alternative framework was proposed to regulate attorneys for their work outside the courts.

The bar swiftly moved into action after this was introduced. While maintaining discussions with Representative Thurston, the bar secured support from lawmakers in both houses to oppose this radical change. To the credit of Representative Thurston, he met with Bar President John Lund and the bar lobbyists on a number of occasions to review various methods to resolve the concerns. He also discussed options with the courts. As such, H.J.R.3 was never heard in committee.

However, Representative Thurston did move forward with H.B. 115, *Bad Faith Demand Letters Concerning Americans with Disabilities Act*, in an attempt to limit the so-called practice of "ADA trolling." As originally drafted, the bill was modeled after patent trolling legislation passed in the state several years ago.

SPRING *into* SAVINGS

Find everything you need for spring with the Utah State Bar Group Benefits website. Access exclusive discounts on popular products and services such as flowers, gifts, dining out, home decor, entertainment and much more! To access the site, simply log in with your username and password via www.utahbar.org/members.

Nutrisystem   Brooks Brothers   Tickets at Work   1-800-Flowers.com   RESTAURANT.COM

FragranceNet.com   teleflora.   Sam's Club   ENVELOPE

UTAH STATE BAR GROUP BENEFITS

Eventually, the legislation was greatly changed after passionate discussions between lawyer-legislators, trial lawyers, and attorneys representing businesses. Incoming Bar President Dickson Burton also conducted numerous discussions with the supporters of the legislation, reducing its negative impacts on the judicial process despite some lingering concerns over the final version by the Government Relations Committee and the Bar Commissioners. Ultimately, the varied interests at play and wide disagreement about the best manner to address the issue prevented the bill from being heard on the senate floor, though we expect a review of legislation by an interim committee.

Even though we could not ultimately be supportive of the final version that passed, the bar was also able to successfully amend H.B. 167, *Incapacitated Person Guardianship Revisions*, by Representative Mike Winder.

Important changes to H.B. 243, *Division of Real Estate Amendments*, by Representative Gage Froerer were accomplished. We appreciate the efforts of the Steve Lovell (Business Law Section) and Tayler Fox (Real Estate Section) for their invaluable assistance.

Several other bills that the bar or its various sections supported also passed, including H.B. 51, *Administrative Office of the Courts Amendments*; H.B. 273, *Criminal Judgment Account Receivable Amendments*; H.B. 343, *Youth and Child Welfare Amendments*; H.B. 402, *Probate Code Amendments*; S.B. 24, *Local Government Indigent Defense Requirement*; S.B. 33, *DNA Amendments*; S.B. 106, *Court Records Amendments*; S.B. 107, *Third District Court Judge*; S.B. 186, *Indigent Defense Amendments*; and S.B. 219, *Court Citation Amendments*.

Overall, the 2018 General Session was successful for the Utah bar as our leaders influenced the language of legislation and enhanced the bar's relationship with lawmakers and staff. Furthermore, lawmakers and especially lawyer-legislators interacted with bar representatives at unprecedented levels.

We would like to express immense gratitude to the Government Relations Committee. Their weekly preparation and provision of insight made a tremendous difference in our abilities to communicate with legislators and other policymakers. We also wish to thank the lawyer-legislators who carry the torch for our interests, especially the Chairman of the Senate Judiciary committee Todd Weiler and the Chairman of the House Judiciary Committee Michael McKell.

If you have any questions or need additional information regarding the bar's participation with the Utah State Legislature, please contact us or the Utah bar.

1.   In contrast, the governor chooses a replacement in the event of a vacancy in the U.S. Senate.

APP.195
USB000504

2019 Governmental Relations Committee Decisions                              Updated: 3/21/2019

| BILL NO. | TITLE | GRC DISPOSITION | DISPOSITION DATE |
|---|---|---|---|
| UT H 020 | Human Trafficking Amendments | NO POSITION | 1/29/2019 |
| UT H 035 | Custody and Parent-Time Revisions | NO POSITION | 1/29/2019 |
| UT H 040 | Criminal Code Task Force Amendments | NO POSITION | 1/29/2019 |
| UT H 052 | Remote Notarization Standards | NO POSITION | 1/29/2019 |
| UT H 053 | Victim Communications Amendments | OPPOSE IN CURRENT FORM | 2/19/2019 |
| UT H 068 | Court Commissioner | NO POSITION | 1/29/2019 |
| UT H 075 | Sex Offender Registry | NO POSITION | 1/29/2019 |
| UT H 082 | Aggravated Kidnapping | NO POSITION | 1/29/2019 |
| UT H 083 | Statute of Limitations Modifications | NO POSITION | 2/5/2019 |
| UT H 087 | Safe Storage of Firearms | NO POSITION | 1/29/2019 |
| UT H 090 | Occupational Licensing | NO POSITION | 1/29/2019 |
| UT H 097 | Uniform Commercial Code | NO POSTION | 1/29/2019 |
| UT H 100 | Sexual Violence Protective Orders | NO POSITION | 1/29/2019 |
| UT H 108 | Human Trafficking Revisions | NO POSITION | 1/29/2019 |
| UT H 111 | Expungement Modifications | NO POSITION | 1/29/2019 |
| UT H 112 | Survival Claims Amendments | NO POSITION | 1/29/2019 |
| UT H 114 | Self Defense | NO POSITION | 1/29/2019 |
| UT H 121 | End of Life Prescription Provisions | NO POSITION | 1/29/2019 |
| UT H 124 | Divorce Provisions Amendments | OPPOSE IN CURRENT FORM | 1/29/2019 |
| UT H 136 | Abortion Amendments | NO POSITION | 1/29/2019 |
| UT H 137 | Domestic Violence Enhancement Amendments | NO POSITION | 1/29/2019 |
| UT H 141 | Aggravated Sexual Exploitation of a Minor | NO POSITION | 1/29/2019 |
| UT H 152 | Voluntary Commitment of a Firearm | NO POSITION | 1/29/2019 |
| UT H 156 | Search Amendments | NO POSITION | 1/29/2019 |
| UT H 189 | Theft Amendments | NO POSITION | 2/5/2019 |
| UT H 192 | Statute of Limitations Amendments | NO POSITION | 2/5/2019 |
| UT H 194 | Uninsured Motorist Amendments | NO POSITION | 1/29/2019 |
| UT H 200 | Appointment of Constables Amendments | NO POSITION | 2/5/2019 |
| UT H 209 | Extreme Risk Protective Order | NO POSITION REAFFIRMED "NO POSITION" | 2/5/2019 2/12/2019 |
| UT H 214 | Office for Victims of Crime Amendments | NO POSITION | 2/5/2019 |
| UT H 223 | Unlawful Installation of a Tracking Device | NO POSITION | 2/5/2019 |
| UT H 225 | Insanity Defense Amendments | NO POSITION | 2/5/2019 |
| UT H 233 | Grand Jury Process Revisions | NO POSITION | 2/5/2019 |
| UT H 234 | Marriage Amendments | NO POSITION | 2/5/2019 |
| UT H 243 | Domestic Violence Modifications | NO POSITION | 2/5/2019 |
| UT H 253 | Domestic Violence Response Amendments | NO POSITION | 2/5/2019 |
| UT H 281 | Prosecution Review Amendments | NO POSITION | 2/12/2018 |
| UT H 287 | Sex Offense Amendments | NO POSITION. | 2/26/2019 |
| UT H 293 | Plea in Abeyance Amendments | NO POSITION | 2/12/2019 |
| UT H 298 | Offender Registry Amendments | SUPPORT | 2/12/2019 |
| UT H 301 | Board of Pardons and Parole | SUPPORT | 2/12/2019 |
| UT H 308 | Abuse of Process and Demand Letters | OPPOSE | 2/12/2019 |
| UT H 311 | Governmental Immunity | NO POSITION. | 3/5/2019 |
| UT H 313 | Hit and Run | NO POSITION | 2/19/2019 |
| UT H 314 | Trust Provisions | NO POSITION | 2/19/2019 |

**APP.196**

| UT H 325 | Domestic Violence Weapons | NO POSITION | 2/26/2019 |
|---|---|---|---|
| UT H 330 | Juvenile Justice Competency Revisions | SUPPORT | 2/26/2019 |
| UT H 332 | Prohibited Persons Amendments | NO POSITION | 2/26/2019 |
| UT H 335 | Criminal Code Task Force Changes | NO POSITION | 2/26/2019 |
| UT H 371 | Consent to Services for Homeless Youth | SUPPORT | 2/26/2019 |
| UT H 396 | Lewdness Statute Modification | NO POSITION | 2/26/2019 |
| UT H 399 | Conversion Therapy for Minors | NO POSITION | 2/26/2019 |
| UT H 400 | Murder Mitigation Amendments | NO POSITION | 2/26/2019 |
| UT H 404 | Juvenile Justice Reform Amendments | NO POSITION | 2/26/2019 |
| UT H 405 | Limited Driver License Amendments | NO POSITION | 2/26/2019 |
| UT H 408 | Notary Public Liability | NO POSITION | 2/26/2019 |
| UT HJR 003 | Communications of Victims | OPPOSE | 2/5/2019 |
| UT S 010 | Identification Request Amendments | NO POSITION | 1/29/2019 |
| UT S 032 | Indigent Defense Act Amendments | SUPPORT | 2/12/2019 |
| UT S 038 | Mental Health Professionals | NO POSITION | 2/26/2019 |
| UT S 043 | Criminal Provisions Modifications | NO POSITION | 1/29/2019 |
| UT S 045 | Domestic Violence Revisions | NO POSITION | 1/29/2019 |
| UT S 053 | Uniform Guardianship Conservatorship Arrangements | NO POSITION | 2/12/2019 |
| UT S 057 | Child Abuse Amendments | NO POSITION | 2/5/2019 |
| UT S 068 | Driver License and Implied Consent Modifications | NO POSITION | 1/29/2019 |
| UT S 070 | Unclaimed Property Amendments | NO POSITION | 1/29/2019 |
| UT S 075 | Domestic Violence Amendments | NO POSITION | 1/29/2019 |
| UT S 076 | Workers' Compensation Adjudication Amendments | SUPPORT | 2/12/2019 |
| UT S 078 | Intestate Succession Amendments | NO POSITION | 1/29/2019 |
| UT S 088 | Crime Victims Restitution Amendments | NO POSITION | 2/5/2019 |
| UT S 092 | Third Judicial District Judge Amendments | SUPPORT | 1/29/2019 |
| UT S 099 | Sales Tax Amendments | NO POSITION | 2/5/2019 |
| UT S 103 | Victim Targeting Penalty Enhancements | NO POSITION | 2/19/2019 |
| UT S 128 | Child Welfare Amendments | OPPOSE IN CURRENT FORM | 2/5/2019 |
| UT S 135 | Prosecution Council Amendments | NO POSITION | 2/12/2019 |
| UT S 148 | Child Welfare in Custody Proceedings | NO POSITION | 2/12/2019 |
| UT S 183 | Uniform Criminal Records Accuracy Act | NO POSITION | 3/5/2019 |
| UT S 193 | Attorney General Enforcement Amendments | NO POSITION | 3/5/2019 |
| UT S 202 | Vulnerable Adult Amendments | NO POSITION | 2/26/2019 |
| UT S 207 | Judiciary Amendments | SUPPORT | 3/5/2019 |
| UT SJR 005 | Ethics Commission Amendments | NO POSITION | 1/29/2019 |
| UT SJR 008 | Rules of Evidence | NO POSITION | 3/5/2019 |
| UT H 427 | Sexual Assault and Domestic Violence Victims | NO POSITION | 3/5/2019 |
| UT H 430 | Prohibition of Genital Mutilation | NO POSITION | 3/5/2019 |
| UT H 431 | Expungement Act Amendments | SUPPORT | 3/5/2019 |
| UT H 432 | Elected Official and Judicial Compensation Commission | NO POSITION | 3/5/2019 |
| UT H 437 | Pre-Sentence Investigation and Probation Report | NO POSITION | 3/5/2019 |
| UT H 441 | Tax Equalization and Reduction Act | OPPOSE | 3/5/2019 |

**APP.197**

| UT H 448 | Litigation Funding Transparency Act | OPPOSE | 3/5/2019 |
|---|---|---|---|
| UT H 450 | Criminal Nonsupport Amendments | NO POSITION | 3/5/2019 |
| UT S 109 | Asset Forfeiture Amendments | NO POSITION | 3/5/2019 |
| UT HJR 25 | Rule of Evidence | OPPOSE | 3/5/2019 |
| UT S 215 | Adoption Service Agencies Amendments | OPPOSE | 3/5/2019 |
| UT S 243 | Adoption Amendments | OPPOSE | 3/5/2019 |

| Number | Title | Prime Sponsor | General Provisions | POSITION |
|--------|-------|---------------|--------------------|----------|
| HB0064 | Custody and Visitation Rights Amendments | Andersen K. | This bill amends provisions related to custody and visitation rights of an individual other than a parent. | 2/11/2020 SUPPORT |
| HB0083 | Expungement Amendments | Stoddard A. | This bill amends provisions related to the expungement of pleas in abeyance. | 2/11/2020 SUPPORT |
| HB0100 | Veterans Treatment Court Act | Snow V.L. | This bill enacts the Veterans Treatment Court Act. | 2/11/2020 SUPPORT |
| HB0102 | Retaliation and Obstruction of Justice Amendments | Hall C. | This bill makes changes to certain criminal statutes regarding interfering with an investigation or legal proceeding. | 2/04/2020 SUPPORT |
| HB0142 | Criminal Proceeding Amendments | Pitcher S. | This bill creates certain pleading requirements. | 2/11/2020 SUPPORT |
| HB0189 | Jury Duty Exemptions | Quinn T. | Amends provisions relating to exemptions from jury service. | 2/04/2020 OPPOSE |
| HB0206 | Bail and Pretrial Release | Pitcher S. | Makes changes to provisions relating to bail. | 2/25/2020 SUPPORT |
| HB0298 | Victim Guidelines for Prosecutors | Stoddard A. | Enacts guidelines for prosecutors and other relevant entities interactions and protocols related to a victim cooperating with an investigation or prosecution. | 2/25/2020 SUPPORT |
| HB0303 | Diversion Fees Amendments | Stoddard A. | Authorizes a court to assess a diversion fee on a criminal defendant when that defendant is eligible for a diversion, enters into a diversion agreement with the prosecuting attorney, and the court approves that agreement. | 2/25/2020 SUPPORT |
| HB0324 | Conviction Integrity Units | Weiler T. | Allows prosecution agencies to create conviction integrity units to review convictions. | 2/25/2020 SUPPORT |
| HB0450 | Attorney Fees Revisions | Brammer B. | This bill prohibits certain state officers or employees from recovering attorney fees and court costs; limits the recovery of certain attorney fees and court costs incurred in an action to recover attorney fees and court costs. | 3/03/2020 OPPOSE |
| SB0034 | Sex Offender Registry Amendments | Weiler T. | This bill amends the Sex and Kidnap Offender Registry. | 2/11/2020 SUPPORT |
| SB0060 | Advice and Consent Amendments | Mayne K. | This bill modifies deadlines, and the information provided by the governor, with respect to non-judicial gubernatorial nominees;  requires a Senate confirmation hearing, and provides an exception to a deadline waiver provision, for certain nominees; requires notice of anticipated vacancies in offices that require Senate consent; provides a process for government entities and other organizations to provide input on gubernatorial appointments;  provides for the governor to receive advice regarding judicial appointments; amends provisions requiring Senate consent to also require Senate advice; and makes technical changes. | 1/28/2020 OPPOSE |
| SB0139 | Indigent Defense Services | Okerlund R. | Addresses indigent defense services. | 2/25/2020 SUPPORT |
| SB0170 | Indigent Defense | Weiler T. | Amends provisions related to indigent defense. | 3/03/2020 SUPPORT |
| SB0175 | Indigent and Parental Defense | Harper W. | Modifies and enacts provisions related to indigent and parental defense. | 3/03/2020 SUPPORT |
| SB0177 | Small Claims Amendments | Cullimore K. | This bill amends provisions related to small claims actions. | 2/25/2020 OPPOSE |
| SB0206 | Judicial Election Amendments | McCay D. | This bill requires the county clerk to include the retention recommendation of the Judicial Retention Evaluation Committee on a judicial retention ballot. | 3/03/2020 OPPOSE |
| SB0220 | Confession of Judgment Amendments | Cullimore K. | This bill allows parties to enter into a confession of judgment before a default except in employment contracts and certain consumer credit contracts; and provides that the default event for a confession of judgment is the default giving rise to the underlying action. | 3/03/2020 OPPOSE |
| SJR005 | Joint Resolution to Amend the Rules of Civil Procedure on Disqualification of a Judge | Cullimore K. | This joint resolution amends the Utah Rules of Civil Procedure, Rule 63, regarding the disqualification of a judge. | 1/28/2020 OPPOSE as DRAFTED 2/18/2020 OPPOSE Reaffirmed vote to oppose based on amendments limiting the scope of this bill to Weber, Davis, Salt Lake, and Utah Counties. |
| SJR008 | Proposal to Amend Utah Constitution – Judiciary Selection Amendments | McCay D. | This resolution proposes to amend the Utah Constitution to:  modify the method of selecting judges of courts of record from appointment by the governor, from nominees certified by a nominating commission and subject to Senate approval, to nonpartisan election;  eliminate the judicial retention election process; and provide for terms of judges of courts of record. | 1/28/2020 OPPOSE |

2021 GOVERNMENTAL RELATIONS COMMITTEE                Prepared by Christy Abad . cabad@utahbar.org

NUMBERED BILLS WITH VOTE(S) TAKEN:

| Number | Title | Prime Sponsor | Vote: |
|---|---|---|---|
| HB0020 | Driving Under the Influence Sentencing | Eliason, S. | 1/12/2021 NO POSITION |
| HB0021 | Stalking Amendments | Pierucci, C | 1/12/2021 HOLD 1/19/2021 HOLD 1/26/2021 HOLD 2/2/2021 NO POSITION |
| HB0026 | 24-7 Sobriety Program Expansion | Pitcher, S. | 1/12/2021 SUPPORT |
| HB0046 | Student Prosperity Savings Program Amendments | Eliason, S. | 1/19/2021 NO POSITION |
| HB0047 | DUI Revisions | Eliason, S. | 1/12/2021 NO POSITION |
| HB0058 | Riot Amendments | Wilcox, R. | 1/19/2021 NO POSITION |
| HB0059 | Law Enforcement Investigation Amendments | Stoddard, A. | 1/12/2021 NO POSITION |
| HB0064 | Factual Innocence Payments Amendments | Wheatley, Mark | 1/12/2021 NO POSITION |
| HB0067 | Juvenile Sentencing Amendments | Hall, Craig | 1/12/2021 HOLD 1/19/2021 NO POSITION |
| HB0073 | Drug Testing Amendments | Watkins C. | 2/9/2021 NO POSITION |
| HB0080 | Data Security Amendments | Brooks, W. | 1/19/2021 NO POSITION |
| HB0090 | Criminal Code Changes Impact Statement | Dailey-Provost, Jennifer | 1/12/2021 NO POSITION |
| HB0095 | Prison Rape Elimination Act Compliance | Romero, A. | 1/19/2021 NO POSITION |
| HB0097 | Property Tax Penalties Amendments | Gwynn, M. | 1/19/2021 NO POSITION |
| HB0100 | Postconviction Remedies Act Amendments | Brammer, B. | 1/19/2021 SUPPORT |
| HB0101 | Protected Persons Amendments | Stoddard, A. | 1/19/2021 NO POSITION |
| HB0103 | Retaliation and Obstruction of Justice Amendments | Hall, C. | 1/19/2021 NO POSITION |
| HB0104 | Victim Address Confidentiality Program | Pitcher, S. | 1/19/2021 NO POSITION |
| HB0106 | Adoption Tax Credit | Shipp, R. | 1/12/2021 NO POSITION |

**APP.200**

| HB0115 | Municipal Boundary Modifications | Waldrip, S. | 1/19/2021 NO POSITION |
|---|---|---|---|
| HB0129 | Office on Domestic and Sexual Violence | Snow, V. L. | 1/19/2021 NO POSITION |
| HB0158 | Juvenile Interrogation Amendments | Judkins, M. | 2/2/2021 HOLD 2/9/2021 NO POSITION |
| HB0179 | Private Cause of Action for Referral Fees | Abbott, N. | 1/26/2021 HOLD 2/2/2021 NO POSITION |
| HB0189 | Grand Jury Amendments | Nelson, M. | 1/26/2021 NO POSITION |
| HB0191 | Adoption Amendments | Nelson, M. | 2/9/2021 NO POSITION |
| HB0207 | Bail Amendments | Shipp, R. | 1/26/2021 NO POSITION |
| HB0218 | Reporting Requirement Amendments | King, B. | 1/26/2021 NO POSITION |
| HB0220 | Pretrial Detention Amendments | Schultz, M. | 1/26/2021 NO POSITION |
| HB0225 | Administrative Garnishment Order Amendments | Miles, K. | 1/26/2021 NO POSITION |
| HB0227 | Self Defense Amendments | Lisonbee, K. | 2/2/2021 HOLD 2/9/2021 NO POSITION |
| HB0228 | Jail Photo Distribution Prohibition | Stratton, K. | 2/23/2021 NO POSITION |
| HB0232 | Attorney General Authority Amendments | King, B. | 2/9/2021 NO POSITION |
| HB0237 | Lethal Force Amendments | Dailey-Provost, J. | 2/23/2021 NO POSITION |
| HB0240 | Pretrial Amendments | Pitcher, S. | 1/26/2021 NO POSITION |
| HB0245 | Forcible Entry and Warrants Amendments | Hall, C. | 2/2/2021 HOLD 2/9/2021 NO POSITION |
| HB0249 | Public Access to Court Records | Handy, S. | 2/2/2021 NO POSITION |
| HB0255 | Protective Order Revisions | Snow, V.L. | 2/2/2021 SUPPORT |
| HB0260 | Criminal Justice Modifications | Lisonbee, K. | 2/2/2021 SUPPORT* |
| HB0264 | Law Enforcement Weapons Use Amendments | Romero, A. | 2/2/2021 NO POSITION |
| HB0267 | Voluntary Lethal Means Restrictions Amendments | Eliason, S. | 2/2/2021 NO POSITION |
| HB0269 | Governmental Immunity Modifications | Moss, C. | 2/9/2021 NO POSITION |
| HB0276 | Notary Public Amendments | Nelson, M. | 2/9/2021 NO POSITION |

**APP.201**

| HB0277 | Child Care Eligibility | Matthews, A. | 2/16/2021 NO POSITION |
| HB0282 | Right of Survivorship Amendments | Miles, K. | 2/9/2021 NO POSITION |
| HB0283 | Community and Police Relations Commission | Wheatley, M. | 2/9/2021 NO POSITION |
| HB0284 | Minimum Wage Amendments | Collard, C. | 2/9/2021 NO POSITION |
| HB0285 | Juvenile Recodification | Snow, V. Lowry | 2/23/2021 NO POSITION |
| HB0289 | Victim Services Amendments | Lisonbee, K. | 2/9/2021 NO POSITION |
| HB0290 | Probation and Parole Amendments | Stratton, K. | 2/9/2021 NO POSITION |
| HB0316 | Common Law Marriage Amendments | Teuscher, J. | 2/9/2021 SUPPORT |
| HB0324 | Alimony Amendments | Teuscher, J. | 2/9/2021 NO POSITION |
| HB0329 | Expungement Revisions | Pierucci, C. | 2/16/2021 NO POSITION |
| HB0350 | Medical Health Records Confidentiality Amendments | Eliason, S. | 2/16/2021 NO POSITION |
| HB0357 | Written Agreements Amendments | Abbott, N. | 2/16/2021 NO POSITION |
| HB0358 | Guardianship Amendments | Spendlove, R. | 2/16/2021 NO POSITION |
| HB0367 | Qualified Immunity Amendments | King, B. | 2/16/2021 NO POSITION |
| HB0373 | Conviction Reduction Amendments | Teuscher, J. | 2/23/2021 SUPPORT |
| HB0374 | Restrictive Covenants Amendments | Winder, M. | 2/23/2021 NO POSITION |
| HB0385 | Antidiscrimination Act Amendments | Petersen, M. | 2/23/2021 NO POSITION |
| HB0406 | Marriage Revisions | Ballard, M.G. | 3/2/2021 NO POSITION |
| HB0410 | Juvenile Justice Amendments | Snow, V. L. | 2/23/2021 NO POSITION |
| HB0412 | Court-appointed Therapists Amendments | Teuscher, J. | 3/2/2021 NO POSITION |
| HB0418 | Uniform Partition of Heirs' Property Act | Snow, V.L. | 3/2/2021 NO POSITION |
| HJR0007 | Joint Resolution Amending Rules of Criminal Procedure on Preliminary Examinations | Watkins, C. | 2/2/2021 HOLD 2/9/2021 NO POSITION |
| HJR0009 | Joint Resolution Amending the Rules of Evidence on Admissibility of Evidence of Crimes or Other Acts | Handy, S. | 2/9/2021 NO POSITION |
| HJR0014 | Proposal to Amend Utah Constitution | King, B. | 2/23/2021 NO POSITION |

**APP.202**

| HR0004 | House Rules Resolution – Forming Special Investigative Committee | Stoddard, A. | 2/23/2021<br>NO POSITION |
|--------|------------------------------------------------------------------|--------------|--------------------------|
| SB0017 | Criminal Code Evaluation Task Force Extension | Mayne, K. | 1/19/2021<br>NO POSITION |
| SB0018 | Property Tax Exemption Amendments | Harper, W. | 1/19/2021<br>NO POSITION |
| SB0024 | Property Tax Revisions | Bramble, C. | 1/19/2021<br>NO POSITION |
| SB0025 | Corporate Tax Amendments | Bramble, C. | 1/19/2021<br>NO POSITION |
| SB0026 | Property Tax Relief Amendments | Davis, G. | 1/19/2021<br>NO POSITION |
| SB0042 | Tax Commission Administrative Garnishment | Bramble, C. | 1/19/2021<br>HOLD<br>1/26/2021<br>NO POSITION |
| SB0046 | Post-Employment Restrictions Amendments | Cullimore, K. | 1/19/2021<br>HOLD<br>1/26/2021<br>NO POSITION |
| SB0050 | Juvenile Offender Penalty Amendments | Thatcher, D. | 1/19/2021<br>SUPPORT |
| SB0051 | Group Gang Enhancement Amendments | Thatcher, D. | 1/19/2021<br>NO POSITION |
| SB0060 | Accident Reports Amendments | Bramble, C. | 1/19/2021<br>NO POSITION |
| SB0064 | Domestic Violence Amendments | Iwamoto, J. | 1/19/2021<br>NO POSITION |
| SB0067 | Workplace Violence Protective Orders | Weiler, T. | 1/19/2021<br>NO POSITION |
| SB0068 | Law Enforcement Weapons Amendments | Buxton, D. | 1/19/2021<br>NO POSITION |
| SB0071 | Property Acquisition Amendments | Fillmore, L. | 1/19/2021<br>HOLD<br>1/26/2021<br>HOLD<br>2/2/2021<br>NO POSITION |
| SB0080 | Utah Antidiscrimination Act Amendments | Kitchen, D. | 1/26/2021<br>NO POSITION |
| SB0083 | POLST Order Amendments | Ward, R.<br>Iwanmoto, J. | 2/9/2021<br>NO POSITION |
| SB0084 | Indigent Defense Transcripts Amendments | Weiler, T. | 1/26/2021<br>HOLD<br>2/2/2021<br>NO POSITION |
| SB0085 | Disinheritance Following Crimes Against Vulnerable Adults | Weiler, T. | 1/26/2021<br>NO POSITION |
| SB0089 | Preconstruction and Construction Liens | McKell, M. | 1/26/2021<br>NO POSITION |
| SB0090 | Parental Defense Amendments | Harper, W. | 1/26/2021<br>NO POSITION |

**APP.203**

| SB0108 | Penalty Enhancement Amendments | Weiler, T. | 1/26/2021 NO POSITION |
|--------|--------------------------------|------------|------------------------|
| SB0112 | Occupational Therapy Licensure Compact | Davis, G. | 2/9/2021 NO POSITION |
| SB0116 | Possessory Lien Amendments | Riebe, K. | 1/26/2021 NO POSITION |
| SB0122 | Custody Amendments | Anderegg, J. | 1/26/2021 NO POSITION |
| SB0126 | Sentencing Commission Requirements | Thatcher, D. | 2/16/2021 SUPPORT |
| SB0128 | Family Planning Service Amendments | Kitchen, D. | 2/16/2021 NO POSITION |
| SB0138 | Violence, Disorder, and Looting Enforcement Protection Act | Hinkins, D. | 2/16/2021 NO POSITION |
| SB0150 | Government Records Access and Management Act Judicial Review Amendments | Weiler, T. | 2/16/2021 NO POSITION |
| SB0156 | Criminal Defense Amendments | Davis, G. | 2/16/2021 NO POSITION |
| SB0171 | Pretrial Detention Revisions | Weiler, T. | 2/16/2021 HOLD 2/23/2021 NO POSITION |
| SB0173 | Medical Records Amendments | Mayne, K. | 2/16/2021 HOLD 2/23/2021 SUPPORT |
| SB0179 | DUI Probation Amendments | Mayne, K. | 2/16/2021 SUPPORT |
| SB0180 | Driver License Suspension Revisions | Mayne, K. | 2/16/2021 NO POSITION |
| SB0197 | Trust Deed Amendments | Wilson, C. | 2/23/2021 NO POSITION |
| SB0215 | Sex Offender Registry Amendments | Anderegg, J. | 2/23/2021 SUPPORT |
| SB0220 | Court Fee Amendments | Riebe, K. | 2/23/2021 NO POSITION |
| SB0231 | Expungement Amendments | Weiler, T. | 2/23/2021 NO POSITION |
| SJR0013 | Joint Resolution on Federal and State Roles in Criminal Justice | Bramble, C. | 2/23/2021 NO POSITION |

**APP.204**

NUMBERED BILLS WITH VOTE(S) TAKEN:

| Number | Title | Prime Sponsor | GRC Committee Vote | Bar Commission Vote |
|--------|-------|---------------|--------------------|--------------------|
| HB0028 | Offender Supervision Amendments | Rep. Lisonbee, K | 1/25/2022 NO POSITION | |
| HB0029 | Driving Offenses Amendments | Rep. Acton, C.K. | 1/25/2022 NO POSITION | |
| HB0040 | Judicial Performance Evaluation Commission Amendments | Rep. Abbott, N. | 1/25/2022 SUPPORT | 1/18/2022 SUPPORT |
| HB0045 | Justice Court Judge Elections Amendments | Rep. Hawkins, J. | 1/18/2022 SUPPORT | 1/18/2022 SUPPORT |
| HB0055 | Juvenile Justice Services Amendments | Rep. Acton, C.K. | 1/25/2022 NO POSITION | |
| HB0065 | Forensic Biological Evidence Preservation | Rep. King, Brian S. | 1/25/2022 HOLD 2/1/2022 HOLD 2/15/2022 SUPPORT | 2/15/2022 SUPPORT |
| HB0081 | Sexual Solicitation Amendments | Rep. Pulsipher, S. | 1/25/2022 NO POSITION | |
| HB0084 | Child Support Statute of Limitations | Rep. Collard, C. | 1/18/2022 NO POSITION | |
| HB0086 | Parenting Plan Amendments | Rep. Moss, C. | 1/18/2022 NO POSITION | |
| HB0093 | Juror and Witness Fee Amendments | Rep. Winder, M. | 1/18/2022 HOLD 1/25/2022 SUPPORT | 1/25/2022 SUPPORT |
| HB0098 | Sexual Offense Amendments | Rep. Romero, A. | 1/25/2022 NO POSITION | |
| HB0099 | Civil Commitment Amendments | Rep. Dailey-Provost, J. | 1/18/2022 HOLD 1/25/2022 NO POSITION | |
| HB0107 | Small Claims Amendments | Rep. Brammer, B. | 1/18/2022 HOLD 1/25/2022 SUPPORT | 1/25/2022 SUPPORT |
| HB0111 | Court-appointed Therapists Amendments | Rep. Teuscher, J. | 1/18/2022 NO POSITION | |
| HB0117 | Victim Address Confidentiality Program | Rep. Pitcher, S. | 1/25/2022 NO POSITION | |
| HB0120 | Uniform Partition of Heirs' Property Act | Rep. Snow, V. L. | 1/18/2022 NO POSITION | |
| HB0122 | Marriage Terminology Amendments | Rep. Weight, E. | 1/18/2022 NO POSITION | |
| HB0123 | Use of Force Revisions | Rep. Birkeland, K. | 1/25/2022 NO POSITION | |
| HB0124 | Forcible Entry Warrant Modifications | Rep. Gwynn, M. | 1/25/2022 NO POSITION | |
| HB0126 | Division of Juvenile Justice Services Rulemaking | Rep. Romero, A. | 2/1/2022 NO POSITION | |
| HB0134 | Victims' Rights Revisions | Rep. Rohner, J. | 1/25/2022 SUPPORT | 1/25/2022 SUPPORT |
| HB0138 | Juvenile Justice Modifications | Rep. Judkins, M. | 2/22/2022 NO POSITION | |
| HB0139 | Traffic Violation Amendments | Rep. Teuscher, | 1/25/2022 NO POSITION | |
| HB0140 | Government Attorney Fees Amendments | Rep. Birkland, K. | 2/1/2022 NO POSITION | |
| HB0147 | Death Penalty Modifications | Rep. Snow, V. L. | 1/25/2022 HOLD 2/1/2022 NO POSITION | |
| HB0148 | Commitment in Criminal Proceedings | Rep. Abbott, N. | 2/1/2022 | |

**APP.205**

| Bill | Title | Sponsor | | |
|------|-------|---------|--|--|
| | | | HOLD 3/1/2022 NO POSITION | |
| HB0149 | Power of Attorney Amendments | Rep. Ballard, M.G. | 2/1/2022 NO POSITION | |
| HB0153 | Child Welfare Interview Requirements | Rep. Musselman, C.R. | 2/1/2022 NO POSITION | |
| HB0171 | Custodial Interrogation Amendments | Rep. Wilcox, R. | 2/1/2022 SUPPORT | 2/1/2022 NO POSITION |
| HB0179 | Juvenile Record Amendments | Rep. Snow, V. L. | 2/1/2022 HOLD 2/15/2022 SUPPORT | 2/15/2022 SUPPORT |
| HB0196 | Transfer of Domestic Violence Cases | Rep. Pitcher, S. | 2/1/2022 HOLD 3/1/2022 NO POSITION | |
| HB0208 | Domestic Violence Offender Treatment Board | Rep. Snow, V.L. | 2/1/2022 NO POSITION | |
| HB0219 | Uniform Unregulated Child Custody Transfer Act | Rep. Nelson, M. | 2/1/2022 NO POSITION | |
| HB0225 | Access to Medical Records Amendments | Rep., Dunnigan, J. | 2/1/2022 NO POSITION | |
| HB0228 | Crime Victim Reparations Amendments | Rep. Ivory, K. | 2/22/2022 HOLD 3/1/2022 NO POSITION | |
| HB0229 | Property and Financial Offense Amendments | Rep. Brammer, B. | 2/1/2022 NO POSITION | |
| HB0231 | Fishing and Hunting Restrictions for Nonpayment of Child Support | Rep. Lisonbee, K. | 2/8/2022 NO POSITION | |
| HB0246 | Protection of Vulnerable Individuals | Rep. King, Brian | 2/22/2022 HOLD 3/1/2022 NO POSITION | |
| HB0248 | Juvenile Amendments | Rep. Snow, V.L. | 2/15/2022 NO POSITION | |
| HB0249 | Juvenile Recodification Cross References | Rep. Snow, V.L. | 2/15/2022 NO POSITION | |
| HB0257 | Public Prosecutor Modifications | Rep. Christofferson, K. | 2/1/2022 OPPOSE | 2/1/2022 OPPOSE |
| HB0261 | Civil Commitment Revisions | Rep. Lyman, P. | 2/15/2022 NO POSITION | |
| HB0277 | Juvenile Competency Amendments | Rep. King, B. | 2/22/2022 NO POSITION | |
| HB0299 | Juvenile Justice Changes | Rep. Snow, V.L. | 2/15/2022 NO POSITION | |
| HB0314 | Inheritance Disqualification Amendments | Rep. Stoddard, A. | 2/15/2022 NO POSITION | |
| HB0318 | Dental Provider Malpractice Amendments | Rep. Teuschner, J. | 2/15/2022 NO POSITION | |
| HB0320 | Guardianship Bill of Rights | Rep. Abbot, N. | 2/15/2022 NO POSITION | |
| HB0321 | Restitution Amendments | Rep., Abbot, N. | 2/15/2022 NO POSITION | |
| HB0325 | Mental Health Support and Law Enforcement Co-response | Rep. Stoddard, A. | 2/22/2022 NO POSITION | |
| HB0351 | Domestic Violence Modifications | Rep. Pierucci, C. | 2/22/2022 NO POSITION | |
| HB0359 | Eviction Records Amendments | Rep. Judkins, M. | 2/22/2022 HOLD 3/1/2022 NO POSITION - DEAD | |
| HB0361 | Criminal Restitution Amendments | Rep. Lisonbee, K. | 3/1/2022 NO POSITION - DEAD | |
| HB0363 | Modifications to Civil Commitment | Rep. Eliason, S. | 2/22/2022 HOLD 3/1/2022 NO POSITION | |

| Bill | Title | Sponsor | | |
|------|-------|---------|---|---|
| HB0367 | Probate and Trust Amendments | Rep. Miles, K. | 2/15/2022 NO POSITION | |
| HB0375 | Office Child Care Amendments | Rep. Matthews, A. | 2/22/2022 NO POSITION | |
| HB0392 | Expungement Fee Amendments | Rep. Dunnigan, J. | 2/22/2022 HOLD 3/1/2022 SUPPORT | 3/1/2022 SUPPORT |
| HB0408 | Product Liability Amendments | Rep. King, B. | 2/22/2022 HOLD 3/1/2022 NO POSITION | |
| HB0412 | Probation and Parole Employment Incentive Program | Rep. Lisonbee, K | 3/1/2022 NO POSITION - DEAD | |
| HB0434 | Theft by Extortion Amendments | Rep. Abbott, N. | 3/1/2022 NO POSITION | |
| HB0444 | Income Tax Revisions | Rep. Spendlove, R. | 3/1/2022 NO POSITION | |
| HB0447 | Penalty for False Statement During Arrest | Rep. Ivory, K. | 3/1/2022 NO POSITION | |
| HB0448 | Statute of Limitations Amendments | Rep. Collard, C. | 3/1/2022 NO POSITION | |
| HB0458 | Adoption Amendments | Rep. Birkland, K. | 3/1/2022 NO POSITION | |
| HB0459 | HIV Testing Modifications | Rep. Judkins, M. | 3/1/2022 NO POSITION | |
| HB0461 | Spinal Cord and Traumatic Brain Injury Fund Amendments | Rep. Ward, R. | 3/1/2022 NO POSITION | |
| HB0473 | Extradition Tolling Amendments | Rep. Ivory, K. | 3/1/2022 NO POSITION | |
| HJR002 | Joint Resolution Amending Rules of Evidence on Admissibility of Evidence of Crimes or Other Acts | Rep. Handy, S. | 2/1/2022 NO POSITION | |
| HJR004 | Proposal to Amend Utah Constitution -- Legislative Power Relating to Civil Action for Child Sexual Abuse | Rep. Ivory, K. | 2/1/2022 HOLD 2/8/2022 HOLD 2/15/2022 BILL "DIED" | |
| HJR010 | Proposal to Amend Utah Constitution - Inherent and Inalienable Rights | Rep. Lyman, P. | 2/15/2022 NO POSITION | |
| HJR013 | Joint Resolution Amending Court Rules of Procedure and Evidence to Address the Medical Candor Process | Rep. Nelson, M. | 2/15/2022 NO POSITION | |
| HJR017 | Joint Resolution Amending the Rules of Criminal Procedure on Hearings with Contemporaneous Transmission | Rep. Waldrip, S. | 2/22/2022 HOLD 3/1/2022 NO POSITION - DEAD | |
| SB0035 | Expungement Modifications | Sen. Weiler, T. | 2/15/2022 SUPPORT | 2/15/2022 SUPPORT |
| SB0043 | Occupational and Professional Licensing Modifications | Sen. Bramble, C. | 2/8/2022 OPPOSE | 2/8/2022 OPPOSE 2/15/2022 NO POSITION |
| SB0056 | Criminal Stalking Exemption Amendments | Sen. Weiler, T. | 2/22/2022 HOLD 3/1/2022 NO POSITION | |
| SB0057 | County Counsel Amendments | Sen. Fillmore, L. | 2/15/2022 NO POSITION | |
| SB0065 | Asset Forfeiture Amendments | Sen. Weiler, T. | 2/8/2022 NO POSITION | |
| SB0074 | Alimony Modifications | Sen. Weiler, T. | 2/8/2022 NO POSITION | |
| SB0080 | Real Property Recording Amendments | Sen. Winterton, R. | 1/25/2022 NO POSITION | |
| SB0085 | Protective Order and Stalking Injunction Expungement | Sen. Weiler, T. | 2/22/2022 HOLD 3/1/2022 SUPPORT | 3/1/2022 SUPPORT |

**APP.207**

| Bill | Title | Sponsor | | |
|---|---|---|---|---|
| SB0086 | District and Juvenile Court Judge Amendments | Sen. Weiler, T. | 2/1/2022 SUPPORT | 2/1/2022 SUPPORT |
| SB0087 | Court Fee Waiver Amendments | Sen. Iwamoto, J. Rep. Snow, V.L. | 1/18/2022 SUPPORT | 1/18/2022 SUPPORT |
| SB0095 | Limitations on Employer Liability | Sen. Owens, D. | 2/8/2022 NO POSITION | |
| SB0098 | Judiciary Amendments | Sen. Weiler, T. | 2/8/2022 SUPPORT | 2/8/2022 SUPPORT |
| SB0108 | Indigent Defense Amendments | Sen. Weiler, T. | 2/15/2022 SUPPORT | 2/15/2022 SUPPORT |
| SB0112 | Pretrial Restorative Justice Amendments | Sen. Kitchen, D. | 2/22/2022 HOLD 3/1/2022 NO POSITION - DEAD | |
| SB0120 | Juvenile Justice Amendments | Sen. Weiler, T. | 2/22/2022 HOLD 3/1/2022 NO POSITION - DEAD | |
| SB0123 | Criminal Code Recodification | Sen. Mayne, K. | 2/22/2022 HOLD 3/1/2022 NO POSITION | |
| SB0124 | Criminal Code Recodification Cross References | Sen. Mayne, K. | 2/22/2022 HOLD 3/1/2022 NO POSITION | |
| SB0141 | Criminal Evidence Retention Amendments | Sen. Harper, W. | 2/15/2022 OPPOSE | 2/15/2022 OPPOSE |
| SB0150 | Criminal Justice Data Management Task Force | Sen. Anderegg, J. | 2/22/2022 HOLD 3/1/2022 NO POSITION | |
| SB0155 | Guardianship and Conservatorship Amendments | Sen. Weiler, T. | 2/8/2022 NO POSITION | |
| SB0156 | Protection Against Extortion Amendments | Sen. Thatcher, D. | 2/22/2022 HOLD 3/1/2022 NO POSITION | |
| SB0161 | Child Welfare Appeals Amendments | Sen. Harper, W. | 2/22/2022 NO POSITION | |
| SB0165 | Animal Treatment Modifications | Sen. Davis, G. | 2/22/2022 HOLD 3/1/2022 NO POSITION | |
| SB0167 | Sexual Exploitation Amendments | Sen. Wilson, C. | 2/22/2022 HOLD 3/1/2022 NO POSITION | |
| SB0181 | Parental Representation Amendments | Sen. Harper, W. | 2/8/2022 NO POSITION | |
| SB0193 | Criminal Defense Prohibition | Sen. Kitchen, D. | 2/22/2022 HOLD 3/1/2022 NO POSITION - DEAD | |
| SB0207 | Wrongful Death Action Amendments | Sen. Weiler, T. | 2/22/2022 NO POSITION | |
| SB0210 | Post-conviction Representation Amendments | Sen. Weiler, T. | 2/22/2022 HOLD 3/1/2022 SUPPORT | 3/1/2022 SUPPORT |
| SB0217 | Protective Order Revisions | Sen. Weiler, T. | 2/22/2022 NO POSITION | |
| SB0227 | Consumer Privacy Act | Sen. Cullimore, K. | 3/1/2022 NO POSITION | |
| SB0231 | Preliminary Hearing Amendments | Sen. Weiler, T. | 3/1/2022 NO POSITION | |
| SB0239 | Congregate Care Program Amendments | Sen. McKell, M. | 3/1/2022 NO POSITION | |

| SB0242 | Child Support Amendments | Sen. Weiler, T. | 3/1/2022<br>NO POSITION | |
| SB0243 | Parent-Time Amendments | Sen. Weiler, T. | 3/1/2022<br>NO POSITION | |
| SJR007 | Joint Resolution Ratifying and Amendment to the United States Constitution | Sen. Riebe, K. | 2/8/2022<br>NO POSITION | |
| SJR008 | Joint Resolution Amending Rules of Criminal Procedure on Appointment of Counsel | Sen. Weiler, T. | 2/22/2022<br>HOLD<br>3/1/2022<br>NO POSITION -<br>MOOT | |

APP.209

David C. Reymann (8495)
PARR BROWN GEE & LOVELESS, P.C.
101 South 200 East, Suite 700
Salt Lake City, Utah 84111
Telephone: (801) 532-7840
dreymann@parrbrown.com

Troy L. Booher (9419)
Dick J. Baldwin (14587)
Caroline Anais Olsen (18070)
ZIMMERMAN BOOHER
Felt Building, Fourth Floor
341 South Main Street
Salt Lake City, Utah 84111
Telephone: (801) 924-0200

Attorneys for Defendants

---

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| AMY POMEROY,<br><br>  Plaintiff,<br><br>vs.<br><br>UTAH STATE BAR, *et al.*,<br><br>  Defendants. | **RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANTS**<br><br>Case No. 2:21-cv-00219-TC-JCB<br><br>Judge Tena Campbell<br>Magistrate Judge Jared C. Bennett |

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Defendants hereby respond to Plaintiff's First Set of Interrogatories to Defendants, served September 15, 2022.

### RESPONSE TO DEFINITIONS AND INSTRUCTIONS

Defendants object to the Definitions and Instructions to the extent that they impose requirements beyond or are otherwise inconsistent with the Federal Rules of Civil Procedure. Any specific application of this objection is noted in each of the responses set forth below. Defendants further do not interpret any request as calling for the production of privileged

information and/or documents, and the lack of any specific privilege objection below shall not be construed as a waiver of any such privilege.

## RESPONSE TO INTERROGATORIES

**INTERROGATORY NO. 1:**  Identify all steps you have taken to ensure that the USB engages only in germane activities.

**RESPONSE:**  The Bar objects that this interrogatory is overbroad, in that every activity in which the Bar engages is germane, and thus the interrogatory essentially calls for a description of all of the Bar's activities and related policies.  The Bar cannot reasonably describe all such activities.  Subject to that objection, the Bar responds that its efforts to ensure that the Bar engages in only germane activities include the following:

- The Bar provides training to every Bar Commissioner on at least an annual basis regarding the proper scope of Bar activities and speech.  This training involves providing written and oral instruction.  Each Commissioner is also provided a copy of *Keller v. State Bar of Cal.*, 496 U.S. 1 (1990) and instructed regarding that decision.

- The Bar does not accredit CLE programs it sponsors or conducts.  That is a function of the Mandatory Continuing Legal Education (MCLE) Board, which is a Utah Supreme Court board.  The Bar must seek accreditation from the MCLE Board and, in the Bar's experience, the Board has not accredited any CLE that does not address or relate to the practice of law.

- The Bar has editorial standards for the *Utah Bar Journal* that are included in the guidelines for submission of articles that require such submissions to be germane within the meaning of *Keller*.  In applying those standards to all proposed content in

**APP.211**

the *Utah Bar Journal*, the editors of the *Utah Bar Journal* occasionally seek guidance as needed from the Bar.

- The Bar has a policies and procedures manual that addresses, among other things, legislative activities and policy positions.  These policies are informed by both *Keller* and Supreme Court Rule 14-106.

- The Governmental Relations Committee of the Bar is the clearinghouse for legislation affecting the Utah State Bar and its licensees.  Each year before the Legislative Session, the Bar's General Counsel trains the Governmental Relations Committee on the Bar's policies and *Keller* restrictions.  The Bar's general counsel attends each meeting to offer guidance on position-taking.

- The Bar's lobbyists are instructed each year by the Executive Director on the Bar's legislative limitations.

- Internal staff, such as the Communications, CLE, and Access to Justice Directors, are trained on *Keller* limitations.

- Bar General Counsel attends the Access to Justice Commission meetings to offer guidance on *Keller* limitations.

**INTERROGATORY NO. 2:**  Identify every person with knowledge of the USB's process of deciding whether to advocate for or against any proposed legislation or any position on any matter of public policy.

**RESPONSE:**  The Bar objects that this interrogatory is potentially overbroad because it asks for an identification of anyone with such knowledge, regardless of whether they are within

**APP.212**

the Bar or not.  The Bar does not interpret the interrogatory that way.  Subject to that

clarification, the Bar responds as follows:

- The Bar Commission

- The Bar's Governmental Relations Committee

- Executive Director Elizabeth Wright

- General Counsel Nancy Sylvester

- Bar lobbyists Doug Foxley and Frank Pignanelli

- Executive Assistant Christy Abad (staff to the GRC Committee)

**INTERROGATORY NO. 3:**  Describe every position the USB has taken on legislation

or public policy.

**RESPONSE:**  The Bar objects to this interrogatory as potentially overbroad.  "Public

policy" is not defined and could conceivably encompass matters that have nothing to do with this

case, such as telling lawyers to fill out judicial evaluation surveys or notifying lawyers of

deadlines for license renewal.  The Bar does not interpret the interrogatory that way.  Subject to

that clarification, pursuant to Fed. R. Civ. P. 33(d), the Bar directs Plaintiff to the business

records produced by the Bar in this case.  The Bar also directs Plaintiff to the Bar's website,

utahbar.org, and specifically utahbar.org/legislative.  With respect to 2017 and 2018, the Bar

directs Plaintiff to the May/June editions of the 2017 and 2018 *Utah Bar Journals* in the articles

entitled "Legislative Update," as reported by the Bar's lobbyists, Douglas Foxley, Frank

Pignanelli, and Steve Foxley.

**INTERROGATORY NO. 4:**  Identify each person responsible for editing and selecting

the content of USB publications.

**APP.213**

**RESPONSE:**  The Bar objects that this interrogatory is potentially overbroad, as "publications" is not defined and could refer to every single statement made by the Bar.  The Bar does not interpret the interrogatory that way.  Subject to that clarification, the Bar responds as follows:  Individuals with responsibility for editing the *Utah Bar Journal* are Judge Gregory Orme, Alisha Giles, Matthew Page, and William Holyoak.  The Bar's Executive Director will assist the Utah Bar President with the president's message to ensure that the content is factually accurate.  Individuals with responsibility for editing email communications to Bar membership are Matthew Page and Elizabeth Wright.  Staff who submit notices to be published in email communications are given the opportunity to proofread those notices.

**INTERROGATORY NO. 5:**  Identify each CLE program that the USB has hosted, sponsored, or otherwise funded or produced, including, for each, the program's title, the program's presenter(s), and any description the USB used to advertise the program.

**RESPONSE:**  Pursuant to Fed. R. Civ. P. 33(d), the Bar directs Plaintiff to the business records produced by the Bar in this case.

**INTERROGATORY NO. 6:**  In addition to the CLE programs identified in response to Plaintiff's Interrogatory No. 5, identify all speeches or presentations given at events hosted, sponsored, or otherwise funded or produced by the USB, including, for each, the presentation's title, the speaker, and any description the USB used to advertise the speaker or the speech in connection with the event.

**RESPONSE:**  The Bar objects to the term "hosted" as overbroad, as it could be read to include non-Bar events where an individual or group simply rented the Bar's facilities.  The Bar does not interpret the interrogatory that way.  Subject to that objection, the Bar responds as

**APP.214**

follows:  Pursuant to Fed. R. Civ. P. 33(d), the Bar directs Plaintiff to the business records produced by the Bar in this case.

**INTERROGATORY NO. 7:**  To the extent you have not done so in response to Interrogatories Nos. 5 and 6, identify all speakers the USB paid to speak at any event, including but not limited to CLE programs, events for members, and events for USB staff or officials, including, for each occasion, the presentation's title, the speaker, and any description the USB used to advertise the speaker or the speech in connection with the event.

**RESPONSE:**  Pursuant to Fed. R. Civ. P. 33(d), the Bar directs Plaintiff to the business records produced by the Bar in this case.

**INTERROGATORY NO. 8:**  Identify every measure the USB has taken to oppose racism, to promote racial equity, to promote equity, or to promote anti-racism.

**RESPONSE:**  The Bar objects to this interrogatory as overbroad, vague, ambiguous, and improper.  The terms listed in this interrogatory are not defined and are not subject to universally accepted definitions.  Different people have different interpretations of what is racist, etc., and thus one person may believe a given measure "opposes" racism or promotes anti-racism while another may not.  *See, e.g.*, *Forte v. Jones*, 2013 WL 1164929, at *6 (E.D. Cal. Mar. 20, 2013) ("[T]he term 'racist' has no factually-verifiable meaning."); *Covino v. Hagemann*, 165 Misc.2d 465, 470 (N.Y. Sup. Ct. 1995) ("[A] certain set of facts might be viewed as racially insensitive by one group of people who do not share the same political or social views, but another group might view it as noncontroversial and socially acceptable."); *Garrard v. Charleston Cnty. Sch. Dist.*, 838 S.E.2d 698, 714 (S.C. Ct. App. 2019) ("[W]hether something is racist is a matter of opinion.").  The interrogatory therefore seeks a response that contains embedded value

**APP.215**

judgments and opinions rather than facts.  As such, this interrogatory is not susceptible of a meaningful response.

**INTERROGATORY NO. 9:**  Identify every measure the USB has taken to oppose, mitigate, or otherwise address white privilege.

**RESPONSE:**  The Bar objects to this interrogatory as overbroad, vague, ambiguous, and improper.  The term "white privilege" is not defined and is not subject to a universally accepted definition.  One person may believe a given measure "opposes," "mitigates," or "addresses" white privilege while another may not.  The interrogatory therefore seeks a response that contains embedded value judgments and opinions rather than facts.  As such, this interrogatory is not susceptible of a meaningful response.

**INTERROGATORY NO. 10:**  Identify every measure the USB has taken to advance or protect the rights or interest of LGBTQ+ people and organizations.

**RESPONSE:**  The Bar objects to this interrogatory as overbroad, vague, ambiguous, and improper.  What it means to "advance or protect" the rights or interests of LGBTQ+ people and organizations is not defined nor is it subject to a universally accepted definition.  One person may believe a given measure "advances" or "protects" the rights or interests of LGBTQ+ people and organizations while another may not.  The interrogatory therefore seeks a response that contains embedded value judgments and opinions rather than facts.  As such, this interrogatory is not susceptible of a meaningful response.

**INTERROGATORY NO. 11:**  Identify every statement the USB has published to any audience addressing issues related to race, sex, gender, sexual orientation, gender identity,

**APP.216**

economic inequality, immigration, gun violence, climate change, voting rights, redistricting, the Trump administration, and the Biden administration.

**RESPONSE:**  The Bar objects that this interrogatory is compound and consists of thirteen different interrogatories, spanning thirteen distinct topics.  The Bar therefore considers Plaintiff to have expended twenty-three interrogatories.  Because this is still under the twenty-five interrogatory limit in the Amended Scheduling Order (Dkt. 101), the Bar responds to each of these thirteen interrogatories.  The Bar further objects that this interrogatory seeks irrelevant information beyond the proper scope of discovery.  Subject to those objections, the Bar responds as follows:  Pursuant to Fed. R. Civ. P. 33(d), the Bar directs Plaintiff to the business records produced by the Bar in this case.

DATED this 17th day of October 2022.

*As to Objections:*

PARR BROWN GEE & LOVELESS, P.C.

 /s/ David C. Reymann
David C. Reymann

ZIMMERMAN BOOHER
Troy L. Booher
Dick J. Baldwin
Caroline Anais Olsen

Attorneys for Defendants

**APP.217**

## <u>VERIFICATION</u>

Elizabeth Wright, on behalf of all Defendants, having reviewed the responses to the Interrogatories contained herein, hereby affirms and declares under penalty of perjury that the responses to those Interrogatories are true and correct to the best of my knowledge, information, and belief.

DATED this 17th day of October 2022.

/s/ Elizabeth Wright

**APP.218**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 17th day of October 2022, I served the foregoing

**RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES TO**

**DEFENDANTS** via email on the following:

      Scott Day Freeman (litigation@goldwaterinstitute.org)
      Goldwater Institute
      500 East Coronado Road
      Phoenix, Arizona 85004

      Ethan W. Blevins (eblevins@pacificlegal.org)
      Pacific Legal Foundation
      839 West 3600 South
      Bountiful, Utah 84010-8423

                    /s/ David C. Reymann

**APP.219**



San Ignacio - Tikal - Ambergris Caye
$1,799
More Inf

San Ignacio - Ambergris Caye
$1,799
More Inf

Turks and Caicos Escape
$728
More Inf

Los Cabos Escape
$530
More Inf

Puerto Vallarta E

Report an ad

The Salt Lake Tribune

SUBSCRIBE    LOG IN    SUBSCRIBE

# Utah Bar takes stand against legislation written by one of its own members

The Utah State Bar opposes a Republican bill to retroactively change court rules and overturn a hold on Utah's abortion ban.



(Trent Nelson | The Salt Lake Tribune) People gather at the State Capitol in Salt Lake City to protest after the U.S. Supreme Court overruled Roe v. Wade, on Friday, June 24, 2022.

By Emily Anderson Stern  |  Jan. 27, 2023, 5:40 a.m.  |  Updated: 11:48 a.m.

💬 Comment

The organization that governs Utah attorneys has taken a stance against a joint resolution making its way through the Legislature that would retroactively change court rules to effectively end a block on abortion in the state, according to a memo obtained by The Salt

It is uncommon for the Utah State Bar to take an official stance against legislation, as it has with Rep. Brady Brammer's, R-Pleasant Grove, Joint Resolution Amending Rules of Civil Procedure on Injunctions, also known as House Joint Resolution 2. According to the general counsel for the bar, Nancy Sylvester, this is the first time it has put out such a memo since it objected to the Tax Equalization and Reduction Act in 2019 — a bill that ultimately failed.

Utah's is a mandatory bar, meaning all lawyers practicing in Utah — including Brammer — are members.

Utah Senator Mike Lee wins Senate race against Evan …

Abortion providers in Utah have been allowed to continue operating because 3rd District Judge Andrew Stone granted Planned Parenthood Association of Utah's request for a preliminary injunction in its case challenging the state's abortion trigger law, which has been in place since the U.S. Supreme Court overturned Roe v. Wade last summer.

UtahBar-Memo to Commission Re HJR2 by Jeff Parrott on Scribd



Millions of books, audiobooks, magazines, documents, sheet music, and more for free.

Utah State

1    of 5

In Stone's order temporarily blocking the trigger law, he wrote that Planned Parenthood "has demonstrated that there are at least serious issues on the merits that should be the subject of further litigation."

**APP.221**

If passed, Brammer's law would make it so judges cannot use that basis to grant such a preliminary injunction. It would also allow parties — such as the Utah attorney general's office, which is representing the state in the trigger law case — to request a judge to reconsider under the resolution whether an injunction should remain in effect.

In the document sent out to its lobbyists and commission Wednesday, the Utah State Bar doesn't mention the abortion trigger law, nor that the pending case against it was the impetus for the bill. It instead focuses on how the joint resolution might impact other cases and courts in the state overall.

"The Bar opposes HJR2 because of its effect on both access to justice and the administration of the judiciary," the memo reads. "Access to justice issues take the form of increased costs to litigants in time and money and the cost of re-litigation will prohibit some litigants from accessing the courts. The Bar also opposes the proposed changes because re-litigation of injunctions will clog already overburdened court dockets."

The bar also noted in its memo that the legislation "raises constitutional separation powers concerns." Under the joint resolution, if a litigant asks the court to reconsider an injunction the judge must do so, effectively "removing judicial discretion," according to the memo.

*[Get the latest Utah political news in the new Daily Buzz email newsletter. Sign up here.]*

Changing these rules should be left to the courts, the bar wrote. The Utah Supreme Court has its own process for making changes to procedural rules.

That process includes a 45-day comment period after the rule has been distributed to various stakeholders, including the Legislature's general counsel and every member of the Utah Bar.

Brammer, who has previously referred to the joint resolution as "an attorney bill set up for a good attorney fight," shared his response to the bar with The Tribune on Friday morning. He requested the bar provide a copy of any court order his joint resolution would impact.

"Thus far I have requested examples from over 1000 different attorneys, various law firms, and the courts," he wrote in the email. "I have yet to receive a single example. Perhaps the bar could provide some."

He continued, "Without any substantial amount of real-life examples, the hypothetical 'what if' scenarios are nothing but hand-wringing puffery and not proper for legislative consideration."

In defending his joint resolution, Brammer also pointed to Article VIII of the Utah Constitution, which says, "The Legislature may amend the Rules of Procedure and Evidence adopted by the Supreme Court upon a vote of two-thirds of all members of both houses of the Legislature."

Although Utah Courts is allowed to take positions on legislation through its Judicial Council, it has not done so. An assistant administrator for the courts, however, relayed concerns that the resolution's retroactivity clause could result in judges having to revisit previously decided issues.

**APP.222**

Case 2:21-cv-00219-TC-JCB    Document 127-20    Filed 01/27/23    PageID.1299

"This affects judicial resources, it affects fairness of process, and these things are of deep concern to the courts," Assistant Administrator Michael Drechsel said.

Sylvester told The Tribune that it decided to take a position on the legislation because of the high volume of calls the bar was receiving from its members.

"If we get a lot of calls from lawyers expressing concern, we'll put together talking points about why we're concerned about it," Sylvester said.

In the memo, the bar wrote that it received complaints from attorneys in multiple practice areas, including estate planning, family law and business litigation. Among them, it said, were "large firms who represent business clients."

"Utah is a business-friendly state, yet these proposed changes may cost business litigants access to the courts," the memo reads.

Brammer, pointing to a portion of his proposal that says "Nothing in this rule shall be construed to limit the equitable powers of the courts in domestic relations cases," has previously argued that the joint resolution would not impact family law and that it would only influence "a small portion" of cases in other areas of law.

On Tuesday, Salt Lake County District Attorney Sim Gill tweeted a link to a Tribune news story about the joint resolution, and wrote, "The Utah Way: Expression of unchecked power. Checks & Balances in name only. Individual liberty a sham. Rule of law as concept not practice. No price too high for the win. Retroactive: a lazy thuggish way to win an argument not by reason but by force."



In advocating for his bill during a committee meeting and floor time, Brammer has said the joint resolution would keep Utah's courts from enjoining "controversial" laws soon after they are passed by the Legislature.

"Injunctions are an extraordinary and drastic remedy and should not be granted lightly," Brammer said while presenting his legislation on the House floor. He continued, saying, "On the long-term issue of this, as far as it relates to the Legislature, one of the concerns is will our laws take effect?"

The joint resolution has so far faced limited opposition from Republicans, passing out of the Utah House along party lines. It is listed among the bills that may be discussed and voted upon in a Senate Judiciary, Law Enforcement and Criminal Justice Committee meeting Friday.

Under the Utah Constitution, amending court rules requires the approval of two-thirds of both legislative bodies, and does not require the governor's signature.



# MEMORANDUM

**TO:**       The Bar Commission and Bar Lobbyists

**FROM**:    Nancy Sylvester, General Counsel

**RE:**       HJR002

**DATE**:    January 25, 2023

---

The memorandum below both summarizes the Utah State Bar's ability to oppose legislation and explains why it now opposes HJR2.

## The Utah State Bar's Legislative Activities

Pursuant to Rule 14-106 of the Rules of Integration and Management, the Utah State Bar may engage in legislative activities. In relevant part, the rule states,

> The Board is authorized to review and analyze pending legislation, to provide technical assistance to the Utah Legislature, the Governor of Utah, the Utah Judicial Council and other public bodies upon request, and **to adopt a position in support of or in opposition to a policy initiative**, to adopt no position on a policy initiative, or to remain silent on a policy initiative…..The Board's consideration of public policy issues **shall be limited to those issues concerning the courts of Utah, procedure and evidence in the courts, the administration of justice, the practice of law, and matters of substantive law on which the collective expertise of lawyers has special relevance and/or which may affect an individual's ability to access legal services or the legal system**.

Utah R. Jud. Admin. 14-106(a)(1) (emphasis added).

The Utah State Bar is a mandatory, or integrated bar, meaning only those admitted to the Utah State Bar may practice law in Utah.  The Utah Supreme Court, "by its constitutional power—[has] authorize[d] and designate[d] the Bar to administer rules and regulations that govern the practice of law in Utah…." Utah R. Jud. Admin.

**APP.225**

14-102(a)(1). In so doing, "the Supreme Court recognize[d] a compelling state interest in using the Bar to assist the Court in governing admission to the practice of law and improving the quality of legal services in the state." Utah R. Jud. Admin. 14-102(a)(2). Because the Utah Supreme Court chose the integrated bar model to assist it in its constitutional prerogative to regulate the practice of law, *Keller* thus applies.

*Keller v. State Bar of California*, 496 U.S. 1, 3-15 (1990), is the seminal case guiding the types of political speech in which mandatory bars may engage. In *Keller*, the Court held that an integrated bar can, consistent with the First Amendment, use a member's compulsory fees to fund activities germane to "regulating the legal profession and improving the quality of legal services." A mandatory bar may not fund "activities having political or ideological coloration which are not reasonably related to the advancement of such goals."

Rule 14-106 authorizes the Bar to engage in legislative activities that are consistent with *Keller*'s (and its progenies') germaneness standard. The Utah State Bar has developed extensive policies in furtherance of that authorization. The Utah State Bar never takes positions with "political or ideological coloration which are not reasonably related to the advancement of" the twin goals of 1) improving the quality of legal services and 2) regulating the legal profession.   Indeed, its position-taking consistently and principally tracks the following subject matters:

**a.  The Judiciary.**

(1) Appointment of judges.
(2) Judicial compensation.
(3) Judicial oversight and qualification.
(4) Legislative requests to add judges to districts or specific functions.
(5) Independence of the judiciary.

**b.  The Courts.**

(1) Issues involving the organization or re-organization of the courts of this state.
(2) Issues involving resources for the courts.
(3) Issues affecting the administration of justice.

**APP.226**

   **c.  Access.**

      (1) Issues affecting an individual's right to seek legal or judicial redress.

   **d.  Practice of Law.**

      (1) Issues involving the qualifications of those authorized to provide legal services in the State and the public's access to legal services.

      (2) Issues involving the regulation of the legal profession, including the education, the ethics, the competency, and the integrity of the profession.

When legislation implicates the above subject matters, the Bar takes positions in support or opposition. Thus, because HJR2 has the potential to negatively impact both access to justice *and* the administration of the judiciary, the Bar has ample authority to oppose it.

**The Bar's Opposition to HJR2**

The Bar opposes HJR2 on the grounds that it will hinder access to justice and adversely affect the administration of the courts.[1] HJR2, which is now in its first substitute, seeks to amend Civil Rule 65A by removing as a ground for preliminary injunction the following: "the case presents serious issues on the merits which should be the subject of further litigation." It also adds a motion for reconsideration that has retroactive effect. In so adding, it removes a judge's discretion to both 1) decide in the first instance to hear the motion for reconsideration (a procedural tool that is currently disfavored), and 2) in the second instance, it tells a judge how to decide the motion ("If the court determines that the issuance of the restraining order or preliminary injunction does not meet the requirements of paragraph (e), the court must terminate the order or injunction.").

---

[1] HJR2, 1st substitute, added the following retroactive provision: "(f) Motion for reconsideration. (f) (1) If a court granted a written restraining order or preliminary injunction on the explicit ground that the case presented serious issues on the merits which should be the subject of further litigation, a party restrained by the order or injunction on the effective date of this resolution may move the court to reconsider whether the order or injunction should remain in effect. (f) (2) A motion for reconsideration under this paragraph (f) may be filed at any time before the final determination of the case. (f) (3) Upon a motion for reconsideration, the court must determine whether the issuance of the restraining order or preliminary injunction meets the requirements in paragraph (e) regardless of the requirements for the issuance of the order or injunction on the day on which the order or injunction was issued. (f) (4) If the court determines that the issuance of the restraining order or preliminary injunction does not meet the requirements of paragraph (e), the court must terminate the order or injunction."

**APP.227**

1. **Access to Justice.**

   a. **Cost.** The motion for reconsideration provision means relitigation. Litigation is already expensive. Relitigation of an injunction means it will get more expensive. Litigants with vast resources will be best positioned to take advantage of this new law. Numerous individual litigants and businesses have already spent time and money to litigate injunctions that are in place, including money spent to enforce existing injunctions. These proposed changes will require the double expenditure of time and resources to re-litigate the injunctions.

   b. **Vested rights.** Injunctions currently in place have given certain litigants vested rights that would be undone by this legislation. This raises constitutional separation of powers concerns. See *In re Handley's Estate*, 49 P. 829, 830-832 (Utah 1897) (holding "that the legislature lacked the power to 'attempt[] by a retrospective act to furnish a method by which vested rights could be divested, and to compel the courts to employ it.'").

   c. **Affects multiple practice areas, including business.** The Bar has received calls from lawyers in multiple practice areas (estate planning, family law, business litigation, etc.) and from law firms of all different sizes expressing concern that their clients will have to spend additional money to revisit existing injunctions. This includes calls from large firms who represent business clients. Utah is a business-friendly state, yet these proposed changes may cost business litigants access to the courts.

   d. **Mid-litigation rule changes.** Our system of laws disfavor changing the rules in the middle of litigation. Cases are filed and motions are considered and granted under the laws and rules existing at the time of filing a case or seeking an injunction. *State v. Clark*, 2011 UT 23, ¶ 13, 251 P.3d 829; *Brown v. Williams*, 2017 UT App 29, ¶ 6 n.4, 392 P.3d 919. This system provides predictability for business in our state and protects the rights of litigants in our courts. Changing rules in the middle of litigation raises serious issues of fairness and constitutionality.

2. **Administration of the Courts.**

   a. **Clogged court dockets**. Litigants who would become "entitled" to file

4

motions for reconsideration under HJR2 will clog court dockets in order to relitigate existing injunctions. The courts are already dealing with a backlog of cases from COVID shutdowns. This will add to dockets and slow the legal process down for all litigants, whether they are subject to injunctions or not.

b.   **Removing judicial discretion.** The proposed changes would require a judge to rehear these matters even if the underlying injunction does not warrant reexamination. A judge has no discretion to say the matter does not need to be relitigated. Motions for reconsideration are disfavored by courts because they negatively impact the fair and efficient administration of justice.  See *Tschaggeny v. Milbank Ins. Co.*, 2007 UT 37, ¶ 15, 163 P.3d 615 ("Because trial courts are under no obligation to consider motions for reconsideration, any decision to address or not to address the merits of such a motion is highly discretionary.")

c.   **No deliberative rulemaking process.**   A change to Utah's injunction standard should be made only after input from all stakeholders. Utah's injunction standard has a "serious issues" element that does not exist in the federal standard. The element was put there for policy reasons that may warrant reexamination. But before eliminating the standard, lawyers, judges, businesses, and other stakeholders should be involved in a deliberative discussion about why the standard exists in the first place and the ramifications of its removal. The Supreme Court's rulemaking procedures are well suited to this task. *See* Utah R. Jud. Admin. 11-101 to 11-106.

### The Bar's Opposition in Sum

The Bar opposes HJR2 because of its effect on both access to justice and the administration of the judiciary. Access to justice issues take the form of increased costs to litigants in time and money and the cost of re-litigation will prohibit some litigants from accessing the courts. The Bar also opposes the proposed changes because re-litigation of injunctions will clog already overburdened court dockets. And the Bar disfavors deviations from the Utah Supreme Court's deliberative rulemaking procedures, particularly when such important and far-reaching issues have been raised.

**APP.229**

LEGISLATIVE GENERAL COUNSEL
₵ Approved for Filing: J. Carlton ₵
₵   01-17-23  4:55 PM   ₵

**H.J.R. 2**
**1st Sub. (Buff)**

Representative **Brady Brammer** proposes the following substitute bill:

1     **JOINT RESOLUTION AMENDING RULES OF CIVIL**

2     **PROCEDURE ON INJUNCTIONS**

3     2023 GENERAL SESSION

4     STATE OF UTAH

5     **Chief Sponsor: Brady Brammer**

6     Senate Sponsor:   Daniel McCay

7

8     **LONG TITLE**

9     **General Description:**

10        This joint resolution amends the Utah Rules of Civil Procedure, Rule 65A, regarding

11    injunctions.

12     **Highlighted Provisions:**

13        This resolution:

14        ‣ amends the Utah Rules of Civil Procedure, Rule 65A, regarding injunctions.

15     **Special Clauses:**

16        This resolution provides a special effective date.

17        This bill provides revisor instructions.

18     **Utah Rules of Civil Procedure Affected:**

19    AMENDS:

20        **Rule 65A**, Utah Rules of Civil Procedure

21

22     *Be it resolved by the Legislature of the state of Utah, two-thirds of all members elected to each*

23    *of the two houses voting in favor thereof:*

24        As provided in Utah Constitution Article VIII, Section 4, the Legislature may amend

25    rules of procedure and evidence adopted by the Utah Supreme Court upon a two-thirds vote of

**1st Sub. H.J.R. 2**



26  all members of both houses of the Legislature:

27       Section 1.  **Rule 65A**, Utah Rules of Civil Procedure is amended to read:

28       **Rule 65A. Injunctions.**

29       (a)  **Preliminary injunctions.**

30       (a) (1)  **Notice.** No preliminary injunction shall be issued without notice to the adverse

31  party.

32       (a) (2)  **Consolidation of hearing.** Before or after the commencement of the hearing of

33  an application for a preliminary injunction, the court may order the trial of the action on the

34  merits to be advanced and consolidated with the hearing of the application. Even when this

35  consolidation is not ordered, any evidence received upon an application for a preliminary

36  injunction which would be admissible at the trial on the merits becomes part of the trial record

37  and need not be repeated at the trial. This subdivision (a)(2) shall be so construed and applied

38  as to save to the parties any rights they may have to trial by jury.

39       (b)  **Temporary restraining orders.**

40       (b) (1)  **Notice.** No temporary restraining order shall be granted without notice to the

41  adverse party or that party's attorney unless (A) it clearly appears from specific facts shown by

42  affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage

43  will result to the applicant before the adverse party or that party's attorney can be heard in

44  opposition, and (B) the applicant or the applicant's attorney certifies to the court in writing as to

45  the efforts, if any, that have been made to give notice and the reasons supporting the claim that

46  notice should not be required.

47       (b) (2)  **Form of order.** Every temporary restraining order shall be endorsed with the

48  date and hour of issuance and shall be filed forthwith in the clerk's office and entered of record.

49  The order shall define the injury and state why it is irreparable. The order shall expire by its

50  terms within such time after entry, not to exceed 14 days, as the court fixes, unless within the

51  time so fixed the order, for good cause shown, is extended for a like period or unless the party

52  against whom the order is directed consents that it may be extended for a longer period. The

53  reasons for the extension shall be entered of record.

54       (b) (3)  **Priority of hearing.** If a temporary restraining order is granted, the motion for a

55  preliminary injunction shall be scheduled for hearing at the earliest possible time and takes

56  precedence over all other civil matters except older matters of the same character. When the

57   motion comes on for hearing, the party who obtained the temporary restraining order shall have

58   the burden to show entitlement to a preliminary injunction; if the party does not do so, the court

59   shall dissolve the temporary restraining order.

60   (b) (4) **Dissolution or modification.** On 48 hours' notice to the party who obtained the

61   temporary restraining order without notice, or on such shorter notice to that party as the court

62   may prescribe, the adverse party may appear and move its dissolution or modification. In that

63   event the court shall proceed to hear and determine the motion as expeditiously as the ends of

64   justice require.

65   (c) **Security.**

66   (c) (1) **Requirement.** The court shall condition issuance of the order or injunction on

67   the giving of security by the applicant, in such sum and form as the court deems proper, unless

68   it appears that none of the parties will incur or suffer costs, attorney fees or damage as the

69   result of any wrongful order or injunction, or unless there exists some other substantial reason

70   for dispensing with the requirement of security. No such security shall be required of the

71   United States, the State of Utah, or of an officer, agency, or subdivision of either; nor shall it be

72   required when it is prohibited by law.

73   (c) (2) **Amount not a limitation.** The amount of security shall not establish or limit the

74   amount of costs, including reasonable attorney fees incurred in connection with the restraining

75   order or preliminary injunction, or damages that may be awarded to a party who is found to

76   have been wrongfully restrained or enjoined.

77   (c) (3) **Jurisdiction over surety.** A surety upon a bond or undertaking under this rule

78   submits to the jurisdiction of the court and irrevocably appoints the clerk of the court as agent

79   upon whom any papers affecting the surety's liability on the bond or undertaking may be

80   served. The surety's liability may be enforced on motion without the necessity of an

81   independent action. The motion and such notice of the motion as the court prescribes may be

82   served on the clerk of the court who shall forthwith mail copies to the persons giving the

83   security if their addresses are known.

84   (d) **Form and scope.** Every restraining order and order granting an injunction shall set

85   forth the reasons for its issuance. It shall be specific in terms and shall describe in reasonable

86   detail, and not by reference to the complaint or other document, the act or acts sought to be

87   restrained. It shall be binding only upon the parties to the action, their officers, agents, servants,

88  employees, and attorneys, and upon those persons in active concert or participation with them

89  who receive notice, in person or through counsel, or otherwise, of the order. If a restraining

90  order is granted without notice to the party restrained, it shall state the reasons justifying the

91  court's decision to proceed without notice.

92      (e)  **Grounds.** A restraining order or preliminary injunction may issue only upon a

93  showing by the applicant that:

94      (e) (1)  there is a substantial likelihood that the applicant will prevail on the merits of

95  the underlying claim;

96      (e) [(1)  The] (2)  the applicant will suffer irreparable harm unless the order or

97  injunction issues;

98      (e) [(2)  The] (3)  the threatened injury to the applicant outweighs whatever damage the

99  proposed order or injunction may cause the party restrained or enjoined; and

100      (e) [(3)  The] (4)  the order or injunction, if issued, would not be adverse to the public

101  interest[, and].

102      [(e) (4)  There is a substantial likelihood that the applicant will prevail on the merits of

103  the underlying claim, or the case presents serious issues on the merits which should be the

104  subject of further litigation.]

105      **(f)  Motion for reconsideration.**

106      (f) (1)  If a court granted a  Ĥ➜ **written** ←Ĥ  restraining order or preliminary injunction on

106a  the  Ĥ➜ **explicit** ←Ĥ  ground that

107  the case presented serious issues on the merits which should be the subject of further litigation,

108  a party restrained by the order or injunction on the effective date of this resolution may move

109  the court to reconsider whether the order or injunction should remain in effect.

110      (f) (2)  A motion for reconsideration under this paragraph (f) may be filed at any time

111  before the final determination of the case.

112      (f) (3)  Upon a motion for reconsideration, the court must determine whether the

113  issuance of the restraining order or preliminary injunction meets the requirements in paragraph

114  (e) regardless of the requirements for the issuance of the order or injunction on the day on

115  which the order or injunction was issued.

116      (f) (4)  If the court determines that the issuance of the restraining order or preliminary

117  injunction does not meet the requirements of paragraph (e), the court must terminate the order

118  or injunction.

**APP.233**

119          [(f)] **(g)  Domestic relations cases.** Nothing in this rule shall be construed to limit the

120     equitable powers of the courts in domestic relations cases.

121          Section 2.  **Effective date.**

122          As provided in Utah Constitution Article VIII, Section 4, this resolution takes effect

123     upon a two-thirds vote of all members elected to each house.

124          Section 3.  **Revisor instructions.**

125          The Legislature intends that the Office of Legislative Research and General Counsel, in

126     preparing the Utah Code database for publication, delete the phrase "the effective date of this

127     resolution" where the phrase appears in paragraph (f) of this resolution and replace the phrase

128     with the actual date on which the resolution takes effect.



| Lamanai - San Ignacio - Placencia | Playa del Carmen Escape | Prague - Vienna - Budapest by Train | Los Cabos Escape | Buenos Ai Igua (Arg |
|---|---|---|---|---|
| $4,230 | $703 | $1,359 | $530 | $ |
| More Inf | More Inf | More Inf | More Inf | |

*The Salt Lake Tribune*

SUBSCRIBE  LOG IN  SUBSCRIBE

# 'Expression of unchecked power': Court may be forced to reconsider hold on Utah's abortion ban soon

The Utah House of Representatives voted in favor of a change to court rules that would effectively end the hold on the state's abortion trigger law.



Case 2:21-cv-00219-TC-JCB  Document 127-32  Filed 01/27/23  PageID.1252  Page 2 of 8

out of the Utah House of Representatives on Monday.

By Emily Anderson Stern  |  Jan. 23, 2023, 3:59 p.m.  |  Updated: Jan. 24, 2023, 8:47 a.m.

💬 Comment

Republicans in the Legislature are one step closer to ending a hold placed on their abortion trigger law in district court after the Utah House voted to change the rules regarding when a judge can issue an injunction.

The joint resolution, introduced by Rep. Brady Brammer, R-Pleasant Grove, aims to retroactively eliminate a judge's ability to grant a preliminary injunction unless a case has a "substantial likelihood" of success. Representatives approved it on party lines Monday, with two Republicans who voted against it in committee flipping their votes.

The final vote was 59-13, with two members not voting.

Alfalfa uses more than half of Utah's water to support …

While Brammer did not reference the hold on the trigger law in his remarks in front of the body, he did, when speaking to the House Judiciary Committee, say, "the trigger law was also a trigger to this."

Abortion providers in Utah have been allowed to continue operating since 3rd District Judge Andrew Stone in July granted Planned Parenthood Association of Utah's request for a preliminary injunction in its case challenging the state's trigger law, which imposes a near ban on abortion. The law went into effect after the U.S. Supreme Court overturned Roe v. Wade, the landmark case that determined women had a constitutional right to an abortion, last summer.

**APP.236**

litigation."

If passed, Brammer's law would make it so judges cannot use that basis to grant such a preliminary injunction. It would also allow parties — such as the Utah attorney general's office, which is representing the state in the trigger law case — to ask a judge to reconsider an injunction under the resolution whether an injunction should remain in effect.

**[Get the latest Utah political news in the new Daily Buzz email newsletter. Sign up here.]**

The Utah Supreme Court in October declined to lift the injunction following a request from the attorney general's office.

"Injunctions are an extraordinary and drastic remedy and should not be granted lightly," Brammer said while presenting his legislation. He continued, saying, "On the long-term issue of this, as far as it relates to the Legislature, one of the concerns is will our laws take effect?"

Most of the opposition to the joint resolution has centered around its retroactivity clause. During a House Judiciary Committee hearing last week, representatives from Utah Courts, the Salt Lake County district attorney's office and the American Civil Liberties Union voiced concerns about the legislation's wider implications.

Utah Courts has not taken an official position on the bill, as noted by Brammer during debate on Monday, but its assistant administrator, Michael Drechsel, relayed worries during a committee meeting that the resolution's retroactivity clause could result in judges having to revisit previously decided issues.

"This affects judicial resources, it affects fairness of process, and these things are of deep concern to the courts," Drechsel said.

According to a fiscal analysis of the joint resolution, every 10 cases with civil temporary restraining orders and civil injunctions impacted by the potential passage of the bill would cost the courts approximately $6,500. It went on to note "the total amount of applicable cases is unknown."

**APP.237**

Case 2:21-cv-00219-TC-JCB Document 127-32 Filed 01/27/23 PageID.1254 Page 4 of 8

(Emily Anderson Stern | The Salt Lake Tribune) Rep. Brady Brammer, R-Pleasant Grove, speaks to the House Judiciary Committee about Joint Resolution 2 in the Senate Building at the Capitol, on Wednesday, Jan. 18, 2023. The legislation would likely end a hold on Utah's abortion trigger law by amending court rules to change the standards judges have to meet when issuing an injunction.

Other critics who spoke to the committee argued it would affect injunctions in family law cases, as well as cases surrounding eminent domain, zoning, contracts and private property rights.

Outside of GOP lawmakers on the committee, no one in attendance spoke in support of the joint resolution.

Brammer, pointing to a portion of his proposal that says "Nothing in this rule shall be construed to limit the equitable powers of the courts in domestic relations cases," said it wouldn't impact family law and that the joint resolution would only influence "a small portion" of cases in other areas of law.

Both in the committee and during floor time, Rep. Brian King, D-Salt Lake City, proposed amending the bill to remove the retroactivity clause.

"The question is, to me, whether we should be acting as a Legislature to inject ourselves into piece of current litigation that involves contested questions or controversies, and using a sledgehammer to deal with the particular facts of that particular case," King said.

All Democrats in the House supported that change, and three Republicans — Rep. Nelson Abbott, R-Orem; Rep. Judy Rohner, R-West Valley City; and Rep. Ryan Wilcox, R-Ogden — voted in favor of it. The amendment ultimately failed.

In a statement released after Monday's vote, the House Democratic Caucus wrote, "Utah courts should remain free to provide the protections guaranteed to Utah's citizens under the state constitution. ... It is disheartening to see the extent lawmakers are willing to go to deny access to lifesaving medical care. This affects both patients and providers.

"Courts, according to our laws and our high-court precedents, go beyond the scope of H.J.R. 2 on all

**APP.238**

The Utah Democratic Party similarly released a statement condemning the vote, saying, "The Republican supermajority will stop at nothing to implement their extreme abortion ban. Rather than respecting the judicial process and waiting for the lawsuit challenging the ban to move through the courts in a fair and balanced manner, they are taking the extraordinary step of retroactively changing the rules to get their way."

This is not Republican lawmakers' first effort to defy the hold on the law. In November, the Legislature's Legislative Management Committee voted to make a rare stand against the injunction, agreeing along party lines to submit an amicus brief to the Utah Supreme Court opposing it.

Republican Reps. Kera Birkeland, R-Morgan, and Karianne Lisonbee, R-Clearfield, in September sent cease-and-desist letters signed by nearly two dozen others — including Brammer — to abortion providers, saying anyone who violates the abortion ban while it is blocked will be prosecuted. They later sent an email to reporters saying the letters were only "our opinion and the opinion of the legislators who signed it."

Brammer's joint resolution next moves on to be considered by the Utah Senate.

Amending court rules requires the approval of two-thirds of both legislative bodies, and does not require the governor's signature.



**eanderson@sltrib.com**
Follow @@emilyreanderson

**Donate to the newsroom now.** The Salt Lake Tribune, Inc. is a 501(c)(3) public charity and contributions are tax deductible

**APP.239**

## IN CASE YOU MISSED IT



PREMIUM

There's not enough interest in Utah's 2 existing vouchers to use up the money for them



Alta breaks a snowfall record after latest Utah storm



Report an ad

'I deserve a body to feel proud of.' Crowds rally for transgender health care at Utah Capitol

## THE LATEST

Health care for transgender youth blocked by Utah lawmakers

What's the ice barrel and is it worth your money? Let's review this popular cold plunge tub.

Feds prepare to order water cuts for Utah, other states that rely on Colorado River

Commentary: Reclaiming our democracy is a matter of faith

Michelle Quist: What can be done about the prevalence of domestic violence in Utah?

Can AI detect wildfires more quickly? Colorado hopes to find out

## CONNECT

Facebook

Twitter

Instagram

YouTube

RSS

## SUBSCRIPTIONS

Subscribe to print + digital

Subscribe to digital only

Free digital for print subscribers

Email newsletters

Login to your print account

Login to your digital account

Subscription FAQs

Help and contact info

Gift Subscriptions

## ABOUT US

History and mission

Our nonprofit model

Board and advisers

Officers and staff

First Amendment Society

Donors and tax filing

Privacy policy

California privacy

Editorial policies and ethics

## MORE

Advertise with us

Legal notices

Store

Podcasts

Archives

Story tip line

Support The Tribune

Donate

Cookie Preferences

Commenting Policy

  

ABOUT US

TERMS OF SERVICE

PRIVACY POLICY

EDITORIAL POLICY

ADVERTISE

CONTACT US

HELP

COOKIE PREFERENCES

SUPPORT

WEEKLY PRINT EDITION

EMAIL NEWSLETTERS

PODCASTS

NEWS TIPS

APP STORE

GOOGLE PLAY

DONATE

**APP.241**

Case 2:21-cv-00219-TC-JCB   Document 127-32   Filed 01/27/23   PageID.1258   Page 8 of 8

sltrib.com © 1996-2023 The Salt Lake Tribune. All rights reserved.



**APP.242**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| AMY POMEROY,<br><br>     Plaintiff,<br><br>v.<br><br>UTAH STATE BAR, et al.,<br><br>     Defendants. | **ORDER AND MEMORANDUM DECISION ON MOTIONS FOR SUMMARY JUDGMENT**<br><br>Case No. 2:21-cv-00219-TC-JCB<br><br>District Judge Tena Campbell<br>Magistrate Judge Jared C. Bennett |

Plaintiff Amy Pomeroy sued Defendant Utah State Bar (Utah Bar) and officers and members of the Utah Bar under 42 U.S.C. § 1983 and 42 U.S.C. § 1988. Ms. Pomeroy contends that the Utah Bar has violated her First and Fourteenth Amendment rights to free speech and association by compelling her membership in the Utah Bar and engaging in activities that are not germane, that is, relevant or connected to, regulating the legal profession or improving the quality of legal services available in Utah. She also argues that the Utah Bar has violated her free speech rights for failing to provide safeguards to ensure members' mandatory dues are not used for impermissible purposes.

Both parties have moved for summary judgment. (Pomeroy Mot. Summ. J., ECF No. 127; Utah Bar Mot. Summ. J., ECF No. 128). For the reasons stated below, the court denies Ms. Pomeroy's motion for summary judgment and grants the Utah Bar's motion.

## BACKGROUND

The Utah Bar is an integrated bar, meaning that attorneys must join and pay compulsory dues to the Utah Bar if they want to practice law in Utah. See Utah Sup. Ct. R. Prof'l. Prac. 14-102(d)(1) ("A person may only practice law in Utah if that person is a licensed lawyer and an active [Utah] Bar member in good standing[.]"). The Utah Supreme Court has authorized the

**APP.243**

Utah Bar to "administer rules and regulations that govern the practice of law in Utah" and "assist

the Court in governing admission to the practice of law."   Rule 14-102(a)(1), (2).  Purposes and

responsibilities of the Utah Bar include: "advancing the administration of justice[,]" "fostering

and maintaining integrity, learning competence, public service, and high standards of conduct

among those practicing law[,]" "providing a service to the public, to the judicial system, and

[Utah] Bar members[,]" and "assisting [Utah] Bar members in improving the quality and

efficiency of their practice[.]"  Rule 14-102(b)(1), (4), (8), (10).

The Utah Bar also has authority to engage in legislative activities.  It may "study and

provide assistance on public policy issues and … adopt positions on behalf of the [Utah Bar]

Board on public policy issues."  Rule 14-106(a).  The Board of Commissioners to the Utah Bar is

"authorized to review and analyze pending legislation, to provide technical assistance to the Utah

Legislature … and to adopt a position in support of or in opposition to a policy initiative, to

adopt no position on a policy initiative, or to remain silent on a policy initiative."  Id.

Among its various activities, the Utah Bar uses member dues to publish the Utah Bar

Journal six times each year and operate social media accounts.  The Utah Bar's mission and

vision is that "[t]he lawyers of the Utah … Bar serve the public and legal profession with

excellence, civility, and integrity.  [The Utah Bar] envision[s] a just legal system that is

understood, valued, and accessible to all."  Mission & History of the Bar, Utah State Bar,

https://www.utahbar.org/about/.

The Utah Bar has established procedures through which members who object to the

expenditure of their fees on activities—legislative or otherwise—can apply for a rebate and,

possibly, receive a refund.  Utah State Bar Keller Refund Request Policieis [sic] and Procedures,

https://www.utahbar.org/wp-content/uploads/Keller-Refund-and-Objection-Procedures.pdf.  Utah

**APP.244**

Bar members who object to expenditures on legislative activities must apply for a rebate in writing to the Executive Director after the Utah Bar Journal publishes its annual notice of rebate. Id.  "Any member of the Bar who objects to the expenditure of funds by the Board may apply for a license fee rebate in an amount representing that member's pro rata portion of the amount of the lawyer's licensing fees spent on legislative activities … for the preceding 12-month period." Id.  Members objecting to "the use of any portion of the licensee's license fees for activities he or she considers promotes or opposes political or ideological causes which are not already included in the rebate may request the Board to review the licensee's objections."  Id.  Within 45 days of the publication of the notice of rebate, members must object in writing and submit their objections by mail to the Executive Director.  Id.  The Board will then review each written objection, respond to each, and, if the Board agrees with the objection, "immediately refund the portion of the licensee's dues that are attributable to the activity, with interest paid on that sum of money from the date the licensee's fees were received to the date of the refund."  Id.  "The Board's response[s] [to each objection] will include an explanation of the Board's reasoning in agreeing or disagreeing with each objection."  Id.

Ms. Pomeroy, as a Utah lawyer, "is compelled to [be] a member of the [Utah Bar] and to pay an annual fee to the [Utah Bar] as a condition of engaging in [the legal] profession." (Compl., ECF No. 2 at ¶ 33.)  She challenges those requirements because the Utah Bar has used her dues to engage in what she alleges are objectionable non-germane activities, including lobbying, publishing the Utah Bar Journal, and making statements on Utah Bar social media accounts.  She also argues that "[b]ecause the U[tah Bar] refuses to implement adequate procedures to allow [her] to avoid funding objectionable non-germane activities with her

**APP.245**

membership dues, [the Utah Bar] has violated its obligation to implement procedural safeguards as [required and laid out by] the Supreme Court[.]"  (ECF No. 127 at 2.[1])

## LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Material facts are those that might affect the outcome of the case.  See Birch v. Polaris Indus., Inc., 812 F.3d 1238, 1251 (10th Cir. 2015) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").

Once the movant shows there is an absence of a genuine dispute of material fact, Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (citation omitted), the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id. at 248.  "[W]hile [courts] draw all reasonable inferences in favor of the non-moving party, 'an inference is unreasonable if it requires a degree of speculation and conjecture that renders [the factfinder's] findings a guess or mere possibility.'"  GeoMetWatch Corp. v. Behunin, 38 F.4th 1183, 1200 (10th Cir. 2022) (quoting Pioneer Ctrs. Holding Co. Emp. Stock Ownership Plan & Tr. v. Alerus Fin., N.A., 858 F.3d 1324, 1334 (10th Cir. 2017)).

"The standard for cross-motions for summary judgments is the same as for individual motions for summary judgment."  Cannon v. State Farm Mut. Auto. Ins. Co., No. 2:13-cv-186,

---

[1] Record citations are to PDF pages rather than internal document pages.

2013 WL 5563303, at *1 (D. Utah Oct. 7, 2013) (citation omitted). "[The court] must view each motion separately, in the light most favorable to the non-moving party, and draw all reasonable inferences in that party's favor." Boyz Sanitation Serv., Inc. v. City of Rawlins, 889 F.3d 1189, 1195 (10th Cir. 2018).

## ANALYSIS

### I.    Scope of Challenged Utah Bar Activities.

Before reaching the merits of Ms. Pomeroy's claims, the court must first determine what material it should examine to decide the parties' motions. This issue is of particular importance because Ms. Pomeroy challenged many Utah Bar activities in her motion for summary judgment that she did not reference in her complaint. (See Defs.' Opp'n to Pomeroy Mot. Summ. J., ECF No. 134 at 1; see also ECF No. 2 at ¶¶ 42–50.)

"[T]he liberal pleading standard for … complaints under [Fed. R. Civ. P.] 8(a) … [typically] does not afford plaintiffs with an opportunity to raise new claims at the summary judgment stage." Navajo Nation Hum. Rights Comm'n v. San Juan Cnty., 281 F. Supp. 3d 1136, 1149 (D. Utah 2017) (citation omitted). But "failure to set forth in the complaint a theory upon which the plaintiff could recover does not bar a plaintiff from pursuing a claim." Rodriguez v. Cascade Collections LLC, 532 F. Supp. 3d 1099, 1112–13 (D. Utah 2021) (quoting McBeth v. Himes, 598 F.3d 708, 716 (10th Cir. 2010)). A court may allow a plaintiff to "constructively amend the [complaint] by means of [a] summary-judgment motion," by applying the same standard that governs motions to amend. Id. at 1113 (citation omitted). Federal Rule of Civil Procedure 15 directs that "[t]he court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). "If the new theory prejudices the other party in maintaining its defense, however, courts will not permit the plaintiff to change her theory." McBeth, 598 F.3d

at 716.  Courts finding "undue delay, bad faith, or dilatory motive" may also prevent the plaintiff

from adding new claims.  Rodriguez, 532 F. Supp. 3d at 1113 (citing Ahmad v. Furlong, 435 F.3d

1196, 1202 (10th Cir. 2006)).

The court finds that the new allegations are unduly delayed.  Ms. Pomeroy filed her

complaint on April 13, 2021.  (See ECF No. 2.)  She filed her summary judgment motion nearly

two years later.  (See ECF No. 127.)  In Rodriguez, the court noted that "[b]ecause [the plaintiff]

asserted the new claims relatively early in the litigation—and while fact discovery was still

open—the court finds no undue delay."  532 F. Supp. 3d at 1113.  Here, Ms. Pomeroy asserted

the new allegations 21 months after filing her complaint, after fact discovery had closed.

But Ms. Pomeroy is not adding entirely new claims; instead, she points to additional

examples to support her original claims.  Furthermore, the Utah Bar has already addressed the

additional Utah Bar Journal articles and social media posts in its briefing.  (See ECF No. 134 at

25–34.)  Finding no prejudice to the Utah Bar, the court will therefore consider this new material.

In contrast, there is insufficient information in the record for the court to review the

pieces of legislation Ms. Pomeroy challenged for the first time in her motion for summary

judgment.  Ms. Pomeroy's source for this legislation is "www.utahbar.org.legislative" (see ECF

No. 127-1), and she provides the court with the Title and Number of the Legislation, the Prime

Sponsor, and the outcome and date of the vote taken on the legislation by the Utah Bar's

governmental relations committee.  (ECF No. 127 at 10–15; Table of Bills & Votes, ECF No.

127-26.)  She also includes "Brief Summaries," but the origin of these summaries is unclear.

(ECF No. 127 at 10–15.)  With this limited information, it is not possible for the court to analyze

the Utah Bar's lobbying on this legislation without speculating about the content of the

legislation and the Utah Bar's activities.  See GeoMetWatch, 38 F.4th at 1200 ("[A]n inference is

**APP.248**

unreasonable if it requires a degree of <u>speculation</u> and conjecture that renders [the factfinder's] findings <u>a guess or mere possibility</u>." (citation omitted)).

There is more information in the record to analyze a proposal related to the injunctions standard in the Utah Rules of Civil Procedure, which is also tied to an abortion trigger law (H.J.R. 2).  (Emily Anderson Stern, <u>'Expression of unchecked power': Court may be forced to reconsider hold on Utah's abortion ban soon</u>, Salt Lake Trib. (Jan. 23, 2023, 3:59 PM), https://www.sltrib.com/news/politics/2023/01/23/expression-unchecked-power-court/, ECF No. 127-32; Memorandum on H.J.R. 2, ECF No. 127-30; Joint Resolution Amending Rules of Civil Procedure on Injunctions, ECF No. 127-31.)  But, as the Utah Bar notes, the law was still being debated when Ms. Pomeroy filed her motion.  (<u>See</u> ECF No. 134 at 26).  Consequently, the court will not analyze Ms. Pomeroy's objection to this legislative activity and will only examine the legislation that Ms. Pomeroy challenged in the complaint.

## II.    First and Fourteenth Amendment Claims Based on Compelled Membership in the Utah Bar.

Ms. Pomeroy claims that by compelling her membership in the Utah Bar and engaging in non-germane activities, the Utah Bar has violated her rights to freedom of speech and association.  The Supreme Court has twice addressed such challenges.

First, in <u>Lathrop v. Donohue</u>, the Court considered whether a state bar's "compelled financial support of group activities" violated freedom of association rights.  367 U.S. 820, 828, 843 (1961) (plurality).  The plaintiff challenged the integration of the Wisconsin Bar, arguing that he was "coerced to support an organization which is authorized and directed to engage in political and propaganda activities."  <u>Id.</u> at 822.  Specifically, he challenged the bar's "promot[ion of] law reform" and its efforts to "make[] and oppose[] proposals for changes in laws and constitutional provisions and argue[] to legislative bodies and their committees and to

the lawyers and to the people with respect to the adoption of changes in codes, laws, and constitutional provisions." Id.  Contrary to the plaintiff's "convictions and beliefs[,]" the Wisconsin State Bar also "used its employees, property and funds in active, unsolicited opposition to the adoption of legislation … which was favored by the plaintiff." Id.  The plurality held that "legislative activity is not the major activity of the State Bar." Id. at 839.  And because "the bulk of State Bar activities serve the function … of elevating the educational and ethical standards of the Bar to the end of improving the quality of the legal service available to the people of the State," a "legitimate end of state policy[,]" the Wisconsin State Bar did not violate the freedom of association right by engaging in the challenged activities. Id. at 843.  But noting the lack of a full record, the plurality of the court declined to address whether the use of the plaintiff's dues money "to support the political activities of the State Bar" was a violation of the plaintiff's free speech rights. Id. at 844–45.

The Court reached that question three decades later in Keller v. State Bar of California. 496 U.S. 1, 9, 14 (1990).  The petitioners—California State Bar members—claimed that through various activities, including lobbying and holding conferences, the California State Bar "expends mandatory dues payments to advance political and ideological causes to which they do not subscribe, in violation of their First and Fourteenth Amendment rights to freedom of speech and association." Id. at 1.  The Court held that a state bar may fund activities using mandatory member dues without violating free speech rights if the activities are germane. Id. at 14.  An activity or expenditure is germane if it is "necessarily or reasonably incurred for the purpose of regulating the legal profession or improving the quality of the legal service available to the people of the State." Id. (citation omitted).  The Court noted that "the extreme ends of the [germaneness] spectrum are clear: [c]ompulsory dues may not be used to endorse or advance a

APP.250

gun control or nuclear weapons freeze initiative[,]" but may be spent on activities "connected with disciplining members of the Bar or proposing ethical codes for the profession." Id. at 16. But the Keller Court only addressed the petitioners' freedom of speech challenge and not their request for an "injunction prohibiting the State Bar from using its name to advance political and ideological causes or beliefs[,]" both because the lower courts did not address this claim and because the "request for relief appear[ed] to implicate a much broader freedom of association claim than was at issue in Lathrop." Id. at 17.

The Tenth Circuit recently pointed to this statement when it reversed a lower court's decision granting a motion to dismiss a challenge to the activities of the Oklahoma Bar, noting that "[n]either Lathrop nor Keller addressed a broad freedom of association challenge to mandatory bar membership where at least some of a state bar's actions might not be germane to regulating the legal profession and improving the quality of legal services in the state." Schell v. Chief Just. and Justs. of Okla. Sup. Ct., 11 F.4th 1178, 1194 (10th Cir. 2021).  In Schell, the plaintiff argued that the Oklahoma Bar was using mandatory member dues to 1) publish articles in the Oklahoma Bar Journal that were non-germane and 2) engage in non-germane legislative activities.  Id. at 1191–92.  These arguments echoed the claims that litigants have made in several other challenges to compelled membership in integrated state bars.[2]

In its decision, the Tenth Circuit first considered whether the Keller decision remained good law after the Supreme Court's decision in Janus v. American Federation of State, County, and Municipal Employees, Council 31, 585 U.S. 878 (2018).  Janus overturned Abood v. Detroit

---

[2] See McDonald v. Longley, 4 F.4th 229, 237 (5th Cir. 2021); Boudreaux v. La. State Bar Ass'n, 86 F.4th 620, 625 (5th Cir. 2023); Crowe v. Or. State Bar, 989 F.3d 714, 720–23 (9th Cir. 2021); Romero v. Colegio de Abogados de P.R., 204 F.3d 291, 293 (1st Cir. 2000); Taylor v. Buchanan, 4 F.4th 406, 407 (6th Cir. 2021); Kingstad v. State Bar of Wis., 622 F.3d 708, 709 (7th Cir. 2010); Gardner v. State Bar of Nev., 284 F.3d 1040, 1041 (9th Cir. 2002).

APP.251

Board of Education, 431 U.S. 209 (1977),[3] the case on which Keller primarily relied, holding

that "exacting scrutiny, if not a more demanding standard, generally applies" in the Court's First

Amendment jurisprudence.  Janus, 585 U.S. at 885, 925.  The Tenth Circuit observed that Keller

was meaningfully distinct from Abood and held that "Janus did not overrule Keller's discussion

of Abood, or its related discussion of germaneness, as the test for the constitutionality of

mandatory dues and expenditures."  Schell, 11 F.4th at 1191.  This ruling is consistent with the

decisions of other Circuit Courts.  See, e.g., Crowe v. Or. State Bar, 989 F.3d 714, 725 (9th Cir.

2021) (rejecting view that Janus must be consulted when analyzing the plaintiff's Keller free

speech claim); Taylor v. Buchanan, 4 F.4th 406, 408 (6th Cir. 2021) (same); cf. Boudreaux v. La.

State Bar Ass'n, 86 F.4th 620, 626 (5th Cir. 2023) (applying "heightened First Amendment

scrutiny" but clarifying that "the constitutionality of mandatory bar associations still turned on

'germaneness.'").  The court is not persuaded by Ms. Pomeroy's argument that the court should

apply exacting scrutiny to the challenged Utah Bar activities.

     The Tenth Circuit also answered a question that was left open in Keller—namely, the

standard by which a court should evaluate the broader freedom of association claim that the

Keller Court mentioned but did not address.  See Keller, 496 U.S. at 17.  The Tenth Circuit

applied the germaneness standard to both the freedom of speech and freedom of association

claims: "In assessing whether the non-time-barred allegations in Mr. Schell's Amended

Complaint are sufficient to advance a claim for a free speech or freedom of association violation,

we consider the germaneness of the alleged activities to the valid goals and purposes" of the

---

[3] In Abood, the Supreme Court held that "agency shop" arrangements—"whereby every
employee represented by a union even though not a union member must pay to the union, as a
condition of employment, a service fee equal in amount to union dues"—were constitutional, so
long as the union expended an objecting individual's dues for activities germane to collective
bargaining.  431 U.S. at 211, 235–36.

Oklahoma Bar.[4]  Schell, F.4th at 1192 (emphasis added); see also Boudreaux, 86 F.4th at 628 ("If a bar's speech activities are germane, then there is no free association or free speech problem with compulsory membership.").

The Tenth Circuit determined that the plaintiff's claims "rest[ed] on two Oklahoma Bar Journal articles" neither party put in the record, thereby preventing the court from analyzing them.  Schell, F.4th at 1193–94.  On remand, the Tenth Circuit instructed the district court "to apply the test from Keller to determine whether the articles [were] germane to the accepted purposes of the state bar" and, if the articles were not germane, "to assess whether Mr. Schell may advance a freedom of association claim based on these two articles."  Id. at 1195.  But the Tenth Circuit declined to decide to "what degree, in quantity, substance, or prominence a bar association must engage in non-germane activities in order to support a freedom-of-association claim based on compelled bar membership."  Id. at 1195 n.11.  In other words, the Tenth Circuit suggested a multifactored approach to the analysis of a freedom of association claim involving non-germane speech and left open the possibility that a de minimis amount of non-germane speech would not run afoul of an objecting member's associational rights.

The Fifth Circuit rejected this suggestion, ruling that a state bar violates the freedom of association right when it engages in any non-germane activities.  Boudreaux, 86 F.4th at 636–37 (holding that Fifth Circuit caselaw did not support such an exception and that a de minimis standard would be "unworkable in the context of free speech").  The Fifth Circuit was

---

[4] The Ninth Circuit has suggested that Keller's germaneness standard does not necessarily apply to a freedom of association claim.  Crowe, 989 F.3d at 728–29 ("Given that [the Supreme Court and the Ninth Circuit] have never addressed such a broad free association claim, the district court will also likely need to determine whether Keller's instructions with regards to germaneness and procedurally adequate safeguards are even relevant to the free association inquiry.").  As discussed below, the Oregon District Court—citing the Tenth Circuit's decision in Schell— nevertheless applied the germaneness standard to the associational rights claim on remand.

unpersuaded by the argument that "mandatory bar associations could not exist" if "every single tweet and email must be strictly 'germane,'" noting that it was "not an impossible burden for bar associations to speak only on topics germane to their purposes." Id. at 637.  The Fifth Circuit proposed a hypothetical tweet supporting "the repeal of all antidiscrimination laws" as an example demonstrating the potential dangers of a de minimis exception.  Id.

This court declines to follow the Fifth Circuit's approach for several reasons.  First, the court is concerned about the burden that such a rigid standard would impose—on the court, if not the bar association.  The court's experience in this case, including Ms. Pomeroy's request at summary judgment to include additional content from recent bar journals and social media accounts, suggests that the lack of a de minimis exception could convert this court into a perpetual monitor of every bar journal article and social media post.  A single tweet wishing attorneys a happy Memorial Day or posting a picture of a puppy dressed like a judge could render mandatory state bars unconstitutional—or at least result in lengthy legal proceedings.

Moreover, and as discussed in more detail below, the Supreme Court has required integrated bars to provide refund mechanisms for member dues that are used for non-germane activities.  Keller, 496 U.S. at 16–17 (discussing requisite refund mechanisms, referred to as "Hudson procedures").  Such a system presupposes the possibility that a state bar might engage in at least some non-germane activities: the refund mechanism is what allows a state bar to cure these infringements on the freedom of speech.  But an opt-out procedure cannot cure a freedom of association violation.  See Taylor, 4 F.4th at 410 (Thapar, J., concurring) ("The speech claim would prevail if an integrated bar association used mandatory membership fees to fund non-germane political or ideological activity without providing adequate opt-out procedures … The association claim could go forward even if the bar association allowed lawyers to opt out of

12

funding ideological activity."); Crowe, 989 F.3d at 727, 729 (holding that the district court was correct to find that the adequacy of the Oregon State Bar's opt-out procedures protected the plaintiffs' free speech rights but that their freedom of association claim remained viable). Opt-out procedures (and several decades of jurisprudence evaluating the constitutionality of these procedures) would be superfluous if every instance of non-germane speech amounted to a violation of the freedom of association right.[5]

The Supreme Court did not adopt such a strict approach to the freedom of association claim in Lathrop, 367 U.S. at 843, but instead determined that there was no violation of the associational right because "the bulk of State Bar activities serve the function, or at least so Wisconsin might reasonably believe, of elevating the educational and ethical standards of the Bar to the end of improving the quality of the legal service available to the people of the State …." 367 U.S. at 843. It is true that Lathrop did not refer to the germaneness framework later adopted by Keller, and that courts must now define and address the broader freedom of association claim that Keller left unresolved, but Lathrop suggests that a holistic approach is useful in the freedom of association context.

Indeed, even the Fifth Circuit—though purporting to reject any de minimis exception— has evaluated certain bar activities in a holistic way. Finding that the publication of the Texas Bar Journal was germane to the practice of law, the Fifth Circuit did not analyze every article but rather considered the Journal's purposes as a whole:

> The Texas Bar Journal publishes information related to regulating the profession and improving legal services. Such information includes, among other things, (1)

---

[5] The Fifth Circuit has characterized Hudson procedures as "prophylactic 'safeguards' designed to prevent the spread of non-germane activities." Boudreaux, 86 F.4th at 638. But if engaging in any non-germane activity amounts to a violation of a bar member's right to freedom of association, then it is unclear how the opt-out procedures—utilized after a bar has engaged in said activity—could be prophylactic.

notices regarding disciplinary proceedings against Bar members, <u>see</u> Tex. R. Disciplinary P. 6.07; (2) announcements of amendments to evidentiary and procedural rules, <u>see</u> Tex. Gov't Code § 22.108(c); <u>id.</u> § 22.109(c); (3) "public statements, sanctions, and orders" issued by the State Commission on Judicial Conduct, <u>see id.</u> § 33.005(e); and (4) articles "devoted to legal matters and the affairs of the [Texas] Bar and its members," Tex. State Bar R. art. IX. Moreover, the <u>Journal</u> purports to feature articles advancing various viewpoints, and, in any event, includes a disclaimer clarifying that the Bar does not endorse any views expressed therein.

<u>McDonald v. Longley</u>, 4 F.4th 229, 252 (5th Cir. 2021).[6]

For these reasons, this court follows the approach adopted by the District of Oregon in a recent case. <u>Crowe v. Or. State Bar</u>, No. 3:18-cv-2139, 2023 WL 1991529 (D. Ore. Feb. 14, 2023). On remand from the Ninth Circuit, the district court was faced with a challenge to mandatory membership in the Oregon State Bar. The district court applied the germaneness framework to the associational rights claim as suggested by the Tenth Circuit in <u>Schell</u>. <u>Id.</u>, at *1. The court also disagreed with "the Fifth Circuit's ultimate conclusion in <u>McDonald</u> that the mere fact that an integrated bar engages in 'some' nongermane activity means that the bar violates associational rights under the First Amendment, without considering whether there is a threshold, or <u>de minimis</u>, amount of nongermane activity that is acceptable." <u>Id.</u>, at *5. Without delineating a precise threshold for nongermane activity, the court held that "a single statement (or even two statements) will not meet it." <u>Id.</u>

---

[6] The <u>Journal</u>'s disclaimer that the Texas Bar does not endorse specific views is more likely to alleviate freedom of association concerns than freedom of speech. A bar member may object to the use of their dues for the publication of various views regardless of whether the bar endorses those views, but it is unlikely that a reasonable person would attribute the beliefs expressed by an article in a state bar journal containing such a disclaimer to the state bar's members. <u>See</u> <u>Lathrop</u>, 367 U.S. at 859 (Harlan, J., concurring) ("Surely the Wisconsin Supreme Court is right when it says that [a mandatory state bar member] can be expected to realize that everyone understands or should understand that the views expressed are those of the State Bar as an entity separate and distinct from each individual." (citation omitted)).

The court therefore analyzes Ms. Pomeroy's claims as follows.  For her freedom of speech claim, the court follows <u>Keller</u> and <u>Schell</u> by 1) analyzing the germaneness of the challenged articles and activities and 2) considering whether the Utah Bar has developed adequate opt-out procedures.  For her freedom of association claim, the court begins by analyzing the germaneness of the challenged articles and activities.  Should the court find that the Utah Bar has engaged in non-germane activities, the court will follow the Tenth Circuit's suggestion to analyze the "quantity, substance, [and] prominence" of the non-germane conduct. <u>Schell</u>, 11 F.4th at 1195 n.11.  In other words, the court will assess 1) the amount of non-germane conduct; 2) the substance of that conduct, including whether the conduct is political or ideological; and 3) the prominence of that conduct, including whether a disclaimer would prevent a reasonable person from attributing the conduct to the beliefs of an objecting member.

With this framework in mind, the court first addresses the germaneness of the Utah Bar's challenged activities.

### A.  <u>Utah Bar Journal</u> Articles Challenged in the Complaint

Ms. Pomeroy challenges several <u>Utah Bar Journal</u> articles.  The complaint first identifies a January/February 2021 <u>Utah Bar Journal</u> issue discussing a claim that the Utah Bar has played an active role in major public policy debates, including debates about the Utah Supreme Court's role in regulating the practice of law and what criteria should be considered when filling judicial vacancies.[7]  (ECF No. 2 at ¶ 42.)  This issue, to the extent it refers to these debates, is germane.

---

[7] The same issue mentions that the Utah Bar has played an active role in a major public policy debate about the taxation of legal services.  (ECF No. 2 at ¶ 42.)  Ms. Pomeroy specifically points to the Utah Bar's advocacy surrounding H.B. 441, the "Tax Equalization and Reduction Act."  (<u>Id.</u> ¶ 43.)  The court discusses whether the Utah Bar's advocacy on this bill is germane in Section B below.

15

The supreme court's role in regulating the practice of law impacts the regulation of the legal profession. The debate over what criteria should be considered when filling judicial vacancies affects who sits on the court, which in turn impacts the regulation of the legal profession and affects the structure and integrity of the judicial system and associated attorney services. See Schell, 11 F.4th at 1193.

Second, Ms. Pomeroy's complaint identifies the May/June 2018 Utah Bar Journal issue, which "state[s] that the 2018 General Session [of the Utah State Legislature] was successful for the Utah Bar, as [its] leaders influenced the language of legislation and enhanced the bar's relationship with lawmakers and staff." (ECF No. 2 at ¶ 46 (citation omitted).) This statement highlights the important role of the Utah Bar and its attorneys in using their professional skills to interpret and advise on pending legislation that may affect the legal profession. See Schell, 11 F.4th at 1193. Such a statement is germane. And it relates to the Utah Bar's "core function to advance the interests of the profession." Id.

Finally, the complaint alleges that recent Utah Bar Journal issues have included statements that opine on current controversies. Ms. Pomeroy points to three articles in the March/April 2021 issue. The first is an article by then-Utah Bar President Heather Farnsworth that asserts the importance of pursuing "equity" as distinct from "equality." (ECF No. 2 at ¶ 50.) The second is an article calling for courtrooms to include "safe space[s]" where unfairness allegations will not be treated with "defensiveness and denial." (Id.) The same article invokes the concept of "implicit bias." (Id.) And the third is an article reviewing a book that proposes criminal penalties for anyone who is made aware of a sexual assault but chooses to protect the institution over the assault survivor. (Id.)

**APP.258**

These three articles involve political or ideological topics.  See Schell 11 F.4th at 1193 (finding that the following materials are inherently political or ideological: 1) an article criticizing big money and special interest groups making campaign contributions and electing judges and 2) an article advocating for the ability of prisoners to bring tort claims against jails). But although these activities are of a political or ideological nature, they are not necessarily non-germane.  See Keller, 496 U.S. at 14.

In her article, President Farnsworth reiterates the Utah Bar's commitment to improving diversity among the Board of Bar Commissioners and the bar membership.  (Mar./Apr. 2021 Utah Bar Journal Issue, ECF No. 68-1 at 14.)  She distinguishes between equality and equity to argue that both are necessary to promote inclusion and truly benefit from diversity.  (Id.) "[E]quality does not take demographic related needs into account, while equity strives to identify the specific requirements of an individual's needs" based on their characteristics.  (Id.)  President Farnsworth also recognizes that there are benefits to increasing diversity and inclusion within the Utah Bar's leadership and among its members.  "Beyond the public perception and confidence in our system[,] diversity affects the quality of legal services and judicial decisions."  (Id. (citation omitted).)  Further, "[t]he [American Bar Association (ABA)] finds [that] a diverse legal profession is more just, productive, and intelligent because diversity, both cognitive and cultural, often leads to better questions, analysis, solutions, and processes."  (Id. (citation omitted).)

Articles on diversity initiatives "aimed at 'creating a fair and equal legal profession for minority, women, and LGBT attorneys'" have been found to be germane.  McDonald, 4 F.4th at

17

**APP.259**

249.  President Farnworth's article advocating for the creation of a more fair, equal, productive, and intelligent legal profession in Utah is germane.[8]

The article calling for courtrooms to include "safe spaces" and invoking the concept of "implicit bias" is also germane.  In this article, The Road to Solutions: Systemic Racism and Implicit Bias in Prosecution, the authors call for safe spaces in courtrooms to raise the issues of systemic racism and implicit bias.  (ECF No. 68-1 at 26–27.)  "Everyone in the courtroom should be free to be anti-racist, … and … shine a light on unconscious bias or racial inequities without the fear of backlash.  Raising fundamental fairness issues must be normalized in our profession." (Id.)  The article closes by inviting prosecutors, and fellow lawyers, to join in this commitment. (Id.)  An article calling on the judicial system to improve the administration of justice and advance a fair, inclusive, and accessible justice system is germane, and Ms. Pomeroy fails to advance any persuasive arguments to the contrary.  See Crowe, 2023 WL 1991529, at *3 ("Plaintiffs do not explain how … improving the administration of justice, or advancing a fair, inclusive, and accessible justice system do not fall within the acceptable spectrum.  Indeed, other federal appellate courts have concluded that [speech] … falling within these categories [is] germane.").  Advocating for conduct that enhances the public's trust in the judicial system and associated attorney services is also germane.  Id. (citing Schell, 11 F.4th at 1193).

The book review about criminal penalties for anyone made aware of a sexual assault, but who chooses to protect the institution over the assault survivor, is also germane.  As the book

---

[8] Relevant to Ms. Pomeroy's freedom of association challenge, this issue of the Utah Bar Journal has a disclaimer that reads: "Statements or opinions expressed by contributors are those of the authors and not necessarily those of the Utah Bar Journal or the Utah State Bar."  (ECF No. 134 at 9.)  This disclaimer is in all Utah Bar Journal issues.  The Utah Bar presented the court with full Utah Bar Journal issues because Ms. Pomeroy's submissions left out the disclaimer in each issue.  (See id.)

review states, the main topic raises many relevant questions, including: "Can we criminalize the behavior of someone who fails to act when they know someone is being harmed? And if so, should we?" (ECF No. 68-1 at 43.)  The article reviewing the book does not condone its ideas. (See id. at 43–44 (discussing ideas the book brings up, including focusing on root causes and prevention for the lack of reporting of sexual assaults).)  These ideas and themes focus on access to justice for a particular group: sexual assault survivors.  See Crowe, 2023 WL 1991529, at *5. Even if these ideas and themes could "be construed as inflammatory or ideological that does not mean they are nongermane," so long as they are "reasonably related to the advancement of the acceptable goals of the [Utah Bar]."  See id. (citation omitted).  This article is therefore germane to the Utah Bar's permitted functions, which ultimately advance the interests of the profession. See Schell, 11 F.4th at 1193.

## B. Lobbying Activities Challenged in the Complaint

The first piece of legislation Ms. Pomeroy identifies in her complaint is proposed legislation affecting the attorney general's ability to invoke a potential conflict of interest or attorney-client privilege (H.B. 198).  (See May/June 2018 Utah Bar Journal Issue, ECF No. 68-7 at 27–28.)  After a U.S. congressman resigned, Utah conducted its first special election for a vacancy in the U.S. House of Representatives, and the Utah Governor and legislature disagreed about how to implement the election.  (Id.)  The legislature requested an opinion from the attorney general, while the attorney general was already counseling the Governor on the issue, making both parties clients of the attorney general under Utah Code Subsection 67-5-1(7) and Utah Constitution article VII, section 16.  (Id.)  The proposed legislation would have prevented

APP.261

the attorney general from invoking a potential conflict of interest, or the attorney-client

relationship, to withhold the release of the opinion from the legislature.  (Id.)

The court agrees with the Utah Bar that lobbying against the proposed legislation is

germane.  The legislation was "directly targeted at Utah's lead lawyer and sought to regulate him

in his role as a lawyer."  (ECF No. 128 at 21.)  The proposed change would have altered the

ethical regulations governing the practice of law.  (Decl. Elizabeth Wright, ECF No. 129-1 at ¶ 6

("The Utah State Bar opposed the bill because it believed … the bill attempted to regulate the

practice of law, by amending the conflict of interest and attorney-client confidentiality rules in

the Utah Rules of Professional Conduct.").)  The legislation refers to the Utah Rules of

Professional Conduct, demonstrating that the legislation sought to modify the ethical

responsibilities of an attorney as an attorney rather than as a public official.  Reflecting the

states' "strong interest in allocating to the members of the bar, rather than the general public the

expense of ensuring that attorneys adhere to ethical practices," Harris v. Quinn, 573 U.S. 616,

655–56 (2014), Utah Bar opposition to legislative interference with the ethical rules governing

attorneys is germane.

The second piece of legislation that Ms. Pomeroy cites is H.B. 441, the "Tax Equalization

and Reduction Act."  (ECF No. 2 at ¶ 43.)  "The Act proposed a new tax on services broadly in

the state of Utah, which would include legal services."  (Order & Mem. Decision, ECF No. 94 at

12.)  The Utah Bar has clarified that while the Act itself was a comprehensive bill, the Utah Bar

"limited its lobbying efforts to opposing the proposed tax on legal services because it believed

the tax would exacerbate access to justice problems, directly reducing the quality and availability

of legal services in the state."  (ECF No. 128 at 22.)  The Utah Bar explains that, in opposing the

APP.262

bill, the Utah Bar objected to direct increases in the costs of legal services, instead of indirect increases.  The court finds that this lobbying effort, too, is germane.

### C.  Utah Bar Activities Challenged for the First Time at Summary Judgment

As stated above, the court will review most of the additional Utah Bar activities that Ms. Pomeroy challenges for the first time at summary judgment.  Specifically, the court will review the additional Utah Bar Journal articles and social media posts that Ms. Pomeroy alleges amount to violations of her rights.  The court holds that these activities, too, are germane.

Ms. Pomeroy's motion for summary judgment identifies two articles, three tweets, and an advertisement focused on diversity, equity, inclusion, and increasing access to justice.[9]  As stated above, "courts have concluded that articles and initiatives [with similar focuses] are germane."  Crowe, 2023 WL 1991529, at *3; see also McDonald, 4 F.4th at 249 (finding diversity initiatives "aimed at creating a fair and equal legal profession" to be germane).

Ms. Pomeroy identifies two other articles about the rule of law and civility.  The first is Judicial Independence and Freedom of the Press, which advocates for protecting and

---

[9] Then-Utah Bar Journal President Robert Rice wrote the first article: The Utah Center for Legal Inclusion.  (See Mar./Apr. 2017 Utah Bar Journal Issue, ECF No. 134-2 at 13–15.)  The theme of the article was diversity in Utah's legal community.  (Id.)  The second article—Script for Mock Board Meeting of Pure Play, Inc.—discussed "[b]oard diversity" and how some jurisdictions are adopting "minimum female representation" mandates for boards of directors.  (Jan./Feb. 2018 Utah Bar Journal Issue, ECF No. 134-3 at 30.)  University of Utah Law reposted the first of the three tweets on September 12, 2022, and it celebrated a graduate's "Living Color Award." (Retweet dated Sept. 12, 2022, ECF No. 127-15.)  The second tweet is a July 30, 2021, tweet the Utah Bar reposted, which states: "Listening to @DrWilliamASmith at the @UtahStateBar summer convention. Racism is a public health crisis.  Racism is an act of violence.  What are the perceptions of African American men?"  (Retweet dated July 30, 2021, ECF No. 127-17.)  And the third is a tweet that says: "strong public support for admitting Dreamers into the [Utah Bar]" and includes a link to an article reporting the same.  (Tweet dated Jan. 22, 2020, ECF No. 127-18.)  Ms. Pomeroy claims that the Summer Convention Advertisement highlighted equity and inclusion dialogue sessions, but the advertisement itself does not mention equity and inclusion. (See ECF No. 68-1 at 58.)

**APP.263**

strengthening democracy and the rule of law.  (Mar./Apr. 2019 <u>Utah Bar Journal</u> Issue, ECF No.

134-4 at 27–31.)  The second is <u>Civility in a Time of Incivility</u>, which encourages Utah lawyers

to practice civility and comply with Utah Standards of Professionalism and Civility.  (<u>Civility in</u>

<u>a Time of Incivility</u>, ECF No. 127-13.)  These articles are germane, as they enhance public trust

in the judicial system and associated attorney services.  <u>See</u> <u>Schell</u>, 11 F.4th at 1193.

Next, Ms. Pomeroy's motion identifies an article in the November/December 2018 <u>Utah</u>

<u>Bar Journal</u> issue about a World War II-era Japanese internment camp in Topaz, Utah.  (ECF No.

127 at 4.)  According to Ms. Pomeroy, the article argues that "some are currently trying to again

elevate war powers to suppress the rights of vilified minorities[.]"  (<u>Id.</u>)  This is incorrect.  The

article discusses "a place in the central Utah desert that stands as a living memorial to …

<u>Korematsu v. United States</u>."  (Nov./Dec. 2018 <u>Utah Bar Journal</u> Issue, ECF No. 129-14 at 22–

25.)  In the article, a law student who joined attorneys visiting the former internment camp

reflected on the experience.  Seattle University School of Law Professor Lorraine Bannai joined

attendees by Zoom to talk about her advocacy focused on correcting <u>Korematsu</u>.  (<u>Id.</u> at 23–24.)

In her remarks, Professor Bannai shared with the group that she worried the Supreme Court will

repeat its mistakes in <u>Korematsu</u>, citing the Trump administration's travel bans.  (<u>See</u> <u>id.</u> at 25.)

The article's author does not endorse these comments, but the author merely provides

context for the visit.  The article informs attorneys of the consequences of litigation and judicial

opinions.  It acknowledges that lawyers and judges make mistakes, but that they can rectify those

mistakes.  The article also calls for Utah attorneys to visit the Topaz site to learn about its

history.  For these reasons, this article is "reasonably incurred for the purpose of" regulating the

legal profession and improving the quality of legal service available to the people of the state.

<u>Keller</u>, 496 U.S. at 14.

**APP.264**

Next, Ms. Pomeroy identifies two articles that better equip Utah Bar attorneys to use their professional skills to interpret and advise on legislation concerning various subjects and counsel clients on related matters.  See Schell, 11 F.4th at 1193.  These articles are germane.  The first discusses proposals to reduce drug prices and alleviate the opioid crisis and issues facing the drug market. (Mar./Apr. 2020 Utah Bar Journal Issue, ECF No. 134-5 at 34–42.)  It also includes opioid crisis solutions for Utah attorneys.  (Id. at 41–42.)  The second explains the cryptocurrency market, identifies critiques and defenses of it, and remarks on challenges the cryptocurrency industry faces.  (Jan./Feb. 2023 Utah Bar Journal Issue, ECF No. 134-7 at 19–27.)

Next, Ms. Pomeroy's motion identifies an article titled Silver Linings of the Pandemic. (ECF No. 127 at 6.)  This article advocates for the idea that, post-pandemic, Utah Bar lawyers should have the option to work from home or appear before the court virtually.  (ECF No. 68-1 at 17–19.)  Promoting this idea—providing flexibility to Utah Bar lawyers to improve their practice—is germane.

Ms. Pomeroy also identifies a USB LinkedIn post, in which the Utah Bar shared a post from Utah Governor Spencer Cox celebrating the passage of pieces of legislation.[10]  (LinkedIn Post, ECF No. 127-20.)  By sharing Governor Cox's post, the Utah Bar is keeping members informed about legislation they might be called to advise on or that affects them in their practice. See Schell, 11 F.4th at 1193.  This LinkedIn post is germane.

---

[10] Neither party has briefed whether the Utah Bar's LinkedIn page contains a disclaimer similar to the disclaimer in all Utah Bar Journal issues.  While the LinkedIn posts Ms. Pomeroy challenges are germane, the lack of a disclaimer on the Utah Bar's page might contribute to a freedom of association violation under Schell if the Utah Bar posted or reposted non-germane content.  As mentioned above, the presence of a disclaimer that prevents a reasonable person from attributing the conduct to the beliefs of an objecting member is one factor a court may examine to decide whether the freedom of association right has been violated.

Ms. Pomeroy challenges another Utah Bar LinkedIn post, through which the Utah Bar shared a post from the ABA inviting people to participate in a 21-day Native American Heritage Equity Habit-Building Challenge syllabus.  (ECF No. 127 at 7–8.)  This is germane, as the Utah Bar is alerting its members to an optional event that fosters growth, learning, and community in the legal profession.  See Boudreaux v. La. State Bar Ass'n, 620 F. Supp. 3d 440, 458 (E.D. La. 2022) (finding optional activity with similar purposes to be germane).

Finally, Ms. Pomeroy's motion points to a Utah Bar Journal article titled The Times They Are a Changin'.  (ECF No. 127 at 4.)  Ms. Pomeroy argues that the article criticizes the electoral college system (id.), but the court finds that a better characterization is that the article uses satire and sports analogies to explain arguments for and against the electoral college.  (ECF No. 134-2 at 23–26.)  The article compares the transition of power from one presidential administration to the next to a corporate takeover, presenting "lessons … for Donald Trump," who had recently been elected.  (Id. at 25.)

This article presents a closer question about whether it is germane.  From a wider perspective, lawyers must understand the electoral system and the Constitutional scheme for a presidential election.  These principles relate to democracy and the rule of law, and a better understanding of this system "help[s] … build and maintain the public's trust in the legal profession and the judicial process ...."  Crowe, 2023 WL 1991529, at *3.  On the other hand, the electoral system is less directly related to the legal profession than other content discussed in the Utah Bar Journal.  Also, the article was published after the 2016 presidential election, in which Donald Trump was elected President after losing the popular vote.  Many people called for the

24

**APP.266**

end of the electoral college system as a result.[11]  Given this context, the article is politically

charged.  But even topics that involve "a sensitive political topic" can be germane.  McDonald, 4

F.4th at 249.  For these reasons, the court finds that reasonable minds could disagree about

whether the article is germane.

Yet whether this single article is germane is not dispositive.  It is one Utah Bar Journal

article out of many Utah Bar activities that Ms. Pomeroy challenges in her complaint and at

summary judgment.  While politically charged to a degree, the article presents its ideas in a

neutral way.  The Utah Bar Journal issue containing this article, like all issues, has a disclaimer

that would prevent a reasonable person from attributing the viewpoint expressed in the article to

the beliefs of an objecting member.  Consequently, when taking these factors into consideration,

the court finds that the Utah Bar did not violate Ms. Pomeroy's freedom of association rights by

publishing this article.

All the other activities Ms. Pomeroy challenges in her complaint and at summary

judgment are germane.  As a result, the Utah Bar has not violated Ms. Pomeroy's rights to

freedom of speech and association.

III.   **First and Fourteenth Amendment Claim for Lack of Adequate Procedural Safeguards.**

Ms. Pomeroy raises a facial challenge to the Utah Bar's refund procedures: "Even if the

[c]ourt finds that Plaintiff is not entitled to summary judgment regarding the nongermane content

in the Utah Bar Journal, the [Utah Bar] nevertheless has the ability to publish nongermane

content in that journal in the future."  (ECF No. 127 at 30.)  By lacking procedural safeguards to

---

[11] See, e.g., Joseph P. Williams, Time for a Change?, U.S. News & World Rep. (Dec. 13, 2016),
https://www.usnews.com/news/the-report/articles/2016-12-13/advocates-call-for-an-end-to-the-
electoral-college-after-trumps-win.

refund non-germane activities, Ms. Pomeroy argues that the Utah Bar has violated the First and Fourteenth Amendment rights to free speech.

The court previously allowed this claim to proceed because the Utah Bar had conceded that, although it offered refunds for its legislative activities, it did not provide a refund mechanism for non-germane non-legislative activities.  (ECF No. 94 at 14.)  The Utah Bar is correct that "[a]s for legislative activity, there is no question that the [Utah Bar's] policy complies with Keller.  That is because the [Utah Bar] does not attempt to distinguish between germane and nongermane legislative activities and simply refunds all of a member's pro rata fees used for those activities."  (ECF No. 128 at 42.)  But at issue now is the refund for non-germane non-legislative activities.

In Keller, the court held that because integrated bars cannot use mandatory member dues to fund non-germane activities, they must provide a refund mechanism for such activities.  496 U.S. at 16–17.  Keller affirmed Chicago Teachers Union, Local No. 1, AFT, AFL-CIO v. Hudson, 475 U.S. 292, 310 (1986), which held that unions must adopt refund procedures that: (1) provide an adequate explanation of the basis for the fee; (2) a reasonably prompt opportunity to challenge the amount of the fee before an impartial decisionmaker; and (3) an escrow for the amounts reasonably in dispute while such challenges are pending.  496 U.S. at 16 (citation omitted).  The Supreme Court in Keller reserved the question whether, in the context of an integrated bar, each of these requirements was mandatory or whether alternative procedures would likewise satisfy the obligation of an integrated bar to protect against members' licensing fees being spent on non-germane activities.  Id. at 17.  The Tenth Circuit in Schell did not analyze the Oklahoma Bar's refund procedures because the Bar adopted procedures consistent

APP.268

with the plaintiff's commands after the litigation began, which mooted the plaintiff's procedural safeguards claim.  11 F.4th at 1182.

Other courts have disagreed on whether the Hudson procedures are mandatory.  Compare Crowe, 989 F.3d at 726 (holding that alternative procedures can satisfy an integrated bar's obligations under Keller), with McDonald, 4 F.4th at 254 ("[G]iven that Keller indicated that Hudson's procedures are sufficient, and Janus held even more protective procedures are necessary, Hudson's procedures are both necessary and sufficient.").  This court is persuaded by the Ninth Circuit's reasoning in Crowe and holds that alternative procedures can satisfy an integrated bar's obligations under Keller.  Importantly, the Keller Court did not hold that "state bars [must] adopt procedures identical to or commensurate with those outlined in Hudson."  Crowe, 989 F.3d at 726.  Moreover, as discussed further below, the court is not convinced that strict adherence to Hudson in the context of a state bar is "necessary—or even effective—to minimize infringement[.]"  Id.

Ms. Pomeroy asserts that the Utah Bar's refund procedures are constitutionally deficient for four reasons: (1) the Utah Bar's refund procedures do not include portions of the fees spent on non-germane non-legislative activities; (2) the Utah Bar's information about the legislative activities refund is based on "slipshod calculations," lacks evidence that the refund amount is equal to the amount spent on non-germane activities, and therefore is not an adequate explanation for the basis of the fee; (3) the Utah Bar's budgets impermissibly make members "undertake an exercise in forensic accounting"; and (4) the Utah Bar only allows members to opt out of speech they disagree with through a refund after the fact, rather than employing an "opt-in" procedure and obtaining "clear, free, and affirmative consent … before an association can use

**APP.269**

an individual's coerced fees or dues to support its political and ideological activities." (ECF No. 135 at 27–29); see McDonald, 4 F.4th at 253 (citation omitted).

Ms. Pomeroy's first argument is moot because the Utah Bar has presented evidence that it now has a refund mechanism for non-germane non-legislative activities. (See Utah Bar's Keller Refund Request Policies and Procedures, ECF No. 129-21.) As discussed in the Written Notice section, "[a] Bar licensee who objects to the use of any portion of the licensee's license fees for activities he or she considers promotes or opposes political or ideological causes[12] which are not already included in the rebate may request" a refund via the detailed procedures. (Id. (emphasis added).) This procedure allows an objecting attorney to opt out of the bar's expenditure of her fees on non-legislative activities with which she disagrees.

Ms. Pomeroy's second argument lacks support in the record. First, her assertions that the refund is not equal to the amount spent on non-germane activities and that the legislative activities refund is based on "slipshod calculations" (and not an adequate explanation of the basis for the fee) are misplaced. The Utah Bar's refund procedures not only explain how the Utah Bar calculates the pro rata fees spent on legislative activities, but the procedures effectively provide members who apply for the legislative activities rebate with automatic refunds of the pro rata fees spent on such activities (see ECF No. 129-21 at 2 (explaining legislative refund procedures)), so long as they meet the other conditions set forth in the procedures (i.e., applying for a rebate in writing to the Executive Director after the Utah Bar Journal publishes its annual

---

[12] It is unsurprising that the Utah Bar has labeled its activities in this way. Given the uncertainty about how courts should evaluate broad freedom of association claims, and the fact that at least one court (the Fifth Circuit) has held that any non-germane activity amounts to a freedom of association violation, it is unlikely that a state bar would classify any of its speech activities as non-germane. See Boudreaux, 86 F.4th at 639 ("[A] prospective budget can only provide so much notice when a bar association can and must classify all of its speech activities as germane.").

notice of rebate (see id.)).  Ms. Pomeroy claims that instead of providing members an adequate explanation of the basis for the fee, "the [Utah Bar] simply asks members to trust its calculations" for pro rata fees.  (ECF No. 127 at 31.)  But the Utah Bar offers an explanation that the court finds sufficient: "That pro rata portion is determined by dividing the total amount spent on legislative activities into the total amount of license revenue collected to date and multiplying that dividend by the licensing fees paid by the member."  (ECF No. 129-21 at 2.)  To the extent Ms. Pomeroy is also arguing that the Utah Bar has not given an adequate explanation of the basis for the fees spent on non-germane non-legislative activities, Ms. Pomeroy has not presented the court with any examples of inadequate explanations the Utah Bar has given objecting members, nor has she explained what else the Utah Bar would need to provide members to comply with Hudson.

Ms. Pomeroy's third argument is that the Utah Bar's lengthy budgets fail to give members sufficient notice of the Utah Bar's activities.[13]  The Utah Bar's budgets contain a breakdown of expenditures by department, giving mostly generic descriptions of expenditures. (See ECF Nos. 129-22–28.)  The Utah Bar's budgets resemble the Texas Bar's budgets in McDonald, in which the Fifth Circuit held that the budgets impermissibly "place[d] the onus on objecting attorneys to parse the Bar's proposed budget—which only details expenses at the line-item level, often without significant explanation—to determine which activities might be objectionable."  4 F.4th at 254.  That was "a far cry from a Hudson notice, which estimates the breakdown between chargeable and non-chargeable activities and explains how those amounts were determined."  Id. (citing Hudson, 475 U.S. at 307 n.18).

---

[13] The Utah Bar's budgets were provided to Ms. Pomeroy and the court in the appendix to the Utah Bar's motion for summary judgment.  (See Utah Bar Budgets, ECF Nos. 129-22–28.)

But the Utah Bar's generic descriptions of expenditures do not pose a constitutional problem because as discussed above, Keller did not hold that state bars are required to adopt procedures identical to those outlined in Hudson.  "Hudson required [a] high-level explanation in the context of a union that affirmatively planned to engage in activities unrelated to collective bargaining for which it could only charge its members.  The Court obligated the union to provide a detailed statement of fees in advance so that nonmembers could object before being charged for impermissible activities."  Crowe, 989 F.3d at 726 (emphasis added).  Ms. Pomeroy has not shown any affirmative plans by the Utah Bar to use members' dues for non-germane activities. A more detailed breakdown between germane and non-germane activities would also not be possible given that the Utah Bar anticipates each year that all its expenditures will be germane. (Defs.' Reply, ECF No. 141 at 19); see Crowe, 989 F.3d at 726 ("[A]dvance notice would not have offered additional protection against the alleged constitutional violations because [the] [Oregon Bar] would have characterized all of its activities as germane."); see also Boudreaux, 86 F.4th at 639 ("[A] prospective budget can only provide so much notice when a bar association can and must classify all of its speech activities as germane.").

Finally, the court finds that Schell forecloses Ms. Pomeroy's fourth argument.  The plaintiff in Schell brought a claim that contended that the Oklahoma Bar, "in accord with Janus, needed to create an opt-in dues system for the subsidization of political and ideological speech not germane to the goal of regulating the practice of law."  Schell, 11 F.4th at 1184–85.  While the district court did not dismiss a claim about "the [Oklahoma Bar's] alleged failure to adopt constitutionally adequate safeguards to prevent the impermissible use of mandatory bar dues[,]" it did dismiss the opt-in claim.  Id. at 1185–86.  The Tenth Circuit affirmed the district court's dismissal of the claim.  Id. at 1191.

None of Ms. Pomeroy's arguments about the Utah Bar's refund procedures are persuasive.  Given the adequacy of its procedures, the Utah Bar has not violated any member's free speech rights.

## ORDER

The Utah Bar has not violated Ms. Pomeroy's free speech and association rights by engaging in activities with which she disagrees, and its refund procedures do not violate its members' free speech rights.  Accordingly, the court ORDERS as follows:

1.      Ms. Pomeroy's motion for summary judgment (ECF No. 127) is DENIED.

2.      The Utah Bar's motion for summary judgment (ECF No. 128) is GRANTED.

DATED this 25th day of April, 2024.

BY THE COURT:

_____
TENA CAMPBELL
United States District Judge

**APP.273**

AO 450 (Rev.5/85) Judgment in a Civil Case

# United States District Court

## District of Utah

AMY POMEROY,

                    Plaintiff,

v.

UTAH STATE BAR, et al.,


                  Defendants.

**JUDGMENT IN A CIVIL CASE**


Case Number: 2:21-cv-00219-TC-JCB


IT IS ORDERED AND ADJUDGED that:

Judgment be entered in favor of the Defendants; all of Plaintiff's causes of action are dismissed.


April 25, 2024
_____
*Date*

BY THE COURT:



_____
U.S. District Judge Tena Campbell

**APP.274**

Scott Day Freeman
(Appearing Pro Hac Vice)
Scharf-Norton Center for
Constitutional Litigation at the
**GOLDWATER INSTITUTE**
500 E. Coronado Road
Phoenix, Arizona 85004
Telephone: (602) 462-5000
litigation@goldwaterinstitute.org

Ethan W. Blevins, Bar No. 16784
**PACIFIC LEGAL FOUNDATION**
839 W 3600 S
Bountiful, UT  84010-8423
Telephone: (916) 459-4379
EBlevins@pacificlegal.org

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| AMY POMEROY,<br><br>Plaintiff,<br><br>UTAH STATE BAR; ELIZABETH WRIGHT, Executive Director, Utah State Bar; ERIK CHRISTIANSEN, President, Utah State Bar; CARA TANGARO, President Elect, Utah State Bar; J. BRETT CHAMBERS, 1st Division Commissioner, Utah State Bar; MATTHEW J. HANSEN, 2nd Division Commissioner, Utah State Bar; CARA TANGARO, 3rd Division Commissioner, Utah State Bar; CHRYSTAL MANCUSO-SMITH, 3rd Division Commissioner, Utah State Bar; GREG HOOLE, 3rd Division Commissioner, Utah State Bar; JOHN REES, 3rd Division Commissioner, Utah State Bar; KIM CORDOVA, 3rd Division Commissioner, Utah State Bar; MARK MORRIS, 3rd Division Commissioner, Utah State Bar; TRACI GUNDERSEN, 3rd Division Commissioner, Utah State Bar; TYLER YOUNG, 4th Division Commissioner, Utah State Bar; TOM J. BAYLES, 5th Division Commissioner, Utah State Bar; RICK HOFFMAN, Public Member Commissioner, Utah State Bar; SHAWN NEWELL, Public Member Commissioner, Utah State Bar,<br><br>Defendants. | **NOTICE OF APPEAL**<br><br>Civil No. 2:21-cv-00219-TC-JCB<br><br>District Judge Tena Campbell<br>Magistrate Judge Jared C. Bennett |

Notice is hereby given that Amy Pomeroy, Plaintiff in the above-named case, hereby appeals the United States Court of Appeals for the Tenth Circuit from the April 4, 2022 Order and Memorandum Decision Granting in Part and Denying in Part Motion to Dismiss (Doc. 94), the April 25, 2024 Order and Memorandum Decision on Motions for Summary Judgment (Doc. 151), and the April 25, 2024 Judgment (Doc. 152).

Respectfully submitted on May 20, 2024.

GOLDWATER INSTITUTE

/s/ *Scott Day Freeman*
Scott Day Freeman
Adam C. Shelton

PACIFIC LEGAL FOUNDATION

/s/ *Ethan W. Blevins*
Ethan W. Blevins

*Attorneys for Plaintiff*

1

**APP.276**

## CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing Notice of Appeal on Defendants' counsel through the Court's ECF system to:

Troy L. Booher
Caroline Anais Olsen
ZIMMERMAN BOOHER
341 South Main Street, Fourth Floor
Salt Lake City, Utah 84111
tbooher@zbappeals.com
colsen@zbappeals.com

Dick J. Baldwin
PARR BROWN GEE & LOVELESS
101 South 200 East, Suite 700
Salt Lake City, UT 84111
dbaldwin@parrbrown.com

*Attorneys for Defendants*

David C. Reymann
PARR BROWN GEE & LOVELESS, P.C.
101 South 200 East, Suite 700
Salt Lake City, Utah 84111
dreymann@parrbrown.com

/s/ *Kris Schlott*
Kris Schlott, Paralegal

**APP.277**

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of October 2024, the foregoing

appendix was filed and served on all counsel of record via the ECF system.


/s/ *Scott Day Freeman*
Scott Day Freeman